# 25-1320
# 25-1417

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

*Plaintiff-Appellant,*

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, ALLISON ANN MCMAHON,

*Defendants-Appellees.*

*On appeal from Order and Judgment of the U.S. District Court for the Southern District of New York*

**APPELLANT'S APPENDIX**

**Vol. I of II**
**pp. A.1-A.248**

**WUERSCH & GERING**
Wall Street Plaza
88 Pine Street, 20th Floor
New York, New York 10005
(212) 509-5050
David.azrin@wg-law.com
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS – APPENDIX

Table of Contents ........................................................................................i

***Volume I of II***

SDNY Civil Docket, Case No. 7:25-cv-01110-JGLC.............................A.1

Complaint and Jury Demand (Sep. 12, 2024) ........................................A.12

Amended Complaint and Jury Demand (Oct. 15, 2024).........................A.32

Emergency Affirmation in Support of Motion for Preliminary Injunction and Temporary Restraining Order to Maintain the Status Quo Brought by Order to Show Cause, David T. Azrin, Esq. (Sep. 12, 2024)..........................................................................................A.52

Affirmation in Support of Motion for Preliminary Injunction and Temporary Restraining Order to Maintain the Status Quo Brought by Order to Show Cause, James Lukezic (Sep. 12, 2024) ...........................A.56

Exhibit A -- Allstate R3001C Exclusive Agency Agreement (Mar. 1, 2024)..........................................................................................A.70

Exhibit B -- Allstate Termination Notice (Jun. 25, 2024).......................A.87

Email, Lopez (on behalf of the Court) to Azrin, Notice of In Person Appearance on Proposed Order to Show Cause (Sep. 13, 2024)............A.89

Transcript of Proceedings, Order to Show Cause and Temporary Restraining Order [Jamieson, J.] (Sep. 19, 2024)..................................A.90

Order to Show Cause and Temporary Restraining Order (Sep. 19, 2024)........................................................................................A.117

Supplemental Affirmation of James Lukezic in Support of Plaintiff's Motion for Preliminary Injunctive Relief (Jan. 5, 2025).......................A.119

Affirmation of James Lukezic in Opposition to Defendant Marc Stevenson's Motion to Dismiss for Lack of Personal Jurisdiction (Nov. 13, 2024)..........................................................................A.127

Exhibit A -- Email Thread, Stevenson with Buglione, Lukezic (Oct. 2023 – Feb. 2024)...........................................................................A.133

Affirmation of James Lukezic in Support of Plaintiff's Motion for Expanded Injunctive Relief to Maintain the Status Quo Brought by Order to Show Cause (Dec. 8, 2024)........ A.220

Exhibit A – Allstate Lending Connection Intake Form ........ A.240

Exhibit B – Promissory Note, Jakes Lukezic (Borrower) to Lake Forest Bank (Lender) (Feb. 28, 2024) ........ A.245

***Volume II of II***

Affirmation of Defendant Regine Marie Napoleon in Opposition to Motion for Preliminary Injunction (Oct. 2, 2024) ........ A.249

Exhibit A – Allstate of Westchester County Business Plan ........ A.255

Exhibit B – Agency Ownership Disclosure Form ........ A.269

Transcript of Proceedings, Preliminary Conference [Jamieson, J.] (Nov. 21, 2024)........ A.276

Preliminary Conference Order [Jamieson, J.] (Nov. 27, 2024)........ A.289

Transcript of Proceedings, Motion for Expanded Injunctive Relief [Jamieson, J.] (Dec. 16, 2024)........ A.302

Transcript of Proceeding, Motion for Preliminary Injunction [Jamieson, J.] (Jan. 8, 2025) ........ A.319

Decision and Order, Motions to Dismiss and Motion for Preliminary Injunction Hon. Linda S. Jamieson, J.S.C. (Jan. 23, 2025)........ A.353

Notice of Removal (Feb. 7, 2025) ........ A.383

Notice of Initial Pretrial Conference (Feb. 13, 2025)........ A.389

Notice of Defendant Allstate Insurance Company's Motion for an Order Declaring that the Temporary Restraining Order has Expired, or, Alternatively, for an Order Dissolving the Temporary Restraining Order (March 14, 2025)........ A.392

Memorandum of Law in Opposition to Defendant Allstate Insurance Company's Motion for an Order Declaring that the Temporary Restraining Order has Expired, or, Alternatively, for an Order Dissolving the Temporary Restraining Order (Mar. 28, 2025)........ A.396

Exhibit A – Declaration of Anthony Fava (March 28, 2025)................A.432

Exhibit B – Declaration of Al Buglione (March 28, 2025)...................A.433

Exhibit C – Email Thread, Stevenson, Cleere, Napoleon (Nov. 16, 2025)..........................................................................................A.435

Exhibit D – Email Thread, Cleere with McMahon (March 25, 2025) ..A.437

Transcript of Proceedings, Motion for An Order Declaring that the Temporary Restraining Order Has Expired [Clarke, J.] (May 8, 2025) A.442

Opinion and Order, Hon. Jessica G. L. Clarke, U.S.D.J. (May 21, 2025)..........................................................................................A.489

Notice of Appeal of May 21, 2025 Opinion and Order (May 21, 2025)A.499

Transcript of Proceedings, Initial Pretrial Conference [Clarke, J.] (May 22, 2025) ..........................................................................A.500

Letter to Court, Supplemental Briefing as to Court's Jurisdiction Pending Appeal Azrin (May 23, 2025) ................................................A.533

Letter to Court, Reply in Support of Letter Motion to Set Hearing Azrin (May 29, 2025) ....................................................................A.539

Opinion and Order, Hon. Jessica G. L. Clarke, U.S.D.J. (Jun. 2, 2025)A.548

Notice of Appeal of June 2, 2025 Opinion and Order (Jun. 3, 2025) ...A.552

Order Granting Temporary Stay, Second Circuit Court of Appeals, (May 30, 2025) ..........................................................................A.553

Amended Order Deferring Decision on Motion to Stay to Merits Panel, Second Circuit Court of Appeals (June 24, 2025)......................A.554

APPEAL,ECF

# U.S. District Court
# Southern District of New York (White Plains)
# CIVIL DOCKET FOR CASE #: 7:25-cv-01110-JGLC

Old Slip Benefits & Insurance Services, LLC v. Allstate Insurance Company et al
Assigned to: Judge Jessica G. L. Clarke
Case in other court: Supreme Court , County of Westchester, 69162/2024
Cause: 28:1332nr Diversity: Notice of Removal

Date Filed: 02/07/2025
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Old Slip Benefits & Insurance Services, LLC** represented by **David T. Azrin**
Wuersch & Gering
100 Wall Street
Ste 10th Floor
New York, NY 10005
212-509-5050
Email: david.azrin@wg-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ramsha Ansari**
Wuersch & Gering LLP
100 Wall Street
Ste 10th Floor
New York, NY 10005
212-509-5050
Email: ramsha.ansari@wg-law.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Allstate Insurance Company** represented by **Erica H Dressler**
Troutman Pepper Locke LLP
Two Logan Square, 100 N 18th Street
Philadelphia, PA 19103
215-981-4691
Fax: 800-685-0691
Email: erica.dressler@troutman.com
*ATTORNEY TO BE NOTICED*

**Milica Krnjaja**
Troutman Pepper Locke LLP
3000 Two Logan Square
18th And Arch Streets
Philadelphia, PA 19103
215-981-4435

Email: millie.krnjaja@troutman.com
*ATTORNEY TO BE NOTICED*

**Arthur Christopher Young**
Troutman Pepper Locke LLP
3000 Two Logan Square
18th And Arch Streets
Philadelphia, PA 19103
215-981-4190
Email: christopher.young@troutman.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Regine Marie Napoleon**

**Defendant**

**Brittany Cleere**

**Defendant**

**Marc Stevenson**

**Defendant**

**Allison Ann McMahon**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/07/2025 | 1 | NOTICE OF REMOVAL from Supreme Court, County of Westchester. Case Number: 69162/2024. (Filing Fee $ 405.00, Receipt Number ANYSDC-30582522).Document filed by Allstate Insurance Company. (Attachments: # 1 Exhibit A-Pleadings 001-083, # 2 Exhibit B-Affirmation Of A.Christopher Young, # 3 Exhibit C-Notice of Filing of Notice of Removal).(Young, Arthur) (Entered: 02/07/2025) |
| 02/07/2025 | 2 | CIVIL COVER SHEET filed..(Young, Arthur) (Entered: 02/07/2025) |
| 02/07/2025 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Allstate Insurance Holdings, LLC, Corporate Parent The Allstate Corporation for Allstate Insurance Company. Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 02/07/2025) |
| 02/10/2025 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Jessica G. L. Clarke. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 02/10/2025) |
| 02/10/2025 | | Magistrate Judge Andrew E. Krause is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 02/10/2025) |
| 02/10/2025 | | Case Designated ECF. (pc) (Entered: 02/10/2025) |

| | | |
|---|---|---|
| 02/10/2025 | | *****NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Arthur Christopher Young. The following case opening statistical information was erroneously selected/entered: County code Westchester;. The following correction(s) have been made to your case entry: the County code has been modified to XX Out of State;. (pc)** (Entered: 02/10/2025) |
| 02/13/2025 | 4 | NOTICE OF INITIAL PRETRIAL CONFERENCE: The conference will be held remotely by Microsoft Teams. Counsel will receive Microsoft Teams log-in credentials at the email addresses listed on the docket. The public listen-only line may be accessed by dialing: 646-453-4442 \| Access Code: 937464169#. As further set forth by this Order. SO ORDERED. Initial Conference set for 5/20/2025 at 12:00 PM before Judge Jessica G. L. Clarke. (Signed by Judge Jessica G. L. Clarke on 2/13/2025) (tg) (Entered: 02/13/2025) |
| 02/13/2025 | 5 | MOTION for Erica H. Dressler to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30617828. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Allstate Insurance Company. (Attachments: # 1 Affidavit In Support, # 2 Exhibit A-Certificate Of Good Standing, # 3 Proposed Order Granting Motion for Pro Hac Vice Admission).(Dressler, Erica) (Entered: 02/13/2025) |
| 02/14/2025 | 6 | MOTION for Milica Krnjaja to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30620388. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Allstate Insurance Company. (Attachments: # 1 Affidavit In Support, # 2 Exhibit A-Certificate Of Good Standing, # 3 Proposed Order Granting Motion for Pro Hac Vice Admission).(Krnjaja, Milica) (Entered: 02/14/2025) |
| 02/14/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 5 MOTION for Erica H. Dressler to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30617828. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 02/14/2025) |
| 02/14/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 6 MOTION for Milica Krnjaja to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30620388. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 02/14/2025) |
| 02/14/2025 | 7 | ANSWER to Complaint. Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 02/14/2025) |
| 02/25/2025 | 8 | ORDER FOR ADMISSION PRO HAC VICE granting 6 Motion to Appear Pro Hac Vice. The motion of Milica Krnjaja for admission to practice Pro Hac Vice in the above captioned action is granted. As further set forth by this Order. The Clerk of Court is directed to terminate ECF No. 6. SO ORDERED. (Signed by Judge Jessica G. L. Clarke on 2/25/2025) (tg) (Entered: 02/25/2025) |
| 02/25/2025 | 9 | ORDER FOR ADMISSION PRO HAC VICE granting 5 Motion to Appear Pro Hac Vice. The motion of Erica H. Dressler for admission to practice Pro Hac Vice in the above captioned action is granted. As further set forth by this Order. The Clerk of Court is directed to terminate ECF No. 5. SO ORDERED. (Signed by Judge Jessica G. L. Clarke on 2/25/2025) (tg) (Entered: 02/25/2025) |
| 02/25/2025 | 10 | NOTICE OF APPEARANCE by David T. Azrin on behalf of Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 02/25/2025) |

| | | |
|---|---|---|
| 03/10/2025 | 11 | NOTICE of Disclosure Of Citizenship. Document filed by Allstate Insurance Company.. (Young, Arthur) (Entered: 03/10/2025) |
| 03/14/2025 | 12 | MOTION For An Order Declaring That The Temporary Restraining Order Has Expired Or, Alternatively, For An Order Dissolving The Temporary Restraining Order . Document filed by Allstate Insurance Company. (Attachments: # 1 Proposed Order Granting Motion). (Young, Arthur) (Entered: 03/14/2025) |
| 03/14/2025 | 13 | MEMORANDUM OF LAW in Support re: 12 MOTION For An Order Declaring That The Temporary Restraining Order Has Expired Or, Alternatively, For An Order Dissolving The Temporary Restraining Order . . Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 03/14/2025) |
| 03/25/2025 | 14 | STATE COURT RECORDS AND PROCEEDINGS PURSUANT TO LOCAL RULE 81. Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit Complaint filed Sept. 12, 2024, # 2 Exhibit First Amended Complaint filed Oct. 15, 2024).(Azrin, David) (Entered: 03/25/2025) |
| 03/27/2025 | 15 | STATE COURT RECORDS AND PROCEEDINGS PURSUANT TO LOCAL RULE 81. Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit Plaintiff's Proposed Order to Show Cause, # 2 Exhibit Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order, # 3 Exhibit Plaintiff's Affirmation of David T. Azrin in Support of Temporary Restraining Order, # 4 Exhibit Plaintiff's Affirmation of James Lukezic in Support of Motion for Preliminary Injunction and Temporary Restraining Order, # 5 Exhibit Exhibit A to Lukezic Affirmation - Old Slip-Allstate Insurance Agency Franchise Agreement, # 6 Exhibit Exhibit B to Lukezic Affirmation - Allstate Termination Notice, # 7 Exhibit Court Notice of Hearing on Proposed Order to Show Cause dated September 13, 2024, # 8 Exhibit Transcript, Sept. 19, 2024 Court Hearing on Request for Temporary Restraining Order and Proposed Order to Show Cause, # 9 Exhibit Order to Show Cause with Temporary Restraining Order, # 10 Exhibit Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunctive Relief, # 11 Exhibit Exhibit A to Defendant's Memorandum of Law - FINRA BrokerCheck Report for James Lukezic, # 12 Exhibit Defendant Regine Napoleon's Affirmation, # 13 Exhibit Exhibit A to Napoleon Affirmation, # 14 Exhibit Exhibit B to Napoleon Affirmation, # 15 Exhibit Plaintiff's Reply Memorandum of Law in Further Support of Preliminary Injunction Motion, # 16 Exhibit Plaintiff's Reply Affirmation in Further Support of Preliminary Injunction Motion, # 17 Exhibit Plaintiff's Notice of Supplemental Authority, JLO v. Amalgamated Bank, # 18 Exhibit Defendant's Response to Plaintiff's Notice of Supplemental Authority, # 19 Exhibit Transcript, Jan. 8, 2025 Court Hearing on Preliminary Injunction Motion, # 20 Exhibit Decision and Order on Plaintiff's Preliminary Injunction Motion and Extending Temporary Restraining Order).(Azrin, David) (Entered: 03/27/2025) |
| 03/27/2025 | 16 | STATE COURT RECORDS AND PROCEEDINGS PURSUANT TO LOCAL RULE 81. Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit Plaintiff's Supplemental Affirmation of James Lukezic in Support of Plaintiff's Motion for Preliminary Injunctive Relief).(Azrin, David) (Entered: 03/27/2025) |
| 03/27/2025 | 17 | STATE COURT RECORDS AND PROCEEDINGS PURSUANT TO LOCAL RULE 81. Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit Defendants Notice of Motion to Dismiss Amended Complaint, # 2 Exhibit Defendants Memorandum of Law in Support of Motion to Dismiss Amended Complaint, # 3 Exhibit Plaintiff's Notice of Supplemental Authority, JLO v. Amalgamated Bank, # 4 Exhibit Defendants Response to Plaintiff's Notice of Supplemental Authority, # 5 Exhibit Defendants Memorandum of Law in Reply in Further Support of Motion to Dismiss Amended Complaint, # 6 Exhibit Transcript, Court Hearing on Defendants Motion to |

| | | |
|---|---|---|
| | | Dismiss Amended Complaint, # 7 Exhibit Decision and Order on Defendants Motion to Dismiss Amended Complaint).(Azrin, David) (Entered: 03/27/2025) |
| 03/27/2025 | 18 | STATE COURT RECORDS AND PROCEEDINGS PURSUANT TO LOCAL RULE 81. Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit Defendant Stevenson's Motion to Dismiss for Lack of Personal Jurisdiction, # 2 Exhibit Defendant Stevenson's Memorandum of Law in Support of Motion to Dismiss for Lack of Personal Jurisdiction, # 3 Exhibit Defendant Stevenson's Affirmation in Support of Motion to Dismiss for Lack of Personal Jurisdiction, # 4 Exhibit Plaintiff's Memorandum of Law in Opposition to Defendant Stevenson's Motion to Dismiss for Lack of Personal Jurisdiction, # 5 Exhibit Affirmation of James Lukezic in Opposition to Defendant Marc Stevenson's Moton to Dismiss for Lack of Personal Jurisdiction, # 6 Exhibit Exhibit A to Lukezic Affirmation - Email Stream of Communications between Stevenson and Lukezic, # 7 Exhibit Defendant Stevenson's Reply Memorandum of Law in Support of Motion to Dismiss for Lack of Personal Jurisdiction, # 8 Exhibit Decision and Order on Defendant Stevenson's Motion to Dismiss for Lack of Personal Jurisdiction).(Azrin, David) (Entered: 03/27/2025) |
| 03/27/2025 | 19 | STATE COURT RECORDS AND PROCEEDINGS PURSUANT TO LOCAL RULE 81. Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit Plaintiff's Proposed Order to Show Cause on Motion to Expand Injunctive Relief in the Restraining Order and Plaintiff's Preliminary Injunction Motion, # 2 Exhibit Plaintiff's Memorandum of Law in Support of Motion for Expanded Injunctive Relief, # 3 Exhibit Affirmation of James Lukezic in Support of Motion for Expanded Injunctive Relief, # 4 Exhibit Order to Show Cause on Plaintiff's Motion for Expanded Injunctive Relief, # 5 Exhibit Transcript, Court Hearing on Plaintiff's Motion for Expanded Injunctive Relief, # 6 Exhibit Decision and Order on Motion for Expanded Injunctive Relief).(Azrin, David) (Entered: 03/27/2025) |
| 03/27/2025 | 20 | STATE COURT RECORDS AND PROCEEDINGS PURSUANT TO LOCAL RULE 81. Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit Notice of Preliminary Conference, # 2 Exhibit Joint Statement of Parties' Contentions, # 3 Exhibit Transcript, Nov. 21, 2024 Preliminary Conference, # 4 Exhibit Preliminary Conference Stipulation and Order, # 5 Exhibit Order of Reference to Mediation, # 6 Exhibit Stipulation and Order for the Production and Exchange of Confidential Information).(Azrin, David) (Entered: 03/27/2025) |
| 03/28/2025 | 21 | MEMORANDUM OF LAW in Opposition re: 12 MOTION For An Order Declaring That The Temporary Restraining Order Has Expired Or, Alternatively, For An Order Dissolving The Temporary Restraining Order . . Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit Ex. A - Declaration of Anthony Fava, # 2 Exhibit Ex. B - Declaration of Al Buglione, # 3 Exhibit Ex. C - Email Stream - Nov. 16, 2023 between Cleere, Foreman, and Stevenson approving Lukezic, # 4 Exhibit Ex. D - Email Stream - March 25, 2024, between Cleere and McMahon).(Azrin, David) (Entered: 03/28/2025) |
| 03/28/2025 | 22 | MOTION to Stay re: 12 MOTION For An Order Declaring That The Temporary Restraining Order Has Expired Or, Alternatively, For An Order Dissolving The Temporary Restraining Order . . Document filed by Old Slip Benefits & Insurance Services, LLC.. (Azrin, David) (Entered: 03/28/2025) |
| 04/02/2025 | 23 | MOTION To Allow Redactions re: 21 Memorandum of Law in Opposition to Motion,, *(Letter Motion)*. Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 04/02/2025) |
| 04/04/2025 | 24 | MEMO ENDORSEMENT granting 23 Motion. ENDORSEMENT: Application GRANTED. The documents filed by Plaintiff as exhibits to ECF No. 21 may remain |

| | | |
|---|---|---|
| | | redacted. Any future redactions must be filed in accordance with the Court's Individual Rule 5. The Clerk of Court is respectfully directed to terminate ECF No. 23. SO ORDERED.. (Signed by Judge Jessica G. L. Clarke on 4/4/2025) (tg) (Entered: 04/04/2025) |
| 04/04/2025 | 25 | REPLY to Response to Motion re: 12 MOTION For An Order Declaring That The Temporary Restraining Order Has Expired Or, Alternatively, For An Order Dissolving The Temporary Restraining Order . . Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 04/04/2025) |
| 04/04/2025 | 26 | LETTER MOTION for Leave to File Redacted Document addressed to Judge Jessica G. L. Clarke from A. Christopher Young dated 04/04/2025. Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 04/04/2025) |
| 04/04/2025 | 27 | REDACTION to 25 Reply to Response to Motion, 26 LETTER MOTION for Leave to File Redacted Document addressed to Judge Jessica G. L. Clarke from A. Christopher Young dated 04/04/2025. -*Redacted Exhibit A To Reply* by Allstate Insurance Company. (Young, Arthur) (Entered: 04/04/2025) |
| 04/04/2025 | 28 | ***EX-PARTE***REDACTION to 26 LETTER MOTION for Leave to File Redacted Document addressed to Judge Jessica G. L. Clarke from A. Christopher Young dated 04/04/2025., 27 Redacted Document, *Unredacted Version Of Exhibit A To Reply* by Allstate Insurance CompanyMotion or Order to File Under Seal: 26 .(Young, Arthur) (Entered: 04/04/2025) |
| 04/09/2025 | 29 | LETTER MOTION to Adjourn Conference addressed to Judge Jessica G. L. Clarke from A. Christopher Young dated 04/09/2025. Document filed by Allstate Insurance Company.. (Young, Arthur) (Entered: 04/09/2025) |
| 04/09/2025 | 30 | LETTER RESPONSE to Motion addressed to Judge Jessica G. L. Clarke from David T. Azrin dated April 9, 2025 re: 26 LETTER MOTION for Leave to File Redacted Document addressed to Judge Jessica G. L. Clarke from A. Christopher Young dated 04/04/2025. . Document filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 04/09/2025) |
| 04/10/2025 | 31 | ORDER granting 29 Letter Motion to Adjourn Conference. Application GRANTED. IT IS HEREBY ORDERED that the conference in this matter, previously scheduled for May 20, 2025 at 12:00 p.m., is RESCHEDULED for May 22, 2025 at 3:00 p.m. The conference will be held remotely via Microsoft Teams. The Clerk of Court is respectfully directed to terminate ECF No. 29. SO ORDERED. (Signed by Judge Jessica G. L. Clarke on 4/10/2025) Initial Conference set for 5/22/2025 at 03:00 PM before Judge Jessica G. L. Clarke. (ar) (Entered: 04/10/2025) |
| 04/11/2025 | 32 | RESPONSE in Opposition to Motion re: 22 MOTION to Stay re: 12 MOTION For An Order Declaring That The Temporary Restraining Order Has Expired Or, Alternatively, For An Order Dissolving The Temporary Restraining Order . . . Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 04/11/2025) |
| 04/11/2025 | 33 | LETTER REPLY to Response to Motion addressed to Judge Jessica G. L. Clarke from A. Christopher Young dated 04/11/2025 re: 26 LETTER MOTION for Leave to File Redacted Document addressed to Judge Jessica G. L. Clarke from A. Christopher Young dated 04/04/2025. . Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 04/11/2025) |
| 04/18/2025 | 34 | REPLY MEMORANDUM OF LAW in Support re: 22 MOTION to Stay re: 12 MOTION For An Order Declaring That The Temporary Restraining Order Has Expired Or, Alternatively, For An Order Dissolving The Temporary Restraining Order . . . Document |

| | | |
|---|---|---|
| | | filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 04/18/2025) |
| 05/01/2025 | | ORDER It is hereby ORDERED that all parties appear for a conference with the Court on May 8, 2025 at 12:00 p.m. The conference will be held remotely via Microsoft Teams. Counsel will receive Microsoft Teams log-in credentials at the email addresses listed on the docket. The public listen-only line may be accessed by dialing: 646-453-4442 \| Access Code: 737883793#. The parties should be prepared to discuss the motions at ECF Nos. 12 , 22 , and 26 . SO ORDERED. (HEREBY ORDERED by Judge Jessica G. L. Clarke) (Text Only Order) (stt) (Entered: 05/01/2025) |
| 05/02/2025 | 35 | LETTER MOTION for Conference re: Order,, *Request to Conduct the Oral Argument on the Pending Motions in-Person Rather Than Remotely by Videoconference and Phone,* addressed to Judge Jessica G. L. Clarke from David T. Azrin dated May 2, 2025. Document filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 05/02/2025) |
| 05/05/2025 | 36 | NOTICE OF APPEARANCE by Ramsha Ansari on behalf of Old Slip Benefits & Insurance Services, LLC..(Ansari, Ramsha) (Entered: 05/05/2025) |
| 05/05/2025 | 37 | MOTION to Amend/Correct *and for Leave to File Second Amended Complaint*. Document filed by Old Slip Benefits & Insurance Services, LLC. (Attachments: # 1 Exhibit A - Proposed Second Amended Complaint, # 2 Exhibit B - Redline of Proposed Second Amended Complaint Showing Changes from Amended Complaint).(Azrin, David) (Entered: 05/05/2025) |
| 05/05/2025 | 38 | MEMORANDUM OF LAW in Support re: 37 MOTION to Amend/Correct *and for Leave to File Second Amended Complaint*. . Document filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 05/05/2025) |
| 05/06/2025 | 39 | ORDER granting 35 Letter Motion for Conference. Application GRANTED. IT IS HEREBY ORDERED that the conference in this matter, previously scheduled for May 8, 2025 at 12:00 p.m. via Microsoft Teams, is RESCHEDULED for May 8, 2025 at 3:00 p.m. and shall take place in Courtroom 11B of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York. The Clerk of Court is directed to terminate ECF No. 35. SO ORDERED. Status Conference set for 5/8/2025 at 03:00 PM in Courtroom 11B, 500 Pearl Street, New York, NY 10007 before Judge Jessica G. L. Clarke. (Signed by Judge Jessica G. L. Clarke on 5/6/2025) (tg) (Entered: 05/06/2025) |
| 05/06/2025 | 40 | LETTER addressed to Judge Jessica G. L. Clarke from A.Christopher Young dated 05/06/2025 re: Request For Two Attorneys To Speak. Document filed by Allstate Insurance Company..(Young, Arthur) (Entered: 05/06/2025) |
| 05/07/2025 | 41 | NOTICE of Filing Verification of Proposed Second Amended Complaint. Document filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 05/07/2025) |
| 05/07/2025 | 42 | MEMO ENDORSEMENT on re: 40 Letter filed by Allstate Insurance Company. ENDORSEMENT: Application GRANTED. Milica Krnjaja may address Plaintiff's Motion to Stay (ECF No. 22), alongside A. Christopher Young, who may address the motions at ECF Nos. 12 and 26. SO ORDERED. (Signed by Judge Jessica G. L. Clarke on 5/7/2025) (ar) (Entered: 05/07/2025) |
| 05/08/2025 | | Minute Entry for proceedings held before Judge Jessica G. L. Clarke: Case Management Conference held on 5/8/2025. Counsel David T. Azrin and Ramsha Ansari present for the Plaintiff. Counsel Arthur C. Young and Milica Krnjaja present for the Defendant. (stt) (Entered: 06/04/2025) |

| | | |
|---|---|---|
| 05/13/2025 | 43 | LETTER addressed to Judge Jessica G. L. Clarke from A. Christopher Young,David T. Azrin dated 05/13/2025 re: Initial Pretrial Conference. Document filed by Allstate Insurance Company. (Attachments: # 1 Exhibit A-Case Management Plan).(Young, Arthur) (Entered: 05/13/2025) |
| 05/16/2025 | 44 | LETTER addressed to Judge Jessica G. L. Clarke from David T. Azrin dated May 15, 2025 re: Additional Authority in response to Court's inquiry at May 8, 2025 oral argument. Document filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 05/16/2025) |
| 05/19/2025 | 45 | TRANSCRIPT of Proceedings re: CONFERENCE held on 5/8/2025 before Judge Jessica G. L. Clarke. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/9/2025. Redacted Transcript Deadline set for 6/20/2025. Release of Transcript Restriction set for 8/18/2025..(McGuirk, Kelly) (Entered: 05/19/2025) |
| 05/19/2025 | 46 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 5/8/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 05/19/2025) |
| 05/19/2025 | 47 | RESPONSE in Opposition to Motion re: 37 MOTION to Amend/Correct *and for Leave to File Second Amended Complaint*. . Document filed by Allstate Insurance Company.. (Young, Arthur) (Entered: 05/19/2025) |
| 05/21/2025 | 48 | OPINION AND ORDER: For the foregoing reasons, the Court finds that the state court's TRO has expired. The Court, however, stays the effect of this Order until June 5, 2025, at Plaintiff's request, to permit Plaintiff to seek an emergency stay from the Second Circuit. Defendant's motion to file a redacted version of Exhibit A to their TRO Reply is DENIED, and Defendant is hereby ORDERED to file the unredacted version of Exhibit A to their TRO Reply by no later than May 26, 2025. The Clerk of Court is respectfully directed to terminate ECF Nos. 12 , 22 , and 26 . (Signed by Judge Jessica G. L. Clarke on 05/21/25) (stt) (Entered: 05/21/2025) |
| 05/21/2025 | 49 | NOTICE OF INTERLOCUTORY APPEAL from 48 Memorandum & Opinion,,. Document filed by Old Slip Benefits & Insurance Services, LLC. Filing fee $ 605.00, receipt number ANYSDC-31119907. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Azrin, David) (Entered: 05/21/2025) |
| 05/22/2025 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 49 Notice of Interlocutory Appeal.(km) (Entered: 05/22/2025) |
| 05/22/2025 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 49 Notice of Interlocutory Appeal, filed by Old Slip Benefits & Insurance Services, LLC were transmitted to the U.S. Court of Appeals.(km) (Entered: 05/22/2025) |
| 05/22/2025 | | Minute Entry for proceedings held before Judge Jessica G. L. Clarke: Initial Pretrial Conference held via Microsoft Teams on 5/22/2025. Counsel David T. Azrin and Ramsha Ansari present for the Plaintiff. Counsel Erica H. Dressler, Milica Krnjaja, and Christopher Young present for the Defendant. As discussed at today's conference, the parties shall submit briefing regarding Plaintiff's motion for a preliminary injunction, including whether |

| | | |
|---|---|---|
| | | the Court may issue a ruling while Plaintiff's appeal is pending before the Second Circuit. Plaintiff's opening brief shall be due May 23, 2025, Defendant's opposition shall be due May 27, 2025, and Plaintiff's reply shall be due May 29, 2025. SO ORDERED. (stt) (Entered: 05/22/2025) |
| 05/23/2025 | 50 | LETTER MOTION for Conference re: Pretrial Conference - Initial,, *to Declare that the Preliminary Injunction Motion is Still Pending and to Set the Hearing on the Preliminary Injunction Motion for next week, with briefing requested by the Court on the issue of the Court's jurisdiction to rule on the motion in light of the appeal of the May 21, 2025 Order* addressed to Judge Jessica G. L. Clarke from David T. Azrin dated May 23, 2025. Document filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 05/23/2025) |
| 05/26/2025 | 51 | LETTER MOTION for Leave to File Exhibit addressed to Judge Jessica G. L. Clarke from Erica H. Dressler dated May 26, 2025. Document filed by Allstate Insurance Company. (Attachments: # 1 Exhibit EA Manual).(Dressler, Erica) (Entered: 05/26/2025) |
| 05/27/2025 | 52 | MEMORANDUM OF LAW in Opposition re: 50 LETTER MOTION for Conference re: Pretrial Conference - Initial,, *to Declare that the Preliminary Injunction Motion is Still Pending and to Set the Hearing on the Preliminary Injunction Motion for next week, with briefing requested by the Court . Document filed by Allstate Insurance Company. (Attachments: # 1 Exhibit A-Old Slip's Emergency Motion To Stay).(Young, Arthur) (Entered: 05/27/2025)* |
| 05/27/2025 | 53 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a United States Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c). The parties have conferred pursuant to Fed. R. Civ. P. 26(f). Settlement discussions have taken place. Defendant believes the parties would benefit from a referral to the Magistrate Judge after the close of discovery. Any motion for leave to amend or join additional parties shall be filed no later than 30 days following the date of this Order. Depositions pursuant to Fed. R. Civ. P. 30 and 31 shall be completed by the date set forth in paragraph 8(a). By September 26, 2025 the parties shall submit a post-discovery joint status letter, as outlined in Section 3(d) of the Court's Individual Rules and Practices in Civil Cases. The letter shall include whether either party has retained or intends to retain or disclose an expert witness. If so, the letter shall include the parties' proposed schedule for expert discovery. The case is to be tried to a jury. Counsel for the parties have conferred and their best estimate of the length of trial is Plaintiff believes that the trial would last 12-15 trial days, while Defendant believes it will not last longer than 5-7 trial days. The parties believe the initial pretrial conference is necessary. SO ORDERED. Deposition due by 9/19/2025. Fact Discovery due by 9/19/2025. Case Management Conference set for 10/2/2025 at 11:00 AM in Courtroom 11B, 500 Pearl Street, New York, NY 10007 before Judge Jessica G. L. Clarke. (Signed by Judge Jessica G. L. Clarke on 5/27/2025) (tg) (Entered: 05/27/2025) |
| 05/27/2025 | 54 | REPLY MEMORANDUM OF LAW in Support re: 37 MOTION to Amend/Correct *and for Leave to File Second Amended Complaint*. . Document filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 05/27/2025) |
| 05/29/2025 | 55 | LETTER REPLY to Response to Motion addressed to Judge Jessica G. L. Clarke from David T. Azrin dated May 29, 2025 re: 50 LETTER MOTION for Conference re: Pretrial Conference - Initial,, *to Declare that the Preliminary Injunction Motion is Still Pending and to Set the Hearing on the Preliminary Injunction Motion for next week, with briefing requested by the Court . Document filed by Old Slip Benefits & Insurance Services, LLC.. (Azrin, David) (Entered: 05/29/2025)* |
| 05/30/2025 | 56 | TRUE COPY ORDER of USCA as to 49 Notice of Interlocutory Appeal filed by Old Slip Benefits & Insurance Services, LLC USCA Case Number 25-1320. USCA Case Number |

| | | |
|---|---|---|
| | | 25-1320. Appellant moves for a stay of the district court's May 21, 2025 order pending appeal. Appellee opposes the motion. IT IS HEREBY ORDERED that the motion is REFERRED to the next available three-judge motions panel. The Court grants a temporary stay of the district court's order until the motion is reviewed and decided by the motions panel. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 5/30/2025. (km) (Entered: 05/30/2025) |
| 05/30/2025 | | Transmission of USCA Mandate/Order to the District Judge re: 56 USCA Order.(km) (Entered: 05/30/2025) |
| 05/30/2025 | 57 | LETTER RESPONSE in Opposition to Motion addressed to Judge Jessica G. L. Clarke from David T. Azrin dated May 30, 2025 re: 51 LETTER MOTION for Leave to File Exhibit addressed to Judge Jessica G. L. Clarke from Erica H. Dressler dated May 26, 2025. . Document filed by Old Slip Benefits & Insurance Services, LLC..(Azrin, David) (Entered: 05/30/2025) |
| 06/02/2025 | 58 | OPINION AND ORDER re: 50 LETTER MOTION for Conference re: Pretrial Conference - Initial,, *to Declare that the Preliminary Injunction Motion is Still Pending and to Set the Hearing on the Preliminary Injunction Motion for next week, with briefing requested by the Court filed by Old Slip Benefits & Insurance Services, LLC. Plaintiff's application is denied. As such, the Court denies Plaintiffs requested relief and will revisit this issue after further ruling from the Second Circuit. The Clerk of Court is respectfully directed to terminate ECF No. 50. SO ORDERED. (Signed by Judge Jessica G. L. Clarke on 6/2/2025) (tg) (Entered: 06/02/2025)* |
| 06/03/2025 | 59 | NOTICE OF INTERLOCUTORY APPEAL from 58 Memorandum & Opinion,,. Document filed by Old Slip Benefits & Insurance Services, LLC. Filing fee $ 605.00, receipt number ANYSDC-31174591. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Azrin, David) (Entered: 06/03/2025) |
| 06/03/2025 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 59 Notice of Interlocutory Appeal. (tp) (Entered: 06/03/2025) |
| 06/03/2025 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 59 Notice of Interlocutory Appeal, filed by Old Slip Benefits & Insurance Services, LLC were transmitted to the U.S. Court of Appeals. (tp) (Entered: 06/03/2025) |
| 06/03/2025 | 60 | ORDER denying 51 Letter Motion for Leave to File Document. Application DENIED. The proposed redactions attempt to redact information that is already publicly available. See Khalil v. Allstate, No. 20-CV-09409 (C.D. Calif. 2022), ECF No. 63-3. Accordingly, and as the Court ordered at ECF No. 48, the EA Manual must be filed without redactions. Louis Vuitton Malletier S.A. v. Sunny Merch. Corp., 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) ("[T]here is no justification for keeping the information that has already been public under seal."). Defendant is hereby ORDERED to file the unredacted version of Exhibit A to their TRO Reply by no later than June 6, 2025. The Clerk of Court is respectfully directed to terminate ECF No. 51. SO ORDERED. (Signed by Judge Jessica G. L. Clarke on 6/3/2025) (tg) (Entered: 06/03/2025) |
| 06/06/2025 | 61 | TRANSCRIPT of Proceedings re: REMOTE CONFERENCE held on 5/22/2025 before Judge Jessica G. L. Clarke. Court Reporter/Transcriber: Kristen Carannante, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/27/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/4/2025. (js) (Entered: 06/06/2025) |

| | | |
|---|---|---|
| 06/06/2025 | 62 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a REMOTE CONFERENCE proceeding held on 5/22/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(js) (Entered: 06/06/2025) |
| 06/06/2025 | 63 | NOTICE of Unredacted Exhibit A-EA Manual re: 51 LETTER MOTION for Leave to File Exhibit addressed to Judge Jessica G. L. Clarke from Erica H. Dressler dated May 26, 2025., 60 Order on Motion for Leave to File Document,,,. Document filed by Allstate Insurance Company..(Dressler, Erica) (Entered: 06/06/2025) |



| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/16/2025 13:47:20 | | | |
| **PACER Login:** | ramshaansari | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:25-cv-01110-JGLC |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---------------------------------------------------------------------x

OLD SLIP BENEFITS & INSURANCE SERVICES LLC,

Index. No.

Plaintiff,

v.

**COMPLAINT & JURY DEMAND**

-against-

ALLSTATE INSURANCE COMPANY,
REGINE MARIE NAPOLEON, BRITTANY CLEERE,
MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.

---------------------------------------------------------------------x

Plaintiff, OLD SLIP BENEFITS & INSURANCE SERVICES LLC (hereafter referred to as "Old Slip" or "Plaintiff"), by and through its undersigned attorneys, and as and for its Complaint against the Defendants ALLSTATE INSURANCE COMPANY (hereafter referred to as "Allstate" or "Defendant"), REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON, alleges as follows:

1. Plaintiff brings this Complaint and the requested injunctive relief herein to prevent the unlawful termination by Defendants of Plaintiff's Exclusive Allstate Franchise Agreement, which termination will result in immediate, irreparable harm to Plaintiff, including the destruction of Plaintiff's business, resulting in the loss of jobs of Old Slip's employees, liability to third parties including its landlord, and the loss of future opportunities for the purchase of additional Allstate agencies, and for other legal and equitable relief.

**Parties**

2. Plaintiff Old Slip Benefits & Insurance Services LLC is a New York limited liability company, with its principal place of business at 199 Main Street, Suite 200, White Plains, New York, whose sole member is domiciled in the state of New York..

3. Defendant Allstate Insurance Company is an Illinois corporation with its principal place of business at 2755 Sanders Road, Northbrook, Illinois.

4. Defendant Regine Marie Napoleon is an individual residing in and domiciled in Queens County, New York, at 7525 153rd Street, Apt. 1137, Kew Gardens Hills, NY 11367, and worked as a sales associate for Defendant Allstate at all relevant times, and actively participated in the sale of the Allstate insurance franchise agreement to Plaintiff.

5. Defendant Brittany Cleere is an individual residing in and domiciled in Berkeley County, Southern Carolina, at 149 Midtown Avenue, Summerville, SC 29486, who worked as a salesperson for Defendant Allstate at all relevant times, and actively participated in the sale of the Allstate insurance franchise agreement to Plaintiff.

6. Defendant Marc Stevenson is an individual residing and domiciled in Haymarket, Virginia, at 6107 Aster Haven Circle, Haymarket, Virginia 20169, who worked as a salesperson for Defendant Allstate at all relevant times, and actively participated in the sale of the Allstate insurance franchise agreement to Plaintiff.

7. Defendant Allison Ann McMahon is an individual residing in and domiciled in Suffolk County, New York at 206 Windwatch Drive, Hauppauge, New York, and worked as a sales director for Defendant Allstate at all relevant times.

8. Venue is proper under Civil Practice Law and Rules 503(a).

## General Allegations

9. Old Slip's owner, James Lukezic, has been in the financial services industry as a Fund Analyst and Financial Advisor for 24 years. In 2016, he took his book of business and began his own practice as a Retirement Investment Advisor and insurance agent and in 2019 purchased a Broker Dealer business from CNN Insurance, renaming it under his brand, Old Slip Capital Management, Inc., a business that was approved for business in 1966.

10. Since 2016, he built up a financial services capital management and investment advisory business, in New York City, with investment clients across the country, offering financial services products of several different investment management companies. His investment advisory business, operating under the name Old Slip Capital Partners, LLC, is affiliated with his company, Old Slip Registered Investment Advisors, LLC, an SEC Registered Investment Advisor, and his company Old Slip Capital Management, Inc., a licensed Broker/Dealer, and member of FINRA/SIPC. He has several securities licenses, including a registered investment advisor (RIA), licensed broker dealer (BD), and accredited investment fiduciary, with Series 7, 24, 63, 65, and 66 securities licenses with the Financial Industry Regulatory Authority (FINRA), the authority which regulates securities brokers and exchange markets in the United States. His affiliated companies have built up a nationwide investment advisory business, selling investment products and variable annuities (but not fixed annuities) across the United States.

11. In late 2023, Lukezic decided to become an Allstate insurance agency franchisee, and to purchase the assets of two existing Allstate insurance agencies located in Westchester County, New York, owned by Anthony Fava and Alfred Buglione respectively, and he formed Plaintiff Old Slip Benefits & Insurance Services LLC to own and operate the new Allstate franchised business. He purchased the customer accounts of two existing Allstate agencies,

consolidated the accounts into one agency, leased space in White Plains, hired and trained employees, and began managing those accounts and selling Allstate insurance products, from its Allstate agency location in White Plains, New York. Since March 2024, he has been operating the agency successfully, providing excellent customer service to the insurance customers, with a fully trained staff. He has been generating significant premiums for Allstate, and Allstate has never raised any issues regarding the agency's performance. Lukezic became an Allstate franchised agent, with the intention of growing the agency, by buying and consolidating additional Allstate insurance agencies in the future, and continuously cross-selling Allstate's insurance products to his existing investment advisory clients, which he would continue to service through his established investment advisory business.

12. During the sales process, Lukezic made it clear to Allstate as well as the sellers, in his business plan and his discussions with them, that his Allstate agency would only be offering insurance products. He also made it clear that he had his own separate investment advisory business, under the name Old Slip Capital Partners, LLC, a diversified financial services firm affiliated with Old Slip Registered Investment Advisors, LLC, an SEC Registered Investment Advisor, and Old Slip Capital Management, Inc., a licensed Broker/Dealer, and member of FINRA/SIPC. He explained to the Allstate salespersons how he wanted to market Allstate insurance products to his affiliates' thousands of 401(k) Participant clients, a strategy that was well received by the Allstate salespersons. At no point in time did the Allstate salespersons say anything to him about transferring his FINRA licenses to Allstate, and they never asked him to sign any of the required paperwork to transfer his FINRA licenses to Allstate, because that was not part of the deal.

13. In fact, every one of his emails during his discussions with the Allstate salespersons came from his "oldslipcap.com" email address, and every email had a description of his separate investment business, as described above. In his email discussions with them, it was clear that he had long-standing relationships with other firms in connection with his investment advisory business. His business plan for the Allstate agency only proposed selling insurance products, and ***not*** investment products.

14. This was consistent with the agency agreement that he signed. The plain language of the Allstate agency agreement only restricted Old Slip from offering insurance products of other companies, and not other non-insurance investment products which its affiliates offer through their regulated investment advisory business and broker-dealer business. Section 1[E] of the Allstate Agency Agreement, Section 1[E] is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance."

15. The plain reading of the contract is bolstered by Allstate's own March 23, 2000 set of Questions and Answers ("Q & As") regarding the exclusive agency agreement, specifically recognizing that the non-competition provisions do not apply to "*non-insurance*" products, and that the offering of non-insurance products to customers is "*not a violation of the noncompete provision.*" *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 350 (E.D. Pa. 2014*), opinion clarified on denial of reconsideration* (Apr. 7, 2014) (emphasis added).. *See also Allstate Ins. Co. v. Fougere*, No. CV 16-11652-JGD, 2019 WL 4776986, at *13 (D. Mass. Sept. 30, 2019) ("the unambiguous language of the EA Agreement provides that the Agency is not to sell *insurance* policies of any competitors") (emphasis added). In fact, there are many Allstate insurance agencies with similar agreements which offer investment products through other companies.

***Establishment and Operation of the Allstate Insurance Agency as an Allstate Franchisee***

16. Old Slip has been operating the agency successfully as an Allstate franchisee since March 2024. The relationship was intended to be a long-term relationship. As a condition for entering into the franchise agreement, for a three month period from about December 2023 to February 2024, Lukezic was required to undergo extensive training, on the Allstate's system and methods. This included, among other things sixty hours of webinars and online training provided by the "Allstate University," which he completed. Old Slip was required to agree to follow all of Allstate's methods, policies, and requirements, and to operate the agency in accordance with the Allstate system of doing business, which it has faithfully done.

17. During the sales and recruitment process, Lukezic was continuously and repeatedly assured by Allstate salespersons that this was a long-term relationship and that Allstate was committed to its agents for the long-term. Allstate assured him that, once you become an Allstate agent you never leave, most of our agents stay with us for life, and we take pride that most of our agents have been with us for more than 25 years. Allstate emphasized that it was loyal to its agents and committed to helping them in every way, referring to them as "Allstaters". Allstate assured him that it would provide a one-stop shop of support, taking care of everything he needed to operate the agency for the long-term.

18. As a condition for entering into the franchise agreement, he was required to purchase and pay Allstate or its affiliated companies for several Allstate required purchases which were required for him to operate as an Allstate franchised business. He was required to purchase many of these items from the "Allstate Technology Store", which could only be accessed through the Allstate portal.

- Old Slip was required to, and did, purchase Allstate signage, which was required to be installed by an Allstate representative, and did in fact purchase and pay about $2,000 for such signage
- Old Slip was required to, and did, purchase Allstate mandated computers, Lenova Thinkpads, for him and his staff, which Allstate loaded with its software, and which were set up by Allstate Technology Support, and did in fact order and pay several thousand dollars for such systems through the Allstate Technology Store. Allstate apparently considered the equipment to be its own equipment, demonstrated by the fact that after Allstate issued its termination letter, Allstate demanded that Lukezic "return Allstate's equipment".
- Old Slip was required to, and did, pay for the entire telephone system, through the Allstate Run the Business Group, only use the telephone number provided by Allstate, and was required to have the telephone system set up onsite by Allstate.
- Old Slip was required to, and did, purchase physical security key fobs, with continually changing security numbers in order to access and login to the Allstate mandated computers, through the Allstate Run the Business Group.
- Old Slip was required to, and did, use and pay for Allstate business cards and stationary, paying Allstate several hundred dollars for such items.

19. As a condition for entering into the franchise agreement, Old Slip was required to, and did, locate the office at a location approved by Allstate. Allstate disapproved the first two locations that were proposed by Lukezic, and only approved the third location.

20. As a condition for entering into the franchise agreement, Old Slip had to agree that its customers must pay their premiums directly to Allstate, rather than to Old Slip, and that Allstate

would keep on average about 93% of the premium payments it received from Old Slip's customers, based on Allstate's mandated formula, and that Allstate would pay Old Slip only about 7% of the premiums collected. Old Slip was required to open its franchised business bank account at one of the two Allstate authorized banks, namely Chase or Wells Fargo, and Allstate required Old Slip to purchase a stamp to be used if customers accidently delivered a premium check to Old Slip (rather than to Allstate), in which case Old Slip was required to use the stamp to endorse the check over to an Allstate controlled bank account.

21. Old Slip was required to, and did, arrange its financing for the purchase of the agencies through the Allstate Lending Connection, and was required to pay the Allstate Lending Connection various administrative and processing fees in connection with the financing, as a condition for the financing and the purchase of the agencies. Allstate and the bank, which was affiliated with Allstate, entered into an agreement which gave the bank a security interest in Old Slip's customer accounts and guaranteed the bank that it would get paid directly from Allstate as a fixed monthly direct payment that was automatically deducted from the commissions that Old Slip earned and was otherwise entitled to be paid by Allstate. Allstate and the bank arranged for a long-term loan, to be repaid over a ten year period at 9% interest, so that Allstate would collect the customers' insurance premiums, calculate Old Slip's commission, and deduct a fixed monthly amount from Old Slip's commission, and pay this fixed monthly amount directly to the bank, for the next ten years.

***The Agency Agreement was an Illegal Franchise Agreement t***

22. Allstate's sale of the agency agreement to Old Slip constituted an illegal sale of a franchise, in violation of New York law.

23. The agreement met all of the elements of the sale of a franchise under New York law. NY GBL § 681. Allstate gave Old Slip the right to engage in the business of offering and selling Allstate products, specifically authorizing Old Slip to "sell products specified by the Company". Old Slip was required to pay a fee, as the term is broadly defined under the New York franchise laws, for entering into the arrangement and becoming an Allstate franchisee, including but not limited to the monies paid for the required Allstate stationary, notepads, and business cards; the Allstate mandated signage and installation; the Allstate mandated computer equipment, software, and installation; the Allstate mandated key fobs; the Allstate mandated bank stamps; the Allstate mandated telephone equipment and installation; the portion of the premiums paid by Old Slip's customers which Allstate kept; the Allstate Lending Connection service fees, countersigning fees, the processing and other fees paid in connection with Allstate Lending Connection's facilitation of the sellers' loan payment; the sellers' transfer fees; and other fees. Allstate gives Old Slip the right to use its marks, and it provides a marketing plan or substantial assistance and control. Thus, as other courts have found in similar circumstances, the sale of this agency agreement to Old Slip was an illegal sale of a franchise.[1]

24. Allstate knowingly and willfully violated every provision of the New York Franchise Sales Act when it sold the agency agreement to Old Slip. NY § GBL 683. New York

[1] *See, e.g., Garbinski v. Nationwide Mutual Insurance Company*, CIVIL ACTION No. 3:10cv1191 (VLB), at *24 (D. Conn. July 26, 2011) ("Plaintiff has plausibly pled that the relationship established under the Agent Agreement could state a claim for relief under the Franchise Act" ); *Bucciarelli v. Nationwide Mutual Insurance Company*, 662 F. Supp. 2d 809, 818 (E.D. Mich. 2009) (finding that the sales of an insurance agency agreement constituted the sale of a franchise under Michigan law which contains a definition similar to New York, noting that the law "makes someone a franchisee if he is engaged in either selling, offering or distributing goods or services", and pays an indirect fee, and obtains the right to use the mark in connection with the business).

law prohibits the sale of a franchise without being registered and without providing the state-approved disclosure document to prospective franchisees ten days before the sale or on their first personal meeting.[2] Here, Allstate failed to provide Lukezic with a franchise disclosure document that specifically summarized the terms of the agreement, or any of the other critical information required in a franchise disclosure document, at least ten days before asking him to sign the agreement or pay any money. In fact, Allstate only provided the agreement to Old Slip on the day he was closing the loan, giving less than one day to even review the agreement, and without the benefit of a franchise disclosure document. It failed to register a franchise disclosure document with the New York Attorney General.

25. The individuals who actively participated in selling the agency agreement to Old Slip, including among others Defendants Regine Napoleon, Brittany Cleere, Marc Stevenson, and Allison McMahon, are individually liable for the violations of the New York Franchise Sales Act. NY GBL § 691. Under New York law, Old Slip is entitled to equitable and compensatory remedies, in addition interest, attorney's fees, and punitive damages. NY GBL § 691.[3]

[2] NY GBL 683(a); *EV Scarsdale Corp. v Engel & Voelkers N. E. LLC*, 48 Misc. 3d 1019, 1032 (Sup. Ct. 2015); *Matter of Southland Corp. v Abrams*, 148 Misc 2d 390, 392 [Sup Ct 1990].

[3] Section 691 provides that "[a] person who offers or sells a franchise in violation" of Sections 683, 684, and 687, "is liable to the person purchasing the franchise for damages." NY GBL § 691(1). Personal liability is imposed on any employee, principal executive officer or directors, person who directly or indirectly controls the company, or a person occupying a similar status or performing similar functions, who materials aids in the act of transactions constituting the violation. NY GBL § 691(3); *Austin Boulevard Restaurant Corp. v. Iacono*, 2010 WL 2594265, at *30 (Nassau County 2010) (imposing personal liability on franchisor's principal); *A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.*, 618 N.Y.S.2d 155 (New York County 1994) (same).

Violations of the NYFSA render the franchisor and individuals who participated in the violations liable for damages and entitled the buyer to rescission, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs." NY GBL § 691(1); *Sea Tow Services Intl., Inc. v Tampa Bay Mar. Recovery, Inc.,* 632 F Supp 3d 91, 108 (EDNY 2022).

***Allstate Illegally Terminated the Agency Agreement***

26. Incredibly and inexplicably, not more than about thirty days after Old Slip was up and running, Allstate's salesperson Regine Napoleon came to Lukezic and demanded that he transfer all of his financial services customers to Allstate's separate financial services company, and cease offering financial services products other than Allstate financial services products to his financial services customers. Allstate salesperson Regine Napoleon called him and told him that he had to relinquish his FINRA licenses and bring all of his investment advisory clients to Allstate. He explained to her that this was never part of the deal and that it would be impossible to do so for many reasons, including the fact that Allstate's AFS platform is not even equipped to handle his much more sophisticated accounts, and the Allstate Agency Agreement states nothing about FINRA or investment advisory or broker/dealer services and only deals with insurance products.

27. This demand made absolutely no sense, because it was not consistent with the agency agreement which did not prohibit him from continuing to operate his investment advisory business. It was also directly contrary to all his discussions with Allstate during the sales process, during which he had emphasized to them that the reason he was purchasing the two agencies was so that he could cross-sell Allstate insurance products to his financial services clients. It also made no sense because to offer Allstate's investment products, he would have had to sign a different agreement with Allstate to transfer the broker/dealer license to Allstate, and Allstate had never even mentioned or asked him to sign such documents during the onboarding process.

28. The request also made no sense because, as he discussed with Allstate, Allstate's financial services division only offers one type of financial services product to its customers, namely a Fidelity Brokerage Account, which is in no way suitable for his financial services customers. The demand, if carried out, would hurt his financial series customers and would have

an anticompetitive effect, because his financial services customers would be forced to purchase only the single Fidelity financial service product offered by Allstate's financial services company, rather than being able to choose from among the many financial services products that his affiliates offer to their clients pursuant to selling agreements with almost every other major firm.. Under FINRA rules, as a broker dealer, Lukezic has a fiduciary duty to offer a range of products to his clients to ensure that they end up with a product that is "suitable" to them.

29. The only explanation for this demand is that the Allstate salespersons were motivated by their personal interests. At the time, Allstate was not allowing agents to write any new insurance business – that had been put on hold. So, the salespersons were not earning new commissions from any new business. The only explanation for their demand is that they wanted to make up for this drop in personal commissions by forcing Lukezic to transfer his financial services business to Allstate financial services so that they could earn more personal commissions from the investment advisory business that he would bring to Allstate.

30. After months of bullying and attempted coercion, Allstate issued Old Slip a termination letter dated June 25, 2024, in which it claimed it was terminating the agreement for cause due to "unauthorized brokering." Allstate falsely and unjustifiably claimed Old Slip had violated the Agency Agreement by maintaining an "outside business interest," which was absolutely false and made absolutely no sense, for all of the reasons outlined above.

31. The termination was wholly unjustified because the plain language of the Allstate Agency Agreement only restricted Old Slip from offering insurance products of other companies, and not other non-insurance investment products which Old Slip's affiliates offer through their regulated investment advisory business and broker-dealer business. Section 1[E] of the Allstate

Agency Agreement, Section 1[E] is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance."

32. As mentioned above, the plain reading of the contract is bolstered by Allstate's own March 23, 2000 set of Questions and Answers ("Q & As") regarding the exclusive agency agreement, specifically recognizing that the non-competition provisions do not apply to "*non-insurance*" products, and the offering of non-insurance products to customers is "*not a violation of the noncompete provision.*" *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 350 (E.D. Pa. 2014*), opinion clarified on denial of reconsideration* (Apr. 7, 2014) (emphasis added). In fact, there are many Allstate insurance agencies with similar agreements which offer investment products through other companies.

33. Old Slip's investment related companies offer investment products and variable annuities (but not fixed annuities). It is well-established by the United Supreme Court for more than 60 years that variable annuities are ***not*** insurance.[4] Rather, they are considered securities.[5]

[4] *See, e.g., S.E. C. v. Variable Annuity Co.*, 359 U.S. 65, 72-73 (1959) (holding that variable annuities are ***not*** insurance, as "they guarantee nothing to the annuitant except an interest in a portfolio of common stocks or other equities — an interest that has a ceiling but no floor. There is no true underwriting of risks, the one earmark of insurance as it has commonly been conceived of in popular understanding and usage").

[5] *See, e.g., Winne v. Equitable Life Assurance Society of the U.S.*, 315 F. Supp. 2d 404, 408 (S.D.N.Y. 2003) ("A variable annuity is different from a fixed annuity in that the seller invests the annuitant's principal in various securities and other investments before the payment stream begins. The annuitant generally controls how the principal is invested, and the future payment stream from the annuity depends on the value of the portfolio over time. Variable annuities must be registered with the SEC as securities under the Securities Act of 1933, *codified* at 15 U.S.C. § 77a*et seq.* Variable annuities are primarily sold by insurance companies, and must be offered through "separate accounts" that must be registered with the SEC as investment companies under the Investment Company Act of 1940 ('1940 Act'), *codified* at 15 U.S.C. § 80a-l *et seq."*

34. Accordingly, Allstate's termination of Old Slip's agreement, on the ground that it was engaged in "unauthorized brokering", was illegal, as it had no legal justification in the agreement, because the Allstate Agency Agreement did not prohibit Old Slip or Lukezic from offering and selling non-insurance products including variable annuities.

35. Any suggestion that Old Slip or Lukezic engaged in improper conduct or unauthorized brokering is patently false. And, to the extent that Allstate makes or intends to make any such suggestion in any statements or filing to anyone or with any government agency, such statements would cause irreparable harm, and jeopardize his other licenses.

***Irreparable and Irreversible Harm***

36. The threatened termination of Old Slip's Allstate insurance franchise agreement, scheduled to go into effect on September 30, 2024, will cause irreparable harm to Old Slip and its owner, because Old Slip's entire business is the offering and sale of Allstate insurance products. The termination will cause the destruction of its business, and result in the loss of jobs of Old Slip's employees, liability to third parties including the landlord, and the loss of future opportunities for purchase of additional agency accounts.

37. The termination will cause irreparable harm to the business and its owner, because Allstate claims the termination was for cause for engaging in "unauthorized brokering," and state insurance law requires Allstate to notify the Department of Financial Services of the termination and the reasons for the termination. The false public accusation of "unauthorized brokering" will have significant irreversible negative repercussions for Old Slip' and Lukezic, and will be a permanent negative mark on his record. It will likely cause other companies to terminate their selling agreements with Old Slip's affiliated companies, and may result in a Department of Financial Services investigation, or get referred to the securities regulators, thereby jeopardizing

his securities licenses. Such an outrageous false allegation will make it impossible for Old Slip to find another insurance agency, and could result in regulatory action being taken against his securities licenses, thereby jeopardizing his entire established financial services business.

38. The restrictions which Allstate is attempting to impose on Old Slip, and its efforts to bully Lukezic to transfer his securities business to Allstate, would violate his selling agreements with other investment companies, and will have anti-competitive effects, by interfering with his customers' freedom to choose their broker and their investments.

39. Allstate has already caused incalculable damage to Old Slip by interfering with its efforts to purchase other Allstate agencies and consolidate them into the Old Slip agency in White Plains. Lukezic had recently negotiated the terms with Andrew Murray for the purchase of the Andrew Murray Allstate Insurance agency in mid-town Manhattan, and had obtained financing approval for the purchase. Allstate wrongfully killed the deal, by notifying Andrew Murray that Old Slip was no longer an "approved buyer", and that Andrew Murray was no longer allowed to sell his agency to Old Slip.

40. Defendant Allstate's wrongful actions will cause irreparable harm to Old Slip and Lukezic and his affiliated companies, as its actions threaten to destroy his name, reputation, and long-established relationships with clients and providers.

**COUNT I**
(Breach of Contract)

41. Plaintiff realleges the foregoing general allegations as if fully set forth herein.

42. Plaintiff entered into an insurance franchise agreement and financing arrangement with Allstate and its affiliates which contemplated a long-term relationship.

43. Defendant Allstate attempted to bully and coerce Old Slip to move all of its financial services clients to Allstate's financial services company, for improper and

anticompetitive motives, even though he was not required to so under the insurance franchise agreement.

44. When this attempt was not successful, Defendant Allstate maliciously elected to terminate the franchise agreement for cause on the ground that Old Slip had engaged in "unauthorized brokering."

45. The claimed justification for the termination was outrageously false, and constituted a breach of the agreements, because Old Slip had not engaged in "unauthorized brokering", the agency agreement only spoke to insurance products, and not did not prohibit Old Slip's owner from continuing his separate established financial services business under his broker dealer and retirement investment advisor licenses.

46. Plaintiff has been damaged and will suffer further harm which cannot be remedied by money damages as a proximate result of the breach and the termination. The termination, if effectuated, will destroy its business and will cause irreparable harm to Old Slip and its owner, which cannot be remedied by money damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment against Defendant Allstate for appropriate legal, declaratory, and equitable relief including but not limited to injunctive relief enjoining the termination of the Allstate insurance franchise agreement..

**COUNT II**
(Implied Covenant of Good Faith and Fair Dealing)

47. Plaintiff realleges the foregoing general allegations above as though fully set forth herein.

48. Plaintiff entered into an insurance franchise agreement and financing arrangement with Allstate and its affiliates which contemplated a ten-year relationship.

49. Implicit in every contract is an implied covenant of good faith and fair dealing by attempting to use a contractual right in a way that aimed to gain benefits the contract denied or to deprive Old Slip of the contract's intended benefits.

50. Defendant attempted to bully and coerce Old Slip's owner to move all of his financial services clients to Defendant Allstate's financial services company, for improper and anticompetitive motives, even though he was not required to do so under the insurance franchise agreement.

51. When this attempt was not successful, Defendant Allstate maliciously elected to terminate the franchise agreement for cause on the ground that Old Slip had engaged in "unauthorized brokering."

52. The claimed justification for the termination was outrageously false, and constituted a breach of the implied covenant of good faith and fair dealing, because Old Slip had not engaged in "unauthorized brokering", the agency agreement only spoke to insurance products, and not did not prohibit Old Slip's owner from continuing his separate established financial services business under his broker dealer and retirement investment advisor licenses.

53. Defendant Allstate breached the implied covenant of good faith and fair dealing because it used a contractual right to terminate in a way that aimed to gain benefits the contract implicitly denied or to deprive Old Slip of the contract's intended benefits.

54. Plaintiff has been damaged and will suffer further harm which cannot be remedied by money damages as a proximate result of the breach and the termination. The termination, if effectuated, will destroy its business and will cause irreparable harm to Old Slip and its owner, which cannot be remedied by money damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment against

Defendant Allstate for appropriate legal, declaratory, and equitable relief including but not limited to injunctive relief enjoining the termination of the Allstate insurance franchise agreement..

**COUNT III**
(Violation of the New York Franchise Sales Act)

55. Plaintiff realleges the foregoing general allegations above as though fully set forth herein.

56. Defendant Allstate willfully and knowingly violated the New York Franchise Sales Act by selling Old Slip a franchise without providing Old Slip with the required disclosures, including but not limited to the information in the required Franchise Disclosure Document which must be given to a prospect at the first personal meeting or ten days prior to signing any agreement or receiving any money, and without being registered to sell franchises, as required under the New York Franchise Sales Act.

57. Old Slip has been damaged, and will suffer further damages which cannot be remedied by money damages if the termination is effectuated, as a proximate result of the Defendant Allstate's illegal sale and violation of the New York Franchise Sales Act.

58. Defendants Napoleon, Cleere, Stevenson, and McMahon personally participated in the violations of the New York Franchise Sales Act, by actively participating in the sales and recruitment process without providing Old Slip with the required registered disclosures and without Allstate being registered to sell franchises.

WHEREFORE, Plaintiff respectfully requests the entry of judgment against Defendants Allstate, Napoleon, Cleere, Stevenson, and McMahon, for appropriate legal, declaratory, and equitable relief, as well as attorney's fees under the New York Franchise Sales Act.

**COUNT IV**

**(**Tortious Interference with Contracts and Relationships**)**

59. Plaintiff realleges the foregoing general allegations above as though fully set forth herein.

60. Defendants Napoleon and McMahon were aware that Old Slip's franchise agreement did not prohibit Old Slip or its owner from continuing to provide financial services products to his financial services products through his established affiliated company.

61. Defendants Napoleon and McMahon sought to coerce Old Slip's owner to transfer this financial services business and customers to Allstate's financial services company, even though he was not required to do so under the agreement.

62. Defendants Napoleon and McMahon were motivated by their desire to earn personal commissions, as distinguished from gain for the corporation, because Allstate agents were not allowed to write new policies on insurance products at that time, and Napoleon and McMahon could only increase their personal commissions if Old Slip signed up new financial services customers. Their actions were undertaken with malice and were calculated to impair the plaintiff's business for their personal profit.

63. Defendants Napoleon and McMahon, acting maliciously, in bad faith, and for their own person interest and vendetta, caused Allstate to terminate the franchise agreement, after less than four months in operation, to coerce Old Slip's owner to transfer his financial services business to Allstate so that they would earn more personal commissions and to punish Old Slip's owner for refusing to do so.

64. Old Slip has been damaged, and will suffer further damages which cannot be remedied by money damages if the termination is effectuated, as a proximate result of the Defendant Napoleon and McMahon's tortious conduct.

WHEREFORE, Plaintiff respectfully requests the entry of judgment against Defendants Napoleon and Mahon for appropriate legal, declaratory, and equitable relief.

**DEMAND FOR A TRIAL BY JURY**

Old Slip demands a trial by jury for all issues so triable.

Dated: New York, New York
September 12, 2024

WUERSCH & GERING LLP

By: /s/David T. Azrin
David T. Azrin

100 Wall Street, 10th Floor
New York, New York 10005
Tel. (212) 509-4745
Email: david.azrin@wg-law.com

Attorneys for Plaintiff

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

--------------------------------------------------------------------x

OLD SLIP BENEFITS & INSURANCE SERVICES LLC,

Plaintiff,

Index. No.

v.

**COMPLAINT & JURY DEMAND**

-against-

ALLSTATE INSURANCE COMPANY,
REGINE MARIE NAPOLEON, BRITTANY CLEERE,
MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.

--------------------------------------------------------------------x

Plaintiff, OLD SLIP BENEFITS & INSURANCE SERVICES LLC (hereafter referred to as "Old Slip" or "Plaintiff"), by and through its undersigned attorneys, and as and for its Complaint against the Defendants ALLSTATE INSURANCE COMPANY (hereafter referred to as "Allstate" or "Defendant"), REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON, alleges as follows:

1. Plaintiff brings this Complaint and the requested injunctive relief herein to prevent the unlawful termination by Defendants of Plaintiff's Exclusive Allstate Franchise Agreement, which termination will result in immediate, irreparable harm to Plaintiff, including the destruction of Plaintiff's business, resulting in the loss of jobs of Old Slip's employees, liability to third parties including its landlord, and the loss of future opportunities for the purchase of additional Allstate agencies, and for other legal and equitable relief.

**Parties**

2. Plaintiff Old Slip Benefits & Insurance Services LLC is a New York limited liability company, with its principal place of business at 199 Main Street, Suite 200, White Plains, New York, whose sole member is domiciled in the state of New York..

3. Defendant Allstate Insurance Company is an Illinois corporation with its principal place of business at 2755 Sanders Road, Northbrook, Illinois.

4. Defendant Regine Marie Napoleon is an individual residing in and domiciled in Queens County, New York, at 7525 153rd Street, Apt. 1137, Kew Gardens Hills, NY 11367, and worked as a sales associate for Defendant Allstate at all relevant times, and actively participated in the sale of the Allstate insurance franchise agreement to Plaintiff.

5. Defendant Brittany Cleere is an individual residing in and domiciled in Berkeley County, Southern Carolina, at 149 Midtown Avenue, Summerville, SC 29486, who worked as a salesperson for Defendant Allstate at all relevant times, and actively participated in the sale of the Allstate insurance franchise agreement to Plaintiff.

6. Defendant Marc Stevenson is an individual residing and domiciled in Haymarket, Virginia, at 6107 Aster Haven Circle, Haymarket, Virginia 20169, who worked as a salesperson for Defendant Allstate at all relevant times, and actively participated in the sale of the Allstate insurance franchise agreement to Plaintiff.

7. Defendant Allison Ann McMahon is an individual residing in and domiciled in Suffolk County, New York at 206 Windwatch Drive, Hauppauge, New York, and worked as a sales director for Defendant Allstate at all relevant times.

8. Venue is proper under Civil Practice Law and Rules 503(a).

## General Allegations

9. Old Slip's owner, James Lukezic, has been in the financial services industry as a Fund Analyst and Financial Advisor for 24 years. In 2016, he took his book of business and began his own practice as a Retirement Investment Advisor and insurance agent and in 2019 purchased a Broker Dealer business from CNN Insurance, renaming it under his brand, Old Slip Capital Management, Inc., a business that was approved for business in 1966.

10. Since 2016, he built up a financial services capital management and investment advisory business, in New York City, with investment clients across the country, offering financial services products of several different investment management companies. His investment advisory business, operating under the name Old Slip Capital Partners, LLC, is affiliated with his company, Old Slip Registered Investment Advisors, LLC, an SEC Registered Investment Advisor, and his company Old Slip Capital Management, Inc., a licensed Broker/Dealer, and member of FINRA/SIPC. He has several securities licenses, including a registered investment advisor (RIA), licensed broker dealer (BD), and accredited investment fiduciary, with Series 7, 24, 63, 65, and 66 securities licenses with the Financial Industry Regulatory Authority (FINRA), the authority which regulates securities brokers and exchange markets in the United States. His affiliated companies have built up a nationwide investment advisory business, selling investment products and variable annuities (but not fixed annuities) across the United States.

11. In late 2023, Lukezic decided to become an Allstate insurance agency franchisee, and to purchase the assets of two existing Allstate insurance agencies located in Westchester County, New York, owned by Anthony Fava and Alfred Buglione respectively, and he formed Plaintiff Old Slip Benefits & Insurance Services LLC to own and operate the new Allstate franchised business. He purchased the customer accounts of two existing Allstate agencies,

consolidated the accounts into one agency, leased space in White Plains, hired and trained employees, and began managing those accounts and selling Allstate insurance products, from its Allstate agency location in White Plains, New York. Since March 2024, he has been operating the agency successfully, providing excellent customer service to the insurance customers, with a fully trained staff. He has been generating significant premiums for Allstate, and Allstate has never raised any issues regarding the agency's performance. Lukezic became an Allstate franchised agent, with the intention of growing the agency, by buying and consolidating additional Allstate insurance agencies in the future, and continuously cross-selling Allstate's insurance products to his existing investment advisory clients, which he would continue to service through his established investment advisory business.

12. During the sales process, Lukezic made it clear to Allstate as well as the sellers, in his business plan and his discussions with them, that his Allstate agency would only be offering insurance products. He also made it clear that he had his own separate investment advisory business, under the name Old Slip Capital Partners, LLC, a diversified financial services firm affiliated with Old Slip Registered Investment Advisors, LLC, an SEC Registered Investment Advisor, and Old Slip Capital Management, Inc., a licensed Broker/Dealer, and member of FINRA/SIPC. He explained to the Allstate salespersons how he wanted to market Allstate insurance products to his affiliates' thousands of 401(k) Participant clients, a strategy that was well received by the Allstate salespersons. At no point in time did the Allstate salespersons say anything to him about transferring his FINRA licenses to Allstate, and they never asked him to sign any of the required paperwork to transfer his FINRA licenses to Allstate, because that was not part of the deal.

13. In fact, every one of his emails during his discussions with the Allstate salespersons came from his "oldslipcap.com" email address, and every email had a description of his separate investment business, as described above. In his email discussions with them, it was clear that he had long-standing relationships with other firms in connection with his investment advisory business. His business plan for the Allstate agency only proposed selling insurance products, and ***not*** investment products.

14. This was consistent with the agency agreement that he signed. The plain language of the Allstate agency agreement only restricted Old Slip from offering insurance products of other companies, and not other non-insurance investment products which its affiliates offer through their regulated investment advisory business and broker-dealer business. Section 1[E] of the Allstate Agency Agreement, Section 1[E] is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance."

15. The plain reading of the contract is bolstered by Allstate's own March 23, 2000 set of Questions and Answers ("Q & As") regarding the exclusive agency agreement, specifically recognizing that the non-competition provisions do not apply to "*non-insurance*" products, and that the offering of non-insurance products to customers is "*not a violation of the noncompete provision.*" *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 350 (E.D. Pa. 2014*), opinion clarified on denial of reconsideration* (Apr. 7, 2014) (emphasis added).. *See also Allstate Ins. Co. v. Fougere*, No. CV 16-11652-JGD, 2019 WL 4776986, at *13 (D. Mass. Sept. 30, 2019) ("the unambiguous language of the EA Agreement provides that the Agency is not to sell *insurance* policies of any competitors") (emphasis added). In fact, there are many Allstate insurance agencies with similar agreements which offer investment products through other companies.

***Establishment and Operation of the Allstate Insurance Agency as an Allstate Franchisee***

16. Old Slip has been operating the agency successfully as an Allstate franchisee since March 2024. The relationship was intended to be a long-term relationship. As a condition for entering into the franchise agreement, for a three month period from about December 2023 to February 2024, Lukezic was required to undergo extensive training, on the Allstate's system and methods. This included, among other things sixty hours of webinars and online training provided by the "Allstate University," which he completed. Old Slip was required to agree to follow all of Allstate's methods, policies, and requirements, and to operate the agency in accordance with the Allstate system of doing business, which it has faithfully done.

17. During the sales and recruitment process, Lukezic was continuously and repeatedly assured by Allstate salespersons that this was a long-term relationship and that Allstate was committed to its agents for the long-term. Allstate assured him that, once you become an Allstate agent you never leave, most of our agents stay with us for life, and we take pride that most of our agents have been with us for more than 25 years. Allstate emphasized that it was loyal to its agents and committed to helping them in every way, referring to them as "Allstaters". Allstate assured him that it would provide a one-stop shop of support, taking care of everything he needed to operate the agency for the long-term.

18. As a condition for entering into the franchise agreement, he was required to purchase and pay Allstate or its affiliated companies for several Allstate required purchases which were required for him to operate as an Allstate franchised business. He was required to purchase many of these items from the "Allstate Technology Store", which could only be accessed through the Allstate portal.

- Old Slip was required to, and did, purchase Allstate signage, which was required to be installed by an Allstate representative, and did in fact purchase and pay about $2,000 for such signage
- Old Slip was required to, and did, purchase Allstate mandated computers, Lenova Thinkpads, for him and his staff, which Allstate loaded with its software, and which were set up by Allstate Technology Support, and did in fact order and pay several thousand dollars for such systems through the Allstate Technology Store. Allstate apparently considered the equipment to be its own equipment, demonstrated by the fact that after Allstate issued its termination letter, Allstate demanded that Lukezic "return Allstate's equipment".
- Old Slip was required to, and did, pay for the entire telephone system, through the Allstate Run the Business Group, only use the telephone number provided by Allstate, and was required to have the telephone system set up onsite by Allstate.
- Old Slip was required to, and did, purchase physical security key fobs, with continually changing security numbers in order to access and login to the Allstate mandated computers, through the Allstate Run the Business Group.
- Old Slip was required to, and did, use and pay for Allstate business cards and stationary, paying Allstate several hundred dollars for such items.

19. As a condition for entering into the franchise agreement, Old Slip was required to, and did, locate the office at a location approved by Allstate. Allstate disapproved the first two locations that were proposed by Lukezic, and only approved the third location.

20. As a condition for entering into the franchise agreement, Old Slip had to agree that its customers must pay their premiums directly to Allstate, rather than to Old Slip, and that Allstate

would keep on average about 93% of the premium payments it received from Old Slip's customers, based on Allstate's mandated formula, and that Allstate would pay Old Slip only about 7% of the premiums collected. Old Slip was required to open its franchised business bank account at one of the two Allstate authorized banks, namely Chase or Wells Fargo, and Allstate required Old Slip to purchase a stamp to be used if customers accidently delivered a premium check to Old Slip (rather than to Allstate), in which case Old Slip was required to use the stamp to endorse the check over to an Allstate controlled bank account.

21. Old Slip was required to, and did, arrange its financing for the purchase of the agencies through the Allstate Lending Connection, and was required to pay the Allstate Lending Connection various administrative and processing fees in connection with the financing, as a condition for the financing and the purchase of the agencies. Allstate and the bank, which was affiliated with Allstate, entered into an agreement which gave the bank a security interest in Old Slip's customer accounts and guaranteed the bank that it would get paid directly from Allstate as a fixed monthly direct payment that was automatically deducted from the commissions that Old Slip earned and was otherwise entitled to be paid by Allstate. Allstate and the bank arranged for a long-term loan, to be repaid over a ten year period at 9% interest, so that Allstate would collect the customers' insurance premiums, calculate Old Slip's commission, and deduct a fixed monthly amount from Old Slip's commission, and pay this fixed monthly amount directly to the bank, for the next ten years.

***The Agency Agreement was an Illegal Franchise Agreement t***

22. Allstate's sale of the agency agreement to Old Slip constituted an illegal sale of a franchise, in violation of New York law.

23. The agreement met all of the elements of the sale of a franchise under New York law. NY GBL § 681. Allstate gave Old Slip the right to engage in the business of offering and selling Allstate products, specifically authorizing Old Slip to "sell products specified by the Company". Old Slip was required to pay a fee, as the term is broadly defined under the New York franchise laws, for entering into the arrangement and becoming an Allstate franchisee, including but not limited to the monies paid for the required Allstate stationary, notepads, and business cards; the Allstate mandated signage and installation; the Allstate mandated computer equipment, software, and installation; the Allstate mandated key fobs; the Allstate mandated bank stamps; the Allstate mandated telephone equipment and installation; the portion of the premiums paid by Old Slip's customers which Allstate kept; the Allstate Lending Connection service fees, countersigning fees, the processing and other fees paid in connection with Allstate Lending Connection's facilitation of the sellers' loan payment; the sellers' transfer fees; and other fees. Allstate gives Old Slip the right to use its marks, and it provides a marketing plan or substantial assistance and control. Thus, as other courts have found in similar circumstances, the sale of this agency agreement to Old Slip was an illegal sale of a franchise.[1]

24. Allstate knowingly and willfully violated every provision of the New York Franchise Sales Act when it sold the agency agreement to Old Slip. NY § GBL 683. New York

[1] *See, e.g.,* *Garbinski v. Nationwide Mutual Insurance Company*, CIVIL ACTION No. 3:10cv1191 (VLB), at *24 (D. Conn. July 26, 2011) ("Plaintiff has plausibly pled that the relationship established under the Agent Agreement could state a claim for relief under the Franchise Act" ); *Bucciarelli v. Nationwide Mutual Insurance Company*, 662 F. Supp. 2d 809, 818 (E.D. Mich. 2009) (finding that the sales of an insurance agency agreement constituted the sale of a franchise under Michigan law which contains a definition similar to New York, noting that the law "makes someone a franchisee if he is engaged in either selling, offering or distributing goods or services", and pays an indirect fee, and obtains the right to use the mark in connection with the business).

law prohibits the sale of a franchise without being registered and without providing the state-approved disclosure document to prospective franchisees ten days before the sale or on their first personal meeting.[2] Here, Allstate failed to provide Lukezic with a franchise disclosure document that specifically summarized the terms of the agreement, or any of the other critical information required in a franchise disclosure document, at least ten days before asking him to sign the agreement or pay any money. In fact, Allstate only provided the agreement to Old Slip on the day he was closing the loan, giving less than one day to even review the agreement, and without the benefit of a franchise disclosure document. It failed to register a franchise disclosure document with the New York Attorney General.

25. The individuals who actively participated in selling the agency agreement to Old Slip, including among others Defendants Regine Napoleon, Brittany Cleere, Marc Stevenson, and Allison McMahon, are individually liable for the violations of the New York Franchise Sales Act. NY GBL § 691. Under New York law, Old Slip is entitled to equitable and compensatory remedies, in addition interest, attorney's fees, and punitive damages. NY GBL § 691.[3]

[2] NY GBL 683(a); *EV Scarsdale Corp. v Engel & Voelkers N. E. LLC*, 48 Misc. 3d 1019, 1032 (Sup. Ct. 2015); *Matter of Southland Corp. v Abrams*, 148 Misc 2d 390, 392 [Sup Ct 1990].

[3] Section 691 provides that "[a] person who offers or sells a franchise in violation" of Sections 683, 684, and 687, "is liable to the person purchasing the franchise for damages." NY GBL § 691(1). Personal liability is imposed on any employee, principal executive officer or directors, person who directly or indirectly controls the company, or a person occupying a similar status or performing similar functions, who materials aids in the act of transactions constituting the violation. NY GBL § 691(3); *Austin Boulevard Restaurant Corp. v. Iacono*, 2010 WL 2594265, at *30 (Nassau County 2010) (imposing personal liability on franchisor's principal); *A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.*, 618 N.Y.S.2d 155 (New York County 1994) (same).

Violations of the NYFSA render the franchisor and individuals who participated in the violations liable for damages and entitled the buyer to rescission, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs." NY GBL § 691(1); *Sea Tow Services Intl., Inc. v Tampa Bay Mar. Recovery, Inc.,* 632 F Supp 3d 91, 108 (EDNY 2022).

***Allstate Illegally Terminated the Agency Agreement***

26. Incredibly and inexplicably, not more than about thirty days after Old Slip was up and running, Allstate's salesperson Regine Napoleon came to Lukezic and demanded that he transfer all of his financial services customers to Allstate's separate financial services company, and cease offering financial services products other than Allstate financial services products to his financial services customers. Allstate salesperson Regine Napoleon called him and told him that he had to relinquish his FINRA licenses and bring all of his investment advisory clients to Allstate. He explained to her that this was never part of the deal and that it would be impossible to do so for many reasons, including the fact that Allstate's AFS platform is not even equipped to handle his much more sophisticated accounts, and the Allstate Agency Agreement states nothing about FINRA or investment advisory or broker/dealer services and only deals with insurance products.

27. This demand made absolutely no sense, because it was not consistent with the agency agreement which did not prohibit him from continuing to operate his investment advisory business. It was also directly contrary to all his discussions with Allstate during the sales process, during which he had emphasized to them that the reason he was purchasing the two agencies was so that he could cross-sell Allstate insurance products to his financial services clients. It also made no sense because to offer Allstate's investment products, he would have had to sign a different agreement with Allstate to transfer the broker/dealer license to Allstate, and Allstate had never even mentioned or asked him to sign such documents during the onboarding process.

28. The request also made no sense because, as he discussed with Allstate, Allstate's financial services division only offers one type of financial services product to its customers, namely a Fidelity Brokerage Account, which is in no way suitable for his financial services customers. The demand, if carried out, would hurt his financial series customers and would have

an anticompetitive effect, because his financial services customers would be forced to purchase only the single Fidelity financial service product offered by Allstate's financial services company, rather than being able to choose from among the many financial services products that his affiliates offer to their clients pursuant to selling agreements with almost every other major firm.. Under FINRA rules, as a broker dealer, Lukezic has a fiduciary duty to offer a range of products to his clients to ensure that they end up with a product that is "suitable" to them.

29. The only explanation for this demand is that the Allstate salespersons were motivated by their personal interests. At the time, Allstate was not allowing agents to write any new insurance business – that had been put on hold. So, the salespersons were not earning new commissions from any new business. The only explanation for their demand is that they wanted to make up for this drop in personal commissions by forcing Lukezic to transfer his financial services business to Allstate financial services so that they could earn more personal commissions from the investment advisory business that he would bring to Allstate.

30. After months of bullying and attempted coercion, Allstate issued Old Slip a termination letter dated June 25, 2024, in which it claimed it was terminating the agreement for cause due to "unauthorized brokering." Allstate falsely and unjustifiably claimed Old Slip had violated the Agency Agreement by maintaining an "outside business interest," which was absolutely false and made absolutely no sense, for all of the reasons outlined above.

31. The termination was wholly unjustified because the plain language of the Allstate Agency Agreement only restricted Old Slip from offering insurance products of other companies, and not other non-insurance investment products which Old Slip's affiliates offer through their regulated investment advisory business and broker-dealer business. Section 1[E] of the Allstate

Agency Agreement, Section 1[E] is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance."

32. As mentioned above, the plain reading of the contract is bolstered by Allstate's own March 23, 2000 set of Questions and Answers ("Q & As") regarding the exclusive agency agreement, specifically recognizing that the non-competition provisions do not apply to "*non-insurance*" products, and the offering of non-insurance products to customers is "*not a violation of the noncompete provision.*" *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 350 (E.D. Pa. 2014*), opinion clarified on denial of reconsideration* (Apr. 7, 2014) (emphasis added). In fact, there are many Allstate insurance agencies with similar agreements which offer investment products through other companies.

33. Old Slip's investment related companies offer investment products and variable annuities (but not fixed annuities). It is well-established by the United Supreme Court for more than 60 years that variable annuities are ***not*** insurance.[4] Rather, they are considered securities.[5]

[4] *See, e.g., S.E. C. v. Variable Annuity Co.*, 359 U.S. 65, 72-73 (1959) (holding that variable annuities are ***not*** insurance, as "they guarantee nothing to the annuitant except an interest in a portfolio of common stocks or other equities — an interest that has a ceiling but no floor. There is no true underwriting of risks, the one earmark of insurance as it has commonly been conceived of in popular understanding and usage").

[5] *See, e.g., Winne v. Equitable Life Assurance Society of the U.S.*, 315 F. Supp. 2d 404, 408 (S.D.N.Y. 2003) ("A variable annuity is different from a fixed annuity in that the seller invests the annuitant's principal in various securities and other investments before the payment stream begins. The annuitant generally controls how the principal is invested, and the future payment stream from the annuity depends on the value of the portfolio over time. Variable annuities must be registered with the SEC as securities under the Securities Act of 1933, *codified* at 15 U.S.C. § 77a*et seq.* Variable annuities are primarily sold by insurance companies, and must be offered through "separate accounts" that must be registered with the SEC as investment companies under the Investment Company Act of 1940 ('1940 Act'), *codified* at 15 U.S.C. § 80a-l *et seq."*

34. Accordingly, Allstate's termination of Old Slip's agreement, on the ground that it was engaged in "unauthorized brokering", was illegal, as it had no legal justification in the agreement, because the Allstate Agency Agreement did not prohibit Old Slip or Lukezic from offering and selling non-insurance products including variable annuities.

35. Any suggestion that Old Slip or Lukezic engaged in improper conduct or unauthorized brokering is patently false. And, to the extent that Allstate makes or intends to make any such suggestion in any statements or filing to anyone or with any government agency, such statements would cause irreparable harm, and jeopardize his other licenses.

***Irreparable and Irreversible Harm***

36. The threatened termination of Old Slip's Allstate insurance franchise agreement, scheduled to go into effect on September 30, 2024, will cause irreparable harm to Old Slip and its owner, because Old Slip's entire business is the offering and sale of Allstate insurance products. The termination will cause the destruction of its business, and result in the loss of jobs of Old Slip's employees, liability to third parties including the landlord, and the loss of future opportunities for purchase of additional agency accounts.

37. The termination will cause irreparable harm to the business and its owner, because Allstate claims the termination was for cause for engaging in "unauthorized brokering," and state insurance law requires Allstate to notify the Department of Financial Services of the termination and the reasons for the termination. The false public accusation of "unauthorized brokering" will have significant irreversible negative repercussions for Old Slip' and Lukezic, and will be a permanent negative mark on his record. It will likely cause other companies to terminate their selling agreements with Old Slip's affiliated companies, and may result in a Department of Financial Services investigation, or get referred to the securities regulators, thereby jeopardizing

his securities licenses. Such an outrageous false allegation will make it impossible for Old Slip to find another insurance agency, and could result in regulatory action being taken against his securities licenses, thereby jeopardizing his entire established financial services business.

38. The restrictions which Allstate is attempting to impose on Old Slip, and its efforts to bully Lukezic to transfer his securities business to Allstate, would violate his selling agreements with other investment companies, and will have anti-competitive effects, by interfering with his customers' freedom to choose their broker and their investments.

39. Allstate has already caused incalculable damage to Old Slip by interfering with its efforts to purchase other Allstate agencies and consolidate them into the Old Slip agency in White Plains. Lukezic had recently negotiated the terms with Andrew Murray for the purchase of the Andrew Murray Allstate Insurance agency in mid-town Manhattan, and had obtained financing approval for the purchase. Allstate wrongfully killed the deal, by notifying Andrew Murray that Old Slip was no longer an "approved buyer", and that Andrew Murray was no longer allowed to sell his agency to Old Slip.

40. Defendant Allstate's wrongful actions will cause irreparable harm to Old Slip and Lukezic and his affiliated companies, as its actions threaten to destroy his name, reputation, and long-established relationships with clients and providers.

## COUNT I
(Breach of Contract)

41. Plaintiff realleges the foregoing general allegations as if fully set forth herein.

42. Plaintiff entered into an insurance franchise agreement and financing arrangement with Allstate and its affiliates which contemplated a long-term relationship.

43. Defendant Allstate attempted to bully and coerce Old Slip to move all of its financial services clients to Allstate's financial services company, for improper and

anticompetitive motives, even though he was not required to so under the insurance franchise agreement.

44. When this attempt was not successful, Defendant Allstate maliciously elected to terminate the franchise agreement for cause on the ground that Old Slip had engaged in "unauthorized brokering."

45. The claimed justification for the termination was outrageously false, and constituted a breach of the agreements, because Old Slip had not engaged in "unauthorized brokering", the agency agreement only spoke to insurance products, and not did not prohibit Old Slip's owner from continuing his separate established financial services business under his broker dealer and retirement investment advisor licenses.

46. Plaintiff has been damaged and will suffer further harm which cannot be remedied by money damages as a proximate result of the breach and the termination. The termination, if effectuated, will destroy its business and will cause irreparable harm to Old Slip and its owner, which cannot be remedied by money damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment against Defendant Allstate for appropriate legal, declaratory, and equitable relief including but not limited to injunctive relief enjoining the termination of the Allstate insurance franchise agreement..

**COUNT II**
(Implied Covenant of Good Faith and Fair Dealing)

47. Plaintiff realleges the foregoing general allegations above as though fully set forth herein.

48. Plaintiff entered into an insurance franchise agreement and financing arrangement with Allstate and its affiliates which contemplated a ten-year relationship.

49. Implicit in every contract is an implied covenant of good faith and fair dealing by attempting to use a contractual right in a way that aimed to gain benefits the contract denied or to deprive Old Slip of the contract's intended benefits.

50. Defendant attempted to bully and coerce Old Slip's owner to move all of his financial services clients to Defendant Allstate's financial services company, for improper and anticompetitive motives, even though he was not required to do so under the insurance franchise agreement.

51. When this attempt was not successful, Defendant Allstate maliciously elected to terminate the franchise agreement for cause on the ground that Old Slip had engaged in "unauthorized brokering."

52. The claimed justification for the termination was outrageously false, and constituted a breach of the implied covenant of good faith and fair dealing, because Old Slip had not engaged in "unauthorized brokering", the agency agreement only spoke to insurance products, and not did not prohibit Old Slip's owner from continuing his separate established financial services business under his broker dealer and retirement investment advisor licenses.

53. Defendant Allstate breached the implied covenant of good faith and fair dealing because it used a contractual right to terminate in a way that aimed to gain benefits the contract implicitly denied or to deprive Old Slip of the contract's intended benefits.

54. Plaintiff has been damaged and will suffer further harm which cannot be remedied by money damages as a proximate result of the breach and the termination. The termination, if effectuated, will destroy its business and will cause irreparable harm to Old Slip and its owner, which cannot be remedied by money damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment against

Defendant Allstate for appropriate legal, declaratory, and equitable relief including but not limited to injunctive relief enjoining the termination of the Allstate insurance franchise agreement..

**COUNT III**
**(**Violation of the New York Franchise Sales Act**)**

55. Plaintiff realleges the foregoing general allegations above as though fully set forth herein.

56. Defendant Allstate willfully and knowingly violated the New York Franchise Sales Act by selling Old Slip a franchise without providing Old Slip with the required disclosures, including but not limited to the information in the required Franchise Disclosure Document which must be given to a prospect at the first personal meeting or ten days prior to signing any agreement or receiving any money, and without being registered to sell franchises, as required under the New York Franchise Sales Act.

57. Old Slip has been damaged, and will suffer further damages which cannot be remedied by money damages if the termination is effectuated, as a proximate result of the Defendant Allstate's illegal sale and violation of the New York Franchise Sales Act.

58. Defendants Napoleon, Cleere, Stevenson, and McMahon personally participated in the violations of the New York Franchise Sales Act, by actively participating in the sales and recruitment process without providing Old Slip with the required registered disclosures and without Allstate being registered to sell franchises.

WHEREFORE, Plaintiff respectfully requests the entry of judgment against Defendants Allstate, Napoleon, Cleere, Stevenson, and McMahon, for appropriate legal, declaratory, and equitable relief, as well as attorney's fees under the New York Franchise Sales Act.

**COUNT IV**
**(**Tortious Interference with Contracts and Relationships**)**

59. Plaintiff realleges the foregoing general allegations above as though fully set forth herein.

60. Defendants Napoleon and McMahon were aware that Old Slip's franchise agreement did not prohibit Old Slip or its owner from continuing to provide financial services products to his financial services products through his established affiliated company.

61. Defendants Napoleon and McMahon sought to coerce Old Slip's owner to transfer this financial services business and customers to Allstate's financial services company, even though he was not required to do so under the agreement.

62. Defendants Napoleon and McMahon were motivated by their desire to earn personal commissions, as distinguished from gain for the corporation, because Allstate agents were not allowed to write new policies on insurance products at that time, and Napoleon and McMahon could only increase their personal commissions if Old Slip signed up new financial services customers. Their actions were undertaken with malice and were calculated to impair the plaintiff's business for their personal profit.

63. Defendants Napoleon and McMahon, acting maliciously, in bad faith, and for their own person interest and vendetta, caused Allstate to terminate the franchise agreement, after less than four months in operation, to coerce Old Slip's owner to transfer his financial services business to Allstate so that they would earn more personal commissions and to punish Old Slip's owner for refusing to do so.

64. Old Slip has been damaged, and will suffer further damages which cannot be remedied by money damages if the termination is effectuated, as a proximate result of the Defendant Napoleon and McMahon's tortious conduct.

WHEREFORE, Plaintiff respectfully requests the entry of judgment against Defendants Napoleon and Mahon for appropriate legal, declaratory, and equitable relief.

**DEMAND FOR A TRIAL BY JURY**

Old Slip demands a trial by jury for all issues so triable.

Dated: New York, New York
September 12, 2024

WUERSCH & GERING LLP

By: /s/David T. Azrin
David T. Azrin

100 Wall Street, 10th Floor
New York, New York 10005
Tel. (212) 509-4745
Email: david.azrin@wg-law.com

Attorneys for Plaintiff

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-----------------------------------------------------------------x
OLD SLIP BENEFITS & INSURANCE SERVICES, LLC

Index. No.

Plaintiff,

v.

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.
-----------------------------------------------------------------x

AFFIRMATION OF EMERGENCY BY DAVID T. AZRIN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND TEMPORARY RESTRAINING ORDER TO MAINTAIN THE STATUS QUO BROUGHT BY ORDER TO SHOW CAUSE

David T. Azrin, an attorney duly admitted to practice in the Courts of this State, affirms the truth of the following, under penalty of perjury:

1. I am counsel for Plaintiff Old Slip Benefits & Insurance Services, LLC ("Old Slip"), a New York limited liability company, and a partner at Wuersch & Gering LLP. I am fully familiar with the facts and proceedings herein. I am submitting this Affirmation of Emergency in support of Plaintiff's motion for preliminary injunctive relief and the application for a temporary restraining order to maintain the status quo pending a hearing on the preliminary injunction motion, brought by an Order to Show Cause.

2. In this action, Old Slip is seeking injunctive and other relief against Allstate Insurance Company ("Allstate) with regard to the scheduled termination of Old Slip's March 1, 2024 agency agreement for the operation of an Allstate franchise insurance agency, which Old Slip has been operating successfully on Main Street in White Plains since March 2024.

**Plaintiff Will Suffer Irreparable Harm if a Temporary Restraining Order is Not Entered Pending a Hearing on the Preliminary Injunction Motion to Stay the Sept. 30 Termination**

3. As demonstrated in the Affirmation of Old Slip's owner, James Lukezic, the threatened termination of his Allstate insurance franchise agreement, scheduled to go into effect on September 30, 2024, will cause irreparable harm to him and Old Slip, because Old Slip's entire business is the offering and sale of Allstate insurance products.

4. The termination will cause the destruction of its business, and will result in the loss of jobs of Old Slip's employees, liability to third parties including the landlord, loss of customer goodwill, and the loss of future opportunities for purchase of additional agency accounts.

5. It will also cause irreparable harm to the business and Lukezic, because Allstate claims the termination was for cause for engaging in "unauthorized brokering," and state insurance law requires Allstate to notify the Department of Financial Services of the termination and the reasons for the termination. The false public accusation of "unauthorized brokering" will have significant irreversible negative repercussions for Old Slip and Lukezic, and will be a permanent negative mark on Lukezic's record. It will likely cause other companies to terminate their selling agreements with Old Slip's affiliated companies, and may result in a Department of Financial Services investigation, or get referred to the securities regulators.

6. The restrictions which Allstate is attempting to impose on Old Slip, and its efforts to bully Lukezic to transfer his securities business to Allstate would violate his selling agreements with other investment companies, and will have anti-competitive effects, by interfering with his customers' freedom to choose their broker and their investments.

7. The extension of the termination date will not cause any great harm to Allstate. Old Slip has been operating the agency successfully for six months, servicing the customer accounts, and providing excellent customer services, with a well-trained staff in its White Plains office.

Allstate has not raised any issues of poor performance. Old Slip has been renewing existing policies, writing new policies, and generating substantial premiums for Allstate. Allstate will not suffer any great harm if the termination date is extended, and Old Slip continues to service the accounts.

***Plaintiff's Counsel Has Given Notice to Allstate's Counsel of the Application for a Temporary Restraining Order***

8. On Friday, September 6, when it became clear that my attempts to resolve this matter with Allstate's counsel were not going to be successful, I notified Allstate's counsel A. Christopher Young, at the Troutman Pepper law firm, on Friday, September 6 by email that, on Thursday, September 12, Old Slip would be filing an action against Allstate seeking preliminary injunctive relief and a temporary restraining order pending a hearing on the motion. Mr. Young acknowledged receipt of the email.

9. On Wednesday, September 10, at about 11 a.m., I wrote to Allstate's counsel Mr. Young again, and I reiterated that, on Thursday, September 11, plaintiff would be filing an action against Allstate, seeking a preliminary injunction to enjoin the termination and a temporary restraining order to stay the termination pending a hearing on the preliminary injunction motion, and I described the basis and the timing for the application, as follows:

> "Chris – as I had notified you by email on Friday, Sept. 6, we will be filing for a TRO and preliminary injunction on Thursday, Sept. 12. We will be filing the action in Westchester County Supreme Court, Commercial Division, and filing the motion and request for TRO by an Order to Show Cause, through e-filing. In our motion, we will be seeking injunctive relief to stay the termination date pending a final determination on the merits of the case, and a TRO staying the termination pending the hearing on the motion for preliminary injunction. We will be arguing that the termination was improper, that our client will suffer irreparable harm if the injunctive relief is not granted, and that the balance of the equities weighs in favor of the granting of injunctive relief, for all for the reasons which we outlined in our original demand letter. We will send you the formal papers as soon as they are ready via email, and certainly upon no later than filing the action, and we will notify you as soon as the Index Number is assigned.

Mr. Young acknowledged receipt of this email.

10. In the subject motion for preliminary injunction and the application for temporary restraining order against Defendant Allstate, Plaintiff Old Slip is seeking to stay Allstate's scheduled September 30 termination of the Allstate insurance agency agreement and a temporary restraining order to stay the termination pending a hearing on the preliminary injunction motion, to maintain the status quo.

11. No previous application for the relief sought herein has been made to this or any other Court.

Dated: September 12, 2024
White Plains, New York

/David T. Azrin/
DAVID T. AZRIN

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-----------------------------------------------------------------x
OLD SLIP BENEFITS & INSURANCE SERVICES, LLC

Index. No.

Plaintiff,

v.

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.
-----------------------------------------------------------------x

AFFIRMATION OF JAMES LUKEZIC IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND TEMPORARY RESTRAINING ORDER TO MAINTAIN THE STATUS QUO BROUGHT BY ORDER TO SHOW CAUSE

James Lukezic, hereby affirms under penalty of perjury, as follows:

1. I am the owner and managing director of Plaintiff Old Slip Benefits & Insurance Services, LLC ("Old Slip"), a New York limited liability company, and have personal knowledge of the facts in this Affirmation. I am submitting this Affirmation in support of Plaintiff's motion for preliminary injunctive relief and temporary restraining order to maintain the status quo brought by an Order to Show Cause.

2. In this action, Old Slip is seeking injunctive and other relief against Allstate Insurance Company ("Allstate) with regard to the scheduled termination of my March 1, 2024 agency agreement for the operation of a Allstate franchise insurance agency, which I have been operating successfully on Main Street in White Plains since March 2024.

***Personal Background***

3. I have been in the financial services industry as a Fund Analyst and Financial

Advisor for 24 years. In 2016, I took my book of business and began my own practice as a Retirement Investment Advisor and insurance agent and in 2019 purchased a Broker Dealer business from CNN Insurance, renaming it under my own brand, Old Slip Capital Management, Inc., a business that was approved for business in 1966.

4. During the past eight years, I have built up a financial services capital management and investment advisory business, in New York City, with investment clients across the country, offering financial services products of several different investment management companies. My investment advisory business, operates under the name Old Slip Capital Partners, LLC. It is affiliated with my company, Old Slip Registered Investment Advisors, LLC, an SEC Registered Investment Advisor, and my company Old Slip Capital Management, Inc., a licensed Broker/Dealer, and member of FINRA/SIPC. I have several securities licenses, including a registered investment advisor (RIA), licensed broker dealer (BD), and accredited investment fiduciary, with Series 7, 24, 63, 65, and 66 FINRA securities licenses. Over the past eight years, my affiliated companies Old Slip Capital Partners LLC, Old Slip Registered Investment Advisors, LLC, and Old Slip Capital Management, Inc., have built up a nationwide investment advisory business, selling investment products and variable annuities (but not fixed annuities) across the United States.

5. Before launching my own capital investment and investment advisory business in 2016, I held positions at Merril Lynch (Financial Analyst), Salomon Smith Barney Holdings (Senior Financial Analyst), Wells Fargo (Institutional Consultant – Corporate Retirement Plans), and Oppenheimer (Director – Investments – Corporate Retirement Plans). I have a bachelor's degree from Cornell University (2000) and was a Visiting Lecturer at Princeton in the department of Politics early in my career at Merrill Lynch.

***Launch of Allstate Insurance Agency***

6. In late 2023, I decided to become an Allstate insurance agency franchisee, and to purchase the assets of two existing Allstate insurance agencies located in Westchester County, New York, owned by Anthony Fava and Alfred Buglione respectively, and I formed Plaintiff Old Slip Benefits & Insurance Services LLC to own and operate the new Allstate franchised business. I purchased the customer accounts of two existing Allstate agencies, consolidated the accounts into one agency, leased space in White Plains, hired and trained employees, and began managing those accounts and selling Allstate insurance products, from its Allstate agency location in White Plains, New York. Since March 2024, I have been operating the agency successfully, providing excellent customer service to the insurance customers, with a fully trained staff. I have been generating significant premiums for Allstate, and Allstate has never raised any issues regarding the agency's performance. I had become an Allstate franchised agent, with the intention of growing the agency, by buying and consolidating additional Allstate insurance agencies in the future, and continuously cross-selling Allstate's insurance products to my existing investment advisory clients, which I would continue to service through my established investment advisory business.

7. During the sales process, I made it clear to Allstate as well as the sellers, in my business plan and my discussions with them, that my Allstate agency would only be offering insurance products. I also made it clear that I had my own separate investment advisory business, under the name Old Slip Capital Partners, LLC, a diversified financial services firm affiliated with Old Slip Registered Investment Advisors, LLC, a SEC Registered Investment Advisor, and Old Slip Capital Management, Inc., a Broker/Dealer, and member of FINRA/SIPC. I explained to the

Allstate salespersons how I wanted to market Allstate insurance products to my affiliates' thousands of 401(k) Participant clients which I have through their 401k corporate accounts, a strategy that was well received by the Allstate salespersons. At no point in time did the Allstate salespersons say anything to me about transferring my FINRA licenses to Allstate, and they never asked me to sign any of the required paperwork to transfer my FINRA licenses to Allstate, because that was not part of the deal.

8. In fact, every one of my emails during my discussions with the Allstate salespersons came from my "oldslipcap.com" email address, and every email had a description of my separate investment business, as described above. In my emails discussions with them, it was clear that I had long-standing relationships with other firms in connection with my investment advisory business. My business plan for the Allstate agency only proposed selling insurance products, and ***not*** investment products.

9. This was consistent with the agency agreement that I signed, a copy of which is attached as Exhibit A. The plain language of the Allstate Agency Agreement only restricted Old Slip from offering insurance products of other companies, and not other non-insurance investment products which its affiliates offer through their regulated investment advisory business and broker-dealer business. Section 1[E] of the Allstate Agency Agreement, Section 1[E] is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance."

10. The plain reading of the contract is bolstered by Allstate's own March 23, 2000 set of Questions and Answers ("Q & As") regarding the exclusive agency agreement, specifically recognizing that the non-competition provisions do not apply to "*non-insurance*" products, and that the offering of non-insurance products to customers is "*not a violation of the noncompete*

*provision.*" *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 350 (E.D. Pa. 2014*), opinion clarified on denial of reconsideration* (Apr. 7, 2014) (emphasis added).. *See also Allstate Ins. Co. v. Fougere*, No. CV 16-11652-JGD, 2019 WL 4776986, at *13 (D. Mass. Sept. 30, 2019) ("the unambiguous language of the EA Agreement provides that the Agency is not to sell *insurance* policies of any competitors") (emphasis added). In fact, there are many Allstate insurance agencies with similar agreements which offer investment products through other companies.

***Operation of the Allstate Insurance Agency as an Allstate Franchisee***

11. Since it started, I have been operating the agency successfully as an Allstate franchisee. The relationship was intended to be a long-term relationship. As a condition for entering into the franchise agreement, for a three month period from about December 2023 to February 2024, I was required to undergo extensive training, on the Allstate's system and methods that were required to be an Allstate agent. This included, among other things sixty hours of webinars and online training provided by the "Allstate University," which I completed. Old Slip was required to agree to follow all of Allstate's methods, policies, and requirements, and to operate the agency in accordance with the Allstate system of doing business, which I have faithfully done.

12. During the sales and recruitment process, I was continuously and repeatedly assured by Allstate salespersons that this was a long-term relationship and that Allstate was committed to its agents for the long-term. Allstate assured me that, once you become an Allstate agent you never leave, most of our agents stay with us for life, and we take pride that most of our agents have been with us for more than 25 years. Allstate emphasized that it was loyal to its agents and committed to helping them in every way, referring to them as "Allstaters". Allstate assured me that it would provide a one-stop shop of support, taking care of everything I need to operate the agency.

13. As a condition for entering into the franchise agreement, I was required to purchase and pay Allstate or its affiliated companies for several Allstate required purchases which were required for me to operate as an Allstate franchised business. I was required to purchase many of these items from the "Allstate Technology Store", which could only be accessed through the Allstate portal.

- .I was required to, and did, purchase Allstate signage, which was required to be installed by an Allstate representative, and did in fact purchase and pay about $2,000 for such signage
- I was required to, and did, purchase Allstate mandated computers, Lenova Thinkpads, for me and my staff, which Allstate loaded with its software, and which were set up by Allstate Technology Support, and did in fact order and pay several thousand dollars for such systems through the Allstate Technology Store. Allstate apparently considered the equipment to be its own equipment, demonstrated by the fact that after Allstate issued its termination letter, Allstate demanded that I "return Allstate's equipment".
- I was required to, and did, pay for the entire telephone system, through the Allstate Run the Business Group, only use the telephone number provided by Allstate, and was required to have the telephone system set up onsite by Allstate.
- I was required to, and did, purchase physical security key fobs, with continually changing security numbers in order to access and login to the Allstate mandated computers, through the Allstate Run the Business Group.
- I was required to, and did, use and pay for Allstate business cards and stationary, paying Allstate several hundred dollars for such items.

14. As a condition for entering into the franchise agreement, I was required to, and did, locate the office at a location approved by Allstate. Allstate disapproved the first two locations that were proposed by me, and only approved the third location.

15. As a condition for entering into the franchise agreement, I had to agree that my customers must pay their premiums directly to Allstate, rather than to Old Slip, and that Allstate would keep on average about 93% of the premium payments it received from Old Slip's customers, based on Allstate's mandated formula, and that Allstate would pay Old Slip only about 7% of the premiums collected. Old Slip was required to open its franchised business bank account at one of the two Allstate authorized banks, namely Chase or Wells Fargo, and Allstate required Old Slip to purchase a stamp to be used if customers accidently delivered a premium check to Old Slip (rather than to Allstate), in which case Old Slip was required to use the stamp to endorse the check over to an Allstate controlled bank account.

16. Old Slip was required to, and did, arrange its financing for the purchase of the agencies through the Allstate Lending Connection, and was required to pay the Allstate Lending Connection various administrative and processing fees in connection with the financing, as a condition for the financing and the purchase of the agencies. Allstate and the bank, which was affiliated with Allstate, entered into an agreement which gave the bank a security interest in Old Slip's customer accounts and guaranteed the bank that it would get paid directly from Allstate as a fixed monthly direct payment that was automatically deducted from the commissions that Old Slip earned and was otherwise entitled to be paid by Allstate. Allstate and the bank arranged for a long-term loan, to be repaid over a ten year period at 9% interest, so that Allstate would collect the customers' insurance premiums, calculate Old Slip's commission, and deduct a fixed monthly amount from Old Slip's commission, and pay this fixed monthly amount directly to the bank, for

the next ten years..

***Allstate Illegally Terminated the Agency Agreement***

17. Incredibly and inexplicably, not more than about thirty days after we were up and running, Allstate's salesperson Regine Napoleon came to me and demanded that I transfer all of my financial services customers to Allstate's separate financial services company, and cease offering financial services products other than Allstate financial services products to my financial services customers. Allstate salesperson Regine Napoleon called me and told me that I had to relinquish my FINRA licenses and bring all of my investment advisory clients to Allstate. I explained to her that this was never part of the deal and that it would be impossible to do so for many reasons, including the fact that Allstate's AFS platform is not even equipped to handle my much more sophisticated accounts, and the Allstate Agency Agreement, states nothing about FINRA or investment advisory or broker/dealer services and only deals with insurance products.

18. This demand made absolutely no sense to me, because it was not consistent with my agency agreement which did not prohibit me from continuing to operate my investment advisory business. It was also directly contrary to all my discussions with Allstate during the sales process, during which I had emphasized to them that the reason I was purchasing the two agencies was so that I could cross-sell Allstate insurance products to my financial services clients. It also made no sense because to offer Allstate's investment products, I would have had to sign a different agreement with Allstate to transfer the broker/dealer license to Allstate, and Allstate had never even mentioned or asked mt to sign such documents during the onboarding process.

19. The request also made no sense because, as I discussed with Allstate, Allstate's financial services division only offers one type of financial services product to its customers, namely a Fidelity Brokerage Account, which is in no way suitable for my financial services

customers.. The demand, if carried out, would hurt my financial series customers and would have an anticompetitive effect, because my financial services customers would be forced to purchase only the Fidelity financial service product offered by Allstate's financial services company, rather than being able to choose from among the many financial services products that my affiliates offer to my clients pursuant to selling agreements with almost every other major firm.. Under FINRA rules, as a broker dealer, I have a fiduciary duty to offer a range of products to my clients to ensure that they end up with a product that is "suitable" to them. I do not understand Allstate's motives, but the only explanation, based on my dealings with Allstate, is that the Allstate salespersons were motivated by their personal interests. At the time, Allstate was not allowing agents to write any new insurance business – that had been put on hold. So, the salespersons were not earning new commissions from any new business. The only explanation for their demand is that they wanted to make up for this drop in personal commissions by forcing me to transfer my financial services business to Allstate financial services so that they could earn more personal commissions from the investment advisory business that I would bring to Allstate.

20. After discussions with them back and forth, Allstate issued me a termination letter dated June 25, 2024, a copy of which is attached as Exhibit B, in which it claimed it was terminating the agreement for cause due to "unauthorized brokering." Allstate falsely and unjustifiably claimed I had violated the Agency Agreement by maintaining an "outside business interest," which was absolutely false and made absolutely no sense, for all of the reasons I mentioned above.

21. The termination was wholly unjustified because the plain language of the Allstate Agency Agreement only restricted Old Slip from offering insurance products of other companies, and not other non-insurance investment products which Old Slip's affiliates offer through their

regulated investment advisory business and broker-dealer business. Section 1[E] of the Allstate Agency Agreement, Section 1[E] is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance."

22. As mentioned above, the plain reading of the contract is bolstered by Allstate's own March 23, 2000 set of Questions and Answers ("Q & As") regarding the exclusive agency agreement, specifically recognizing that the non-competition provisions do not apply to "*non-insurance*" products, and the offering of non-insurance products to customers is "*not a violation of the noncompete provision.*" *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 350 (E.D. Pa. 2014*), opinion clarified on denial of reconsideration* (Apr. 7, 2014) (emphasis added). In fact, there are many Allstate insurance agencies with similar agreements which offer investment products through other companies.

23. My investment related companies offer investment products and variable annuities (but not fixed annuities). It is well-established by the United Supreme Court for more than 60 years that variable annuities are ***not*** insurance.[1] Rather, they are considered securities.[2]

[1] *See, e.g., S.E. C. v. Variable Annuity Co.*, 359 U.S. 65, 72-73 (1959) (holding that variable annuities are ***not*** insurance, as "they guarantee nothing to the annuitant except an interest in a portfolio of common stocks or other equities — an interest that has a ceiling but no floor. There is no true underwriting of risks, the one earmark of insurance as it has commonly been conceived of in popular understanding and usage").

[2] *See, e.g., Winne v. Equitable Life Assurance Society of the U.S.*, 315 F. Supp. 2d 404, 408 (S.D.N.Y. 2003) ("A variable annuity is different from a fixed annuity in that the seller invests the annuitant's principal in various securities and other investments before the payment stream begins. The annuitant generally controls how the principal is invested, and the future payment stream from the annuity depends on the value of the portfolio over time. Variable annuities must be registered with the SEC as securities under the Securities Act of 1933, *codified* at 15 U.S.C. § 77a*et seq.* Variable annuities are primarily sold by insurance companies, and must be offered through "separate accounts" that must be registered with the SEC as investment companies under the Investment Company Act of 1940 ('1940 Act'), *codified* at 15 U.S.C. § 80a-l *et seq."*

24. Accordingly, Allstate's termination of my agreement, on the ground that I was engaged in "unauthorized brokering", was illegal, as it had no legal justification in the agreement, because the Allstate Agency Agreement did not prohibit Old Slip or me from offering and selling non-insurance products including variable annuities.

25. Any suggestion that Old Slip or I engaged in improper conduct or unauthorized brokering is patently false. And, to the extent that Allstate makes or intends to make any such suggestion in any statements or filing to anyone or with any government agency, such statements would cause irreparable harm, and jeopardize my other licenses.

***Irreparable and Irreversible Harm***

26. The threatened termination of my Allstate insurance franchise agreement, scheduled to go into effect on September 30, 2024, will cause irreparable harm to me and Old Slip, because Old Slip's entire business is the offering and sale of Allstate insurance products. The termination will cause the destruction of its business, and result in the loss of jobs of Old Slip's employees, liability to third parties including the landlord, and the loss of future opportunities for purchase of additional agency accounts.

27. The termination will cause irreparable harm to the business and myself, because Allstate claims the termination was for cause for engaging in "unauthorized brokering," and state insurance law requires Allstate to notify the Department of Financial Services of the termination and the reasons for the termination. The false public accusation of "unauthorized brokering" will have significant irreversible negative repercussions for Old Slip' and myself, and will be a permanent negative mark on my record. It will likely cause other companies to terminate their selling agreements with Old Slip's affiliated companies and myself, and may result in a Department of Financial Services investigation, or get referred to the securities regulators, thereby

jeopardizing my securities licenses. Such an outrageous false allegation will make it impossible for Old Slip to find another insurance agency, and could result in regulatory action being taken against my securities licenses, thereby jeopardizing my entire established financial services business.

28. The restrictions which Allstate is attempting to impose on Old Slip, and its efforts to bully me to transfer my securities business to Allstate would violate my selling agreements with other investment companies, and will have anti-competitive effects, by interfering with my customers' freedom to choose their broker and their investments.

29. Allstate has already caused damage to Old Slip by interfering with its efforts to purchase other Allstate agencies and consolidate them into the Old Slip agency in White Plains. I had recently negotiated the terms with Andrew Murray for the purchase of the Andrew Murray Allstate Insurance agency in mid-town Manhattan, and I had obtained financing approval for the purchase. Allstate wrongfully killed the deal, by notifying Andrew Murray that Old Slip was no longer an "approved buyer", and that Andrew Murray was no longer allowed to sell his agency to me.

30. The extension of the termination date will not cause any great harm to Allstate. Old Slip has been operating the agency successfully for six months, servicing the customer accounts, and providing excellent customer services, with a well-trained staff in its White Plains office. I have built up customer goodwill with these customers. Allstate has not raised any issues of poor performance. Old Slip has been renewing existing policies, writing new policies, and generating substantial premiums for Allstate. Allstate will not suffer any great harm if the termination date is extended, and Old Slip continues to service the accounts.

31. On the other side, as outlined above, Allstate's scheduled termination, if carried out,

will cause irreparable harm to both Old Slip and myself, as well as Old Slip's employees and its affiliated companies, as its actions threaten to destroy my name, reputation, and long-established relationships with clients and providers.

I affirm this date, September 11, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

DocuSigned by:
A34EB23BE231478...
JAMES LUKEZIC

RK 09/12/202

# xhibit

# ALLSTATE R3001C EXCLUSIVE AGENCY AGREEMENT

This Agreement is between ALLSTATE INSURANCE COMPANY and such affiliates and subsidiaries as are named in the Supplement for the R3001 Agreement (referred to in this Agreement as "the Company") and Old Slip Benefits & Insurance Services, LLC (referred to in this Agreement as "Agency").

The Company and Agency agree as follows:

**I. AUTHORITY:**

A. Effective 3/1/2024, the Company appoints Agency as its agent to represent the Company in the Exclusive Agency Program. Agency is authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance covering such classes of risks located in the state(s) of New York as the Company may from time to time authorize to be written. Agency is also authorized to sell products specified by the Company and through the companies specified in the Supplement for the R3001 Agreement (referred to in this Agreement as "Company Business"). The Company will own all business produced under the terms of this Agreement. Agency will not represent itself as having any authority other than that specifically granted to it by the Company. Agency will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

B. This Agreement is the sole and entire agency agreement between the Company and Agency, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and Agency and any of its officers, directors, shareholders, members, and employees. This Agreement also supersedes any prior oral statements and representations by the Company and any prior written statements and representations by the Company in letters, manuals, booklets, memoranda, or any other format.

C. The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to Agency, except that notice regarding changes to commission amounts will be given as indicated in Section XV.

D. The relationship between the Company and Agency and its officers, directors, shareholders, members, employees, and other persons working in connection with this Agreement, will be that of an independent contractor for all purposes. Agency will not represent that it has authority to act on behalf of the Company or enter into any contract on behalf of the Company, except for contracts of insurance or other contracts as expressly authorized by this Agreement.

E. Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company. Agency may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

F. The Company will determine in its sole discretion all matters relating to its business and the operation of the Company including, but not limited to, the following:

1. The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;
2. The acceptance or rejection of any application;
3. The termination or modification of any contract or the refusal to renew any contract;
4. The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business;
5. The obtaining of any licenses of the Company or the Company's withdrawal from any state, jurisdiction, or territory; and
6. The type and quality of customer service received by Company policyholders.

G. Agency represents and warrants that prior to the execution of this Agreement, Agency has provided to the Company the full names and addresses of its officers, directors and any persons who own any shares of or interest in Agency. Thereafter, Agency shall promptly furnish to the Company the full names and addresses of any new officers, directors, or owners.

II. **DUTIES AND CONDITIONS:**

A. Agency will act as an agent of the Company for the purpose of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement. As an agent of the Company, Agency will provide customer service, including the collection of payments, for any and all Company policyholders and will assist in claims administration in accordance with the Company's rules and procedures.

B. Agency will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service. Agency will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

C. Agency will record, transmit, and process insurance and Company Business in the manner prescribed in the then current provisions of the Supplement.

D. Agency agrees to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting its operation and warrants that Agency, its officers, directors, shareholders, members, and employees will maintain any required agent licenses in the state or states in which Agency is appointed to represent the Company.

E. This Agreement is being entered into with Agency in reliance upon and in consideration of the skills, qualifications, and representations of JAMES LUKEZIC ____________ (referred to in this Agreement as "Key Person"). Agency agrees that it will employ Key Person to provide services under this Agreement for its term.

F. The Company recognizes that Agency may, in its sole discretion, arrange to have business conducted at its sales location in Key Person's absence by its other employees or other persons and that the time during which Key Person is physically present at Agency's sales location is entirely in Agency's sole discretion. Key Person must, however, remain actively involved in the conduct of business at Agency's sales location.

G. The Company shall at all times be entitled to conclusively rely upon the authority of Key Person (or in the event of the death or incapacity of Key Person, his executor or personal representative) to bind Agency and its officers, directors, shareholders and members, regardless of any directions received by the Company from any person or entity which conflict with directions received from Key Person, unless the Company is properly served with an order of a court of competent jurisdiction abrogating Key Person's authority and designating an alternate authorized representative to act on behalf of Agency under this Agreement.

H. Agency agrees that the Company will have the authority to use the name of Agency or Key Person and the Key Person's signature, or facsimile thereof, on policy documents and customer communication materials.

I. Agency agrees to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. Agency also agrees that, because it is conducting business with the public under the Allstate name, Company representatives shall be permitted access to its sales location to review compliance with this Agreement during the business hours of that sales location.

J. Agency agrees that, as requested by the Company, it will demonstrate its knowledge of the Company products it is authorized to sell, as well as of federal, state, or local laws, rules, regulations and ordinances affecting its operation. If Agency is unable to demonstrate its knowledge of any product, the Company reserves the right to deny Agency the authority, or withdraw Agency's existing authority, to sell that product, until Agency demonstrates such knowledge.

## III. AGENCY EMPLOYEES:

A. Agency has no authority to employ persons on behalf of the Company, and no employee of Agency will be deemed to be an employee or agent of the Company, such employees at all times remaining Agency's employees. Agency has sole and exclusive control over its labor and employee relations policies, and its policies relating to wages, hours, and working conditions of its employees. Agency has the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge its employees.

B. Agency is solely responsible for all salaries and other compensation of all its employees and will make all necessary salary deductions and withholdings from its employees' salaries and other compensation. Agency is solely responsible for the payment of any and all contributions, taxes, and assessments, and all other requirements of the federal Social Security, federal and state unemployment compensation, and federal, state, and local withholding of income tax laws on all salary and other compensation of its employees.

C. Agency will comply with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding its employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, Agency's warranty and agreement to comply with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans With Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D. Agency agrees and warrants that its employees, while working in connection with this Agreement, will comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances.

## IV. COMPANY PROPERTY, CONFIDENTIALITY:

A. The Company will furnish Agency such signs, forms, manuals, records, and other materials and supplies as the Company deems advisable to assist Agency. All such property and information furnished by the Company will remain the property of the Company. In addition, the Company will offer, at Agency's expense, such additional materials and supplies as the Company feels may be helpful to Agency.

B. Agency agrees that it will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of the Company, except upon direct written authority of the Company. Furthermore, upon termination of this Agreement, Agency agrees to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company.

C. Agency agrees that it will not disclose or grant access to any confidential information or trade secrets to any of its employees or other persons providing services for it in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement, attached as Appendix A if Key Person and Appendix B if other than Key Person. Appendix B is a sample copy of the electronic version of the document that must be transmitted to the Company.

D. Confidential information includes, but is not limited to: business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. All such confidential information is wholly owned by the Company. Such confidential information may be used by Agency only for the purposes of carrying out the provisions of this Agreement.

E. Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or by Agency, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F. Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

## V. SALES LOCATION:

A. Agency may select its sales location, within a geographical area specified by the Company, subject to Company approval. Initially, Agency has selected the location at 199 Main Street, Ste 200, White Plains, NY 1060 and such sales location has been approved by the Company. Agency agrees that it will not establish any additional sales location without the prior written approval of the Company. Agency acknowledges that it has no exclusive territorial rights in connection with its sales location.

B. Agency agrees to keep its sales location open for business as appropriate in the market to provide a proper level of customer service. As a minimum, Agency agrees to operate its sales location consistently with the Agency Standards.

C. Agency is authorized to sell insurance offered by the Company and Company Business only in the state containing its sales location and other states in which Agency has been authorized to act as a Company agent.

VI. **ADVERTISING:**

A. The Company will advertise its products and provide promotional material in accordance with its advertising policies. Agency may also advertise in its sole discretion, subject to the requirements in paragraph B. below.

B. Agency will submit all signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all other materials to the Company for approval, if they use or contain any reference to any service mark or trade name of the Company. Agency will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company. The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject the Company to liability or loss of goodwill; may damage the reputation of the Company or Company customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to conform to community or Company standards of good taste and honest dealing; or may be detrimental to the business interests of the Company.

VII. **SERVICE MARK AND TRADE NAME PROTECTION:**

A. Agency agrees to cooperate fully in the quality control program conducted by the Company relating to the use of its service marks and trade names and the nature and quality of services rendered and goods distributed under its service marks and trade names. The Company will have the right to specify, delineate, or limit the services or goods in connection with which Agency may use any of its service marks or trade names. In the event that the nature or the quality of the services or goods in connection with which Agency uses any of the service marks or trade names of the Company is not acceptable to the Company, then the Company will have the right to require Agency to institute appropriate procedures to correct any deficiencies noted by the Company.

B. Agency agrees, at the request and expense of the Company, to assist the Company in protecting and enforcing the rights of the Company in and to any and all of its service marks and trade names which Agency may then be using.

C. Agency will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names the Company authorizes the Agency to use in the performance of this Agreement, except as permitted in Section XVI.

D. Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

**VIII. EXPENSES:**

Agency will be responsible for the payment of all expenses that it incurs in the performance of this Agreement including, but not limited to: expenses for its sales location, supplies not furnished by the Company, compensation of its employees or other assisting persons whom it engages, telephone, postage, and advertising expenses incurred at its direction, and all other charges and expenses.

**IX. TELEPHONE:**

All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company.

**X. INDEMNIFICATION:**

A. The Company will defend and indemnify Agency against liability, including the cost of defense and settlements, imposed on Agency by law for damages sustained by policyholders and caused by acts or omissions of the Company, provided that Agency has not caused or contributed to cause such liability by its acts or omissions. Agency agrees, as a condition to such indemnification, to notify the Company promptly of any claim or suit against it and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent. The Company reserves the right to select counsel to represent Agency in connection with any such claim or suit. Agency also agrees to cooperate fully with the Company in any such investigation, settlement, or defense.

B. Agency will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by the acts or omission of Agency, its officers, directors, shareholders, members, employees, including Key Person or other persons working in connection with this Agreement, provided that the Company has not caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify Agency promptly of any such claim or suit against the Company. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

**XI. INSURANCE:**

A. Agency agrees that it will, at its sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Manual, as may be amended from time to time. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies.

B. Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement. Each policy must also expressly provide that it will not be subject to material change or cancellation without at least thirty (30) days prior written notice to the Company.

C. Agency must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise Agency and if Agency does not furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, the Company will have the right to obtain additional insurance at Agency's expense and deduct the cost of such insurance plus a processing fee from monies owed Agency by the Company.

**XII. FINANCIAL INFORMATION:**

Agency shall maintain all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate. All of the foregoing records shall be open and available for inspection or audit at any time during Agency business hours without notice by the Company or its designated auditors and Agency shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

**XIII. POLICIES IN AGENCY'S ACCOUNT:**

Policies which are credited to Agency's account are described in the Supplement. While this Agreement is in effect, the Company will leave in Agency's account all policies credited to such account so long as the policyholder resides within a state in which Agency is authorized to act as a Company agent, except that the Company may remove any policy from Agency's account at the request of a policyholder.

**XIV. MONEY COLLECTED BY AGENCY:**

All payments collected or received by Agency in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company. Agency must maintain accurate records and current remittance reports which may be inspected by the Company at any time without notice and which shall be submitted to the Company in accordance with its rules and procedures.

**XV. COMPENSATION:**

A. The sole compensation to which Agency will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time. All commissions will be paid solely to the Agency, except as described in Section XIX. below. The Company will pay Agency its commissions at the time and in the manner set forth in the Supplement. However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes commission amounts, it will provide Agency with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

B. The Company may provide Agency with such bonuses, awards, prizes, and other remuneration based on performance, if any, as it may prescribe in its sole discretion.

C. If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to Agency, or if any premium paid is not earned by the Company, the commissions paid to Agency on the amount returned or credited to the policyholder, or the amount overpaid to Agency, will constitute an indebtedness of the Agency to the Company and will be charged to Agency or recovered from Agency by reducing any future commissions, awards, or bonuses due Agency.

**XVI. TRANSFER OF INTEREST:**

A. Agency may not execute a transfer of its interest in this Agreement without the prior written approval of the Company. A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it. Neither Agency, nor any shareholder or member of Agency, shall transfer any shares or interest in Agency, including, but not limited to, any sale, assignment, conveyance, or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company. Agency has the obligation to notify the Company of a proposed transfer and to request Company approval.

B. Agency has an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in its Allstate customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, Agency may transfer its entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of Agency's interest in this Agreement or any share or interest in Agency shall constitute a breach of this Agreement and cause for termination of this Agreement.

C. Approval of a proposed transfer of Agency's entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee.

D. Policies in Agency's account (Section XIII. above) will be transferred to an approved transferee.

**XVII. TERMINATION OF AGREEMENT:**

A. This Agreement will be terminated automatically:

1. On the effective date of any transfer of Agency's entire interest in this Agreement, whether approved or not, as described in Section XVI. above;
2. Upon the death or permanent incapacity of Key Person;
3. On the date Key Person ceases to be employed by Agency;
4. Upon the loss of any required agent license of Agency or Key Person;
5. Upon the dissolution of Agency; or
6. Upon the surrender of, or the election not to renew, the Company's license to sell insurance in all lines in the state in which Agency's sales location is located or the discontinuation of the sale of insurance in the state.

B. This Agreement may be terminated:

1. At any time by mutual agreement of the parties in writing;

2. By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law. Once written notice of termination has been given by either party, Agency will, immediately upon request of the Company, cease to act or to represent itself in any way as an agent or representative of the Company, but it will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

**XVIII. OBLIGATIONS UPON TERMINATION OF AGREEMENT:**

Except as otherwise provided in a subsequent agreement between Agency and the Company, upon termination of this Agreement, Agency agrees that:

A. Agency will not act or represent itself in any way as an agent or representative of the Company.

B. Agency will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies.

C. Agency will immediately cease to use such telephone numbers referenced in Section IX. above and execute an Order of Transfer of Responsibility for such numbers in its or Key Person's name to the Company or to any party the Company designates, and Agency will immediately notify the telephone company of any such transfer. Agency will be responsible for all charges incurred up to the date of execution of the transfer.

D. For a period of one year following termination, neither Agency, nor any of its officers, directors, shareholders, members, or employees, including Key Person or any other persons working in connection with this Agreement, will solicit the purchase of products or services in competition with those sold by the Company:

1. With respect to any person, company, or organization to whom Agency or anyone acting on its behalf sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;

2. With respect to any person, company, or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered as a result of Agency's status as a Company agent or as a result of Agency's access to confidential information of the Company; or

3. From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph D. conflicts with any existing law, it will be applied to the extent permitted by such law.

E. Agency will immediately cease and desist from any and all use of Company service marks and trade names. Agency will immediately return to the Company all property in its possession or under its control bearing any Company service mark or trade name, or dispose of it in such manner as the Company specifies.

F. Agency recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Agency agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

G. Agency recognizes and acknowledges that each of the foregoing provisions of this Section XVIII. is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom. Agency and Key person recognize and acknowledge that the foregoing provisions are not an undue restraint on Agency or Key Person.

**XIX. PAYMENT TO AGENCY UPON DISSOLUTION:**

If at any time following the Company's receipt of notice of Agency's dissolution, the Company shall be obligated under this Agreement to pay money to Agency, the Company is irrevocably authorized to pay such money to Key Person, or in the event of the death or incapacity of Key Person, his executor or personal representative, who shall be responsible to Agency's successors-in-interest for distribution of such payment to the persons or entities legally entitled thereto. Company shall have no liability whatsoever for any payments made pursuant to the foregoing authority regardless of whether Company has received any conflicting demand from any other person or entity, except for payments made by the Company in violation of an order of a court of competent jurisdiction properly served upon the Company which directs the Company not to make any such payment to Key Person and designates an alternate person or entity to which the Company is directed to make such payments.

**XX. NOTICE:**

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

if to the Company: Allstate Insurance Company
P.O. Box 223988
Dallas, TX 75222-3988
Attention: Agent Commissions - MS #27

if to Agency: Old Slip Benefits & Insurance Services, LLC
199 Main Street, Ste 200
White Plains, NY 10601

or to such other person or address as any party may furnish or designate to the other in writing.

## XXI. GENERAL PROVISIONS:

A. Agency warrants and represents that Agency is a [corporation] [limited liability company] duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite power and [corporate] [limited liability company] authority to enter into this Agreement and to perform Agency's duties and obligations under this Agreement. Agency further warrants and represents that it is duly qualified and in good standing to do business in every jurisdiction in which such qualification is necessary because of the nature of the business conducted by it pursuant to this Agreement.

B. Agency and Key Person warrant and represent that Agency and Key Person have the power, [corporate] [limited liability company] authority, and capacity to enter into and consummate this Agreement. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary [corporate] [limited liability company] action, as applicable, on the part of Agency and Key Person.

C. This Agreement may not be modified except by a written agreement between the Company and Agency which expressly states that it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement, except as provided in this Section XXI. Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.

D. Agency acknowledges that it has reviewed the Supplement, EA Manual, and Agency Standards and that it has an ongoing responsibility to review all changes to the Supplement, EA Manual and Agency Standards issued by the Company and agrees to be bound by them.

E. References in this Agreement to the Supplement, EA Manual, and Agency Standards are references to the Supplement, EA Manual, and Agency Standards including any changes which may be made from time to time and distributed to Agency by the Company.

F. Agency acknowledges that it has read this Allstate R3001C Exclusive Agency Agreement, understands it, and agrees to be bound by its terms.

G. The authority granted to Agency under this Agreement is nonexclusive. The term "Exclusive" as used in the title of this Agreement refers to the obligations assumed by Agency under Section I.E.

H. The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

I. If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

J. The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term. The obligation of the parties with respect to any such future performance will continue in full force and effect.

K. Nothing in this Agreement shall be construed to confer upon any person or entity other than the Company and Agency any rights under this Agreement.

L. This Agreement, and the obligations or rights hereunder, shall not be assignable by Agency except as provided by Section XVI. The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

M. This Agreement may be executed in counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, the Company and Agency have caused this Agreement to be executed by their authorized representatives and the parties hereby accept the terms of this Agreement.

ALLSTATE INSURANCE COMPANY

e-Signed by Stacy Wines
on 2024-02-21 21:01:26 GMT

(authorized representative)

February 21, 2024

(date)

AGENCY

e-Signed by JAMES LUKEZIC
on 2024-02-21 20:20:23 GMT

(name)

JAMES LUKEZIC

(Key Person)

February 21, 2024

(date)

R3001C
APPENDIX A

**CONFIDENTIALITY AND NON-COMPETITION AGREEMENT**

**KEY PERSON**

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this 1 day of March, 2024, by and between JAMES LUKEZIC (referred to in this Agreement as "Service Provider"), and Old Slip Benefits & Insurance Services, LLC (referred to in this Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1. The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2. Service Provider acknowledges that while assisting Agency in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3. Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company; nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agency in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by Agency will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agency.

6. Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to Agency or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement may be executed in counterparts, each of which will be deemed an original. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of facsimile signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| e-Signed by JAMES LUKEZIC on 2024-02-21 20:20:34 GMT | e-Signed by JAMES LUKEZIC on 2024-02-21 20:20:35 GMT | e-Signed by Stacy Wines on 2024-02-21 21:01:29 GMT |
| (Key Person as an Individual) | (Key Person on behalf of Agency) | (authorized representative) |
| February 21, 2024 | February 21, 2024 | February 21, 2024 |
| (date) | (date) | (date) |

R3001C
APPENDIX B

# CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this ____________ day of ________________, __________, by and between ______________________________ (referred to in this Agreement as "Service Provider"), and ______________________________ (referred to in this Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1. The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2. Service Provider acknowledges that while assisting Agency in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3. Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company; nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agency in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by Agency will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agency.

6. Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to Agency or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| (name) | (Key Person) | (authorized representative) |
| (date) | (date) | (date) |

RK 09/12/202

xhibit

June 25, 2024

Old Slip Benefits & Insurance Services LLC
Attn: James Lukezic
199 Main St. Ste. 200
White Plains, NY 10601-3204

Dear James Lukezic:

This letter is notice that Allstate Insurance Company is terminating the Allstate R3001C Exclusive Agency Agreement ("Agreement") with Old Slip Benefits & Insurance Services LLC ("Agency") effective September 30, 2024. The termination is pursuant to Section XVII.B.2 of the Agreement. Allstate is taking this action for reasons that include maintaining an outside business interest which creates a conflict of interest and unauthorized brokering.

**If you have any questions in regard to this termination, please contact this company's representative, Tim Laury, HR Manager Allstate Insurance Company at 972-915-5208, Allstate Insurance Company, PO Box 661003, Dallas, TX 75266-1003.**

The New York Insurance Law prohibits insurers from engaging in redlining practices based upon geographic location of the risk or the producer. If you have reason to believe that we have acted in violation of such law, you may file your complaint with the Department either on its website at http://www.dfs.ny.gov/consumer/fileacomplaint.htm or by writing to the State of New York Department of Financial Services, Consumer Assistance Unit, Financial Frauds and Consumer Protection Division, at either One State Street Plaza Street New York, NY 10004 or One Commerce Plaza, Albany, NY 12257.

Upon termination of the agreement, Agency's obligations to Allstate are stated in the Agreement. The Agreement requires that Agency must, among other things:

- Immediately return all property belonging to Allstate including all manuals, equipment, and any materials bearing any Allstate service mark or trade name;
- Immediately cease to use any telephone numbers used to conduct Allstate business from the former sales location; and
- Immediately cease and desist from any and all use of Allstate service marks and trade names.

Agency may have the option of accepting a termination payment from Allstate or selling the economic interest to an approved buyer as outlined in the Supplement for the R3001C Agreement. If Agency is eligible for and elects the termination payment option, Agency will receive such payment calculated and

paid in accordance with the Supplement for the R3001C Agreement. Please note the termination payment is conditioned upon, for example, compliance with the confidentiality and non-solicitation provisions that survive the termination of the Agreement and the immediate return of all Allstate property.

If Agency elects to sell the economic interest in the book of business, Allstate has the absolute right of approval of the buyer. The buyer must meet Allstate's eligibility requirements. If Allstate approves a proposed buyer, the sale must be completed on or before October 1, 2024 and must be effective on the first day of that or any earlier month. If Agency does not present a buyer or the buyer that Agency presents is not approved, we will process the termination payment as described above.

If agency elects, it may sell its interest in any assigned risk policies it may own. After the Agreement terminates, agency will continue to receive commissions on existing assigned risk policies processed by Allstate that it retains, if any. Also, if agency elects, it may seek to sell any flood policies it may have produced to another Allstate agent or rewrite them with another company, subject to such rules and policies that are applicable to flood business.

Please contact me with any questions you have regarding the termination process.

Sincerely,

Allison McMahon
District Sales Leader
Sales - East Zone

CC: 17301 Biscayne Blvd, Apt 506
Aventura, FL 33160-4897

**David Azrin**

**From:** Demary Lopez <dlopez@nycourts.gov>
**Sent:** Friday, September 13, 2024 10:14 AM
**To:** David Azrin
**Cc:** Young, A. Christopher; Joseph Hadala
**Subject:** RE: Old Slip Benefits & Insurance Services LLC v. Allstate Insurance Company, Index No. 69162/2024 - Scheduling

**[CAUTION: EXTERNAL EMAIL]**

This is on for an In Person appearance on 9/19/24 at 2:30 pm in Courtroom 103 in the Annex. The OSC will not be marked up before the appearance. The TRO, opposition & reply papers scheduling will be discussed at the conference.

---

**From:** David Azrin <david.azrin@wg-law.com>
**Sent:** Thursday, September 12, 2024 5:22 PM
**To:** Demary Lopez <dlopez@nycourts.gov>
**Cc:** Young, A. Christopher <Christopher.Young@troutman.com>; David Azrin <david.azrin@wg-law.com>
**Subject:** Old Slip Benefits & Insurance Services LLC v. Allstate Insurance Company, Index No. 69162/2024 - Scheduling

Dear Ms. Lopez:

We are writing on behalf of the Plaintiff Old Slip Benefits & Insurance Services LLC in the above-referenced matter. We are copying opposing counsel for Defendant Allstate Insurance Company, Mr. A. Christopher Young.

We write, pursuant to Section VII of the Westchester County Joint Protocols for New York State Courts E-Filing and the Court's Local Rules, to advise the Court as to the Plaintiff's filing of its motion for preliminary injunctive relief as to the impending termination of the Plaintiff's Allstate insurance agency agreement set to be terminated on September 30, 2024 and the filing of the Plaintiff's request for a temporary restraining order pending the scheduling of the hearing on the preliminary injunction motion to maintain the status quo, and to inquire about scheduling on the motion and the request for interim relief, as the Court deems appropriate.

Thank you for your consideration of this matter.

Respectfully submitted,

WUERSCH & GERING

David T. Azrin, Partner

Wuersch & Gering LLP | 100 Wall Street, 10th Fl. | New York, NY 10005
212-509-4745 (direct) | 786-374-3916 (cell) | 212-509-5050 (firm)
david.azrin@wg-law.com | www.wg-law.com
Download V-Card

This message and any attachments hereto contain confidential information and information which may be subject to the attorney-client privilege. It is intended for the individual or entity named above. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also please notify the sender by replying to this message, and then delete it from your system. Thank you.

SUPREME COURT STATE OF NEW YORK
COUNTY OF WESTCHESTER

------------------------------------------

OLD SLIP BENEFITS & INSURANCE SERVICES,
Plaintiff,

-against-

ALLSTATE INSURANCE COMPANY, et al,
Defendants.

------------------------------------------

INDEX NO. 69162/2024

Westchester Supreme Court
111 Dr. MLK Jr. Blvd.
White Plains, N.Y. 10601
September 19, 2024

B E F O R E:

HONORABLE LINDA S. JAMIESON
JUSTICE OF THE SUPREME COURT

A P P E A R A N C E S:

WUERSCH & GERING
Attorneys for Plaintiff
BY: DAVID AZRIN, ESQ.

TROUTMAN PEPPER HAMILTON SANDERS, LLP
Attorneys for Defendant
BY: A. CHRISTOPHER YOUNG, ESQ.

DONNA LOOMBA
SENIOR COURT REPORTER

THE COURT CLERK: Number nine on the calendar, Old Slip Benefits and Insurance Services, LLC versus Allstate Insurance Company, index number 69162 of 2024.

Appearances please.

MR. AZRIN: Good morning, your Honor. David Azrin with the law firm of Wuersch & Gering.

THE COURT: Good afternoon. It has been a long morning.

MR. AZRIN: And on behalf of the plaintiff, Old Slip Benefits and Insurance Services, with me is my client James Lukezic.

THE COURT: Good morning.

MR. YOUNG: Good afternoon, your Honor. Christopher Young with the law firm of Troutman Pepper, on behalf of the defendant Allstate Insurance Company.

THE COURT: Good afternoon. Honestly, I did not get a chance to look at this. I'm back, it's my first day back from a long vacation. So you have to tell me.

MR. AZRIN: Thank you so much, your Honor.

My client has established a financial services business. For ten years or so, he has had various different types of securities licenses, sells financial services products to clients all over the country. He has a financial services business located down on Wall Street.

And he was living at the time down in Florida, in

2023, doing the financial services business essentially remotely. And he started into discussions with Allstate Insurance, in the end of 2023, to become one of their agents to sell insurance products.

He went through a four- or five-month what they call "onboarding process". He provided them with information about himself. They asked him questions. He went through 60 hours of training. And as part of those discussions, he made it clear to them that he wanted to become an Allstate agent so he could sell their insurance products. Because he was in the financial services business and did not sell strict insurance products, property, casualty, that type of thing.

And in his discussions with them, he made it clear the purpose of him becoming an insurance agent would be so he could cross sell and so that he could offer the Allstate Insurance to his financial services clients.

And he signed a contract with Allstate, dated May 1st, and that contract was an insurance agency contract. It was not for the sale of financial services. The only way he could have sold Allstate Financial Services was if he transferred his broker dealer license, his retirement investment advisory license, and that was never mentioned during onboarding and never mentioned in the contract.

The contract only says you cannot offer other

companies' insurance products. It does not say that he couldn't offer -- continue to offer the financial services products to his existing customers. And in fact, again, that was a crucial part of the whole deal.

He invested a tremendous amount of time and money, moved his family, his wife and his two-and-a-half-year-old daughter up here to White Plains -- they live a couple of blocks from here -- in order to establish this Allstate agency under his brand name Old Slip.

He purchased two books of business from other insurance agents at different locations. He consolidated those books of business. He rented office space here on Main Street. He initially proposed two different locations, they did not approve those. They approved the Main Street location. He signed a long-term lease. During discussions with Allstate, they told him, reassured him repeatedly this is a long-term relationship. Our agents stay with us for decades.

They gave him a ten-year projection of how much money he would make over the next ten years. He relied on that, he entered into the agreement with the idea that this was going to be a long-term relationship. He moved his family, invested all the money, rented the space.

About a month or two into the arrangement, apparently, because some of the people he was dealing with

internally at Allstate, they make their money on a percentage of commissions of new business that comes in. Allstate, at the time, up until very recently was not allowing their agents to write new insurance policies.

These people who he was dealing with at Allstate, they were not seeing an increase in their commissions. They came in, unjustifiably, a month or two into the relationship and said you have to transfer all of your securities licenses to Allstate. You have to tell all of your financial services clients, who he is offering -- he has selling agreements with every major investment company you can think of, T. Rowe Price, every investment firm you can think of.

He was told he has to tell all of his clients that they have to transfer their financial services products to Allstate. Allstate only offers one financial services product, with Fidelity. It is a very rudimentary type of product. It is not at all suitable for his sophisticated clients.

But more importantly, it was never part of the deal. He had never, during the onboarding process, been asked to transfer his license. And it wasn't in the contract.

It appears that the people at Allstate, for whatever reason, they were motivated, they tried to

essentially bully him and coerce him to transfer over his licenses. He said that was not part of the deal, that is not part of my contract. They sent him a termination letter at the end of June. The termination letter specifically says it is for cause. It says it was for unauthorized trading, which makes absolutely no sense, because again, they were well aware of it. It was part of the deal. They never asked him to sign, because there is a separate agreement for him to sell Allstate securities products.

So they gave him a 90-day notice. The consequences of the termination, if it goes through, will be -- it's irreparable harm and it is almost impossible to calculate. The business has been operating for six months. It has a very -- it has developed very good relationship, customer service relationship and reputation with the hundreds of customers that he took over.

It is billed as, there is a sign on the door, Old Slip Allstate Insurance Agency. If the termination goes through, all of that good will will be destroyed. The business only had one purpose, this business Old Slip Retirement and Insurance Services only had one purpose, which was to sell Allstate Insurance. The business, that entity's business will be destroyed. The employees will lose their jobs. He will have huge problems with the landlord. He will not be able to obtain the benefit, your

Honor.

In his discussions with Allstate, he made it clear that not only was he going to consolidate these two books of business into a new efficient consolidated operation, but his plan was to buy additional books of business and grow the business. And he did it very well and very efficiently.

THE COURT: And those books of business were just insurance business books?

MR. AZRIN: Exactly, your Honor. And in fact, your Honor, he had a firm written letter of intent agreement with another agency located in Manhattan to buy their agency when this termination notice was given. And since the termination notice was given, Allstate has given word that they will no longer approve that purchase.

So the reason that's relevant, your Honor, is if you are trying to calculate the damages of a termination that will go through, it is his lost opportunities to grow the business. And that is something that will be almost impossible to calculate if the termination goes through, his opportunity to buy that business and to growing the business.

Most importantly, your Honor, if the termination goes through, under Insurance Code Section 2112, Allstate is required to file a notice with the Department of Financial Services and they are supposed to give notice to the state

that this insurance agent has been terminated, and the reasons for the termination.

This will go on his public record. It will make it impossible for him to buy or to sign any other agreement with any other insurance company because it will be on his record that he was engaged in quote, unquote, unauthorized trading and will likely lead to problems with his financial services business.

We brought this motion, your Honor, after we naively thought if we could get somebody on the phone at Allstate and explain the situation, we could resolve the matter. We sent an initial letter of communication to Allstate in the middle of July, just a couple of weeks after the termination notice.

My first conversation with Allstate counsel was August 6, and then we had discussions during August. It became clear we were not going to be able to resolve it. I'm not going to get into the substance of those discussions.

But in terms of the timing, so you could understand how we are where we are today, I gave notice on September 6th that I would definitely be seeking injunctive relief, and have filed papers as expeditiously as possible, gotten everybody served. The termination is scheduled to go into effect September 30th. And what we are seeking, your

Honor, is that we schedule the preliminary injunction hearing. And that in order to maintain the status quo pending that hearing, because if not, if the termination is allowed to go into effect on September 30th, we will have all those irreparable harms that I mentioned: Loss of good will, the employees, his family, the lease, the lost opportunities, good will and the insurance notice.

So our request for today is that we schedule that preliminary injunction hearing. We are willing to do it as expeditiously as possible. We would request that -- we are willing to forego any major discovery, depositions. But that we would request some minimal discovery, limited written discovery on various specific issues; namely, the e-mails and text messages and Zoom calls during that onboarding process.

THE COURT: Are the Zoom calls video'd?

MR. AZRIN: Yes. They were recorded. And during that onboarding process, during that four months. And then in the interim ones. He obviously has the e-mails that he was a party to, but we are talking about the internal ones between the people involved, the named defendants, and as well as the text messages, e-mails. And I don't think there were any Zoom calls after he signed the agreement, but after he signed the agreement relating to the internal decisionmaking to terminate him for unauthorized trading.

So we would like to schedule the hearing. We would like to and are willing to do it on an expedited basis, with very limited narrow written discovery. And in the meantime, keep the TRO in place. We cited the case law, your Honor. The case law has dealt with almost identical situations.

There is a number of cases from the Second Department, cases where preliminary injunctions were denied in almost identical situations. And the Second Department said that probably should have gone into place. And those cases dealt with not only licensing agreements, real estate licensing agreements, franchise agreements.

And in those cases, the courts uniformly, both New York State courts, as well as the federal courts which we also cited that applied New York law, have said that when you are talking about an agreement for an agency or company or franchisee where their sole purpose is to sell that service or product of that agency, that the loss of the good will, the difficulty in calculating the damages, the effect on employees, on third parties, that does constitute irreparable harm which does justify a preliminary injunction pending a final determination on the merits.

THE COURT: Temporary injunction.

MR. AZRIN: Thank you.

THE COURT: Counsel.

MR. YOUNG: Thank you, counsel. Your Honor, may it

please the Court.

THE COURT: Yes.

MR. YOUNG: The irony here is counsel's last statement or nearly last statement talking about the franchise agreements where injunctions were given because a franchisee agreement involves a franchisee selling products of the brand. Because what this situation presents is entirely the opposite.

This is a situation in which Mr. Lukezic does not want to be an exclusive Allstate agent, as the contract plainly says. And that's where the problem arose. Let me explain.

What counsel refers to as being very clear to Mr. Lukezic was not clear to Allstate. Now that's a fact issue, and really I suggest a fact issue more for the merits of the case, which will be taken up later on, much later on. I do not believe it merits the kind of discovery or an issue at injunction hearing.

The exclusive agency agreement is part of the record attached as Exhibit A. It plainly says that Mr. Lukezic agreed to be exclusive agent for Allstate to sell Allstate's insurance products and other company products.

THE COURT: Where is that?

MR. YOUNG: It is -- give me one second. It's

roman numeral 2A: Agency will act as an agent of the company for the purpose of soliciting, selling and servicing insurance and other company business.

THE COURT: In accordance with the provisions of this agreement.

MR. YOUNG: This agreement, correct, your Honor.

THE COURT: Okay. Does it point out anything about the other?

MR. YOUNG: The other company business, it was not attached to Exhibit B, there is an agreement that is referenced, an appendix that is referenced, that makes it clear that Mr. Lukezic was authorized to sell Allstate financial products.

Mr. Lukezic also sells other companies' financial products, as counsel pointed out. He is a registered broker. He has other businesses, other affiliated businesses that he currently operates and has been operating for ten years.

He entered into this agreement in March of 2024, just six months ago. When Allstate asked him for information regarding being an Allstate exclusive agent after he signed the agreement, it became apparent to Allstate that he intended to continue to operate his other businesses.

That presented a problem for Allstate. Allstate

has its own financial services product. Mr. Lukezic and his company was authorized to sell it. Allstate is concerned about conflicts of interest. Exclusive agency means something to Allstate. Allstate was concerned about its liability if products other than those that it sponsors are being sold by somebody else.

For example, Madoff or something like that. Mr. Lukezic's business is operating as a registered exclusive agent of Allstate. It does not take a lot of imagination to understand if an investor lost money in the Madoff fund, or whatever that fund is, Allstate may well incur some risk of liability in that situation. So that's the reason why a conversation was had with Mr. Lukezic, do you want to be an exclusive Allstate agent or do you not?

Being an exclusive Allstate agent would mean that you would have to be exclusive, that you could not do those other businesses. It was his choice. He made the choice that he wants to do both. He did not want to do one or the other, he wanted to do both. That's the problem.

And that's why Allstate ultimately decided in late June that it could not tolerate both. It had to have someone exclusive to Allstate willing to sell Allstate product exclusively as the contract provides.

So Allstate gave a notice of termination June 25th. Gave 90 days of written notice. The contract permits either

party to terminate the agreement with or without cause upon 90 days' written notice. That's Exhibit A section roman numeral 17, which states -- it is roman numeral 17-B2, termination may be by either party with or without cause upon providing 90 days' prior written notice to the other, or such greater number of days as is required by law.

That's what Allstate gave Old Slip, the plaintiff. Counsel referred to certain discussions. There were certain discussions along the way. But it is worth noting, your Honor, that he had 90 days, actually to September 30th is 95. What counsel refers to as emergency relief is being sought after filing a complaint on 79th-day. The immediacy and the emergency, I submit, is Mr. Lukezic's making.

What counsel is here asking for today is an injunction, a TRO pending an injunction hearing, which as you know is an extraordinary remedy. They bear a very high burden. To get a TRO, plaintiff must show it will suffer an immediate and irreparable harm in the absence of a TRO, CPLR 6313 section A.

I submit to you, your Honor, there is no immediacy here. Allstate, as I mentioned, Allstate gave plaintiff 95 days' written notice, and we are now here at the eleventh hour. Any immediate harm suffered is due to plaintiff's own failure to seek relief sooner. We are in a court of equity, your Honor. There is a phrase, one seeking equity must do

equity. And waiting until the 11th hour to seek emergency relief does not create immediate irreparable harm.

On the subject of irreparable harm, there is none here, your Honor. Irreparable harm does not mean just using that word. You have to show, and counsel has not shown it. Nor do the motion papers show it.

Significant is the fact that this business has been in operation only six months. There are federal court cases, Southern District of New York, that recognize where a business has been in business for only a short period of time, that does not equal irreparable harm. Termination, it is too short of a time to establish a loss of good will.

I will reference two cases. One is called Truglia versus KFC Corporation. Which, by the way, is a case involving a franchise agreement exactly the one that counsel says this case falls within. If I may approach the Court and hand you a copy of that case.

And there is one other case I would like to hand up, your Honor. It is called GPA Incorporated versus Liggett Group Inc. Those are both Southern District New York cases in which the Court found for purposes of an injunction that the party seeking injunction could not establish irreparable harm where the business was, in one case in operation for eight months, and in another case for 16 months.

Lastly, I just want to go back to a point I made in reciting the facts. As you know, it is not necessarily relevant for this hearing but if we get to an injunction hearing, the likelihood of success on the merits is very important. But it is also important for purposes in this case of measuring whether irreparable harm actually has been suffered.

I point out the contract allowed Allstate to, either party, to terminate on 90 days' notice, which is what Allstate gave the plaintiff. Plaintiff is not likely to succeed on the merits, given that termination, at least on the breach of contract claim, which is, I understand, the reason why he is in court today.

But if you think about it, plaintiff could not have suffered any harm due to actions that he consented to in the agreement. So I submit to you that establishes there is no irreparable harm.

Now plaintiff may have other damages, and is welcome to raise those in the normal course. But those do not establish the equitable relief which the courts of this state have described as extraordinary. He does not meet that extraordinary burden.

We ask that the Court deny the Order to Show Cause. If the Court wishes to sign one today, we would ask that the Court schedule a hearing as soon as possible as per CPLR

6313. Frankly, we are not sure what would be accomplished by the discovery that counsel described. That has to do with the making of this agreement. And the making of this agreement really has nothing to do with whether he is entitled to extraordinary injunctive relief. So we ask for a hearing as soon as possible. Thank you, your Honor.

THE COURT: Thank you. Counsel.

MR. AZRIN: Thank you, your Honor. So with respect to the timing of the application for the relief, as I already outlined, the notice of termination came at the end of June. We sent our letter, our initial communication in the middle of July. We could not get anybody on the phone until August 6th.

We naively thought once we started talking with someone, explained what was going on, we would be able to resolve the matter. Had further communications in August as expeditiously as possible that gave notice we were filing the application, and then filed it as rapidly as possible.

With respect to the agreement itself, your Honor, there is a separate agreement that Allstate has when it's transferring somebody to become, to sell their financial services products. It is a formal process. You have to formally transfer the licenses. The securities license, the retirement investment advisory license.

This agreement, which my client signed, Section 1A,

is clearly limited to insurance products. Agency will not either directly or indirectly solicit, sell, or service insurance of any kind for any other company, agent, or broker.

If you look at the key person agreement which he signed, which is attached, on page two, it is the third to the last page, that is likewise limited to insurance. While employed by agency, service provider agrees he will not either directly or indirectly solicit or sell insurance of any kind.

This is a form contract that Allstate has used. It has been litigated before, your Honor. When it has been litigated in federal court, Allstate explicitly stipulated, it is in the court decision which we cited, this is only an insurance agreement, because the agents were concerned about the scope of this new form of agreement, and Allstate issued a Frequently Asked Questions, FAQS.

And in the FAQs, one question was does this apply to noninsurance products, this contract? Does it limit us? And Allstate's answer, which is in the federal court decision we cited is, no, this is only an insurance contract, no worries.

With respect, your Honor, about the irreparable harm.

THE COURT: What about the termination on 90 days?

MR. AZRIN: With respect to the termination, the key fact which counsel glossed over is this was not a termination without cause. They terminated explicitly for cause. They elected to terminate for cause. That's point number one. There is four points here, your Honor.

And the second point, the reason that they did not terminate without cause is because that's not part of the model. This is a long-term relationship, you are going to become an Allstater for life. Our agents always stay for decades. Allstate gave him a ten-year financial projection. He invested in this, moved his family, rented the space, consolidated the agencies based on this being a long-term relationship.

And the reason they didn't terminate him without cause is because it is not part of the model. They probably would never be able to sell another agency. If everybody knew that Allstate is going to sign you up as an agent and have you invest all this money and then turn around and terminate you without cause, then they would not be able to sell another franchise, another agency agreement.

They elected to terminate it with cause for reasons that simply don't make sense and are inconsistent with the agreement. And it is inconsistent with the fact that this was clearly a long-term relationship based upon everything that they told him, the promises, the representations they

made.

Moreover, your Honor, to the extent that they had the discretion to exercise the termination, it has to be done in good faith and fair dealing. The implied duty of good faith and fair dealing applies to any contract. To the extent that they did this to try to coerce him for anticompetitive reasons, to force him to bring over those financial services clients, to only sell a product that was an inferior product, is an anticompetitive purpose.

And we believe it was also motivated by personal motivations of the people of Allstate because of the reasons of not being able to generate commissions. So the implied duty of good faith and fair dealing applies to the entire contract.

There are also questions related to the entire circumstances of him -- giving the contract to him, at the last moment, not giving him the supplements that referred to it. And for those reasons, your Honor, we believe that that discretion had to be exercised in good faith and not for an arbitrary reason.

With respect to the irreparable harm, I have discussed that, the balancing is an equitable balancing, the harms on each side. On our side we have a business that is exclusively set up to sell Allstate products. That business, the good will it has generated will be destroyed,

the employees, the family, the lease situation, the opportunities to buy additional books of business, all of that will be lost. The insurance notice will go to the Department of Financial Services, and destroy his -- really hurting his reputation irreparably. And if you are looking at public policy interests, public policy is also served.

Number one, public policy is the overreaching of franchisors and licensors in these types of relationships, which is mentioned in one of the cases that we cited. And the public policy of the fact that this termination for quote-unquote unauthorized trading was in fact done for an anticompetitive purpose.

So to address those issues, the public policy interests also weigh in favor of granting injunctive relief.

THE COURT: Anything else?

MR. YOUNG: Very briefly.

MR. AZRIN: One thing, sorry. My client reminded me as I alluded to, but not specifically mentioned, for him to be authorized to sell Allstate Financial Services products, this agreement does not cut it. There has to be a separate agreement for financial services products, and he has to formally transfer the FINRA licence, the broker dealer license, the retirement investment advisory license. None of that was even discussed, much less being written in the agreement.

MR. YOUNG: Your Honor, I forgot to point out in my opening, by principal comments when I handed you those cases, I did highlight the sections that support the point I made about being in business for six months does not have good will to be destroyed.

On the for cause versus without cause, if you look at section three, if Allstate was to terminate for cause, it could do so immediately. It did not do that here. It felt it had cause. It felt it had a reason, a good reason for terminating the relationship, but it waited 90 days.

The point being, your Honor, whether you say it is for cause or without cause, that Section Two applies. It allowed either party to terminate the contract upon 90 days' written notice, which is what Allstate did. Thank you.

THE COURT: Thank you. So how much time do you need to submit papers in response?

MR. YOUNG: We could have papers submitted by Wednesday next week.

THE COURT: Wednesday next week.

Would you like reply time?

MR. AZRIN: Yes, your Honor.

THE COURT: How much time?

MR. AZRIN: If we could have until the Monday, the 30th.

THE COURT: Okay. I am going to grant the TRO at

this time, but we are going to move the case quickly. There is no -- just given what I've heard, I think that there is a balancing of equities and I'm doing it at this time given the little amount that I know, okay.

So we will come back after you submit all the papers and we will discuss. I always recommend people to go to mediation because there is presumptive mediation here. I would suggest that you -- I will give you a few names. There is a bunch of great mediators in the area that I would suggest that you talk to.

I understand your position of conflicts. I also understand there is carving-outs that you can do and different indemnity things if that's your concern.

So there has been a complaint served as well, correct?

MR. AZRIN: Yes, your Honor.

THE COURT: When is that on? Is that on today for preliminary conference, no?

MR. AZRIN: It was served last week.

THE COURT: Okay. So I will send you a preliminary conference proposed order that you can agree upon. You can do it now if you want, or do it at another time. And as I said, mediation is something that I do. Submit all your papers. I will decide the motion in time. I am kind of backed up right now but I should do it rather quickly.

MR. YOUNG: Will you have us back here for argument? Do you want to schedule that now?

THE COURT: I will if you would like to. Would you like argument?

MR. YOUNG: I think argument would be helpful.

THE COURT: Submit by the 30th. The only thing is I am starting a class action trial October 1st that's scheduled for a month. That's a jury trial, and it is going to be really hard for me to give you oral argument time in between that. There is Jewish holidays in between. We are off the first week November. I don't know if you want to take more time responding.

MR. AZRIN: Related to that your Honor, is to the extent there are any factual issues, that may make sense to have an evidentiary hearing for you to hear the testimony on the preliminary injunction.

THE COURT: That would happen once I decide the -- I mean that would be in my decision ordering a hearing and set a date on that.

MR. AZRIN: Understood, okay.

THE COURT: So I would ask that you do some discovery between now and then. That's why I asked you if you had a preliminary conference order, so you could do your discovery that you want. And I know you only want a little bit of discovery. I know you had a contract here, but there

are e-mails that should be discovered, right?

MR. AZRIN: Yes. Thank you, your Honor.

THE COURT: Tell me when you want to come back, and if you need more time to respond. It is your call.

MR. YOUNG: In light of the fact we are not going to be -- I was thinking that we would get this before your Honor as expeditiously as possible, but understanding your schedule and dockets, why don't we move it to file October 2nd our response. And then you have as much time as you need.

MR. AZRIN: We are dealing with, as you mentioned, the Jewish holidays are going to knock out that week. So if we could have until the two weeks after he files his response, so the 16th.

THE COURT: The 16th, okay. It is fully submitted the October 18th. I will bring you in the first week of November, yes, if you want to argue this orally. Tell me.

MR. YOUNG: I'm attached for trial in Mercer County starting November 4th.

THE COURT: How long is that trial going to be?

MR. YOUNG: Two weeks. Maybe that week after?

THE COURT: The 18th of November?

MR. YOUNG: Sure.

THE COURT: I am going to put you on for November 19th, okay?

MR. AZRIN: Yes. That's fine.

THE COURT: That will be oral argument and a conference.

MR. AZRIN: Then we will decide whether we are going to have an evidentiary hearing?

THE COURT: Yes.

MR. AZRIN: Very good.

THE COURT: That would be 2:00 p.m.

I am going to mark this up and it will be uploaded. Thank you.

MR. AZRIN: Thank you, your Honor.

MR. YOUNG: Thank you, your Honor.

MR. AZRIN: The service section of the proposed Order to Show Cause --

THE COURT: Are you accepting service?

MR. YOUNG: I will accept service.

MR. AZRIN: For all the defendants?

MR. YOUNG: Well, there is only one that you are seeking to enjoin.

MR. AZRIN: Yes, okay.

THE COURT: Yes. With respect to the Order to Show Cause, it is really just going to be Allstate Insurance Company.

MR. YOUNG: I will accept service on behalf of Allstate.

MR. AZRIN: Thank you, your Honor.

* * *

This is to certify that the foregoing transcript is a true and accurate transcription of the original stenographic record.

Donna Loomba (signature)

Donna Loomba
Senior Court Reporter

At ~~IAS Part ____ of the~~ Supreme Court of the State of New York held in and for the County of Westchester, New York, at the Courthouse located at 111 Dr. Martin Luther King, Jr. Blvd., White Plains, NY 10601, on the 19th day of Sept, 2024

PRESENT:

HON. LINDA S. JAMIESON,

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
----------------------------------------------------------------x
OLD SLIP BENEFITS & INSURANCE SERVICES, LLC

Index. No. 69162/202

Plaintiff,

v.

**ORDER TO SHOW CAUSE**

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON and ALLISON ANN MCMAHON,

Defendants.
----------------------------------------------------------------x

UPON the Affirmation of Joseph Lukezic, sworn to on September 11, 2024, the Affirmation of Emergency of David T. Azrin, dated September 12, 2024, and the Memorandum of Law in Support of the Motion for Preliminary Injunction and Temporary Restraining Order to Maintain the Status Quo by Order to Show Cause, dated September 12, 2024,

Let Defendant Allstate Insurance Company or its attorneys, show cause before this Court, at ~~IAS Part~~ ________, before the Honorable Linda S. ________, at the Courthouse located at 111 Dr. Martin Luther King, Jr. Boulevard, White Plains NY 10601, on Octobe, 2024, NO ~~at~~ ______ ~~a.m./p.m.~~, or as soon thereafter as counsel can be heard, why an Order should not be made and entered as follows:

1. Granting injunctive relief pursuant to CPLR 6301 to maintain the status quo enjoining the

Defendant Allstate Insurance Company from terminating the March 1, 2024 agency agreement between Plaintiff Old Slip Benefits & Insurance Services, LLC and Defendant Allstate Insurance Company ("Agency Agreement"), pending a full determination of the merits of this action; and

2. Granting such other, further and different relief as this Court may deem just, proper and equitable under the circumstances.

SUFFICIENT CAUSE THEREFORE APPEARING, it if further

ORDERED that, pursuant to CPLR 6313 and the applicable caselaw cited in the Plaintiff's application, in order to maintain the status quo and prevent irreparable harm, pending the hearing and determination of Plaintiff's motion for preliminary injunctive relief, Defendant Allstate Insurance Company shall refrain from carrying out or effectuating the scheduled termination of the Agency Agreement until a hearing and determination can be had on Plaintiff's motion for preliminary injunctive relief.

ALL SERVICE ACCEPTED

ORDERED that service of a copy of this Order to Show Cause, together with a copy of the papers upon which it is based, upon Defendant Allstate Insurance Company's counsel A. Chirstopher Young, Troutman Pepper, via email to Christopher.Young@troutman.com, on or before the _______ day of _________, 2024, shall be deemed good and sufficient service thereof.

ORDERED that the answering papers in opposition to this Order to Show Cause shall be served on Plaintiff's counsel via NYSCEF no later than _________________________, 2024.

ORDERED, that Plaintiff shall serve reply papers on Defendant Allstate Insurance Company by NYSCEF no later than ____________Octobe____________, 2024.

ENTER:

Hon. Linda S. Jamieson, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------------x
OLD SLIP BENEFITS & INSURANCE SERVICES, LLC

Index. No. 69162/2024

Plaintiff,

v.

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.
-------------------------------------------------------------------x

SUPPLEMENTAL AFFIRMATION OF JAMES LUKEZIC IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

James Lukezic, hereby affirms under penalty of perjury, as follows:

1. I am the owner and managing director of Plaintiff Old Slip Benefits & Insurance Services, LLC ("Old Slip"), a New York limited liability company, and have personal knowledge of the facts in this Affirmation. I am submitting this Affirmation to provide the Court with additional information that has arisen last month, on December 12, supporting the Plaintiff's Motion for Preliminary Injunctive Relief, and to reiterate the key points in the three affidavits I have already submitted to the Court, including the Affidavit filed Sept. 12, 2024 [Docket Entry No. 5], the Affidavit filed November 14, 2024 [Docket Entry No. 52], and the Affidavit filed December 10, 2024 [Docket Entry No. 63], which are incorporated herein.

2. On October 18, 2024, my attorneys served a subpoena on FINRA, the organization which regulates securities professionals, dated October 16, 2024, seeking any documents or communications in FINRA's possession from Allstate relating to me or my registered broker-dealer firm, Old Slip Capital Management.

3. Significantly, on December 12, 2024, in FINRA's response to our subpoena, FINRA did ***not*** produce any U4 Form from Allstate to transfer my securities licenses to Allstate's broker dealer firm, which Allstate would have been required to submit to FINRA if Allstate wanted or intended that I would be selling Allstate financial products.

4. The fact that FINRA did not produce such a form, shows and confirms what I have stated, namely that *Allstate **never submitted** a U4 Form to FINRA to transfer my securities licenses to Allstate's broker dealer Allstate Financial Services, LLC* for me to sign, which confirms that there was never any intent by either side that I would be selling Allstate's investment products, because to do so, Allstate Financial Services would have had to submit a U4 FINRA form to register me with Allstate Financial Services.

5. As stated in my prior affidavits, at no point in time did the Allstate salespersons say anything to me about transferring my FINRA licenses to Allstate, and they never asked me to sign any of the required paperwork to transfer my FINRA licenses to Allstate, because that was not part of the deal. My business plan for the Allstate agency only proposed selling Allstate insurance products, and ***not*** investment products. This is consistent with the language of the agency agreement which we signed. For example, Section 1[E] of the Allstate Agency Agreement, Section 1[E] is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance." [Docket Entry No. 6].

6. As stated in my prior affidavits, Defendant Allstate, through its intensive marketing, onboarding and training programs during the 3-4 months, from September 2023 through February 2024, before I signed the agency agreement on February 21, 2024, intentionally led me to believe that it was offering my new agency, Old Slip Benefits & Insurance Services, LLC ("Old Slip"), a long-term relationship, in return for my commitment to invest in setting up

and operating the agency, Allstate would do everything to support my new agency, and Allstate would not terminate the relationship with my agency unless it breached its obligations.

7. As stated in my prior affidavits, Allstate's marketing materials specifically promised and reassured Old Slip that:

- "When you become an Allstate agency owner, you're not on your own. From day one, we'll help you build the knowledge, skills and tools you need to succeed."
- "Build a legacy. When you're ready, sell your business or pass it down to a family member."
- "Nobody's business but yours."

8. Allstate's salespersons assured me that once I become an Allstate agent, you never leave, most of our agents stay with us for life, we take pride that most of our agents have been with us for more than 25 years. Further, Allstate arranged all of the financial terms with the sellers of the accounts Old Slip was purchasing, telling me that these sellers have been with Allstate for almost 30 years, and that Allstate wanted me to be with Allstate for 30 years. When I asked what happens if I am unable to perform for some reason, Allstate assured that Allstate would line up a buyer for me, just like they lined up a buyer for the sellers. Allstate did not provide me with the form agency agreement until the day it had to be signed in time for the closing, and when I expressed that I was not comfortable with the form, Allstate's salesperson told me it was a formality that I just needed to sign right away, or else I would not get the financing.

9. During the sales and recruitment process, Allstate's sales team sent me specific representations projecting how much money Old Slip would make, including revenues and expenses, over each of the next five years.

10. When I signed the agreement, I understood that I was entering into a long-term relationship with Allstate, under which both sides were committing to invest in each other over the

long-term, where neither could terminate unless the other breached their obligations.

11. Various provisions in the agreement bolster this understanding that the parties were making a long term commitment to each other and that, if there were any problems, the parties would attempt to resolve them. (NYSECF Doc. No. 6). See, for example, the following provisions: §VII (if quality of services was not acceptable, Allstate would require Old Slip "to institute appropriate procedures to correct any deficiencies noted by the Company"); §XI (Allstate would give Old Slip 15 days' notice and opportunity to cure if Old Slip did not have adequate insurance); §II(J) (if Old Slip could no demonstrate knowledge of any product, Allstate could withdraw Old Slip's authority to sell it until it demonstrated such knowledge); §II(I) (Allstate could request that Old Slip meet with Allstate representatives to discuss various business topics); §XVI(B) (failure to obtain prior written approval for a transfer would be sufficient "cause" for termination); §IV(A) (Allstate would furnish Old Slip with the signs, forms, manuals, records, and other materials and supplies it needed to succeed); §V(A) (Allstate would review and approve Old Slip's location); §VI (Allstate would advertise and provide promotional material). The agreement should be interpreted in a manner that is consistent with these provisions, that would not make them meaningless or superfluous, or deprive Old Slip of the benefit of the bargain.

12. In December 2023, well before I signed the franchise insurance agency agreement in February 2024, Allstate sent me a list of all of the requirements I would have to fulfill to become an Allstate franchised agent, including for example, all of the licensing requirements, the requirements to purchase signs from Allstate, the requirement to have sufficient liquid capital, the requirement to purchase Allstate marketing material and the required laptop computers, and the requirements to complete the extensive online training program.

13. As a condition for entering into the franchise agreement, Old Slip was required to

purchase and pay Allstate or its affiliated companies for several Allstate required purchases which were required for me to operate as an Allstate franchised business. I was required to purchase many of these items from the "Allstate Technology Store", which could only be accessed through the Allstate portal.

14. As a condition for entering into the franchise agreement, Old Slip was required to, and did, locate the office at a location approved by Allstate. Allstate disapproved the first two locations that I proposed, and only approved the third location.

15. As a condition for entering into the franchise agreement, Old Slip had to agree that its customers must pay their premiums directly to Allstate, rather than to Old Slip, and that Allstate would keep on average about 93% of the premium payments it received from Old Slip's customers, based on Allstate's mandated formula, and that Allstate would pay Old Slip only about 7% of the premiums collected. Old Slip was required to open its franchised business bank account at one of the two Allstate authorized banks, namely Chase or Wells Fargo, and Allstate required Old Slip to purchase a stamp to be used if customers accidently delivered a premium check to Old Slip (rather than to Allstate), in which case Old Slip was required to use the stamp to endorse the check over to an Allstate controlled bank account.

16. Old Slip was required to, and did, arrange its financing for the purchase of the agencies through the Allstate Lending Connection, and was required to pay the Allstate Lending Connection various administrative and processing fees in connection with the financing, as a condition for the financing and the purchase of the agencies. Allstate and the bank, which was affiliated with Allstate, entered into an agreement which gave the bank a security interest in Old Slip's customer accounts and guaranteed the bank that it would get paid directly from Allstate as a fixed monthly direct payment that was automatically deducted from the commissions that Old

Slip earned and was otherwise entitled to be paid by Allstate. Allstate and the bank arranged for a long-term loan, to be repaid over a ten year period at 9% interest, so that Allstate would collect the customers' insurance premiums, calculate Old Slip's commission, and deduct a fixed monthly amount from Old Slip's commission, and pay this fixed monthly amount directly to the bank, for the next ten years.

17. In February 2024, Allstate told me which entity I needed to use to enter into the agency franchise agreement, telling me that I had to sign the agreement with Allstate in the name of the entity that had a state insurance agency license. They also told me I had to complete the required training program, before I could even sign the Allstate agency franchise agreement and become an Allstate agent. Allstate had to sign off on all of the financing requirements, and instructed me on the Allstate Lending Connection requirements, including giving a security interest to the bank in the accounts.

18. In February 2024, in my communications with Allstate and the lender, Allstate told me that the lender could not issue the loan documents until I had signed the Allstate agency franchise agreement, known as the R3001 agreement. Strangely, when I tried to get it from Allstate, I received a notice from Allstate that it could not provide the agreement to me until five days before the scheduled March 1 effective date. The lender told me that it needed it sooner, in order to have time to issue the loan documents and get them signed at least two days before the March 1 date. The lender representative told me to ask my "fields sales leader" again for the contract, referring to Marc Stevenson. When I asked Allstate, whether, given that I did not yet even have the contract, if it would be ok if I signed it the following week, and they told me no, because then we would have to delay the closing, and that as a result, the funding might fall through and I might not be able to get the financing at a later date, and the entire transaction would fall

through.

19. I finally received the contract on Wednesday, February 21, and pursuant to Allstate's specific instructions that I had to sign it right away, I went ahead and signed it right away minutes after I got it, so that we could meet the deadline. Neither Allstate or the bank sent the agreement to my attorney at the time who was communicating with the bank. I was under extreme pressure by Allstate to sign it right away, which I had to do, because otherwise the deal might fall through, and neither me or my attorney at the time were given time to review it because Allstate did not even send me the agreement until there was no time left.

20. On the Monday, February 26, 2024, Allstate had still not signed the agreement. So, Allstate went ahead and sent a copy of the agreement which I had signed to the lender, and promised they were working on getting it signed by the authorized Allstate "Zone District Leader." Later that same day, Allstate finally sent the fully-signed R3001 agreement directly to the lender, with only four days before the scheduled closing.

21. When I entered into the agency agreement, based on everything Allstate had done and told me, I was under the distinct impression and understanding that this was a long-term relationship, that Allstate could not unilaterally terminate the agency agreement unless it had a legitimate reason to do so, and that I was investing all of my time, hard work and money into this relationship in return for this commitment by Allstate. It is absolutely ridiculous to me to even suggest that anyone would think that I would take out a $405,000 loan approved by Allstate, sign a long-term lease approved by Allstate at a location approved by Allstate, move my family to New York, undertake months of training, hire employees and set up the agency, and that Allstate could turn around the next day and terminate the entire agreement without even having any reason.

22. When I signed the franchise insurance agency agreement with Allstate in February

2024, it was clearly understood and intended that I would continue selling investment products through my own broker-dealer firm. Allstate was fully aware that I had my own broker-dealer license because I discussed this with Allstate in my conversations with Allstate, including among others the recorded Zoom video-conference call I had with Defendant Brittany Cleere where I described how I would maintain my investment business and I would cross-sell Allstate's insurance products to my investment customers, and Brittany Cleere said that this was a great idea. Despite my lawyer's repeated requests, Allstate has still not turned over the recording of the Zoom video-conference call, in response to our document requests in this case.

23. Allstate knew I had my own broker-dealer firm because it was mentioned at the bottom of every email correspondence I had with Allstate, which contained a caption at the bottom which specifically said that "Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC."

24. In addition, my association with my broker-dealer firm Old Slip Capital Management was publicly available to the world on the online FINRA BrokerCheck database, at www.brokercheck.finra.org, as shown on the BrokerCheck Report which Allstate itself submitted in this case. [Docket Entry No. 21].

25. I affirm this date, January 5, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

DocuSigned by:
A34EB23BE231478...
JAMES LUKEZIC

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------------x
OLD SLIP BENEFITS & INSURANCE SERVICES, LLC

Plaintiff,

v.

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.
------------------------------------------------------------------x

Index. No. 69162/2024

Mot. Seq. 002

Hon. Linda S. Jamieson

**AFFIRMATION OF JAMES LUKEZIC IN OPPOSITION TO DEFENDANT MARC STEVENSON'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

James Lukezic, hereby affirms under penalty of perjury, as follows:

1. I submit this Affirmation in opposition to Defendant Marc Stevenson's Motion to Dismiss for Lack of Personal Jurisdiction ("Motion").

2. I am suing Defendant Marc Stevenson because he personally committed violations of the New York Franchise Sales Act, and he has statutory individual liability.

3. As outlined in the Amended Complaint and the accompanying memorandum of law in opposition to the Motion, Allstate sold me an insurance franchise business without complying with the basic requirements of New York franchise sales laws. Those laws specifically require that any company selling a franchise (broadly defined) in the State of New York must register with the State of New York and must provide the prospective franchisee with an approved detailed

disclosure document, at least 14 days before the prospect signs or pays anything, which describes the franchise offering in detail, including among other things, a clear description of the grounds for terminating the agreement. NY GBL § 683(a); 13 NYCRR § 200.2. The purpose of the law is to prevent overreaching by franchisors during the franchise sales process. As described in the Complaint and the accompanying memo of law, Allstate's sale of the insurance agency constituted the offering of a franchise, as it meets all the elements of a franchise, NY GBL § 681; 13 NYCRR § 200.1(a) & (b), and therefore the sale violated New York law.

4. As further outlined in the Complaint and the accompanying memorandum of law, the New York Franchise Sales Act specifically imposes individual liability on any employee of the franchisor "***who materially aids in the act of transaction constituting the violation***." N.Y. Gen. Bus. Law § 691. Accordingly, Stevenson is individually liable if he materially aided in the violation, namely, the sale of an unregistered franchise to me, without giving me a registered franchise disclosure document, and without giving me at least 14 days to review the disclosure document and the proposed agreement.

5. Not only did Stevenson aid in committing the violation, he was the dominant and integral force responsible for every aspect of the sales process, from the beginning to the end, including being the one who had Allstate provide me with the agreement at the very last minute to meet the deadline he had set, and who instructed me and pressured me that I had to sign it right away.

6. It is important to understand that I did not become an Allstate franchised agent and I did not sign the Allstate franchise agency agreement until Wednesday, ***February 21, 2024***. Prior to signing that agreement, I had no contractual relationship with Allstate. Rather, I was merely a prospect or a candidate. During the four months from October 2023 leading up to my signing the

agreement in February, it was Marc Stevenson who was the leader in the recruitment and sales process.

7. The following is a chronology of Stevenson's integral role, during the four months ***from October 2023 through February 2024***, in *leading* the sales process to get me to sign the Allstate franchise agreement on February 21, 2024, even though Allstate was never registered to sell franchises in the State of New York, and never gave me the required approved franchise disclosure document. Attached as *Exhibit A* are some of the email communications I had with Stevenson during this time period, in chronological order.

8. In September 2023, after I expressed an interest in becoming an Allstate franchisee, I was contacted by an Allstate recruiter Jim Hoffsher, who introduced me to Allstate salespersons Adriane Foreman and Regine Napoleon, who introduced me to two Allstate franchised insurance agencies that were interested in selling their accounts, namely Anthony Fava and Alfred Buglione ("Sellers"). In October or November 2023, Adriane Foreman introduced me to Marc Stevenson on a phone call or zoom call, and told me that Marc was going to be my main contact person, responsible for everything during the recruiting process, including managing and overseeing the discussions with the Sellers, transferring my insurance licenses, guiding me in completing the training, obtaining financing, and signing the necessary agreements.

9. Thereafter, in each of his numerous emails to me, his signature block always described himself as my "Candidate Concierge", on the "Agency Strategy, Producer Onboarding & Offboarding Team." He specifically listed the State of New York as his personal geographic area of responsibility, along with 7 other nearby states. Regardless of his title, from that time on, until I signed the franchise agreement on February 21, 2024, Stevenson was the lead person pitching me on how great it would be to become an Allstate franchisee.

10. In November 2023, Stevenson pushed along the process of getting information from the Sellers and myself regarding the planned sale. Stevenson set the effective date of the sale to be March 1, 2024, even before I had even signed my asset purchase agreements with the Sellers which did not take place until later in January 2024. Stevenson coordinated me and the Sellers submitting UCC information for the Agency Purchase Approval Request ("APAR") form, which Stevenson signed. Note that this form was not the agency agreement – that came four months later. The APAR form was merely Allstate's acknowledgement that we had submitted our required UCC information. I had not yet signed any agreement with Allstate to be an Allstate agent, I had not yet signed any agreement with the Sellers, and I had not yet completed any training. I was merely a prospect or candidate.

11. In December 2023, Stevenson sent me a list of all of the requirements I would have to fulfil to become an Allstate franchised agent, including for example, all of the licensing requirements, the requirements to purchase signs from Allstate, the requirement to have sufficient liquid capital, the requirement to purchase Allstate marketing material and the required laptop computers, and the requirements to complete the extensive online training program. During December 2023, Stevenson also had various communications between me and the Sellers, before I had even signed any agreement with the Seller, answering our questions and acting as a sort of broker to push us along to get us to sign our asset purchase agreements.

12. In December 2023 and January 2024, Stevenson pushed things along, instructing me on what I needed to do with respect to my state insurance agent license, where I had to buy E&O insurance, the banking requirements, and signage requirements.

13. In February 2024, he directed me on the entity I needed to use to enter into the agency franchise agreement, telling me that I had to sign the agreement with Allstate in the name

of the entity that had a state insurance agency license. He also instructed me on everything I needed to do to complete the required training program, which I had to complete before I could even sign the Allstate agency franchise agreement and become an Allstate agent. Stevenson was also coordinating the lending for me to obtain financing for the purchase of the Seller's accounts, informing me I had to use the required Allstate Lending Connection and approved Allstate lender. Stevenson had to sign off on all of the financing requirements, and instructed me on the Allstate Lending Connection requirements. Stevenson instructed me that I had to give a security interest to the bank in the accounts. Stevenson was basically running the show.

14. In February 2024, in my communications with Stevenson and the lender, I was informed that the lender could not issue the loan documents until I had signed the Allstate agency franchise agreement, known as the R3001 agreement. Strangely, when I tried to get it from Allstate, I received a notice from Allstate that it could not provide the agreement to me until five days before the scheduled March 1 effective date. The lender told me that it needed it sooner, in order to have time to issue the loan documents and get them signed at least two days before the March 1 date. The lender representative told me to ask my "fields sales leader" again for the contract, referring to Marc Stevenson. On Saturday, February 17, I communicated with Marc Stevenson again and asked him to have a call on this "asap". Soon after that, I spoke with Marc, he called me in New York, and we discussed the timing of my signing the agency agreement. I asked Marc whether, given that I did not yet even have the contract, if it would be ok if I signed it the following week, and he told me no, because then we would have to delay the closing, and that as a result, the funding might fall through and I might not be able to get the financing at a later date. I finally received the contract on Wednesday, February 21, and pursuant to Marc's specific instructions that I had to sign it right away, I went ahead and signed it right away minutes after I

got it, so that we could meet the deadline. On the Monday, February 26, Allstate had still not signed the agreement. So, Marc went ahead and sent a copy of the agreement which I had signed to the lender, and promised he was working on getting it signed by the authorized Allstate "Zone District Leader." Later that same day, Marc finally sent the fully-signed R3001 agreement directly to the lender, with only four days before the scheduled closing.

15. In every aspect leading up to me signing the Allstate agency franchise agreement, Stevenson was calling the shots, dictating every aspect of the deal. Stevenson had to approve everything. He arranged for Allstate to send me the franchise agency agreement, and he is the one that told me I had to sign it right away. In this sense, Stevenson was the "franchise seller" – because he is the one who led and coordinated the effort to get me to become an Allstate insurance agent and to sign the agreement for a New York based Allstate agency, even though Allstate was not even registered to sell franchises in the State of New York.

16. For all these reasons, I respectfully request that this Court should deny Marc Stevenson's motion to dismiss for lack of personal jurisdiction.

I affirm this date, 11/13/2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

DocuSigned by:
A34EB23BE231478...
JAMES LUKEZIC

CLERK 11/14/2024 05

# EXHIBIT A

**Wednesday, October 2, 2024 at 13:29:01 Eastern Daylight Time**

**Subject:** RE: Agency Purchase Approval Request (APAR) - Buglione/Lukezic
**Date:** Thursday, November 30, 2023 at 1:26:51 PM Eastern Standard Time
**From:** Stevenson, Marc
**To:** BUGLIONE, Al, James Lukezic
**CC:** Foreman, Adrian, Napoleon, Regine
**Attachments:** image001.jpg, image002.jpg, APAR - Buglione-Lukezic - 3.1.24.pdf

Good afternoon,

Please find attached the fully executed copy of the Agency Purchase Approval Request (APAR).

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** Stevenson, Marc
**Sent:** Monday, November 20, 2023 12:16 PM
**To:** BUGLIONE, Al <ABUGLIONE@allstate.com>; james@oldslipcap.com
**Cc:** Foreman, Adrian <afory@allstate.com>; Napoleon, Regine <rnapo@allstate.com>
**Subject:** Agency Purchase Approval Request (APAR) - Buglione/Lukezic
**Importance:** High

Hi Al & James,

The Agency Purchase Approval Request (APAR) has been sent to you to complete via ESign. The email will be coming from "Allstate Insurance signers@esign.allstate.com ".

It will go to the seller first then the buyer. Once the seller completes his/her portion and click on Confirm/Done, the system will automatically send the form to the buyer to complete. Please ensure that you review and complete the form in its entirety. Attached to this email is the reference guide. Please use this document to assist you in completing the form.

Please be advised:

- **Sale effective date should be 3/1/2024**

**Al,** Allstate Lending Connection Site shows below Active Assignments on your book. **Please use the attached guide to complete the online form to reflect the below and any other liens including those found in the UCC results.** If you have any question regarding below assignment, please contact the Lending Connection at allstatelendingconnection@allstate.com for direction. Please note we will need a lien release by 3/1/24 to process the sale.

**Active Assignments with Allstate Lending Connection**

| KEY PERSON | ASSIGNMENT TYPE | ASSIGNMENT STATUS | LENDER | SIGNATURE DATE | COMMENCEMENT DATE | TERM DATE | POSITION |
|---|---|---|---|---|---|---|---|
| ALFRED BUGLIONE | SAG | Active | Capital Resources, LLC | 2009-11-12 | | - | 1st |

**Results Found on UCC Search**

**Name of Individual Searched :**

BUGLIONE ALFRED ***All Filings**

Back | View First Page(s)

1. Debtor Names: **BUGLIONE & ASSOCIATES LLC** — **565 GRAMATAN AVENUE, MT. VERNON, NY 10552, USA**
**BUGLIONE, ALFRED P.** — **203 CLAREMONT AVE., MOUNT VERNON, NY 10552, USA**
Secured Party Names: **REPUBLIC BANK OF CHICAGO** — **2221 CAMDEN COURT, FLOOR 1, OAK BROOK, IL 60523, USA**

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200909175836720 | 09/17/2009 | 09/17/2014 | Financing Statement | 1 | View |
| 201406195650989 | 06/19/2014 | 09/17/2019 | Continuation | 1 | View |
| 201907085871378 | 07/08/2019 | 09/17/2024 | Continuation | 1 | View |

1 of 2

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

Allstate

# *Agency Purchase Approval Request*

**Sale Effective Date:** 03/01/2023

**PART I: Seller's description of the Agency to be sold**

Agent/Key Person Name: Anthony Fava

List Corporation | Entity Name as shown within the R3001 agreement:
A J Fava Agency Inc

All names under which agency has conducted business:
A J Fava Agency, Inc, Fava and Maxwell

Agent Number: a099526

☒ I understand that I must email the Buyer a copy of my **prior-year end** and **current month** Business Metrics reports for the review and approval of purchase request. Provide the email to the candidate concierge upon request.

**PART II: Disclosure of Assignment & Disclosure of Deficiencies**

**Seller**

I certify that I have made, or am aware of, the **following transfers of my interest*** in my R3001 Agreement and interests in my business under that Agreement. ***Examples of transfer of interest: Active Liens, UCC filings, TPP Assignments, Security Interest Assignments, Assignments of Commission.**
Disclose each lender/secured party below or indicate Not Applicable if there are none:

__X__ Not applicable due to no transfers, liens or assignments

_____ Yes. List each lender/secured party below:

______________________________________________________________________

Are you aware of any **additional alleged claim** to your interest in your R3001 Agreement or any interest in your business under that Agreement that is not listed above, including but not limited to **tax liens**, **financial obligations owed to the company or legal judgments** rendered against you?

__X__ No

_____ Yes. Please explain and enter dollar amount:

______________________________________________________________________



© 2023 Allstate Insurance Company Revised 08/2023

Allstate

***Agency Purchase Approval Request***

I certify that I have notified the buyer in writing and also emailed the buyer a copy of the documents reflecting the above transfers, liens, assignments or judgments.

__X__ Not applicable due to no transfers, liens, assignments or judgments disclosed above
_____ Yes, I have notified the buyer.
_____ No, I have not notified the buyer. Explanation required:

______________________________________________________________________________

I certify that I have notified the buyer in writing of the manner in which I intend to satisfy the above transfers, liens, assignments or judgments, as required by the EA Independent Contractor Manual.

__X__ Not applicable due to no transfers, liens, assignments or judgments disclosed above
_____ Yes, I have notified the buyer.
_____ No, I have not notified the buyer. Explanation required:

______________________________________________________________________________

I certify that after agreeing to the terms of the purchase and/or providing pertinent DASH reports to the buyer, I have not approved the transfer of any policies (via Agent Change request) credited to my account as stated in Section XIII. of the R3001 Agreement.

__X__ Yes, I agree with the statement above and have not approved the transfer of policies.
_____ No, I do not agree with the statement above and have approved the transfer of policies. (Provide details below)

______________________________________________________________________________

I certify that I have notified the buyer in writing outlining any non-resident policies in the book of business and the license(s) the buyer must secure. I also provided total premium, Policies in Force and the lines of insurance attached to each non-resident State to allow the buyer to decide if they will secure the required licenses.

__X__ I do not have non-resident premium in my book.
_____ If yes, list each non-resident State, line of insurance, Policies in Force, and total premium per State

______________________________________________________________________________

I certify that I have notified the buyer of any and all deficiencies which could materially impact the value of the book of business. Examples of deficiencies could include but are not limited to: improper rating of policies, unprocessed termination requests, etc. Below is a description of each and every deficiency known to me and disclosed to the buyer. I will also provide any supporting documents of any and all deficiencies fully disclosing each and every deficiency known to me and disclosed in this section to the buyer.

__X__ Not applicable due to no deficiencies
_____ Yes, please explain below
_____ No, please explain below

Description of deficiencies:

______________________________________________________________________________



© 2023 Allstate Insurance Company 

Allstate

***Agency Purchase Approval Request***

Seller or authorized representative Acknowledgement: I declare that all the information contained in this Agency Purchase Approval request form is true, correct, and complete. I understand that the Company's approval of the sale of my economic interest in the agency is contingent upon my disclosing any and all assignments, conveyance, liens, security interests, pledges, or mortgage and lender UCC filings to the buyer, and obtaining a release of same. I must also disclose to the buyer any and all deficiencies that could materially impact the value of the book of business. As a condition to approval of the sale, the Company may require me to make such disclosures to the buyer using this form.

I understand that written acknowledgment of the proposed sale from the assignee must be provided prior to the Company's agreeing to grant an economic interest in the book of business to the buyer. I also understand that, before the Company completes transfer of the policies associated with the sale to the buyer's account, I must provide the Company with a copy of a written release of any assignment(s) from the assignee(s) and satisfy any other conditions the Company establishes for approving the sale. Finally, I understand that failure to provide written release(s) of all assignments, conveyances, liens, security interests, pledges, or mortgage and lender UCC filings may result in the Company revoking its contingent approval of the sale.

☐ I understand that I must submit a copy of written release of any assignments from the assignee(s) to my Agency Establishment Candidate Consultant before the book of business can transfer.

☒ Not applicable due to no assignment(s)

e-Signed by Anthony Fava
on 2023-11-21 15:23:35 GMT
(Seller or authorized representative signature)

November 21, 2023
(Date)

---

**PART III: Proposed Buyer's Agent/Key Person Information**

**Must use same name as on Social Security Card**

Name Lukezic (Last) James (First) Joseph (Middle)

If Buyer is a Corporation or other entity, name of corporation or entity:

Old Slip Capital Partners, LLC

If Financing is part of the purchase, please list finance company/individual you are working with currently, or if there is no financing at this time, please state so below:

Wintrust

☒ I acknowledge I must have a confirmed plan to purchase the economic interest of the seller's book of business prior to opening my agency, and validation of such may be required.



© 2023 Allstate Insurance Company

Allstate

*Agency Purchase Approval Request*

**PART IV: Documents to be sent to my Candidate Concierge**

Buyer must ensure the following:

**For purchase approval:**

☒ All UCC Filings – provide documentation of all UCC Filings or documentation of search showing no result for each name seller disclosed in Part 1.

☒ I acknowledge that I have received an email from the Seller that contains a copy of their prior-year end and current month Business Metrics reports for my review and approval of the purchase request.

☒ I certify I was notified by the seller the composition of the book includes non-resident premium. I also understand the non-resident license(s) that I must secure to qualify to receive this portion of the book of business.

____ Not applicable to the book I am purchasing

__X__ I will accept the non-resident premium. I will apply for the non-resident license(s) after receiving notice from Allstate that the request for non-resident appointment(s) has been approved and after receiving approval to purchase the seller's book.

____ I am declining the premium attached to the following State(s): ___________________________________

If the non-resident state(s) has new market restrictions, there cannot be any new or additional marketing actions of cold calling, advertising, and direct mail campaigns aimed at generating new customers in the non-resident state. Products and services can only be provided to family, friends, and centers of influence that are established. Confirm whether the non-resident state(s) being requested is restricted from new marketing actions with your Sales Leader.

---

**For a sale to be processed:**

☒ Written Sale Agreement between Buyer and Seller with the sale price and any other confidential term and/or conditions redacted.

Buyer understands and agrees that the Company's consent to the purchase of the agency is subject to the Company obtaining a written and signed sale agreement to show a sale has been completed or will take an effect in the future without any contingencies other than payment for consideration. The copy provided to the Company should have the sale price and any other confidential terms and/or conditions redacted. By its receipt of the sale agreement, the Company is not making any representations or warranties regarding the sales agreement, nor is the Company assuming any responsibilities regarding its validity or enforceability.


© 2023 Allstate Insurance Company 

Allstate

# *Agency Purchase Approval Request*

NOTICE: THE PURCHASE OF AN INSURANCE AGENCY IS A COMPLEX COMMERCIAL TRANSACTION. ALLSTATE RECOMMENDS THAT YOU OBTAIN PROPER LEGAL REPRESENTATION TO ADVISE AND CONSULT YOU IN THIS TRANSACTION.

An investigative consumer report may be ordered by Allstate to check your background. The investigation will be limited to: credit reports, bankruptcies, suits, judgments, criminal records (involving conviction only) and driving records. You may request a more detailed disclosure of the nature and scope of the investigation.

I certify that the information contained in this form is correct to the best of my knowledge and I understand that deliberate falsification of this information may lead to termination of the Allstate Exclusive Agency Agreement. I authorize the references listed on my resume or provided separately to give you any and all information concerning my previous employment/position and any pertinent information, they may have, personal or otherwise, and release all parties from all liability for any damage that may result from furnishing them to you.

I understand that it is my responsibility to perform requisite due diligence into the book of business and to ascertain whether there are any existing assignments, conveyances, liens, security interests, pledges, or mortgages and lender UCC filings on the economic interest in the agency and to verify the release of any such assignments and UCC filings prior to the transfer of the book of business. I also understand that the Company makes no representations or warranties as to whether the economic interest to be acquired is the subject of any encumbrances of any kind, or any deficiencies that could materially impact the value of the book of business. I understand I am solely responsible for identifying such deficiencies and I should consider the same when negotiating the sale price for the book of business. Further, the seller has made all such disclosures to me regarding deficiencies which could materially impact the value of the book of business. I understand that from time to time the Company may take corrective actions, cancel or non-renew policies and contracts and that the value of the book of business may change on a regular basis. I acknowledge that the Company shall bear no responsibility to me should there be any change that could impact the value of this book of business.

I also understand that in order for my purchase of this agency to be approved by Allstate, I must provide Allstate with written confirmation that I have conducted a proper search for UCC filings on the economic interest in the agency. This written confirmation is required to be in the form of a copy of the UCC filings search results.

e-Signed by James Lukezic
on 2023-11-21 15:31:07 GMT    November 21, 2023

Proposed Buyer Signature    Date

*Refer to the following page for a list of considerations when buying a book of business.

NOTE: ***Sale of Agency as a result of permanent incapacity or death of Agent/Key Person***

Documentation must be provided that demonstrates that the seller of the economic interest in the book of business has authority to act on behalf of the Agent/Key Person (e.g. legal guardianship, conservatorship, durable power of attorney) or on behalf of the estate of the Agent/Key Person (e.g. letters of administration, letters testamentary, corporate resolution and/or by-laws). This documentation must be forwarded to National Agency Establishment Team for review and approval before the sale can take place. For additional information on this process, please refer to the Exclusive Agent Reference Guide.



© 2023 Allstate Insurance Company Revised 08/2023

Allstate
You're in good hands.

**CONSIDERATIONS WHEN BUYING A BOOK OF BUSINESS**

Following are examples of issues you, as the potential buyer, may wish to consider as you decide whether you want to purchase the economic interest in an Allstate exclusive agency as well as the price you may decide to pay for that economic interest. Please note in sale of agency situations, Allstate is neither the buyer nor the seller. You, as the buyer, are solely responsible for conducting your own due diligence into the book of business and determining the method used to value the economic interest. You are also responsible for creating your own business plan and projecting the potential written premium of the agency. When projecting potential premium, please keep in mind that your projections should be reasonable and achievable. You may wish to use historical data in your market (if available) or talk with other Allstate agents to determine what you might be able to achieve based on your business plan and the manner in which you decide to operate your agency.

Typical considerations may include:

- Accounting business related decisions
- Tax considerations:
  - Underlying agency compensation
  - Contract between buying and selling parties
  - Other potential consequences
- Legal business-related considerations
  - Entity structure
  - Licensing requirements
  - FINRA/Securities implications
  - Other
- Understand terms of buy sell agreement and agency agreements
- What to negotiate
- Percentage of ownership issues
- Tenure of agreement
- Future ownership interest buy out or in
- Estate planning, key man insurance, buyout agreements
- Understanding how to successfully run the business
- Clearly defined roles and responsibilities within your business
- Due diligence into reports, book of business
- Discuss with seller whether there are known inaccuracies/issues/errors within the book, that if corrected, the value of the book might significantly change after purchase
- "What ifs"/Exit strategies/consequences if roles and responsibilities are not being upheld

* The list is intended as a potential set of items you may want to consider. It is not intended to be an exhaustive list and should not suggest there are no other considerations you should explore before entering into any ownership agreement or business transaction. You should discuss a broad range of potential considerations with your advisers, accountants, and attorneys, and always conduct appropriate due diligence before entering into any contractual agreement.



© 2023 Allstate Insurance Company 

Allstate
You're in good hands.

The National Agency Establishment Team Candidate Concierge should ensure the file is complete prior to providing to the ZDL, and the ZDL is responsible for verifying all requirements below. This review cannot be delegated to others.

NAET Concierge Signature: e-Signed by Marc Stevenson on 2023-11-21 16:06:10 GMT Date: November 21, 2023

**ZDL To Complete:**

**ZDL to contact Enterprise Business Conduct to verify Summary of Evidence (SOE) aligns with seller deficiency statement:**

- ☐ Not applicable to this transaction
- ☐ If any investigations or SOE exist, compare the disclosure on APAR and seller email to buyer clearly outline potential deficiencies

**Reviewed Agency Purchase Approval Form Pages 1-5**

- X Part II – Seller Disclosure of all liens, assignments and claims to the asset are documented
- ☐ Part II – Deficiencies are listed by Seller including any SOE or Compliance findings (if applicable)
- X UCC Filing results (findings or no findings) are uploaded - for individual and for corporation (if applicable)

ZDL Signature: e-Signed by MATTHEW STEVENS on 2023-11-21 22:11:28 GMT Date: November 21, 2023



© 2023 Allstate Insurance Company 

**Wednesday, October 2, 2024 at 13:30:13 Eastern Daylight Time**

**Subject:** Confirmation of Approval for Candidate - James Lukezic
**Date:** Monday, December 4, 2023 at 2:53:50 PM Eastern Standard Time
**From:** Stevenson, Marc
**To:** James Lukezic
**CC:** Schwartz, Janice, Foreman, Adrian, Napoleon, Regine, EastZoneNewAgentUpdates
**Priority:** High
**Attachments:** Agent - Agency Name Guidelines 2020.pdf, New Agent Checklist_Pre National Info_NY.pdf, 2024 Candidate-Facing Onboarding Timeline_v1.pdf

James,

Congratulations! You have been approved as an Exclusive Agent with Allstate purchasing **Al Buglione (A051088) & Anthony Fava (A099526)** books of businesses with a target appointment date of **03/01/24**. You are now ready to start the next phase of your onboarding process.

Your appointment is contingent on the following items:

**Proof of Capital** – If you haven't shown the full amount of liquid capital, it is highly recommended to begin the process to secure the remaining funding needed to operate your agency immediately after receiving this email to get you off to a fast start operating your agency.

Licensing –

- Property & Casualty and Life & Health exams need to be passed before Agency Strategy Week begins. See attached.
- After passing your exams, you need to register through your state's department of insurance to apply and issue the license
- As a New York agent, you will be required to obtain your P&C Broker license as well

Our onboarding team looks forward to partnering with you to help you launch a successful agency!

- **Onboarding Consultant – Janice Schwartz**
  - In addition to your NAL, your onboarding consultant will work with you to keep your appointment moving along. You will receive separate communication from your onboarding consultant to collect important documents and ensure you are ready to open on day one. Your onboarding consultant will work with you to determine your agency signage needs and having signs installed at your new agency. Signage is approximately a 90-day process due to working with landlords, local municipalities and with external sign companies. Please respond promptly to your consultant to ensure your signage is installed as close to your opening as possible.
  - **Marketing Team** – agencymarketingsupport@allstate.com

- You will be introduced to our Centrally Led Marketing Team during your education for branding your agency, marketing materials, your agency website and more!

- **Technology Support**
  - Our technology team will assist you with laptop set up prior to the start of education

- **Education Team**
  - You will receive separate communications from our centrally led Education Team regarding virtual education. For the best experience with the new learning platform please use Google Chrome www.allstateu.com
  - Phase I Coursework – **12/18 – 1/9**
    - Self-paced, on demand, completed through Allstate University
    - Welcome Webinar
      - 1-hour webinar; @ 10am or 1pm CST
    - Staffing Webinar
      - 2- hour webinar; @10am or 1pm CST
    - Agency Comp Webinar
      - 2- hour webinar; @10am or 1pm CST
  - Agency Strategy Week– **1/15 – 1/19**
    - "Live" Zoom Education
    - Prepare to be logged into webinar training for all days.

- **LSP Recruiters**
  - Experience tells us agents are more successful when properly staffed from day one. To get started with your search for agency staff, once you receive your agent number and laptop, please visit our attracting staff Gateway page where you can find OnDemand recruiting resources.

Congratulations again!

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team

East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**Wednesday, October 2, 2024 at 13:37:38 Eastern Daylight Time**

---

**Subject:** RE: Confirmation of Approval for Candidate - James Lukezic
**Date:** Monday, December 4, 2023 at 2:57:11 PM Eastern Standard Time
**From:** Napoleon, Regine
**To:** Stevenson, Marc, James Lukezic
**CC:** Schwartz, Janice, Foreman, Adrian, EastZoneNewAgentUpdates
**Attachments:** image001.png

Congratulations James!

**Regine Napoleon**
Sales Market Leader – Agency Distribution
**Phone:** (516)269-9339
**Email:** rnapo@allstate.com
**Allstate Insurance** (New York, NY)

**From:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Sent:** Monday, December 4, 2023 2:54 PM
**To:** james@oldslipcap.com
**Cc:** Schwartz, Janice <Janice.Schwartz@allstate.com>; Foreman, Adrian <afory@allstate.com>; Napoleon, Regine <rnapo@allstate.com>; EastZoneNewAgentUpdates <EastZoneNewAgentUpdates@allstate.com>
**Subject:** Confirmation of Approval for Candidate - James Lukezic
**Importance:** High

James,

Congratulations! You have been approved as an Exclusive Agent with Allstate purchasing **Al Buglione (A051088) & Anthony Fava (A099526)** books of businesses with a target appointment date of **03/01/24**. You are now ready to start the next phase of your onboarding process.

Your appointment is contingent on the following items:

**Proof of Capital** – If you haven't shown the full amount of liquid capital, it is highly recommended to begin the process to secure the remaining funding needed to operate your agency immediately after receiving this email to get you off to a fast start operating your agency.

**Licensing** –

- Property & Casualty and Life & Health exams need to be passed before Agency Strategy Week begins. See attached.
- After passing your exams, you need to register through your state's department of insurance to apply and issue the license

- As a New York agent, you will be required to obtain your P&C Broker license as well

Our onboarding team looks forward to partnering with you to help you launch a successful agency!

- **Onboarding Consultant – Janice Schwartz**
  - In addition to your NAL, your onboarding consultant will work with you to keep your appointment moving along. You will receive separate communication from your onboarding consultant to collect important documents and ensure you are ready to open on day one. Your onboarding consultant will work with you to determine your agency signage needs and having signs installed at your new agency. Signage is approximately a 90-day process due to working with landlords, local municipalities and with external sign companies. Please respond promptly to your consultant to ensure your signage is installed as close to your opening as possible.
  - **Marketing Team** – agencymarketingsupport@allstate.com
    - You will be introduced to our Centrally Led Marketing Team during your education for branding your agency, marketing materials, your agency website and more!
- **Technology Support**
  - Our technology team will assist you with laptop set up prior to the start of education
- **Education Team**
  - You will receive separate communications from our centrally led Education Team regarding virtual education. For the best experience with the new learning platform please use Google Chrome www.allstateu.com
  - Phase I Coursework – **12/18 – 1/9**
    - Self-paced, on demand, completed through Allstate University
    - Welcome Webinar
      - 1-hour webinar; @ 10am or 1pm CST
    - Staffing Webinar
      - 2- hour webinar; @10am or 1pm CST
    - Agency Comp Webinar
      - 2- hour webinar; @10am or 1pm CST
  - Agency Strategy Week– **1/15 – 1/19**
    - "Live" Zoom Education

- Prepare to be logged into webinar training for all days.

- **LSP Recruiters**

  - Experience tells us agents are more successful when properly staffed from day one. To get started with your search for agency staff, once you receive your agent number and laptop, please visit our attracting staff Gateway page where you can find OnDemand recruiting resources.

Congratulations again!

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**Wednesday, October 2, 2024 at 13:38:09 Eastern Daylight Time**

---

| | |
|---|---|
| **Subject:** | RE: Agency Purchase Approval Request (APAR) - Fava/Lukezic |
| **Date:** | Wednesday, December 13, 2023 at 11:47:49 AM Eastern Standard Time |
| **From:** | Napoleon, Regine |
| **To:** | FAVA, ANTHONY, Stevenson, Marc, James Lukezic |
| **CC:** | Foreman, Adrian |
| **Attachments:** | image001.png |

Tony,

3/1 is the proposed purchase date, I'm not sure about the final commission deposit date.

Marc – can you provide clarity on this?

**Regine Napoleon**
Sales Market Leader – Agency Distribution
**Phone:** (516)269-9339
**Email:** rnapo@allstate.com

**Allstate Insurance** (New York, NY)

**From:** FAVA, ANTHONY <Mamaroneck@allstate.com>
**Sent:** Tuesday, December 12, 2023 1:36 PM
**To:** Napoleon, Regine <rnapo@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>; james@oldslipcap.com
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** Re: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Hi Regine,

Thank you for your prompt reply. I forwarded the Asset Purchase Agreement and all sale related documents to my attorney for review as you suggested.

Can you, or someone copied in this email thread please verify my understanding of the transition date and final commission deposit for my Agency:

1. March 1, 2024 the book of business will be transferred to the new owner.
2. March 19th, 2024 the final commission deposit for A J Fava Agency, Inc based on earned premium of February 2024 will be deposited.

Is that correct?

**Tony Fava, Agent**

**A J Fava Agency, Inc.**
**600 Mamaroneck Avenue**
**Mamaroneck, New York 10543**

**office: 914 698 8855**

*"A J Fava Agency providing Insurance services since 1989"*

*

---

**From:** Napoleon, Regine <rnapo@allstate.com>
**Sent:** Monday, December 11, 2023 11:16 AM
**To:** FAVA, ANTHONY <Mamaroneck@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>; james@oldslipcap.com <james@oldslipcap.com>
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** RE: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Good Morning Tony,

The Asset Purchase agreement is in reference to you selling your Book of Business to James. You should contact an attorney to assist you with closing and document/ contract review.

I hope this helps.

**Regine Napoleon**
Sales Market Leader – Agency Distribution
**Phone:** (516)269-9339
**Email:** rnapo@allstate.com
**Allstate Insurance** (New York, NY)

**From:** FAVA, ANTHONY <Mamaroneck@allstate.com>
**Sent:** Saturday, December 9, 2023 2:01 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>; james@oldslipcap.com
**Cc:** Foreman, Adrian <afory@allstate.com>; Napoleon, Regine <rnapo@allstate.com>
**Subject:** Re: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Hello Marc and all other interested parties,

Thank you for the attached Agency Approval Document.

I received an "Asset Purchase Agreement" from the buyer's attorney that I find difficult to apply to what I understand about the "transfer of my financial interest".

Can someone in this email loop or an Allstate attorney please advise me in detail exactly what I am selling to the buyer. I would like legal wording from Allstate, that will be the exact description of the transaction so I can be sure the sale is documented properly with no confusion.

Best regards,

**Tony Fava, Agent**
**A J Fava Agency, Inc.**
**600 Mamaroneck Avenue**
**Mamaroneck, New York 10543**

**office: 914 698 8855**

*"A J Fava Agency providing Insurance services since 1989"*

*

---

**From:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Sent:** Tuesday, November 21, 2023 5:24 PM
**To:** FAVA, ANTHONY <Mamaroneck@allstate.com>; james@oldslipcap.com <james@oldslipcap.com>
**Cc:** Foreman, Adrian <afory@allstate.com>; Napoleon, Regine <rnapo@allstate.com>
**Subject:** RE: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Good afternoon,

Please find attached the fully executed copy of the Agency Purchase Approval Request (APAR).

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

☎ 571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** Stevenson, Marc
**Sent:** Monday, November 20, 2023 12:08 PM
**To:** FAVA, ANTHONY <Mamaroneck@allstate.com>; james@oldslipcap.com
**Cc:** Foreman, Adrian <afory@allstate.com>; Napoleon, Regine <rnapo@allstate.com>
**Subject:** Agency Purchase Approval Request (APAR) - Fava/Lukezic
**Importance:** High

Hi Anthony & James,

The Agency Purchase Approval Request (APAR) has been sent to you to complete via ESign. The email will be coming from "Allstate Insurance signers@esign.allstate.com ".

It will go to the seller first then the buyer. Once the seller completes his/her portion and click on Confirm/Done, the system will automatically send the form to the buyer to complete. Please ensure that you review and complete the form in its entirety. Attached to this email is the reference guide. Please use this document to assist you in completing the form.

Please be advised:

- Sale effective date should be **3/1/2024**

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**Wednesday, October 2, 2024 at 13:30:33 Eastern Daylight Time**

**Subject:** RE: Agency Purchase Approval Request (APAR) - Fava/Lukezic
**Date:** Wednesday, December 13, 2023 at 12:24:01 PM Eastern Standard Time
**From:** Stevenson, Marc
**To:** James Lukezic

That is correct!

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Wednesday, December 13, 2023 12:22 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** [External] Re: Agency Purchase Approval Request (APAR) - Fava/Lukezic

**This Message Is From an External Sender!**

This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

Marc, that only covers Feb up to March 1st correct? March 1st on is me...correct?

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

On Dec 13, 2023, at 12:19 PM, Stevenson, Marc <MARC.STEVENSON@allstate.com> wrote:

Good afternoon,

The payment schedule is March 19, 2024. The final commission payment is typically mailed to your home address on file, so please ensure your home address on the MY INFO tab of Gateway is correct. If you prefer to have the funds issued via direct deposit, please contact Commissions at (800) 340-0475 or COMMPAY2@allstate.com.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

☎ 571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** Napoleon, Regine <rnapo@allstate.com>
**Sent:** Wednesday, December 13, 2023 11:48 AM
**To:** FAVA, ANTHONY <Mamaroneck@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>; james@oldslipcap.com
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** RE: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Tony,

3/1 is the proposed purchase date, I'm not sure about the final commission deposit date.

Marc – can you provide clarity on this?

**Regine Napoleon**

Sales Market Leader – Agency Distribution
**Phone:** (516)269-9339
**Email:** rnapo@allstate.com

**Allstate Insurance** (New York, NY)
<image001.png>

**From:** FAVA, ANTHONY <Mamaroneck@allstate.com>
**Sent:** Tuesday, December 12, 2023 1:36 PM
**To:** Napoleon, Regine <rnapo@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>; james@oldslipcap.com
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** Re: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Hi Regine,

Thank you for your prompt reply. I forwarded the Asset Purchase Agreement and all sale related documents to my attorney for review as you suggested.

Can you, or someone copied in this email thread please verify my understanding of the transition date and final commission deposit for my Agency:

1. March 1, 2024 the book of business will be transferred to the new owner.
2. March 19th, 2024 the final commission deposit for A J Fava Agency, Inc based on earned premium of February 2024 will be deposited.

Is that correct?

**Tony Fava, Agent**
**A J Fava Agency, Inc.**
**600 Mamaroneck Avenue**
**Mamaroneck, New York 10543**

**office: 914 698 8855**

*"A J Fava Agency providing Insurance services since 1989"*

*

---

**From:** Napoleon, Regine <rnapo@allstate.com>
**Sent:** Monday, December 11, 2023 11:16 AM
**To:** FAVA, ANTHONY <Mamaroneck@allstate.com>; Stevenson, Marc

<MARC.STEVENSON@allstate.com>; james@oldslipcap.com <james@oldslipcap.com>
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** RE: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Good Morning Tony,

The Asset Purchase agreement is in reference to you selling your Book of Business to James. You should contact an attorney to assist you with closing and document/ contract review.

I hope this helps.

**Regine Napoleon**
Sales Market Leader – Agency Distribution
**Phone:** (516)269-9339
**Email**: rnapo@allstate.com

**Allstate Insurance** (New York, NY)
<image001.png>

**From:** FAVA, ANTHONY <Mamaroneck@allstate.com>
**Sent:** Saturday, December 9, 2023 2:01 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>; james@oldslipcap.com
**Cc:** Foreman, Adrian <afory@allstate.com>; Napoleon, Regine <rnapo@allstate.com>
**Subject:** Re: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Hello Marc and all other interested parties,

Thank you for the attached Agency Approval Document.

I received an "Asset Purchase Agreement" from the buyer's attorney that I find difficult to apply to what I understand about the "transfer of my financial interest".

Can someone in this email loop or an Allstate attorney please advise me in detail exactly what I am selling to the buyer. I would like legal wording from Allstate, that will be the exact description of the transaction so I can be sure the sale is documented properly with no confusion.

Best regards,

**Tony Fava, Agent**
**A J Fava Agency, Inc.**
**600 Mamaroneck Avenue**
**Mamaroneck, New York 10543**

**office: 914 698 8855**

*"A J Fava Agency providing Insurance services since 1989"*

*

---

**From:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Sent:** Tuesday, November 21, 2023 5:24 PM
**To:** FAVA, ANTHONY <Mamaroneck@allstate.com>; james@oldslipcap.com <james@oldslipcap.com>
**Cc:** Foreman, Adrian <afory@allstate.com>; Napoleon, Regine <rnapo@allstate.com>
**Subject:** RE: Agency Purchase Approval Request (APAR) - Fava/Lukezic

Good afternoon,

Please find attached the fully executed copy of the Agency Purchase Approval Request (APAR).

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

☎ 571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** Stevenson, Marc
**Sent:** Monday, November 20, 2023 12:08 PM
**To:** FAVA, ANTHONY <Mamaroneck@allstate.com>; james@oldslipcap.com
**Cc:** Foreman, Adrian <afory@allstate.com>; Napoleon, Regine <rnapo@allstate.com>
**Subject:** Agency Purchase Approval Request (APAR) - Fava/Lukezic
**Importance:** High

Hi Anthony & James,

The Agency Purchase Approval Request (APAR) has been sent to you to complete via ESign. The email will be coming from "Allstate Insurance signers@esign.allstate.com ".

It will go to the seller first then the buyer. Once the seller completes his/her portion and click on Confirm/Done, the system will automatically send the form to the buyer to complete. Please ensure that you review and complete the form in its entirety. Attached to this email is the reference guide. Please use this document to assist you in completing the form.

Please be advised:

- Sale effective date should be **3/1/2024**

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

**Wednesday, October 2, 2024 at 13:30:54 Eastern Daylight Time**

**Subject:** RE: Property and Casualty Agent Life Of Authority **New Department of Finance**
**Date:** Tuesday, December 26, 2023 at 12:39:53 PM Eastern Standard Time
**From:** Stevenson, Marc
**To:** Foreman, Adrien, James Lukezic
**CC:** Schwartz, Janice
**Attachments:** image001.png, image002.png, image003.png, image004.jpg, image005.png, image006.png, image007.png, image008.png, image009.png, image011.jpg

Hi James,

Happy Holidays! I hope you are doing well! According to the NY DFS website, your Property & Casualty Agent line still has not issued. Please follow-up with the NY DFS at (800) 342-3736 to ensure this line is added as soon as possible.




Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** Foreman, Adrian <afory@allstate.com>
**Sent:** Wednesday, November 15, 2023 12:27 PM
**To:** james@oldslipcap.com
**Cc:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** Property and Casualty Agent Life Of Authority **New Department of Finance**

James,

I just checked, and your life and health status are perfect. They now have to add the **Property and Casualty "Agent"** to your class status.

# Department of Financial Services

SECURE PORTAL

[redacted]

**Licensee Detail**

| Name | Business Type | License No. | E-Mail | Hc |
|---|---|---|---|---|
| LUKEZIC, JAMES J | Individual | 987894 | james@oldslipcap.com | N (R |

| Class | Status | Status Date | Eff. Date | Exp. Date | Licensed S |
|---|---|---|---|---|---|
| Property and Casualty Broker | Active | 05/22/2020 | 08/24/2023 | 08/23/2025 | 05/22/202 |
| Life/Accident & Health Agent | Active | 09/13/2017 | 08/24/2023 | 08/23/2025 | 09/05/201 |
| Life/Accident & Health Broker | Active | 03/28/2019 | 08/24/2023 | 08/23/2025 | 03/28/201 |




Allstate.com Gateway Allstate Mobile

Be more than just an agent.

Be an Allstate Agency Owner.

Allstate

Outlook

**Re: Mobile Email**

**From** Napoleon, Regine <rnapo@allstate.com>
**Date** Thu 12/28/2023 12:04 PM
**To** LUKEZIC, JAMES <jlukezic@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Cc** Foreman, Adrian <afory@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>

James,

Avaya is the phone system we use. You won't have access to that until you are appointed / opened on 3/1

**Regine Napoleon**
Sales Market Leader – Agency Distribution
**Email:** rnapo@allstate.com
**Allstate Insurance (New** York, NY)

---

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Thursday, December 28, 2023 12:02:17 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Cc:** Napoleon, Regine <rnapo@allstate.com>; Foreman, Adrian <afory@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>
**Subject:** RE: Mobile Email

Right, but my seller is using a Avaya application – is that not available until live?

**From:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Sent:** Thursday, December 28, 2023 10:04 AM
**To:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Cc:** Napoleon, Regine <rnapo@allstate.com>; Foreman, Adrian <afory@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>
**Subject:** RE: Mobile Email

Hi James,

Allstate email is available for Android or iOS. I've attached the job aid to enroll in InTune for mobile email (Android or iOS). You will need your customer friendly email address jlukezic@allstate.com to sign-on. For addition information on Outlook, you can visit the Office 365 home page.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

☎ 571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Thursday, December 28, 2023 9:12 AM
**To:** Napoleon, Regine <rnapo@allstate.com>; Foreman, Adrian <afory@allstate.com>
**Subject:** Mobile Email

Regine, Adrian,

How do I get my mobile email setup with Avaya?

I'm currently working through the Allstate University Coursework.

James J Lukezic
Manging Principal
Agency Manging Director

Allstate Insurance
199 Main Street
Suite 201
White Plains, NY 10621
www.allstate.com

***Providing Insurance Services Since 1989***
***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

Outlook

**RE: Calsurance E&O**

**From** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Date** Tue 1/16/2024 1:35 PM
**To** LUKEZIC, JAMES <jlukezic@allstate.com>
**Cc** Foreman, Adrian <afory@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>

1 attachments (50 KB)
CalSurance Errors and Ommissions Tips.pdf;

Hi James,

You can complete the on-line enrollment for your Errors and Omissions (E&O) coverage through the CalSurance website at www.calsurance.com/allstateagent. You will need your six-digit Allstate agent number **(0D9296)** to complete this on-line enrollment.

**The coverage effective date should be effective 3/1/24. Coverage should be purchased as soon as possible, but no later than 2/14/23.**

**Failure to purchase the necessary E&O coverage through CalSurance will result in the Company paying the premium for E&O coverage on the agent's behalf. The applicable premium amount, plus a processing fee of 25% of the applicable premium amount, will then be automatically deducted from the agent's future commissions.**

The customer service number for CalSurance is 1-888-734-6457. Their web-site www.calsurance.com/allstateagent provides detailed information regarding the rates, available coverage, and answers to commonly asked questions. You should look at the site www.calsurance.com/allstateagent in advance of doing the actual enrollment. **If you have any questions regarding enrollment, please contact the customer service number.** I've provided links to additional information regarding E&O Insurance below.

**Errors and omissions**

**Errors and Omissions program FAQs**

Please either forward a copy of the certificate or respond to this e-mail so that I can go to the site to pull a copy once you have completed it.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

☎ 571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Tuesday, January 16, 2024 1:27 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** Calsurance E&O

Marc,

Can you connect me with Calsurance?

James J Lukezic
Manging Principal
Agency Manging Director

Allstate Insurance
199 Main Street
Suite 201
White Plains, NY 10621
www.allstate.com

***Providing Insurance Services Since 1989***
***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

Outlook

**RE: Bank Accounts**

**From** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Date** Tue 1/16/2024 1:39 PM
**To** LUKEZIC, JAMES <jlukezic@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>

Hi James,

Are you referring to the Agent Group Banking account for Wells Fargo? At the end of each business day, you will be required to close out all remittance reports and deposit any customer payments into your Allstate Agent Group Banking account. Please note that this is an established Allstate account and is separate from your own business/ commissions account. There is no further action required at this time. You will receive your Agent Group Banking log-on information and account details from the Banking Admin team approximately 14-days prior to your opening.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Tuesday, January 16, 2024 1:26 PM
**To:** Schwartz, Janice <Janice.Schwartz@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** Bank Accounts

Janice, Marc,

How do we open the required bank accounts?

James J Lukezic
Manging Principal
Agency Manging Director

Allstate Insurance
199 Main Street
Suite 201
White Plains, NY 10621

www.allstate.com

***Providing Insurance Services Since 1989***

***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

**Wednesday, October 2, 2024 at 13:31:14 Eastern Daylight Time**

---

| | |
|---|---|
| **Subject:** | RE: Consultation 2 Follow-up > James Lukezic purchasing Al Buglione & Anthony Fava |
| **Date:** | Tuesday, January 16, 2024 at 1:59:49 PM Eastern Standard Time |
| **From:** | Stevenson, Marc |
| **To:** | James Lukezic, Schwartz, Janice |
| **Attachments:** | image001.jpg, image002.png, image003.png |

Hi James,

Just to confirm, are you entering your agent ID without the A? CalSurance will only accept your ID as **0D9296**. You can also call CalSurance at 1-888-734-6457 and they can assist.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Tuesday, January 16, 2024 1:57 PM
**To:** Schwartz, Janice <Janice.Schwartz@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** [External] Re: Consultation 2 Follow-up > James Lukezic purchasing Al Buglione & Anthony Fava

**This Message Is From an External Sender!**

This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

The calsurance site doesn't accept my agent ID.

James J. Lukezic, AIF®
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

---

**From:** Schwartz, Janice <Janice.Schwartz@allstate.com>
**Date:** Tuesday, January 16, 2024 at 1:47 PM
**To:** James Lukezic <james@oldslipcap.com>
**Subject:** RE: Consultation 2 Follow-up > James Lukezic purchasing Al Buglione & Anthony Fava

Hi James,

I see that Marc provided you the requested information.

Thanks.

**Want to meet? Book time with me.**



**Janice Schwartz** | Onboarding Consultant
Design & Delivery – Distribution Enablement | Producer Onboarding & Offboarding
Phone 732-751-5358
**Property–Liability | Sales and Distribution**

Allstate
You're in good hands.

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Tuesday, January 16, 2024 12:59 PM
**To:** Schwartz, Janice <Janice.Schwartz@allstate.com>
**Subject:** [External] Re: Consultation 2 Follow-up > James Lukezic purchasing Al Buglione & Anthony Fava

> **This Message Is From an External Sender!**
> This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

Hi Janice,

What is the name and number of the person I call for E&O insurance. You mentioned it on our last consulation but I misplaced the name.

Best,
James.

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

---

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Date:** Friday, January 12, 2024 at 9:13 AM
**To:** James Lukezic <james@oldslipcap.com>
**Subject:** Fwd: Consultation 2 Follow-up > James Lukezic purchasing Al Buglione & Anthony Fava

Get Outlook for iOS

---

**From:** Schwartz, Janice <Janice.Schwartz@allstate.com>
**Sent:** Thursday, January 11, 2024 5:43:12 PM
**To:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Subject:** FW: Consultation 2 Follow-up > James Lukezic purchasing Al Buglione & Anthony Fava

Hi James,

Can you please complete and return the attached New Sign Request form.

I need it to initiate your signage.

Thanks.

**Want to meet? Book time with me.**



**Janice Schwartz** | Onboarding Consultant
Design & Delivery – Distribution Enablement | Producer Onboarding & Offboarding
Phone 732-751-5358
**Property–Liability | Sales and Distribution**

Allstate
You're in good hands.

**From:** Schwartz, Janice
**Sent:** Thursday, January 4, 2024 1:57 PM
**To:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Cc:** Napoleon, Regine <rnapo@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** Consultation 2 Follow-up > James Lukezic purchasing Al Buglione & Anthony Fava

Hi James,

Thank you again for taking time to meet today. Below is a recap of items we discussed along with reminders and next steps:

**Licensing**

- Continue to monitor NY DFS website for your NY P&C Agent license to be issued

**Daily**

- Continue to access the Candidate Portal to complete required tasks

**This week**

- Order any additional computers from CDW (or by calling 877-559-7312) **by Jan. 11th**, if you plan to order computers
- Determine any interior branding needs, if applicable
- *If you intend to or have already formed a business entity and would like for Allstate to recognize your business entity, begin the conversion process by completing the steps below:*
  - Access Agency Gateway Link to Gateway
  - On the right side of your Gateway home page, click the Submit WSR button under the My Requests section to open the Agency Request Center.




Once you have the Agency Request Center open, follow the instructions below:

- Click Web Services tab > Agent Compensation Inquiry > Entity Inquiry
- Request Type: Tax-ID Conversion > Sole Proprietor to Corp (SSN to EIN)
- Agency Type: EA (Exclusive Agent)

**Manage My Staff (MMS)**

- Below are links to MMS job aids to assist you with adding your staff to MMS

  Manage My Staff: Add a staff job aid
  Onboarding and Appointing Agency Staff
  Licensed sales producer on-boarding and appointment process flow
  Agency staff appointment FAQs
  P&C Binding Authority education FAQs
  Allstate University Online - Onboarding staff

**Commercial General Liability, Workers Compensation and Business Owners Policy (BOP)**

Attached you will find the details for Commercial General Liability, workers compensation and Business Owners Policy (BOP). This is the recommended limits of liability. Most will secure a policy > than the recommended limit. In addition, I've provided additional resources below.

- **Business Insurance Specialists Homepage**
- **Business Insurance Center (BIC) at 800-729-3005**
- **Business Owners Policy (BOP) - BOP stands for Business Owner Policy. Line code 50, 55 - A bundled policy that combines protection from property and liability risks in one package; issued to business owners. Please visit Allstate Business Insurance Central for more information.**
- **General Liability FAQs**

**No later than 30 days prior to appointment**

- Liquidate full capital requirement
  - Upload bank statement with a balance of at least $100,000 in your account, in your name only, by February 1, 2024; please redact account numbers except for the last four digits

- Purchase E&O Insurance through CalSurance.com/allstateagent

**Exterior signage update**

- Complete attached signage form and return with a copy of your final, signed lease

**In preparation for our next consultation**

Our next meeting will be during the week of Jan 29th. I will invite the selling agent and we will be covering items related to the agency transition. Please review the Buying and selling an agency Gateway site.

You should also have an event scheduled on your calendar in the Candidate Portal for the Allstate Lending Connection Intake form training on **Feb. 1st**. Please make every effort to attend that training as it will cover important information.

If you need anything before, we meet again, please contact me via phone, email, or portal chat.

I'm here to support you and happy to help.

Thanks.

**Want to meet? Book time with me.**



**Janice Schwartz** | Onboarding Consultant
Design & Delivery – Distribution Enablement | Producer Onboarding & Offboarding
Phone 732-751-5358
**Property–Liability | Sales and Distribution**

Allstate
You're in good hands.

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

**Wednesday, October 2, 2024 at 13:31:31 Eastern Daylight Time**

---

**Subject:** RE: Dashboard (yext.com)
**Date:** Wednesday, January 17, 2024 at 10:15:04 AM Eastern Standard Time
**From:** Stevenson, Marc
**To:** James Lukezic, Schwartz, Janice
**CC:** Foreman, Adrian
**Attachments:** image001.jpg, image002.png

Thanks for providing these examples. We are working to fix this. We'll keep you posted. I apologize for any inconvenience.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Wednesday, January 17, 2024 10:08 AM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** [External] Re: Dashboard (yext.com)

**This Message Is From an External Sender!**

This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

See attached - not fixed anywhere

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

---

**From:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Sent:** Wednesday, January 17, 2024 10:04:18 AM
**To:** James Lukezic <james@oldslipcap.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** RE: Dashboard (yext.com)

Hi James,

We show your name is correct in our system. We are working with Centralized Licensing to ensure your name is corrected in all data feeds including CalSurance. Janice has already submitted a request to update your suite number.

| | |
|---|---|
| Agency Name | LUKEZIC, JAMES |
| Short Name | LUKEZIC, JAMES |

| Last or Org. Name 1 First or Org. I |
|---|
| LUKEZIC, JAMES |

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

☎ 571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Wednesday, January 17, 2024 9:55 AM
**To:** Schwartz, Janice <Janice.Schwartz@allstate.com>; Stevenson, Marc

<MARC.STEVENSON@allstate.com>
**Cc:** Foreman, Adrian <afory@allstate.com>
**Subject:** [External] Dashboard (yext.com)

**This Message Is From an External Sender!**

**This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.**

Janice, Marc,

My name is wrong and address says suite 101 instead of 201.

Can we fix this?

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY 10005
www.oldslipcap.com

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

Outlook

**Automatic reply: [External] Producer Express Password**

**From** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Date** Fri 1/26/2024 10:06 PM
**To** LUKEZIC, JAMES <jlukezic@allstate.com>

Thank you for contacting me. **I am currently out of the office on Friday, January 26th with limited access to email.** If you have a question regarding one of the items below, please use the resource(s) identified; otherwise, I will respond to your inquiry upon return. If you require immediate assistance, please contact **Denise Morales.**

| Question / Inquiry | Resource |
|---|---|
| Agent/Agency Name Changes | COMCOEConversions@allstate.com |
| Agency Phone Number Changes | IAMKTS@allstate.com |
| Non-Resident Approval for Existing Agents | Reach out to your SML |
| Agency Compensation | • Gateway FAQs<br>• (800) 340-0475<br>• Commission Pay |
| Agent Group Banking | • AGB Deposit Order Form<br>• How to change bank account details<br>• AGB Representative Chat |
| Agency or LSP Education | Virtual Education & Delivery Team |
| General Inquiries not related to onboarding or offboarding | NAETGeneral@allstate.com |
| Signage | • Allstate Brand Central or allstatebrandcentral@allstate.com<br>• Branded Retail Environment<br>• Other questions, contact NAETSignage@allstate.com |
| Technical Support (Hardware/Allstate Applications)<br>VIP Access / Password Resets | Agent Online Technology Support<br>Manage My Access |
| Other topics (Compliance, Education, Licensing, etc) | Gateway Quick Reference for Support |

For all other questions, please search Agency Gateway or reach out to your appropriate sales leader.

**Wednesday, October 2, 2024 at 13:31:47 Eastern Daylight Time**

**Subject:** RE: WSR
**Date:** Thursday, February 1, 2024 at 10:49:55 AM Eastern Standard Time
**From:** Stevenson, Marc
**To:** James Lukezic
**CC:** Schwartz, Janice

Hi James,

If you are converting your agency to a Corporation, Partnership or LLC, you are required to obtain an Agency Insurance License from your state's department of insurance. This license must be in the name that is on your new W-9 and must be registered with the department of insurance with your new Tax ID Number. This license must be obtained before you submit your change of legal entity paperwork to the Centralized Distribution Team. If you write business or receive commissions for any non-resident business, you must also obtain an agency license in those non-resident states.

New York requires specific agency applications.

- Contact the Department of Insurance at 518-473-3207
- https://nipr.com/licensing-center/state-requirements/new-york-resident-licensing-business

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

☎ 571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Wednesday, January 31, 2024 5:47 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** [External] WSR

**This Message Is From an External Sender!**

This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

Marc,

If I'm switching from personal to corporate does the corporate have to be an agency that is licensed with the state in NY?

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

Outlook

**RE: Tech support**

**From** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Date** Fri 2/2/2024 1:12 PM
**To** LUKEZIC, JAMES <jlukezic@allstate.com>

Hi James,

The ATSC is 1-800-336-9400. If you need technical assistance or help with VIP access/1st time log-on for staff, use prompts 1, 2, 1. Stay on the line until you are transferred to a representative. This will ensure you speak to a live representative.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Friday, February 2, 2024 1:09 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** Tech support

Marc,

What's the 800 number for tech support?

James J Lukezic
Managing Principal
Agency Managing Director

Allstate Insurance
199 Main Street
Suite 200
White Plains, NY 10601
www.allstate.com

***Providing Insurance Services Since 1989***

***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

Outlook

RE: Pat's Onboarding Education

From Stevenson, Marc <MARC.STEVENSON@allstate.com>
Date Fri 2/2/2024 3:26 PM
To LUKEZIC, JAMES <jlukezic@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>
Cc MEGARO, PAT <patrickmegaro@allstate.com>

Hi James,

Allstate University should be accessed through Gateway by clicking the Allstate University quick link. If it is not already a quick link, you can simply search "Allstate University" to access the learning platform. For access to the learning platform and for the best learning experience, please make sure staff are using Microsoft Edge. If they do not have Edge on their computer, please have them visit the Software Center on their desktop and download/install it.

I've provided steps on how to access the coursework within Allstate University. LSPs can contact the virtualdeliveryteam@allstate.com if they have any questions or require any assistance.

**HOW TO ACCESS COURSEWORK IN ALLSTATE UNIVERSITY**

**FIRST**, once they are in the Allstate U website, they will use their established **Staff ID Number** and **password** to access the single sign on for Allstate U. The staff should click on the **EDUCATION** tab at the top of the page to begin with ***courses***. Please have them begin with the **Allstate University Onboarding (Agency Staff) course** first as this course will show them how to navigate within the new platform!

**SECOND**, click on the **CURRICULA** option, then click the link for the curricula they want to start working on (**LSP Onboarding Education**). They will see a list of all the courses within that curriculum. As they begin completing the courses, the overall curricula percentage bar will start moving toward 100% completion. We recommend taking the courses in order from the top down as they are designed to build upon each other. Please note, within the curricula there are a couple "state-specific" courses (Castle Key Indemnity for FL and/or Allstate House and Home) that can be skipped only if they do not apply to your state. All other courses must be completed. Skipping state-specific courses that do not apply to your state will NOT prevent the curricula from showing 100% when complete.

Once they are **100% complete** with the curricula, ***there is no need to advise Education, they automatically notify Licensing*** and the LSP will get an email containing a **course completion badge**. Allstate Licensing will process the appointment (generally within 3-5 business days from the day the course is shown complete). Please check **Manage My Staff (MMS)** for any outstanding requirements from a licensing standpoint.

**NOTE!** There's a great tutorial on Allstate University that shows you how to look at each of the staff in your agency in reference to their course progress, enrollments, and completions. Agents who have taken it say it's very helpful.

**Click HERE to view it!**

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Friday, February 2, 2024 2:59 PM
**To:** Schwartz, Janice <Janice.Schwartz@allstate.com>
**Cc:** MEGARO, PAT <patrickmegaro@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** Pat's Onboarding Education

Janice,

Who is Pat's onboarding training contact? He is finally in on the system but doesn't see the training.

James J Lukezic
Managing Principal
Agency Managing Director

Allstate Insurance
199 Main Street
Suite 200
White Plains, NY 10601
www.allstate.com

***Providing Insurance Services Since 1989***
***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

**Wednesday, October 2, 2024 at 13:32:04 Eastern Daylight Time**

**Subject:** RE: Allstate Lending Connection
**Date:** Wednesday, February 7, 2024 at 5:49:14 PM Eastern Standard Time
**From:** Stevenson, Marc
**To:** FAVA, ANTHONY
**CC:** James Lukezic, Schwartz, Janice
**Attachments:** Consultation 3 - Sale of Agency Consultation Follow-up > Tony Fava to James Lukezic.eml

Hi Tony,

According to our records, Allstate Lending Connection has not received an intake form. The granting of security interest **or** waiver of security interest is a **requirement** for the approval of a book sale. To begin the process, the buying agent must complete the **ALC intake form** in the full version of Adobe Acrobat and email it to **allstatelendingconnection@allstate.com**. This will generate the contracts for signatures via email.

For additional information on submitting the intake form, I recommend reviewing the Allstate Lending Connection website ***here***.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** FAVA, ANTHONY <Mamaroneck@allstate.com>
**Sent:** Wednesday, February 7, 2024 4:37 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Cc:** James Lukezic <james@oldslipcap.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>
**Subject:** Allstate Lending Connection

Hello Mark,

Did I fill out an Allstate Lending Connection intake form?

I don't have a record that you sent it to me or that I filled one out yet. Please look into this and advise me accordingly.

**Tony Fava, Agent**
**A J Fava Agency, Inc.**
**600 Mamaroneck Avenue**
**Mamaroneck, New York 10543**

**office: 914 698 8855**

*"A J Fava Agency providing Insurance services since 1989"*

*

**Wednesday, October 2, 2024 at 13:32:20 Eastern Daylight Time**

**Subject:** RE: In take forms
**Date:** Thursday, February 8, 2024 at 4:38:51 PM Eastern Standard Time
**From:** Stevenson, Marc
**To:** James Lukezic
**Attachments:** ALC intake_form_2022_09.pdf

Hi James,

I've attached a blank intake form. I did not receive a copy of Al or Tony's intake form. If you have a signed copy, please send to me and I'll make sure that Lending Connection obtains a copy.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Thursday, February 8, 2024 2:02 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** [External] In take forms

**This Message Is From an External Sender!**

This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

Marc,

Can you resend the intake forms for AL and Tony?

I signed these but you don't have a record for some reason.

James J. Lukezic, AIF®

Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

**Wednesday, October 2, 2024 at 13:32:37 Eastern Daylight Time**

---

**Subject:** RE: Al Buglione Intake Form Attached.
**Date:** Friday, February 9, 2024 at 1:15:53 PM Eastern Standard Time
**From:** Stevenson, Marc
**To:** James Lukezic, Allstate Lending Connection
**CC:** Schwartz, Janice
**Attachments:** image001.png

Good afternoon,

I recommend we scheduled a zoom call upon Monica's return on Monday to ensure the intake form is completed correctly.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

☎ 571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Friday, February 9, 2024 1:06 PM
**To:** Allstate Lending Connection <AllstateLendingConnection@allstate.com>
**Cc:** Schwartz, Janice <Janice.Schwartz@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** [External] Re: Al Buglione Intake Form Attached.

**This Message Is From an External Sender!**

This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

I was on the basic training zoom education but my case is unique.

I need a 5 min call to discuss the deficiencies on the form if there are any.

James J. Lukezic, AIF®

Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY. 10005
www.oldslipcap.com

---

**From:** Allstate Lending Connection <AllstateLendingConnection@allstate.com>
**Date:** Friday, February 9, 2024 at 1:03 PM
**To:** James Lukezic <james@oldslipcap.com>
**Cc:** Schwartz, Janice <Janice.Schwartz@allstate.com>, Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** RE: Al Buglione Intake Form Attached.

James,

We offered a training session that covered the completion of the intake form. I've attached a link to our Gateway page that has a recorded version if you'd like to review. I cannot change the intake form that you are submitting. It would need to have a position listed for the lender that you are completing the intake form for.

Here is a link to the recorded training session. On the Gateway page, there are also copies of the contracts themselves. You can review the samples prior to requesting a contract and signing. Once you sign, the contract becomes legally binding.
https://agencygateway.allstate.com/wps/myportal/id/130702

Our contracts can only be released by the lender when a release letter is submitted. We would not be liable for upholding any causes from other contracts. I can send you the release letter guidelines if you'd like.

If these resources do not assist you, please let me know and I'll have Monica set up a zoom session for Monday. She is out of the office today.

Have a great day!

Jennifer K.

Allstate Lending Connection

*Building stronger agency owner-lender relationships*

Visit our website: https://www.allstate.com/landingpages/lendingconnection.aspx

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Friday, February 9, 2024 12:42 PM
**To:** Allstate Lending Connection <AllstateLendingConnection@allstate.com>
**Cc:** Schwartz, Janice <Janice.Schwartz@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** [External] Al Buglione Intake Form Attached.

**This Message Is From an External Sender!**

**This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.**

See attached, Al Bugliones Intake Form.

Wintrust is also in 1st position here and a claw back clause in our contract applies.

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the

following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

Outlook

**RE: Janice Schwartz**

**From** Schwartz, Janice <Janice.Schwartz@allstate.com>
**Date** Wed 2/21/2024 3:14 PM
**To** LUKEZIC, JAMES <jlukezic@allstate.com>; Glau, Jennifer L <jglau@wintrust.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>

Great!

You may receive the final, signed copy before me. If so, please share a copy with Jennifer.

Thank you!

**Want to meet? Book time with me.**



**Janice Schwartz** | Onboarding Consultant
Design & Delivery – Distribution Enablement | Producer Onboarding & Offboarding
Phone 732-751-5358
**Property–Liability | Sales and Distribution**

Allstate
You're in good hands.

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Wednesday, February 21, 2024 3:13 PM
**To:** Schwartz, Janice <Janice.Schwartz@allstate.com>; Glau, Jennifer L <jglau@wintrust.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** Re: Janice Schwartz

I just signed it and now Allstate signs and done

James J Lukezic
Managing Principal
Agency Managing Director

Allstate Insurance
199 Main Street
Suite 200

White Plains, NY 10601
www.allstate.com

***Providing Insurance Services Since 1989***
***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

---

**From:** Schwartz, Janice <Janice.Schwartz@allstate.com>
**Sent:** Wednesday, February 21, 2024 3:05:52 PM
**To:** Glau, Jennifer L <jglau@wintrust.com>; LUKEZIC, JAMES <jlukezic@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** RE: Janice Schwartz

Hi Jennifer,

I'm chasing the area that provides the R3001C. I will share it is soon as it's received. We were advised we would receive it today.

Thanks.

**Want to meet? Book time with me.**



**Janice Schwartz** | Onboarding Consultant
Design & Delivery – Distribution Enablement | Producer Onboarding & Offboarding
Phone 732-751-5358
**Property–Liability | Sales and Distribution**

Allstate
You're in good hands.

**From:** Glau, Jennifer L <jglau@wintrust.com>
**Sent:** Wednesday, February 21, 2024 1:49 PM
**To:** LUKEZIC, JAMES <jlukezic@allstate.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>
**Subject:** [External] RE: Janice Schwartz
**Importance:** High

**This Message Is From an External Sender!**

This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

Hi Marc & Janice – Please provide a copy of the R3001 for James Lukezic as soon as possible. Our loan operations team requires this before sending out the loan documents.

Thanks!

WINTRUST
AGENT FINANCE

**Jennifer Glau, Portfolio Manager**
**Wintrust Agent Finance | Wintrust Financial Corporation**
9701 West Higgins Road, Suite 330, Rosemont, IL 60018 | Email: jglau@wintrust.com
Phone: (847) 268-9776

**Follow us on LinkedIn**

*[agentfinance.com]agentfinance.com – Allstate*

*[agentfinance.com/agent]agentfinance.com/agent – Farmers*

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Saturday, February 17, 2024 6:08 PM
**To:** Glau, Jennifer L <jglau@wintrust.com>; Stevenson, Marc <MARC.STEVENSON@allstate.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>
**Subject:** Re: Janice Schwartz

**Caution: This message is from an external sender**

This message came from outside the organization.

Marc,

Can we have a call on this asap?

I don't want any delays on the loan from wintrust and I've recieved conflicting information on the delivery of the 3001 form.

Best,
James

James J Lukezic
Managing Principal
Agency Managing Director

Allstate Insurance

199 Main Street
Suite 200
White Plains, NY 10601
www.allstate.com

***Providing Insurance Services Since 1989***
***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

---

**From:** Glau, Jennifer L <jglau@wintrust.com>
**Sent:** Saturday, February 17, 2024 7:06:12 PM
**To:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Subject:** [External] RE: Janice Schwartz

Please let them know we need this before sending loan documents. I receive this from borrowers sooner than 5 days prior. If you want you can copy me and I don't mind following up as well.

Thanks so much.

WINTRUST
AGENT FINANCE

**Jennifer Glau, Portfolio Manager**
**Wintrust Agent Finance | Wintrust Financial Corporation**
9701 West Higgins Road, Suite 330, Rosemont, IL 60018 | Email: jglau@wintrust.com
Phone: (847) 268-9776

**Follow us on LinkedIn**

*[agentfinance.com]agentfinance.com – Allstate*

*[agentfinance.com/agent]agentfinance.com/agent – Farmers*

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Saturday, February 17, 2024 5:56 PM
**To:** Glau, Jennifer L <jglau@wintrust.com>
**Subject:** Re: Janice Schwartz

**Caution: This message is from an external sender**

This message came from outside the organization.

They said I can't get it until 5 days prior to our close date of 3/1. Will ask again.

James J Lukezic
Managing Principal
Agency Managing Director

Allstate Insurance
199 Main Street
Suite 200
White Plains, NY 10601
www.allstate.com

***Providing Insurance Services Since 1989***
***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

---

**From:** Glau, Jennifer L <jglau@wintrust.com>
**Sent:** Saturday, February 17, 2024 5:30:58 PM
**To:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Subject:** [External] RE: Janice Schwartz

When you ask your field sales leader, they'll provide you with an agent contract to e-sign. You can also submit the request to comcoeall@allstate.com.

WINTRUST
AGENT FINANCE

**Jennifer Glau, Portfolio Manager**
**Wintrust Agent Finance | Wintrust Financial Corporation**
9701 West Higgins Road, Suite 330, Rosemont, IL 60018 | Email: jglau@wintrust.com
Phone: (847) 268-9776

**Follow us on LinkedIn**

*[agentfinance.com]agentfinance.com – Allstate*

*[agentfinance.com/agent]agentfinance.com/agent – Farmers*

**From:** LUKEZIC, JAMES <jlukezic@allstate.com>
**Sent:** Saturday, February 17, 2024 4:25 PM
**To:** Glau, Jennifer L <jglau@wintrust.com>
**Subject:** Janice Schwartz

**Caution: This message is from an external sender**

This message came from outside the organization.

Jen,

When I ask for the 3001 they send me this letter?!?

What do I say to them?

James J Lukezic
Managing Principal
Agency Managing Director

Allstate Insurance
199 Main Street
Suite 200
White Plains, NY 10601
www.allstate.com

***Providing Insurance Services Since 1989***
***Buglione and Fava Agencies are now BFL Insurance Group, LLC (DBA Allstate Insurance)***

---

CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

---

CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

---

CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

Outlook

**RE: James Lukezic R3001C**

**From** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Date** Mon 2/26/2024 6:03 PM
**To** Glau, Jennifer L <jglau@wintrust.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>; LUKEZIC, JAMES <jlukezic@allstate.com>
**Cc** Miranda, Amanda <AMirand@wintrust.com>

**1 attachments (318 KB)**
R3001S_Lukezic.pdf;

Good afternoon,

Please find attached the fully executed copy of the R3001S agreement.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** Stevenson, Marc
**Sent:** Monday, February 26, 2024 5:56 PM
**To:** Glau, Jennifer L <jglau@wintrust.com>; Schwartz, Janice <Janice.Schwartz@allstate.com>; LUKEZIC, JAMES <jlukezic@allstate.com>
**Cc:** Miranda, Amanda <AMirand@wintrust.com>
**Subject:** RE: James Lukezic R3001C

Good afternoon,

Please find attached the R3001S agreement for James Lukezic. We are waiting on the Zone District Leader to sign the agreement. I'll send over the fully executed contract once it's signed by the Zone District Leader. Please let us know if you have any questions or require any other information.

Thank you,

**Marc Stevenson**
Candidate Concierge

Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** Glau, Jennifer L <jglau@wintrust.com>
**Sent:** Monday, February 26, 2024 2:39 PM
**To:** Schwartz, Janice <Janice.Schwartz@allstate.com>; LUKEZIC, JAMES <jlukezic@allstate.com>
**Cc:** Stevenson, Marc <MARC.STEVENSON@allstate.com>; Miranda, Amanda <AMirand@wintrust.com>
**Subject:** [External] RE: James Lukezic R3001C
**Importance:** High

**This Message Is From an External Sender!**

This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

Hi Janice – I think James already reached out. I am also reaching out due to the urgency of this request. Please provide a copy of the R3001-S under James Lukezic. The entity you provided is causing confusion with the loan documents and could cause a delay with the close. The Assignment of Commission shows James Lukezic. Please provide by end of day.

Thanks!

WINTRUST
AGENT FINANCE

**Jennifer Glau, Portfolio Manager**
**Wintrust Agent Finance | Wintrust Financial Corporation**
9701 West Higgins Road, Suite 330, Rosemont, IL 60018 | Email: jglau@wintrust.com
Phone: (847) 268-9776

**Follow us on LinkedIn**

*[agentfinance.com]agentfinance.com – Allstate*

*[agentfinance.com/agent]agentfinance.com/agent – Farmers*

**From:** Schwartz, Janice <Janice.Schwartz@allstate.com>
**Sent:** Wednesday, February 21, 2024 3:27 PM
**To:** LUKEZIC, JAMES <jlukezic@allstate.com>

**Cc:** Stevenson, Marc <MARC.STEVENSON@allstate.com>; Glau, Jennifer L <jglau@wintrust.com>
**Subject:** James Lukezic R3001C

**Caution: This message is from an external sender**

This message came from outside the organization.

Hi James,

Attached is your signed R3001C.

Thank you.

**Want to meet? Book time with me.**



**Janice Schwartz |** Onboarding Consultant
Design & Delivery – Distribution Enablement | Producer Onboarding & Offboarding
Phone 732-751-5358
**Property–Liability | Sales and Distribution**

Allstate.
You're in good hands.

CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

# ALLSTATE R3001C EXCLUSIVE AGENCY AGREEMENT

This Agreement is between ALLSTATE INSURANCE COMPANY and such affiliates and subsidiaries as are named in the Supplement for the R3001 Agreement (referred to in this Agreement as "the Company") and Old Slip Benefits & Insurance Services, LLC (referred to in this Agreement as "Agency").

The Company and Agency agree as follows:

**I. AUTHORITY:**

A. Effective 3/1/2024, ______, the Company appoints Agency as its agent to represent the Company in the Exclusive Agency Program. Agency is authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance covering such classes of risks located in the state(s) of New York as the Company may from time to time authorize to be written. Agency is also authorized to sell products specified by the Company and through the companies specified in the Supplement for the R3001 Agreement (referred to in this Agreement as "Company Business"). The Company will own all business produced under the terms of this Agreement. Agency will not represent itself as having any authority other than that specifically granted to it by the Company. Agency will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

B. This Agreement is the sole and entire agency agreement between the Company and Agency, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and Agency and any of its officers, directors, shareholders, members, and employees. This Agreement also supersedes any prior oral statements and representations by the Company and any prior written statements and representations by the Company in letters, manuals, booklets, memoranda, or any other format.

C. The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to Agency, except that notice regarding changes to commission amounts will be given as indicated in Section XV.

D. The relationship between the Company and Agency and its officers, directors, shareholders, members, employees, and other persons working in connection with this Agreement, will be that of an independent contractor for all purposes. Agency will not represent that it has authority to act on behalf of the Company or enter into any contract on behalf of the Company, except for contracts of insurance or other contracts as expressly authorized by this Agreement.

E. Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company. Agency may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

F. The Company will determine in its sole discretion all matters relating to its business and the operation of the Company including, but not limited to, the following:

1. The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;
2. The acceptance or rejection of any application;
3. The termination or modification of any contract or the refusal to renew any contract;
4. The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business;
5. The obtaining of any licenses of the Company or the Company's withdrawal from any state, jurisdiction, or territory; and
6. The type and quality of customer service received by Company policyholders.

G. Agency represents and warrants that prior to the execution of this Agreement, Agency has provided to the Company the full names and addresses of its officers, directors and any persons who own any shares of or interest in Agency. Thereafter, Agency shall promptly furnish to the Company the full names and addresses of any new officers, directors, or owners.

## II. DUTIES AND CONDITIONS:

A. Agency will act as an agent of the Company for the purpose of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement. As an agent of the Company, Agency will provide customer service, including the collection of payments, for any and all Company policyholders and will assist in claims administration in accordance with the Company's rules and procedures.

B. Agency will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service. Agency will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

C. Agency will record, transmit, and process insurance and Company Business in the manner prescribed in the then current provisions of the Supplement.

D. Agency agrees to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting its operation and warrants that Agency, its officers, directors, shareholders, members, and employees will maintain any required agent licenses in the state or states in which Agency is appointed to represent the Company.

E. This Agreement is being entered into with Agency in reliance upon and in consideration of the skills, qualifications, and representations of JAMES LUKEZIC ______________(referred to in this Agreement as "Key Person"). Agency agrees that it will employ Key Person to provide services under this Agreement for its term.

F. The Company recognizes that Agency may, in its sole discretion, arrange to have business conducted at its sales location in Key Person's absence by its other employees or other persons and that the time during which Key Person is physically present at Agency's sales location is entirely in Agency's sole discretion. Key Person must, however, remain actively involved in the conduct of business at Agency's sales location.

G. The Company shall at all times be entitled to conclusively rely upon the authority of Key Person (or in the event of the death or incapacity of Key Person, his executor or personal representative) to bind Agency and its officers, directors, shareholders and members, regardless of any directions received by the Company from any person or entity which conflict with directions received from Key Person, unless the Company is properly served with an order of a court of competent jurisdiction abrogating Key Person's authority and designating an alternate authorized representative to act on behalf of Agency under this Agreement.

H. Agency agrees that the Company will have the authority to use the name of Agency or Key Person and the Key Person's signature, or facsimile thereof, on policy documents and customer communication materials.

I. Agency agrees to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. Agency also agrees that, because it is conducting business with the public under the Allstate name, Company representatives shall be permitted access to its sales location to review compliance with this Agreement during the business hours of that sales location.

J. Agency agrees that, as requested by the Company, it will demonstrate its knowledge of the Company products it is authorized to sell, as well as of federal, state, or local laws, rules, regulations and ordinances affecting its operation. If Agency is unable to demonstrate its knowledge of any product, the Company reserves the right to deny Agency the authority, or withdraw Agency's existing authority, to sell that product, until Agency demonstrates such knowledge.

**III. AGENCY EMPLOYEES:**

A. Agency has no authority to employ persons on behalf of the Company, and no employee of Agency will be deemed to be an employee or agent of the Company, such employees at all times remaining Agency's employees. Agency has sole and exclusive control over its labor and employee relations policies, and its policies relating to wages, hours, and working conditions of its employees. Agency has the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge its employees.

B. Agency is solely responsible for all salaries and other compensation of all its employees and will make all necessary salary deductions and withholdings from its employees' salaries and other compensation. Agency is solely responsible for the payment of any and all contributions, taxes, and assessments, and all other requirements of the federal Social Security, federal and state unemployment compensation, and federal, state, and local withholding of income tax laws on all salary and other compensation of its employees.

C. Agency will comply with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding its employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, Agency's warranty and agreement to comply with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans With Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D. Agency agrees and warrants that its employees, while working in connection with this Agreement, will comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances.

**IV. COMPANY PROPERTY, CONFIDENTIALITY:**

A. The Company will furnish Agency such signs, forms, manuals, records, and other materials and supplies as the Company deems advisable to assist Agency. All such property and information furnished by the Company will remain the property of the Company. In addition, the Company will offer, at Agency's expense, such additional materials and supplies as the Company feels may be helpful to Agency.

B. Agency agrees that it will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of the Company, except upon direct written authority of the Company. Furthermore, upon termination of this Agreement, Agency agrees to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company.

C. Agency agrees that it will not disclose or grant access to any confidential information or trade secrets to any of its employees or other persons providing services for it in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement, attached as Appendix A if Key Person and Appendix B if other than Key Person. Appendix B is a sample copy of the electronic version of the document that must be transmitted to the Company.

D. Confidential information includes, but is not limited to: business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. All such confidential information is wholly owned by the Company. Such confidential information may be used by Agency only for the purposes of carrying out the provisions of this Agreement.

E. Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or by Agency, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F. Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

**V. SALES LOCATION:**

A. Agency may select its sales location, within a geographical area specified by the Company, subject to Company approval. Initially, Agency has selected the location at 199 Main Street, Ste 200, White Plains, NY 1060 and such sales location has been approved by the Company. Agency agrees that it will not establish any additional sales location without the prior written approval of the Company. Agency acknowledges that it has no exclusive territorial rights in connection with its sales location.

B. Agency agrees to keep its sales location open for business as appropriate in the market to provide a proper level of customer service. As a minimum, Agency agrees to operate its sales location consistently with the Agency Standards.

C. Agency is authorized to sell insurance offered by the Company and Company Business only in the state containing its sales location and other states in which Agency has been authorized to act as a Company agent.

**VI. ADVERTISING:**

A. The Company will advertise its products and provide promotional material in accordance with its advertising policies. Agency may also advertise in its sole discretion, subject to the requirements in paragraph B. below.

B. Agency will submit all signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all other materials to the Company for approval, if they use or contain any reference to any service mark or trade name of the Company. Agency will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company. The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject the Company to liability or loss of goodwill; may damage the reputation of the Company or Company customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to conform to community or Company standards of good taste and honest dealing; or may be detrimental to the business interests of the Company.

**VII. SERVICE MARK AND TRADE NAME PROTECTION:**

A. Agency agrees to cooperate fully in the quality control program conducted by the Company relating to the use of its service marks and trade names and the nature and quality of services rendered and goods distributed under its service marks and trade names. The Company will have the right to specify, delineate, or limit the services or goods in connection with which Agency may use any of its service marks or trade names. In the event that the nature or the quality of the services or goods in connection with which Agency uses any of the service marks or trade names of the Company is not acceptable to the Company, then the Company will have the right to require Agency to institute appropriate procedures to correct any deficiencies noted by the Company.

B. Agency agrees, at the request and expense of the Company, to assist the Company in protecting and enforcing the rights of the Company in and to any and all of its service marks and trade names which Agency may then be using.

C. Agency will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names the Company authorizes the Agency to use in the performance of this Agreement, except as permitted in Section XVI.

D. Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

**VIII. EXPENSES:**

Agency will be responsible for the payment of all expenses that it incurs in the performance of this Agreement including, but not limited to: expenses for its sales location, supplies not furnished by the Company, compensation of its employees or other assisting persons whom it engages, telephone, postage, and advertising expenses incurred at its direction, and all other charges and expenses.

**IX. TELEPHONE:**

All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company.

**X. INDEMNIFICATION:**

A. The Company will defend and indemnify Agency against liability, including the cost of defense and settlements, imposed on Agency by law for damages sustained by policyholders and caused by acts or omissions of the Company, provided that Agency has not caused or contributed to cause such liability by its acts or omissions. Agency agrees, as a condition to such indemnification, to notify the Company promptly of any claim or suit against it and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent. The Company reserves the right to select counsel to represent Agency in connection with any such claim or suit. Agency also agrees to cooperate fully with the Company in any such investigation, settlement, or defense.

B. Agency will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by the acts or omission of Agency, its officers, directors, shareholders, members, employees, including Key Person or other persons working in connection with this Agreement, provided that the Company has not caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify Agency promptly of any such claim or suit against the Company. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

**XI. INSURANCE:**

A. Agency agrees that it will, at its sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Manual, as may be amended from time to time. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies.

B. Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement. Each policy must also expressly provide that it will not be subject to material change or cancellation without at least thirty (30) days prior written notice to the Company.

C. Agency must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise Agency and if Agency does not furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, the Company will have the right to obtain additional insurance at Agency's expense and deduct the cost of such insurance plus a processing fee from monies owed Agency by the Company.

**XII. FINANCIAL INFORMATION:**

Agency shall maintain all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate. All of the foregoing records shall be open and available for inspection or audit at any time during Agency business hours without notice by the Company or its designated auditors and Agency shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

**XIII. POLICIES IN AGENCY'S ACCOUNT:**

Policies which are credited to Agency's account are described in the Supplement. While this Agreement is in effect, the Company will leave in Agency's account all policies credited to such account so long as the policyholder resides within a state in which Agency is authorized to act as a Company agent, except that the Company may remove any policy from Agency's account at the request of a policyholder.

**XIV. MONEY COLLECTED BY AGENCY:**

All payments collected or received by Agency in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company. Agency must maintain accurate records and current remittance reports which may be inspected by the Company at any time without notice and which shall be submitted to the Company in accordance with its rules and procedures.

**XV. COMPENSATION:**

A. The sole compensation to which Agency will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time. All commissions will be paid solely to the Agency, except as described in Section XIX. below. The Company will pay Agency its commissions at the time and in the manner set forth in the Supplement. However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes commission amounts, it will provide Agency with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

B. The Company may provide Agency with such bonuses, awards, prizes, and other remuneration based on performance, if any, as it may prescribe in its sole discretion.

C. If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to Agency, or if any premium paid is not earned by the Company, the commissions paid to Agency on the amount returned or credited to the policyholder, or the amount overpaid to Agency, will constitute an indebtedness of the Agency to the Company and will be charged to Agency or recovered from Agency by reducing any future commissions, awards, or bonuses due Agency.

**XVI. TRANSFER OF INTEREST:**

A. Agency may not execute a transfer of its interest in this Agreement without the prior written approval of the Company. A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it. Neither Agency, nor any shareholder or member of Agency, shall transfer any shares or interest in Agency, including, but not limited to, any sale, assignment, conveyance, or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company. Agency has the obligation to notify the Company of a proposed transfer and to request Company approval.

B. Agency has an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in its Allstate customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, Agency may transfer its entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of Agency's interest in this Agreement or any share or interest in Agency shall constitute a breach of this Agreement and cause for termination of this Agreement.

C. Approval of a proposed transfer of Agency's entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee.

D. Policies in Agency's account (Section XIII. above) will be transferred to an approved transferee.

**XVII. TERMINATION OF AGREEMENT:**

A. This Agreement will be terminated automatically:

1. On the effective date of any transfer of Agency's entire interest in this Agreement, whether approved or not, as described in Section XVI. above;
2. Upon the death or permanent incapacity of Key Person;
3. On the date Key Person ceases to be employed by Agency;
4. Upon the loss of any required agent license of Agency or Key Person;
5. Upon the dissolution of Agency; or
6. Upon the surrender of, or the election not to renew, the Company's license to sell insurance in all lines in the state in which Agency's sales location is located or the discontinuation of the sale of insurance in the state.

B. This Agreement may be terminated:

1. At any time by mutual agreement of the parties in writing;

2. By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law. Once written notice of termination has been given by either party, Agency will, immediately upon request of the Company, cease to act or to represent itself in any way as an agent or representative of the Company, but it will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

**XVIII. OBLIGATIONS UPON TERMINATION OF AGREEMENT:**

Except as otherwise provided in a subsequent agreement between Agency and the Company, upon termination of this Agreement, Agency agrees that:

A. Agency will not act or represent itself in any way as an agent or representative of the Company.

B. Agency will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies.

C. Agency will immediately cease to use such telephone numbers referenced in Section IX. above and execute an Order of Transfer of Responsibility for such numbers in its or Key Person's name to the Company or to any party the Company designates, and Agency will immediately notify the telephone company of any such transfer. Agency will be responsible for all charges incurred up to the date of execution of the transfer.

D. For a period of one year following termination, neither Agency, nor any of its officers, directors, shareholders, members, or employees, including Key Person or any other persons working in connection with this Agreement, will solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency or anyone acting on its behalf sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;

   2. With respect to any person, company, or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered as a result of Agency's status as a Company agent or as a result of Agency's access to confidential information of the Company; or

   3. From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph D. conflicts with any existing law, it will be applied to the extent permitted by such law.

E. Agency will immediately cease and desist from any and all use of Company service marks and trade names. Agency will immediately return to the Company all property in its possession or under its control bearing any Company service mark or trade name, or dispose of it in such manner as the Company specifies.

F. Agency recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Agency agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

G. Agency recognizes and acknowledges that each of the foregoing provisions of this Section XVIII. is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom. Agency and Key person recognize and acknowledge that the foregoing provisions are not an undue restraint on Agency or Key Person.

**XIX. PAYMENT TO AGENCY UPON DISSOLUTION:**

If at any time following the Company's receipt of notice of Agency's dissolution, the Company shall be obligated under this Agreement to pay money to Agency, the Company is irrevocably authorized to pay such money to Key Person, or in the event of the death or incapacity of Key Person, his executor or personal representative, who shall be responsible to Agency's successors-in-interest for distribution of such payment to the persons or entities legally entitled thereto. Company shall have no liability whatsoever for any payments made pursuant to the foregoing authority regardless of whether Company has received any conflicting demand from any other person or entity, except for payments made by the Company in violation of an order of a court of competent jurisdiction properly served upon the Company which directs the Company not to make any such payment to Key Person and designates an alternate person or entity to which the Company is directed to make such payments.

**XX. NOTICE:**

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

| | |
|---|---|
| if to the Company: | Allstate Insurance Company<br>P.O. Box 223988<br>Dallas, TX 75222-3988<br>Attention: Agent Commissions - MS #27 |
| if to Agency: | Old Slip Benefits & Insurance Services, LLC<br>199 Main Street, Ste 200<br>White Plains, NY 10601 |

or to such other person or address as any party may furnish or designate to the other in writing.

**XXI. GENERAL PROVISIONS:**

A. Agency warrants and represents that Agency is a [corporation] [limited liability company] duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite power and [corporate] [limited liability company] authority to enter into this Agreement and to perform Agency's duties and obligations under this Agreement. Agency further warrants and represents that it is duly qualified and in good standing to do business in every jurisdiction in which such qualification is necessary because of the nature of the business conducted by it pursuant to this Agreement.

B. Agency and Key Person warrant and represent that Agency and Key Person have the power, [corporate] [limited liability company] authority, and capacity to enter into and consummate this Agreement. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary [corporate] [limited liability company] action, as applicable, on the part of Agency and Key Person.

C. This Agreement may not be modified except by a written agreement between the Company and Agency which expressly states that it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement, except as provided in this Section XXI. Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.

D. Agency acknowledges that it has reviewed the Supplement, EA Manual, and Agency Standards and that it has an ongoing responsibility to review all changes to the Supplement, EA Manual and Agency Standards issued by the Company and agrees to be bound by them.

E. References in this Agreement to the Supplement, EA Manual, and Agency Standards are references to the Supplement, EA Manual, and Agency Standards including any changes which may be made from time to time and distributed to Agency by the Company.

F. Agency acknowledges that it has read this Allstate R3001C Exclusive Agency Agreement, understands it, and agrees to be bound by its terms.

G. The authority granted to Agency under this Agreement is nonexclusive. The term "Exclusive" as used in the title of this Agreement refers to the obligations assumed by Agency under Section I.E.

H. The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

I. If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

J. The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term. The obligation of the parties with respect to any such future performance will continue in full force and effect.

K. Nothing in this Agreement shall be construed to confer upon any person or entity other than the Company and Agency any rights under this Agreement.

L. This Agreement, and the obligations or rights hereunder, shall not be assignable by Agency except as provided by Section XVI. The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

M. This Agreement may be executed in counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, the Company and Agency have caused this Agreement to be executed by their authorized representatives and the parties hereby accept the terms of this Agreement.

ALLSTATE INSURANCE COMPANY

e-Signed by Stacy Wines
on 2024-02-21 21:01:26 GMT

(authorized representative)

February 21, 2024

(date)

AGENCY

e-Signed by JAMES LUKEZIC
on 2024-02-21 20:20:23 GMT

(name)

JAMES LUKEZIC

(Key Person)

February 21, 2024

(date)

**R3001C**
**APPENDIX A**

**CONFIDENTIALITY AND NON-COMPETITION AGREEMENT**

**KEY PERSON**

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this 1 day of March, 2024, by and between JAMES LUKEZIC (referred to in this Agreement as "Service Provider"), and Old Slip Benefits & Insurance Services, LLC (referred to in this Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1. The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2. Service Provider acknowledges that while assisting Agency in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3. Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company; nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agency in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by Agency will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agency.

6. Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to Agency or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement may be executed in counterparts, each of which will be deemed an original. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of facsimile signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| e-Signed by JAMES LUKEZIC on 2024-02-21 20:20:34 GMT | e-Signed by JAMES LUKEZIC on 2024-02-21 20:20:35 GMT | e-Signed by Stacy Wines on 2024-02-21 21:01:29 GMT |
| (Key Person as an Individual) | (Key Person on behalf of Agency) | (authorized representative) |
| February 21, 2024 | February 21, 2024 | February 21, 2024 |
| (date) | (date) | (date) |

**R3001C**
**APPENDIX B**

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this ______________ day of __________________, __________, by and between ______________________________(referred to in this Agreement as "Service Provider"), and ______________________________ (referred to in this Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1. The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2. Service Provider acknowledges that while assisting Agency in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3. Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company; nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agency in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by Agency will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agency.

6. Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to Agency or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| (name) | (Key Person) | (authorized representative) |
| (date) | (date) | (date) |

Outlook

**Automatic reply: Phones**

**From** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Date** Wed 2/28/2024 3:00 PM
**To** LUKEZIC, JAMES <jlukezic@allstate.com>

Thank you for contacting me. **I am currently out of the office on February 28th with limited access to email.** If you have a question regarding one of the items below, please use the resource(s) identified; otherwise, I will respond to your inquiry upon return. If you require immediate assistance, please contact **Denise Morales**.

| Question / Inquiry | Resource |
|---|---|
| Agent/Agency Name Changes | COMCOEConversions@allstate.com |
| Agency Phone Number Changes | IAMKTS@allstate.com |
| Non-Resident Approval for Existing Agents | Reach out to your SML |
| Agency Compensation | • Gateway FAQs<br>• (800) 340-0475<br>• Commission Pay |
| Agent Group Banking | • AGB Deposit Order Form<br>• How to change bank account details<br>• AGB Representative Chat |
| Agency or LSP Education | Virtual Education & Delivery Team |
| General Inquiries not related to onboarding or offboarding | NAETGeneral@allstate.com |
| Signage | • Allstate Brand Central or allstatebrandcentral@allstate.com<br>• Branded Retail Environment<br>• Other questions, contact NAETSignage@allstate.com |
| Technical Support (Hardware/Allstate Applications)<br>VIP Access / Password Resets | Agent Online Technology Support<br>Manage My Access |
| Other topics (Compliance, Education, Licensing, etc) | Gateway Quick Reference for Support |

For all other questions, please search Agency Gateway or reach out to your appropriate sales leader.

**Wednesday, October 2, 2024 at 13:32:56 Eastern Daylight Time**

**Subject:** RE: Allstate eSignature - Please sign your document(s) for the package "APAR - Buglione/Lukezic".
**Date:** Monday, March 25, 2024 at 10:11:19 AM Eastern Daylight Time
**From:** Stevenson, Marc
**To:** James Lukezic
**Attachments:** APAR - Buglione-Lukezic - 3.1.24.pdf

Hi James,

Please disregard this email. This APAR was an old document that Al had incorrectly completed. I've attached the fully executed copy of the APAR completed between you and Al.

Also, I've escalated your greeting issue with Allstate Agency Voice (AAV) via ticket number INC21101988. I've requested an update this morning and will keep you posted.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

571-235-0827 | 866-855-8453 Fax | mstbh@allstate.com

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call (800)-336-9400 (Option 6) to be connected to the correct person fast!***

**From:** James Lukezic <james@oldslipcap.com>
**Sent:** Sunday, March 24, 2024 3:20 PM
**To:** Stevenson, Marc <MARC.STEVENSON@allstate.com>
**Subject:** [External] Fwd: Allstate eSignature - Please sign your document(s) for the package "APAR - Buglione/Lukezic".

**This Message Is From an External Sender!**
**This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.**

?

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

Begin forwarded message:

**From:** Allstate Insurance <signers@esign.allstate.com>
**Date:** November 21, 2023 at 6:06:00 PM EST
**To:** James Lukezic <james@oldslipcap.com>
**Subject: Allstate eSignature - Please sign your document(s) for the package "APAR - Buglione/Lukezic".**
**Reply-To:** Marc Stevenson <mstbh@allstate.com>

Hi James Lukezic,

Below is a link to the Agency Purchase Approval Request (APAR) form, which includes sections to be completed by both Seller and Buyer.

REVIEW EACH QUESTION CAREFULLY. This document must be approved by Allstate to allow approval of a sale. Every question must be answered with a respons

Signing order: The document will first be sent to the Selling Agent and then forwarded automatically to the Buyer. Upon completion, it will be sent to the National Agen

Thank you!

Go to Documents

For troubleshooting, please contact me.

Thank you for using Allstate eSignature!

Marc Stevenson
**Allstate Insurance Company**
mstbh@allstate.com

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------------x
OLD SLIP BENEFITS & INSURANCE SERVICES, LLC

Index. No. 69162/2024

Plaintiff,

v.

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.
------------------------------------------------------------------x

AFFIRMATION OF JAMES LUKEZIC IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPANDED INJUNCTIVE RELIEF TO MAINTAIN THE STATUS QUO BROUGHT BY ORDER TO SHOW CAUSE

James Lukezic, hereby affirms under penalty of perjury, as follows:

1. I am the owner and managing director of Plaintiff Old Slip Benefits & Insurance Services, LLC ("Old Slip"), a New York limited liability company, and have personal knowledge of the facts in this Affirmation. I am submitting this Affirmation in support of Plaintiff's motion for expanded injunctive relief to maintain the status quo brought by an Order to Show Cause.

2. In this action, Old Slip is seeking injunctive and other relief against Allstate Insurance Company ("Allstate) with regard to the scheduled termination of my March 1, 2024 agency agreement for the operation of an Allstate franchise insurance agency, which I have been operating successfully on Main Street in White Plains since March 2024.

***Personal Background***

3. I have been in the financial services industry as a Fund Analyst and Financial Advisor for 24 years. In 2019, I purchased a Broker Dealer business from CNA Insurance,

renaming it under my own brand, Old Slip Capital Management, Inc., a business that was approved for business in 1966.

4. During the past eight years, I have built up a financial services capital management and investment advisory business, in New York City, with investment clients across the country, offering financial services products of several different investment management companies. I have several securities licenses, including a registered investment advisor (RIA), licensed broker dealer (BD), and accredited investment fiduciary, with Series 7, 24, 63, 65, and 66 FINRA securities licenses. Over the past eight years, my affiliated companies Old Slip Capital Partners LLC, Old Slip Registered Investment Advisors, LLC, and Old Slip Capital Management, Inc., have built up a nationwide investment advisory business, selling investment products and variable annuities (but not fixed annuities) across the United States.

5. Before launching my own capital investment and investment advisory business in 2016, I held positions at Merril Lynch (Financial Analyst), Salomon Smith Barney Holdings (Senior Financial Analyst), Wells Fargo (Institutional Consultant – Corporate Retirement Plans), and Oppenheimer (Director – Investments – Corporate Retirement Plans). I have a bachelor's degree from Cornell University (2000) and was a Visiting Lecturer at Princeton in the department of Politics early in my career at Merrill Lynch.

***Original Requested Equitable Relief***

6. On September 19, 2024, this Court entered an Order to Show Cause as to why an Order should not be entered granting injunctive relief to maintain the status quo enjoining the Defendant Allstate Insurance Company from terminating the March 1, 2024 agency agreement between my firm Plaintiff Old Slip Benefits & Insurance Services, LLC and Defendant Allstate Insurance Company "Agency Agreement"), pending a full determination of the merits of this

action, and that, pending the hearing and determination of the motion for preliminary injunctive relief, Defendant Allstate Insurance Company shall refrain from carrying out or effectuating the scheduled termination of the Agency Agreement until a hearing and determination can be had on Plaintiff's motion for preliminary injunctive relief. (NYSECF Doc. No. 16).

7. The Court entered this equitable directive based upon my preliminary showing that Allstate wrongfully terminated the Agency Agreement, Plaintiff Old Slip would suffer irreparable harm if the termination was effectuated during the pendency of the motion and this action, and the balance of the equities weighed in favor of entering the relief.

8. As explained in more detail below, because of recent actions by Allstate to circumvent the Court's order, I am requesting that the injunctive relief be expanded to include prohibiting Allstate from falsely telling people that Plaintiff's Agency Agreement has been terminated, or from instigating action with my bank, landlord, or regulatory agencies calculated to cause them to terminate, default, or discipline me or my company, during the pendency of this action..

***Spirt and Intent of the Court's September 19 Order***

9. The spirt and intent of the Court's September 19 Order, and the requested preliminary injunctive relief, was to prevent Allstate from going forward with its planned termination of my Allstate franchise agency agreement, to maintain the status quo and prevent the destruction of the business, pending a hearing on the merits of my claims that the termination was unlawful, improper, and not justified under the circumstances.

10. As noted in my motion, in late 2023, I decided to become an Allstate insurance agency franchisee, and to purchase the assets of two existing Allstate insurance agencies located in Westchester County, New York, owned by Anthony Fava and Alfred Buglione respectively,

and I formed Plaintiff Old Slip Benefits & Insurance Services LLC to own and operate the new Allstate franchised business. I purchased the customer accounts of two existing Allstate agencies, consolidated the accounts into one agency, leased space in White Plains, hired and trained employees, and began managing those accounts and selling Allstate insurance products, from its Allstate agency location in White Plains, New York. I moved my family, including my wife and young daughter, to White Plains from Florida, to open the agency. Since March 2024, I have been operating the agency successfully, providing excellent customer service to the insurance customers, with a fully trained staff. I have been generating significant premiums for Allstate, and Allstate has never raised any issues regarding the agency's performance. I had become an Allstate franchised agent, with the intention of growing the agency, by buying and consolidating additional Allstate insurance agencies in the future, and continuously cross-selling Allstate's insurance products to my existing investment advisory clients, which I would continue to service through my established investment advisory business.

11. During the sales process, I made it clear to Allstate as well as the sellers, in my business plan and my discussions with them, that my Allstate agency would only be offering insurance products. I also made it clear that I had my own separate investment advisory business, under the name Old Slip Capital Partners, LLC, a diversified financial services firm affiliated with Old Slip Registered Investment Advisors, LLC, a SEC Registered Investment Advisor, and Old Slip Capital Management, Inc., a Broker/Dealer, and member of FINRA/SIPC. I explained to the Allstate salespersons how I wanted to market Allstate insurance products to my affiliates' thousands of 401(k) Participant clients which I have through their 401k corporate accounts, a strategy that was well received by the Allstate salespersons. At no point in time did the Allstate salespersons say anything to me about transferring my FINRA licenses to Allstate, and they never

asked me to sign any of the required paperwork to transfer my FINRA licenses to Allstate, because that was not part of the deal. My business plan for the Allstate agency only proposed selling insurance products, and ***not*** investment products.

12. This was consistent with the agency agreement that I signed, Doc. No. 6. The plain language of the Allstate Agency Agreement only restricted Old Slip from offering insurance products of other companies, and not other non-insurance investment products which its affiliates offer through their regulated investment advisory business and broker-dealer business. Section 1[E] of the Allstate Agency Agreement, Section 1[E] is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance."

13. The plain reading of the contract is bolstered by Allstate's own March 23, 2000 set of Questions and Answers ("Q & As") regarding the exclusive agency agreement, specifically recognizing that the non-competition provisions do not apply to "*non-insurance*" products, and that the offering of non-insurance products to customers is "*not a violation of the noncompete provision.*" *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 350 (E.D. Pa. 2014*), opinion clarified on denial of reconsideration* (Apr. 7, 2014) (emphasis added).. *See also Allstate Ins. Co. v. Fougere*, No. CV 16-11652-JGD, 2019 WL 4776986, at *13 (D. Mass. Sept. 30, 2019) ("the unambiguous language of the EA Agreement provides that the Agency is not to sell *insurance* policies of any competitors") (emphasis added). In fact, there are many Allstate insurance agencies with similar agreements which offer investment products through other companies.

14. Soon after I started operating the agency, Allstate's representatives including Regine Napoleon, came to the new office and they saw very clearly that I was operating the Allstate insurance agency as well as my separate securities business out of the same office, with separate

computers and business cards, and Napoleon did not say anything or raise any objection.

***Representations During the Sales Process***

15. Since it started, I have been operating the agency successfully as an Allstate franchisee. The relationship was intended to be a long-term relationship. As a condition for entering into the franchise agreement, for a three month period from about December 2023 to February 2024, I was required to undergo extensive training, on the Allstate's system and methods that were required to be an Allstate agent. This included, among other things sixty hours of webinars and online training provided by the "Allstate University," which I completed. Old Slip was required to agree to follow all of Allstate's methods, policies, and requirements, and to operate the agency in accordance with the Allstate system of doing business, which I have faithfully done.

16. Defendant Allstate, through its intensive marketing, onboarding and training programs during the 3-4 months, from September 2023 through February 2024, before I signed the agency agreement on February 21, 2024, intentionally led me to believe that it was offering my new agency, Old Slip Benefits & Insurance Services, LLC ("Old Slip") a long-term relationship, in return for my commitment to invest in setting up and operating the agency, Allstate would do everything to support my new agency, and Allstate would not terminate the relationship with my agency unless it breached its obligations. I did not become an Allstate franchised agent and I did not sign the Allstate franchise agency agreement until Wednesday, February 21, 2024. Prior to signing that agreement, I had no contractual relationship with Allstate. Rather, I was merely a prospect or a candidate.

17. Allstate's marketing materials specifically promised and reassured Old Slip that:

- "When you become an Allstate agency owner, you're not on your own. From day one, we'll help you build the knowledge, skills and tools you need to succeed."

- "Build a legacy. When you're ready, sell your business or pass it down to a family member."
- "Nobody's business but yours."

18. Allstate's salespersons assured me that once I become an Allstate agent, you never leave, most of our agents stay with us for life, we take pride that most of our agents have been with us for more than 25 years. Further, Allstate arranged all of the financial terms with the sellers of the accounts Old Slip was purchasing, telling me that these sellers have been with Allstate for almost 30 years, and that Allstate wanted me to be with Allstate for 30 years. When I asked what happens if I am unable to perform for some reason, Allstate assured that Allstate would line up a buyer for me, just like they lined up a buyer for the sellers. Allstate did not provide me with the form agreement until the day it had to be signed in time for the closing, and when I expressed that I was not comfortable with the form, Allstate's salesperson told me it was a formality that I just needed to sign right away, or else I would not get the financing.

19. During the sales and recruitment process, Allstate's sales team sent me specific representations projecting how much money Old Slip would make, including revenues and expenses, over each of the next five years.

20. When I signed the agreement, I understood that I was entering into a long-term relationship with Allstate, under which both sides were committing to invest in each other over the long-term, where neither could terminate unless the other breached their obligations.

21. Various provisions in the agreement bolster this understanding that the parties were making a long term commitment to each other and that, if there were any problems, the parties would attempt to resolve them. (NYSECF Doc. No. 6). See, for example, the following provisions: §VII (if quality of services was not acceptable, Allstate would require Old Slip "to

institute appropriate procedures to correct any deficiencies noted by the Company"); §XI (Allstate would give Old Slip 15 days' notice and opportunity to cure if Old Slip did not have adequate insurance); §II(J) (if Old Slip could no demonstrate knowledge of any product, Allstate could withdraw Old Slip's authority to sell it until it demonstrated such knowledge); §II(I) (Allstate could request that Old Slip meet with Allstate representatives to discuss various business topics); §XVI(B) (failure to obtain prior written approval for a transfer would be sufficient "cause" for termination); §IV(A) (Allstate would furnish Old Slip with the signs, forms, manuals, records, and other materials and supplies it needed to succeed); §V(A) (Allstate would review and approve Old Slip's location); §VI (Allstate would advertise and provide promotional material). The agreement should be interpreted in a manner that is consistent with these provisions, that would not make them meaningless or superfluous, or deprive Old Slip of the benefit of the bargain.

22. In December 2023, Allstate sent me a list of all of the requirements I would have to fulfil to become an Allstate franchised agent, including for example, all of the licensing requirements, the requirements to purchase signs from Allstate, the requirement to have sufficient liquid capital, the requirement to purchase Allstate marketing material and the required laptop computers, and the requirements to complete the extensive online training program.

23. As a condition for entering into the franchise agreement, Old Slip was required to purchase and pay Allstate or its affiliated companies for several Allstate required purchases which were required for me to operate as an Allstate franchised business. I was required to purchase many of these items from the "Allstate Technology Store", which could only be accessed through the Allstate portal.

- Old Slip was required to, and did, purchase Allstate signage, which was required to be installed by an Allstate representative, and did in fact purchase and pay about

$2,000 for such signage

- Old Slip was required to, and did, purchase Allstate mandated computers, Lenova Thinkpads, for him and his staff, which Allstate loaded with its software, and which were set up by Allstate Technology Support, and did in fact order and pay several thousand dollars for such systems through the Allstate Technology Store. Allstate apparently considered the equipment to be its own equipment, demonstrated by the fact that after Allstate issued its termination letter, Allstate demanded that I return Allstate's equipment".
- Old Slip was required to, and did, pay for the entire telephone system, through the Allstate Run the Business Group, only use the telephone number provided by Allstate, and was required to have the telephone system set up onsite by Allstate.
- Old Slip was required to, and did, purchase physical security key fobs, with continually changing security numbers in order to access and login to the Allstate mandated computers, through the Allstate Run the Business Group.
- Old Slip was required to, and did, use and pay for Allstate business cards and stationary, paying Allstate several hundred dollars for such items.

24. As a condition for entering into the franchise agreement, Old Slip was required to, and did, locate the office at a location approved by Allstate. Allstate disapproved the first two locations that I proposed, and only approved the third location.

25. As a condition for entering into the franchise agreement, Old Slip had to agree that its customers must pay their premiums directly to Allstate, rather than to Old Slip, and that Allstate would keep on average about 93% of the premium payments it received from Old Slip's customers, based on Allstate's mandated formula, and that Allstate would pay Old Slip only about 7% of the

premiums collected. Old Slip was required to open its franchised business bank account at one of the two Allstate authorized banks, namely Chase or Wells Fargo, and Allstate required Old Slip to purchase a stamp to be used if customers accidently delivered a premium check to Old Slip (rather than to Allstate), in which case Old Slip was required to use the stamp to endorse the check over to an Allstate controlled bank account.

26. Old Slip was required to, and did, arrange its financing for the purchase of the agencies through the Allstate Lending Connection, and was required to pay the Allstate Lending Connection various administrative and processing fees in connection with the financing, as a condition for the financing and the purchase of the agencies. Allstate and the bank, which was affiliated with Allstate, entered into an agreement which gave the bank a security interest in Old Slip's customer accounts and guaranteed the bank that it would get paid directly from Allstate as a fixed monthly direct payment that was automatically deducted from the commissions that Old Slip earned and was otherwise entitled to be paid by Allstate. Allstate and the bank arranged for a long-term loan, to be repaid over a ten year period at 9% interest, so that Allstate would collect the customers' insurance premiums, calculate Old Slip's commission, and deduct a fixed monthly amount from Old Slip's commission, and pay this fixed monthly amount directly to the bank, for the next ten years. A copy of the Allstate intake lending form is attached as Exhibit A, and a copy of the Promissory Note is attached as Exhibit B.

27. In February 2024, Allstate told me which entity I needed to use to enter into the agency franchise agreement, telling me that I had to sign the agreement with Allstate in the name of the entity that had a state insurance agency license. They also told me I had to complete the required training program, before I could even sign the Allstate agency franchise agreement and become an Allstate agent. Allstate had to sign off on all of the financing requirements, and

instructed me on the Allstate Lending Connection requirements, including giving a security interest to the bank in the accounts.

***Allstate Delayed in Providing Me With the Agreement and Pressured Me to Sign***

28. In February 2024, in my communications with Allstate and the lender, Allstate told me that the lender could not issue the loan documents until I had signed the Allstate agency franchise agreement, known as the R3001 agreement. Strangely, when I tried to get it from Allstate, I received a notice from Allstate that it could not provide the agreement to me until five days before the scheduled March 1 effective date. The lender told me that it needed it sooner, in order to have time to issue the loan documents and get them signed at least two days before the March 1 date. The lender representative told me to ask my "fields sales leader" again for the contract, referring to Marc Stevenson. When I asked Allstate, whether, given that I did not yet even have the contract, if it would be ok if I signed it the following week, and they told me no, because then we would have to delay the closing, and that as a result, the funding might fall through and I might not be able to get the financing at a later date, and the entire transaction would fall through.

29. I finally received the contract on Wednesday, February 21, and pursuant to Allstate's specific instructions that I had to sign it right away, I went ahead and signed it right away minutes after I got it, so that we could meet the deadline. Neither Allstate or the bank sent the agreement to my attorney at the time who was communicating with the bank. I was under extreme pressure by Allstate to sign it right away, which I had to do, because otherwise the deal might fall through, and neither me or my attorney at the time were given time to review it because Allstate did not even send me the agreement until there was no time left.

30. On the Monday, February 26, 2024, Allstate had still not signed the agreement. So,

Allstate went ahead and sent a copy of the agreement which I had signed to the lender, and promised they were working on getting it signed by the authorized Allstate "Zone District Leader." Later that same day, Allstate finally sent the fully-signed R3001 agreement directly to the lender, with only four days before the scheduled closing.

31. When I entered into the Agency Agreement, based on everything Allstate had done and told me, I was under the distinct impression and understanding that this was a long-term relationship, that Allstate could not unilaterally terminate the Agency Agreement unless it had a legitimate reason to do so, and that I was investing all of my time, hard work and money into this relationship in return for this commitment by Allstate. It is absolutely ridiculous to me to even suggest that anyone would think that I would take out a $405,000 loan approved by Allstate, sign a long-term lease approved by Allstate at a location approved by Allstate, move my family to New York, undertake months of training, hire employees and set up the agency, and that Allstate could turn around the next day and terminate the entire agreement without even having any reason.

***The Agency Agreement was an Illegal Franchise Agreement***

32. I now know that Allstate's sale of the agency agreement to Old Slip constituted an illegal sale of a franchise, in violation of New York law.

33. The agreement met all of the elements of the sale of a franchise under New York law. NY GBL § 681. Allstate gave Old Slip the right to engage in the business of offering and selling Allstate products, specifically authorizing Old Slip to "sell products specified by the Company". Old Slip was required to pay a fee, as the term is broadly defined under the New York franchise laws, for entering into the arrangement and becoming an Allstate franchisee, including but not limited to the monies paid for the required Allstate stationary, notepads, and business cards; the Allstate mandated signage and installation; the Allstate mandated computer equipment,

software, and installation; the Allstate mandated key fobs; the Allstate mandated bank stamps; the Allstate mandated telephone equipment and installation; the portion of the premiums paid by Old Slip's customers which Allstate kept; the Allstate Lending Connection service fees, countersigning fees, the processing and other fees paid in connection with Allstate Lending Connection's facilitation of the sellers' loan payment; the sellers' transfer fees; and other fees. Allstate gave Old Slip the right to use its marks, and it provides a marketing plan or substantial assistance and control. Thus, the sale of this agency agreement to Old Slip was an illegal sale of a franchise.

34. I now know that Allstate knowingly and willfully violated every provision of the New York Franchise Sales Act when it sold the agency agreement to Old Slip. NY § GBL 683. New York law prohibits the sale of a franchise without being registered and without providing the state-approved disclosure document to prospective franchisees ten days before the sale or on their first personal meeting.

35. Here, Allstate failed to provide me with a franchise disclosure document that specifically summarized the terms of the agreement, or any of the other critical information required in a franchise disclosure document, at least ten days before asking me to sign the agreement or pay any money. In fact, Allstate only provided the agreement to me right before the deadline for the closing, giving me less than one day to even review the agreement, and without the benefit of a franchise disclosure document.

***Allstate Illegally Terminated the Agency Agreement***

36. Incredibly and inexplicably, not more than about thirty days after Old Slip was up and running, Allstate's salesperson Regine Napoleon came to me and demanded that I transfer all of his financial services customers to Allstate's separate financial services company, and cease offering financial services products other than Allstate financial services products to his financial

services customers. Napoleon called me and told me that I had to relinquish my FINRA licenses and bring all of his investment advisory clients to Allstate. I explained to her that this was never part of the deal and that it would be impossible to do so for many reasons, including the fact that Allstate's AFS platform is not even equipped to handle his much more sophisticated accounts, and the Allstate Agency Agreement states nothing about FINRA or investment advisory or broker/dealer services and only deals with insurance products.

37. This demand made absolutely no sense, because it was not consistent with the agency agreement which did not prohibit me from continuing to operate his investment advisory business. It was also directly contrary to all my discussions with Allstate during the sales process, during which I had emphasized to them that the reason I was purchasing the two agencies was so that I could cross-sell Allstate insurance products to my financial services clients. It also made no sense because to offer Allstate's investment products, I would have had to sign a different agreement with Allstate to transfer the broker/dealer license to Allstate, and Allstate had never even mentioned or asked me to sign such documents during the onboarding process.

38. The request also made no sense to me because, as I discussed with Allstate, Allstate's financial services division only offers one type of financial services product to its customers, namely a Fidelity Brokerage Account, which is in no way suitable for his financial services customers. The demand, if carried out, would hurt my financial series customers and would have an anticompetitive effect, because my financial services customers would be forced to purchase only the single Fidelity financial service product offered by Allstate's financial services company, rather than being able to choose from among the many financial services products that my affiliates offer to my clients pursuant to selling agreements with almost every other major firm.. Under FINRA rules, as a broker dealer, I have a fiduciary duty to offer a range of products to my

clients to ensure that they end up with a product that is "suitable" to them.

39. After months of bullying and attempted coercion, Allstate issued Old Slip a termination letter dated June 25, 2024, in which it claimed it was terminating the agreement for cause due to "unauthorized brokering." (NYSECF Doc. No. 7). Allstate falsely and unjustifiably claimed Old Slip had violated the Agency Agreement by maintaining an "outside business interest," which was absolutely false and made absolutely no sense, for all of the reasons outlined above.

40. The termination was wholly unjustified because the plain language of the Allstate Agency Agreement only restricted Old Slip from offering insurance products of other companies, and not other non-insurance investment products which Old Slip's affiliates offer through their regulated investment advisory business and broker-dealer business. Old Slip's investment related companies offer investment products and variable annuities (but not fixed annuities. Allstate's termination of Old Slip's agreement, on the ground that it was engaged in "unauthorized brokering", was illegal, as it had no legal justification in the agreement, because the Allstate Agency Agreement did not prohibit Old Slip or Lukezic from offering and selling non-insurance products including variable annuities.

***Allstate's Most Recent Actions to Circumvent the Court's September 19, 2024 Order***

41. As I described in my moving papers, the threatened termination of Old Slip's Allstate insurance franchise agreement, which was scheduled to go into effect on September 30, 2024, will cause irreparable harm to Old Slip and to me, because Old Slip's entire business is the offering and sale of Allstate insurance products. The termination will cause the destruction of its business, and result in the loss of jobs of Old Slip's employees, liability to third parties including the bank and the landlord, and the loss of future opportunities for purchase of additional agency

accounts.

42. As the Court is aware, on September 19, 2024, this Court ordered Defendant Allstate, to maintain the status quo and prevent irreparable harm, pending the hearing and determination of Plaintiff's motion for preliminary injunctive relief, to:

> **"refrain from carrying out or effectuating the scheduled termination of the Agency Agreement until a hearing and determination can be had on Plaintiff's motion for preliminary injunctive relief."[1]** (NYSECF Doc. No. 16).

43. The Court entered this equitable directive based upon our showing that Plaintiff would suffer irreparable harm if Defendant Allstate was permitted to go forward with the scheduled termination of the Agency Agreement which was scheduled to go into effect on September 26, because the termination would effectively destroy the business.

44. Despite this equitable directive, and since the Court entered its September 19, 2024 order, Defendant Allstate has recently taken additional action directly calculated to circumvent this Court's directive, destroy the Plaintiff's business, and accomplish what it was originally seeking to do by terminating the Plaintiff's Agency Agreement, namely to shut down Plaintiff's business.

45. As Defendant Allstate is well aware, in order to establish this business, Old Slip had to take out a $405,000 loan from Wintrust Bank (fka Lake Forest Bank), and gave Wintrust

[1] The underlying motion for injunctive relief sought a preliminary injunction:

**"to maintain the status quo, enjoining Defendant Allstate Insurance Company from terminating the Marh 1, 2024 agency agreement between Plaintiff Old Slip Benefits & Insurance Services, LLC and Defendant Allstate Insurance Company ("Agency Agreement"), pending a full determination of the merits of this action."** (NYSECF Doc. No. 16).

Bank a security interest in the premium payments which Allstate received on Plaintiff's customer accounts.

46. In the end of November, 2024, I received a telephone call from my Wintrust Bank relationship manager stating that she was told by Allstate that my Allstate Agency Agreement had been terminated and was converting to termination status known as "TPP".

47. Allstate's communication to Wintrust Bank – indicating that my Agency Agreement has been terminated - is ***false*** in light of the fact that this Court has entered an equitable directive that Allstate was ordered to "**refrain from carrying out or effectuating the scheduled termination of the Agency Agreement.**"

48. Moreover, the communication directly violates the spirit and intent of the Corut's order, which was to maintain the status quo, and for Allstate to refrain from effectuating the scheduled termination.

49. The potential effects of Allstate making this false statement to Wintrust Bank are devastating. Wintrust Bank's loan is secured by a security interest in the payment stream from the insurance premium payments paid to Allstate on Plaintiff's accounts. Pursuant to agreements between Plaintiff, Allstate and the Bank, the Bank receives its loan payments directly from those premium payments, as a deduction from the monies which Plaintiff's receives, so that Plaintiff is not required to advance any monies for the loan payments each month. (*See* Exhibit A).

50. Allstate's statements to Wintrust will almost certainly cause Wintrust to declare a default on the loan. The loan documents contain cross-default provisions, which provide that Plaintiff's default under any agreement with any person that may materially affect its property or its ability to repay the Note or perform its obligations under the Note constitutes a default under the Note. Wintrust can also declare a default if there is any material adverse change in Plaintiff's

financial condition likewise constitutes a default, or any other reason for Wintrust be believe its ability to collect on the loan is insecure. (*See* Exhibit B). Upon the occurrence of a default, the Bank will have the right to accelerate the Note and demand full payment of the loan amount plus attorney's fees and costs. In that event, Plaintiff would be unable to continue in business.

51. As a result, by telling Plaintiff's bank that Plaintiff's Agency Agreement had been terminated – even though the Court directed Allstate to "refrain from . . . effectuating the scheduled termination," Defendant Allstate has sought to circumvent the Court's order, to punish me and bully me, and accomplish the destruction of the business.

52. In addition to my concern about Allstate's communications with my bank, I am also concerned about Allstate's communications with licensing agencies. Specifically, I am concerned that Defendant will falsely file a report to the New York State Insurance Department that my Agency Agreement has been terminated, which will also have devastating effects on me and Old Slip. The insurance law requires Allstate to notify the Department of Financial Services of the termination and the reasons for the termination. The false public accusation of "unauthorized brokering" will have significant irreversible negative repercussions for Old Slip' and myself, and will be a permanent negative mark on my record. It will likely cause other companies to terminate their selling agreements with Old Slip's affiliated companies and myself, and may result in a Department of Financial Services investigation, or get referred to the securities regulators, thereby jeopardizing my securities licenses, make it impossible for Old Slip to find another insurance agency,

53. I am also concerned that Defendant Allstate has recently instigated the securities licensing body known as FINRA to recommend disciplinary action against me relating to an unrelated matter involving my securities clients. On June 25, 2024, ***the exact same day*** that

Allstate issued its termination notice to me, FINRA notified me (through my counsel) that it was going to be recommending disciplinary action against me relating to an unrelated securities matter, and issuing a "Wells Notice" that was considering disciplinary action. [2]

54. It is simply an impossible coincidence that I received Allstate's notice of termination and the FINRA notice on the very same date, and it is more likely that Allstate – which is an influential member of FINRA, a private self-regulatory associations of securities firms - directly or indirectly caused FINRA to open this baseless investigation, to punish me for refusing to transfer my securities clients.

55. Based on all of the foregoing, I am requesting that the requested injunctive relief be expanded to include prohibiting Allstate from falsely telling people that Old Slip's Agency Agreement has been terminated, or from instigating other action with my bank, landlord, suppliers or regulatory agencies calculated to cause them to terminate, default, or discipline me or my company, during the pendency of this action..

[2] As outlined in my previously filed affidavit (NYSECF Doc. No. 33), the FINRA matter has absolutely no merit whatsoever. In 2019, my firm, Old Slip Capital Management Inc. purchased a broker dealer license. As a result, a number of customer accounts were inherited by me and became listed under my firm's broker dealer license. Even though I was listed as the broker dealer on the accounts, American Funds was trying to stop me from transferring the accounts. I asked American Funds to either permit me to transfer these accounts take my name off of the statements as it was a compliance issue. In 2021, one of the clients asked me about a recent trade which he said showed up on his statement which he had not authorized. I explained to the client that I did not know anything about it because I did not even have control over the account. After I called American Funds, they retracted the trades, they fixed the problem, and the clients did not lose any money. American Funds told me the trades were a result of a technical issue or computer glitch on their end. Nevertheless, more than two years later, *on the very same day (June 25, 2024) that I received the termination notice from Allstate* terminating my Agency Agreement, I received notice from FINRA (through my attorney) that it intended to issue a formal written notice (known as a "Wells Notice") that it was recommending disciplinary action with regard to the American Fund trades in the five inherited customer accounts, and that it would be posting disparaging remarks on my U6 form, which is a public filing on BrokerCheck.

56. I affirm this date, December 8, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

DocuSigned by:
A34EB23BE231478...

JAMES LUKEZIC

# EXHIBIT A

Allstate Lending Connection℠

## Intake Form

Note: Hover cursor over fields for help.

Agent Name James Lukezic

Agent Number (six digit) 0d9296

Lender Name Lake Forest Bank & Trust Company, N.A.

Lender Email (signing representative only) agentfinanceops@wintrust.com

Lender Email (for notifications only)

Lender Phone 855-552-5626 Ext

Lender Address

Line 1 727 Bank Lane

Line 2

City Lake Forest State IL Zip 60045

Lender above has sold/is selling their economic interest in a book of business to the above-mentioned agent. ○ Yes ◉ No

Lender Agent Number (if Lender is selling)

The state listed above is the State of Governing Law ○ Yes ◉ No

If no, what is the State of Governing Law for this arrangement? IL

### Form Options

☑ **Request for Consent to the Granting of Security Interest in the Economic Interest in an R3001 Contract –** A contract that an Agency and Lender may choose to enter into that allows the Lender to interest in the Agency's economic interest in a book of business. **If you are replacing an active Granting of Security with the same Lender, a replacement letter must be submitted via email to AllstateLendingConnection@allstate.com for approval before a replacement assignment will be generated.** For replacement letter guidelines, please visit Gateway or contact Allstate Lending Connection directly.

***Processing Fee***
$25 New assignment
$25 Refinance (Replace existing Granting of Security; Lender remains the same)

☑ **Assignment of Commission –** A contract that an Agency and Lender may choose to enter into that allows the Lender to obtain a fixed payment from the commissions paid monthly to an Agency owner. **If you are replacing an active Assignment of Commission with the same Lender, a replacement letter must be submitted via email to AllstateLendingConnection@allstate.com for approval before a replacement assignment will be generated.** For guidelines, please visit gateway or contact Allstate Lending Connection directly.

***Processing Fee***
$810 New assignment of 1 - 120 months (max. 10 yrs)
$1,080 New assignment of 121 - 180 months (max. 15 yrs)
$270 Refinance (Replace existing Assignment of Commission; Lender remains the same)

- **Update Banking Information –** For Lenders who wish to change the deposit information for their Assignment of Commissions payments. Agent signature not required.
- **Agreement to Assume –** A contract that assumes a pre-existing Agreement filed with Allstate Lending Connection under a new name or entity.
  ***Processing Fee***
  $270 (If the Assignment of Commission on file did not commence within the past 6 months)
- **Security Interest Waiver –** Provides notice that a seller will no longer have an interest in the book they are selling. A Waiver or Granting of Security Interest is required for all book sales.

**If electing to receive a Granting of Security**

Apply a lien to all associated agent numbers (●) Yes ( ) No
Lender is requesting position on book (choose one) 1st
Is this a Refinance (Replace existing Granting of Security; Lender remains the same) ( ) Yes (●) No

**If electing to enter into an Assignment of Commission**

Commencement Date Requested (3 Month window MON-YYYY) APR 2024
Monthly Deduction $ 5130.37
Total Deduction Amount $ 615644.40
Is this a Refinance? (Replace existing Assignment of Commission; Lender remains the same)
( ) Yes (●) No

Lender Payment Delivery Method (●) Electronic Payment (ACH) ( ) Paper Check

*If electing electronic payment, please complete this section*
Lender/Assignee Bank Name Lake Forest Bank & Trust Company NA
Lender/Assignee Bank Routing Number 071925334
Lender/Assignee Bank Account Number 9197324241
Account Type: (●) Checking Account ( ) Savings Account ( ) Loan Account

*If electing paper check, please complete this section*
Payee Name for Lender/Assignee Check
Payee Address
Line 1
Line 2
City State Zip
Attn.
Memo

**If Changing Banking Information**

Lender Payment Delivery Method ◯ Electronic Payment (ACH) ◯ Paper Check

*If electing electronic payment, please complete this section*

Lender/Assignee Bank Name

Lender/Assignee Bank Routing Number

Lender/Assignee Bank Account Number

Account Type: ◯ Checking Account ◯ Savings Account ◯ Loan Account

*If electing paper check, please complete this section*

Payee Name for Lender/Assignee Check

Payee Address

Line 1

Line 2

City State Zip

Attn.

Memo

**If electing to enter into an Agreement to Assume**

New Entity ◯ Corporation ◯ Sole Proprietorship

New Name

**Optional Services**

☐ Manual Entry Fee – If Intake Form has not been completed, signed and submitted electronically
$15

By signing this form, you are authorizing Allstate Lending Connection to release information about your economic interest in the book of business including, but not limited, to lien activity, entity status and R3001 contract details.

- James Lukezic

**Agent Signature**

**For questions and concerns:**

Allstate Lending Connection

AllstateLendingConnection@allstate.com

Email completed form to: AllstateLendingConnection@allstate.com

# EXHIBIT B

# PROMISSORY NOTE

| | | | |
|---|---|---|---|
| **Borrower:** | **James Joseph Lukezic**<br>**55 Wall Street Apt. 708**<br>**New York, NY 10005** | **Lender:** | **Lake Forest Bank & Trust Company, N.A.**<br>**727 N. Bank Lane**<br>**Lake Forest, IL 60045** |

**Principal Amount: $405,000.00** **Interest Rate: 9.000%** **Date of Note: February 28, 2024**

**PROMISE TO PAY. James Joseph Lukezic ("Borrower") jointly and severally promises to pay to Lake Forest Bank & Trust Company, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Four Hundred Five Thousand & 00/100 Dollars ($405,000.00), together with interest on the unpaid principal balance from February 28, 2024, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 9.000%, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.**

**PAYMENT. Borrower will pay this loan in 119 payments of $5,130.37 each payment and an irregular last payment estimated at $5,130.14. Borrower's first payment is due April 15, 2024, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on March 15, 2034, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 30/360 simple interest basis; that is, with the exception of odd days before the first full payment cycle, monthly interest is calculated by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. Interest for the odd days before the first full month is calculated on the basis of the actual days and a 360-day year. All interest payable under this Note is computed using this method.**

**PREPAYMENT PENALTY.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. **Upon prepayment of this Note, Lender is entitled to the following prepayment penalty: In addition to all principal, interest and costs owing at the time of prepayment, with a one (1) business days notice, Borrower agrees to pay a prepayment premium equal to: 3% of the amount of principal being prepaid, if paid on or prior to 36th month from the date of the Promissory Note issuance date; 1% of the amount of principal being prepaid, if paid on or after the 37th month until maturity. Borrower's notice of its intent to prepay shall be irrevocable. If the balance of this Note is accelerated in accordance with the terms of this Note, the resulting balance due shall be considered a prepayment due and payable as of the date of acceleration and shall be subject to the applicable premium if due and payable during a time period stated above. Borrower agrees that the prepayment premium is payable as liquidated damages for the loss of bargain, and its payments shall not in any way reduce, affect or impair any other obligation of the Borrower under this Note. In any event, all prepayments shall be applied to installments of principal in their inverse order of maturity, and no prepayment shall reduce the dollar amount of fixed principal installments required to be paid, until this Note is paid in full. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due.** Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Lake Forest Bank & Trust Company, N.A., 727 N. Bank Lane Lake Forest, IL 60045.**

**LATE CHARGE.** If a payment is 20 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by 6.000 percentage points. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

# PROMISSORY NOTE
## (Continued)



**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.**

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Illinois.**

**CONFESSION OF JUDGMENT.** Borrower hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Borrower for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full. Borrower hereby waives and releases any and all claims or causes of action which Borrower might have against any attorney acting under the terms of authority which Borrower has granted herein arising out of or connected with the confession of judgment hereunder.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Lake Forest Bank & Trust Company, N.A. 727 N. Bank Lane Lake Forest, IL 60045.

**DOCUSIGN PROVISION.** Each of the parties hereto agrees that this agreement and all other related documents may be entered into by means of (i) a DocuSign® electronic signature or another electronic signature that Lender accepts or (ii) manual signature. Each party agrees, and acknowledges that it is such party's intent, that if such party signs this agreement and/or all other related documents using an electronic signature, it is signing, adopting, and accepting this agreement and/or all other related documents and that signing this agreement and/or all other related documents using an electronic signature is the legal equivalent of having placed its handwritten signature on this agreement and/or all other related documents. The use of electronic signatures, records and transmissions (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

**TRANSFERABLE RECORD.** Borrower expressly agrees that this Note is a "transferable record" as defined in applicable law relating to electronic transactions and that it may be created, authenticated, stored, transmitted and transferred in a manner consistent with and permitted by such applicable law.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**ILLINOIS INSURANCE NOTICE. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made**

# PROMISSORY NOTE
## (Continued)



**against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.**

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

DocuSigned by:

X 8D6F6F4489494E6...
**James Joseph Lukezic**

LaserPro, Ver. 23.4.10.021 Copr. Finastra USA Corporation 1997, 2024. All Rights Reserved. - IL D:\LaserPro\CCO\CFI\LPL\D20.FC TR-57343 PR-603