# 25-1320
# 25-1417

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

*Plaintiff-Appellant,*

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, ALLISON ANN MCMAHON,

*Defendants-Appellees.*

*On appeal from Order and Judgment of the U.S. District Court for the Southern District of New York*

**APPELLANT'S APPENDIX** **Vol. II of II pp. A.248-A.554**

**WUERSCH & GERING**
Wall Street Plaza
88 Pine Street, 20th Floor
New York, New York 10005
(212) 509-5050
David.azrin@wg-law.com
*Attorneys for Plaintiff-Appellant*

TABLE OF CONTENTS – APPENDIX

Table of Contents ........................................................................... i

***Volume I of II***

SDNY Civil Docket, Case No. 7:25-cv-01110-JGLC.............................. A.1

Complaint and Jury Demand (Sep. 12, 2024) ........................................ A.12

Amended Complaint and Jury Demand (Oct. 15, 2024) ......................... A.32

Emergency Affirmation in Support of Motion for Preliminary Injunction and Temporary Restraining Order to Maintain the Status Quo Brought by Order to Show Cause, David T. Azrin, Esq. (Sep. 12, 2024) ................................................................................... A.52

Affirmation in Support of Motion for Preliminary Injunction and Temporary Restraining Order to Maintain the Status Quo Brought by Order to Show Cause, James Lukezic (Sep. 12, 2024) ........................... A.56

Exhibit A -- Allstate R3001C Exclusive Agency Agreement (Mar. 1, 2024)................................................................................... A.70

Exhibit B -- Allstate Termination Notice (Jun. 25, 2024)....................... A.87

Email, Lopez (on behalf of the Court) to Azrin, Notice of In Person Appearance on Proposed Order to Show Cause (Sep. 13, 2024) ............ A.89

Transcript of Proceedings, Order to Show Cause and Temporary Restraining Order [Jamieson, J.] (Sep. 19, 2024)................................... A.90

Order to Show Cause and Temporary Restraining Order (Sep. 19, 2024)................................................................................... A.117

Supplemental Affirmation of James Lukezic in Support of Plaintiff's Motion for Preliminary Injunctive Relief (Jan. 5, 2025)....................... A.119

Affirmation of James Lukezic in Opposition to Defendant Marc Stevenson's Motion to Dismiss for Lack of Personal Jurisdiction (Nov. 13, 2024)................................................................................... A.127

Exhibit A -- Email Thread, Stevenson with Buglione, Lukezic (Oct. 2023 – Feb. 2024)................................................................................... A.133

Affirmation of James Lukezic in Support of Plaintiff's Motion for Expanded Injunctive Relief to Maintain the Status Quo Brought by Order to Show Cause (Dec. 8, 2024) .................................................. A.220

Exhibit A – Allstate Lending Connection Intake Form ........................ A.240

Exhibit B – Promissory Note, Jakes Lukezic (Borrower) to Lake Forest Bank (Lender) (Feb. 28, 2024) ................................................ A.245

***Volume II of II***

Affirmation of Defendant Regine Marie Napoleon in Opposition to Motion for Preliminary Injunction (Oct. 2, 2024) ............................... A.249

Exhibit A – Allstate of Westchester County Business Plan ................ A.255

Exhibit B – Agency Ownership Disclosure Form ............................... A.269

Transcript of Proceedings, Preliminary Conference [Jamieson, J.] (Nov. 21, 2024) ......................................................................... A.276

Preliminary Conference Order [Jamieson, J.] (Nov. 27, 2024) ............ A.289

Transcript of Proceedings, Motion for Expanded Injunctive Relief [Jamieson, J.] (Dec. 16, 2024) ........................................................... A.302

Transcript of Proceeding, Motion for Preliminary Injunction [Jamieson, J.] (Jan. 8, 2025) ............................................................... A.319

Decision and Order, Motions to Dismiss and Motion for Preliminary Injunction Hon. Linda S. Jamieson, J.S.C. (Jan. 23, 2025) .................. A.353

Notice of Removal (Feb. 7, 2025) ....................................................... A.383

Notice of Initial Pretrial Conference (Feb. 13, 2025) ........................... A.389

Notice of Defendant Allstate Insurance Company's Motion for an Order Declaring that the Temporary Restraining Order has Expired, or, Alternatively, for an Order Dissolving the Temporary Restraining Order (March 14, 2025) ........................................................... A.392

Memorandum of Law in Opposition to Defendant Allstate Insurance Company's Motion for an Order Declaring that the Temporary Restraining Order has Expired, or, Alternatively, for an Order Dissolving the Temporary Restraining Order (Mar. 28, 2025) ............ A.396

Exhibit A – Declaration of Anthony Fava (March 28, 2025)................A.432

Exhibit B – Declaration of Al Buglione (March 28, 2025)...................A.433

Exhibit C – Email Thread, Stevenson, Cleere, Napoleon (Nov. 16, 2025)...........................................................................................A.435

Exhibit D – Email Thread, Cleere with McMahon (March 25, 2025) ..A.437

Transcript of Proceedings, Motion for An Order Declaring that the Temporary Restraining Order Has Expired [Clarke, J.] (May 8, 2025) A.442

Opinion and Order, Hon. Jessica G. L. Clarke, U.S.D.J. (May 21, 2025)...........................................................................................A.489

Notice of Appeal of May 21, 2025 Opinion and Order (May 21, 2025)A.499

Transcript of Proceedings, Initial Pretrial Conference [Clarke, J.] (May 22, 2025) .........................................................................A.500

Letter to Court, Supplemental Briefing as to Court's Jurisdiction Pending Appeal Azrin (May 23, 2025) ................................................A.533

Letter to Court, Reply in Support of Letter Motion to Set Hearing Azrin (May 29, 2025) ....................................................................A.539

Opinion and Order, Hon. Jessica G. L. Clarke, U.S.D.J. (Jun. 2, 2025)A.548

Notice of Appeal of June 2, 2025 Opinion and Order (Jun. 3, 2025) ...A.552

Order Granting Temporary Stay, Second Circuit Court of Appeals, (May 30, 2025) .........................................................................A.553

Amended Order Deferring Decision on Motion to Stay to Merits Panel, Second Circuit Court of Appeals (June 24, 2025)......................A.554

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

| | |
|---|---|
| OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,<br>Plaintiff,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,<br>Defendants. | Index No. 69162/2024<br><br>Judge: Linda S. Jamieson, J.S.C. |

**DEFENDANT REGINE NAPOLEON'S AFFIRMATION**

I, Regine Marie Napoleon, declare as follows:

1. I am a Sales Market Leader at Allstate Insurance Company ("Allstate") since September 3, 2019. In that role, I support a team of agents providing guidance, education, and support through sales, strategy, development, market analysis, data analytics, compliance, risk management, and customer relationship building.

2. I am licensed by the Financial Industry Regulatory Authority ("FINRA") and hold Series 6, 63, and 26 licenses.

3. Allstate appointed Plaintiff Old Slip Benefit & Insurance Services, LLC ("Old Slip" or "Plaintiff") as its exclusive agent as of March 1, 2024.

4. The duties and obligations of an exclusive agent are set forth in the Agreement, the Supplement for the R3001 Agreement ("Supplement"), the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards"). Agreement § I(C).

5. The Agreement authorized Plaintiff to solicit, sell, and service Allstate's "Company Business." Agreement § I.(A). Company Business includes various insurance lines, as well as other products offered through Allstate's affiliated companies such as investment products written by Financial Industry Regulatory Authority ("FINRA") licensed agents, life and annuity products, and others.

6. To sell investment products, Allstate's exclusive agents must be licensed with FINRA.

7. Allstate's exclusive agents are meant to be "exclusive" to Allstate. Allstate's expectation is that exclusive agents are not to solicit, sell, or service products not identified as Company Business without Allstate's prior approval. Exclusive agents are also expected not to

carry any appointments other than those approved by Allstate. Allstate insists on the "exclusive" policy for several reasons. First, Allstate and its affiliate, Allstate Financial Services ("AFS"), cannot supervise securities transactions executed by third parties thus creating legal exposure. Second, Allstate is not comfortable with its exclusive agents being affiliated with third party financial firms because Allstate cannot verify the financial solvency of those third parties. Third, an exclusive agency relationship allows Allstate to avoid or limit conflicts of interests that are inherent in non-exclusive relationships. Lastly, it limits Allstate's exposure to inherent risks associated with agency relationships such as third-party lawsuits, damage to Allstate's reputation, and loss of customer trust.

8. As a Sales Market Leader, I communicated with Plaintiff's Owner, Mr. Lukezic both before and after Plaintiff became an Allstate exclusive agent. Exclusivity was an important aspect of Allstate's relationship with Plaintiff. I communicated this to Plaintiff's Owner Mr. Lukezic during our initial discussions before the Agreement was finalized. This was also reiterated in the Agreement and accompanying documents and emphasized in my subsequent communications with Mr. Lukezic.

9. Mr. Lukezic expressed a commitment to exclusively sell Company Business, including Allstate's registered products during our initial discussions and later in his Business Plan. Lukezic Business Plan, attached hereto as Exhibit A. Mr. Lukezic expressed that he wanted to utilize his prior experience in the financial services industry to expand into selling property and casualty insurance products as well as other financial services products, such as AFS. Mr. Lukezic's readiness to commit exclusively to selling and offering Allstate's products factored into Allstate's decision to work with Plaintiff.

10. In late March 2024, Allstate learned that Mr. Lukezic had an independent agency listed as an appointment on his Property and Casualty license and that he was listed as president of an independent agency.

11. Upon this discovery, I asked Mr. Lukezic to confirm if he is still affiliated with another business or agency and reminded him that as an exclusive agent, he is expected to only carry appointments approved by Allstate, AFS, and its affiliates.

12. Mr. Lukezic responded that he maintains an outside investment advisory business "Old Slip Capital Partners, LCC," which is affiliated with two other outside businesses "Old Slip Registered Investment Advisors, LLC" (SEC Registered Investment Advisors), and "Old Slip Capital Management, Inc." (a broker dealer and member of FINRA).

13. I believe this was the first time I learned that Mr. Lukezic maintained an outside business. Mr. Lukezic did not disclose having an investment advisory or brokerage business on his "Agency Ownership Disclosure Form" completed before the execution of the Agreement. Agency Ownership Disclosure Form, attached hereto as Exhibit B. To the extent he mentioned his prior experience and employment in the financial services industry, I understood that he did so to show his extensive experience, not that he would maintain those business after entering the Agreement.

14. Mr. Lukezic also responded that he never intended to be affiliated with AFS. I advised Mr. Lukezic that to continue as an Allstate exclusive agent, he would need to affiliate with AFS. He refused to do so.

15. I explained multiple times that even if he chooses not to be affiliated with Allstate's broker dealer (despite indicating clear intent to do so in his Business Plan), Allstate expects he will

not write any securities or investment products with any other carrier, and failure to meet those expectations would result in termination of the Agreement.

16. On April 26, 2024, Allstate's counsel sent a letter to Mr. Lukezic's attorney stating Allstate will terminate the agreement with Plaintiff if Mr. Lukezic fails to divest any interests he has in outside advisory and brokerage businesses because failure to do so places him in a conflict of interest with respect to the duties he owes to Allstate.

17. I understand that Plaintiff's engaging in business as an investment advisor representative or broker outside of Allstate's approved programs through Allstate Financial Services and/or Allstate Financial Advisors is a conflict of interest which presents a risk to Allstate. For example, a customer of one of Plaintiff's affiliated businesses might try to hold Allstate responsible for an investment loss because of Plaintiff's principal, Mr. Lukezic's association with Allstate.

18. To my knowledge, Mr. Lukezic refused to divest his interests in his outside businesses or comply with any Allstate's requests.

19. On June 25, 2024, Allstate sent a Notice of Termination to Plaintiff stating that the Agreement would terminate in ninety days without cause. Lukezic Affirmation, Exhibit B, Allstate's Notice of Termination ("Notice of Termination").

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 2, 2024.

____________________________

RK 10/02/20

XHIBIT

# ALLSTATE OF WESTCHESTER COUNTY

# MAMARONECK, NY

## Business Plan

Allstate®
You're in good hands.




**Prepared by**:

JAMES J LUKEZIC

Business plan • Contents

**EXECUTIVE SUMMARY.......... 2**

**AGENCY MISSION AND VISION .......... 2**

**BUSINESS DESCRIPTION.......... 3**

**OFFICE HOURS.......... 3**

**STAFFING PLAN .......... 4**

**AGENCY COMPENSATION .......... 6**

**LIFE AND RETIREMENT COMMISION..........7**

**ELITE SEGMENTATION PLAN..........8**

**RETENTION PLAN..........8**

**MARKETING PLAN .......... 9**

**LEAD MANAGER .......... 10**

**FINANCIAL PLAN.......... 11**

**MONTHLY PRODUCTION BREAKDOWN.......... 11**

**5 YEAR ESTIMATED INCOME .......... 12**

# Biography



**James J. Lukezic**
**Managing Principal**
**Executive Managing Director**
**Institutional Consultant**

James is a graduate of Cornell University starting his career at Merrill Lynch & Co. participating in its Junior Executive Training Program in New York City. James was selected to join as a Financial Analyst in the Offshore Funds and Private investor Sales Division. During this time James spent two years, participating part-time, as a Visiting lecturer at Princeton University in the Department of Politics and completed his Executive Education in Marketing at the Harvard Business School in Cambridge, Massachusetts.

At Merrill Lynch, James was part of the international private client group (IPCG) and responsible for developing new business and maintaining existing business with high end clientele; corporate, government, and individual high net worth. James had the opportunity to develop and hone his skills as a marketer and relationship manager, with responsibilities for clientele in New York and Miami, and later maintaining and developing new business with clients in Buenos Aires (Merrill's largest foreign broker office at the time), and Santiago Chile. James also later worked for Citigroup Global Markets, Bank of America and Wells Fargo as a Relationship Manager and Retirement Plan Consultant serving corporate clients. Most recently James served as Director of Investments at Oppenheimer & Co. Inc., where he focused on providing corporate retirement plan services, with an emphasis on fiduciary governance. Retirement plan consultation included consultation on defined contribution plans and platforms, defined benefit plans, ESOP's and Non-Qualified Deferred Contribution Plans.

Ultimately, James uses a consultative, planning-based approach in recommending client strategies. James leverages what is a truly unconflicted investment environment at Old Slip Capital Partners that enables James to identify and select superior investment management services wherever they are housed. Through the use of a combination of traditional and

alternative investments for qualified investors (some or all alternative investments may not be suitable for certain investors) in the asset allocation process, James is able to, with his substantial research focused team, create customized institutional portfolios that are deemed to address strict mandated series of criteria, including diversification needs, time horizons, and risk thresholds.

James, of Manhattan, is the Chairman of ITF USA, a 501(c)(3) non-profit organization that assists landmine victims in over 30 countries worldwide. He is also the Chairman to The Lukezic Family Foundation, Inc., a charity that assists children in need in the five boroughs of NYC that have only one parent. James is also a member of the United States Polo Association, New York City's Fencers Club, and the American Helicopter Society.

## Vision Statement

"To be the leading provider of innovative and personalized insurance solutions, trusted by individuals and businesses alike, while fostering long-term relationships built on integrity, expertise, and exceptional customer service."

This vision statement highlights several key elements that are important for an insurance agency:

1. **Leading Provider**: The agency aspires to be at the forefront of the insurance industry, offering cutting-edge solutions that meet the evolving needs of clients. This implies a commitment to staying updated with industry trends, technology advancements, and regulatory changes.

2. **Innovative and Personalized Solutions**: The agency aims to differentiate itself by offering innovative insurance products and services tailored to individual client needs. This may include customized coverage options, flexible policy terms, or digital tools that enhance the customer experience.

3. **Trusted by Individuals and Businesses**: Building trust is crucial in the insurance industry. The agency seeks to establish itself as a reliable partner for both individuals and businesses, providing them with peace of mind through comprehensive coverage, prompt claims handling, and transparent communication.

4. **Long-Term Relationships**: The vision statement emphasizes the importance of fostering long-term relationships with clients. This implies a commitment to understanding their changing needs over time, providing ongoing support, and adapting insurance solutions accordingly.

5. **Integrity, Expertise, and Exceptional Customer Service**: These core values are essential for

any successful insurance agency. By prioritizing integrity, the agency demonstrates its commitment to ethical practices and transparency. Expertise ensures that clients receive accurate advice and guidance, while exceptional customer service sets the agency apart from competitors.

In summary, a vision statement for an insurance agency should capture the agency's aspirations, values, and commitment to providing innovative and personalized insurance solutions. It should inspire confidence in clients and stakeholders while guiding the agency towards long-term success.

## Mission Statement

At Allstate of Westchester County our mission is to provide exceptional insurance solutions and personalized service to our clients. We are committed to protecting their assets, managing risks, and ensuring peace of mind through comprehensive coverage options. Our dedicated team of experienced professionals strives to build long-lasting relationships based on trust, integrity, and transparency.

We understand that insurance needs vary from individual to individual and business to business. Therefore, we aim to tailor our services to meet the unique requirements of each client. By conducting thorough assessments and analysis, we identify potential risks and develop customized insurance plans that offer optimal protection at competitive rates.

Our mission extends beyond simply selling insurance policies. We believe in educating our clients about the importance of insurance and empowering them to make informed decisions. Through clear communication and ongoing support, we ensure that our clients understand their coverage options, policy terms, and any changes that may affect their insurance needs.

As an insurance agency, we are committed to staying up to date with industry trends, regulations, and emerging risks. This enables us to provide proactive advice and recommend appropriate coverage enhancements as necessary. We continuously invest in technology and training to streamline our processes and enhance the overall client experience.

Furthermore, we strive to be a trusted resource for our clients by offering additional services such as risk management consultations, claims assistance, and periodic policy reviews. Our goal is to be there for our clients throughout their insurance journey – from initial policy selection to ongoing support during claims or policy adjustments.

In summary, our mission is to be a reliable partner for individuals and businesses seeking

comprehensive insurance solutions. We aim to exceed expectations by delivering exceptional service, tailored coverage options, and expert guidance. By prioritizing the needs of our clients above all else, we strive to build long-term relationships based on trust, reliability, and mutual success.

## Business Description/Demographics

I will be purchasing two agencies in Westchester County, Tony Fava and Al Buglione, combining the two to create one larger agency with approx. 4.2M in yearly premiums. The retention rate is relatively high at 88%, this will serve as a strong foundation upon which to expand. Expansion plans are to cross sell existing clients and hire two agents for full time prospecting.

I will be purchasing these agencies effective March 1st, 2023. I will be relocating both agencies with a new office located *White Plains, New York.* According to the United States Census Bureau, the city had a population of 57,865 as of 2020.

In terms of demographics, White Plains has a diverse population with a mix of different age groups, genders, races, and ethnicities.

Age:

* The median age of the population in White Plains is 43.3 years old, which is slightly higher than the national median age of 38.1 years old.
* The population is relatively evenly distributed across different age groups, with 27.5% of residents under the age of 18, 56.5% between the ages of 18 and 64, and 16% aged 65 or older.

Gender:

* The population of White Plains is relatively evenly split between males and females, with females making up 51.2% of the population and males making up 48.8%.

Race and Ethnicity:

* The racial makeup of White Plains is diverse, with the following breakdown:
+ 64.3% White
+ 21.2% Asian
+ 11.1% Hispanic or Latino

+ 6.5% Black or African American
+ 0.2% Native American or Alaska Native
+ 0.1% Pacific Islander
+ 6.4% from other races
+ 2.5% from two or more races.
* The city's Hispanic or Latino population is the largest racial or ethnic minority group, making up over 11% of the population.

Education:

* According to the 2020 United States Census, 72.6% of residents aged 25 or older have a high school diploma or higher, while 34.3% have a bachelor's degree or higher.
* The city's educational attainment is higher than the national average, with a higher percentage of residents holding a bachelor's degree or higher.

Income:

* The median household income in White Plains is $71,455, which is higher than the national median household income of $67,149.
* The per capita income for the city is $34,676, which is also higher than the national per capita income of $31,176.

Housing:

* The city has a mix of different housing types, including apartments, single-family homes, and condominiums.
* According to Zillow, the median home value in White Plains is $563,100, which is higher than the national median home value of $277,700.
* The city has a relatively low vacancy rate of 2.6%, indicating a strong demand for housing.

Overall, White Plains, New York has a diverse population with a mix of different age groups, genders, races, and ethnicities. The city has a high level of educational attainment and a strong economy, with a higher median household income and per capita income than the national average. The housing market is also strong, with a mix of different housing types and a relatively low vacancy rate. The office will be open 9am-6pm Monday through Friday, and from 9am -noon on Saturday.

**Purchased Book Summary**

Initial Metrics Total ECP

| Metric | | Agent + Purchased | Assigned | Service | Total |
|---|---|---|---|---|---|
| Items in Force | | 2,784 | 0 | 60 | 2,844 |
| Policies in Force | | 2,024 | 0 | 18 | 2,042 |
| Policy Retention | | 89.6% | 0.0% | 85.7% | 89.5% |
| 12 MM Written Premium | | $4,559,958 | $3 | $97,121 | 4,657,082 |
| 12 MM Earned Premium | | $4,494,386 | $258 | $90,483 | 4,585,127 |
| Total Purchased Commissions | (5 Years) | $1,386,206 | $0 | $6,579 | $1,392,785 |
| Avg Monthly Commissions | | $23,103 | $0 | $110 | $23,213 |

# Staffing Plan

The Staffing Plan, Day one is to hire one new Account Manager for Al Buglione's book of business; this account manager will manage Al's existing book of business. Tony Fava's account manager has agreed to stay on post transition, she will continue to manage Tony's existing clientele. Two new agents will be hired to prospect in the region.

Sales, Service and Administration will be the mantra of the new combined agency.

1. **Sales Representatives**: The agency will hire only customer service representatives who will cater to the needs of a diverse customer base. The representatives will be highly organized and pay attention to detail. They should also be knowledgeable about various types of insurance products and be able to analyze customer needs to recommend the most appropriate coverage.
2. **Account Managers**: The agency will hire experienced account managers who have a deep understanding of the insurance industry and the ability to build strong relationships with clients. The account managers will be responsible for managing existing client relationships, identifying new business opportunities, and growing the agency's revenue.

# Salary

| Commission Structure | |
|---|---|
| **Monthly Commission Income** | **Bonus %** |
| Up to $10,000/month | 10% |

| | |
|---|---|
| $10,000 - $14,000/month | 12% |
| $14,000 - $18,000/month | 15% |
| $18,000/month and higher | 18% |

| Title / Position | Start Date | Starting Monthly Base Salary | New Business Compensation |
|---|---|---|---|
| Licensed Sales Producer - Prospecting and Selling | 2/1/2024 | $2,000 | 10 - 18% Bonus |
| Licensed Sales Producer - Customer Service | 2/1/2024 | $2,000 | 10 - 18% Bonus |
| Relationship Manager – Existing Book Tony Fava | 2/1/2024 | | |
| Relationship Manager – Existing Book Al Bugliione | 2/1/2024 | | |
| | | | |

Licensed Sales Producer will make $2000 in base pay plus commisison bonus. For up to $10000 in new commission, there is a 10% bonus, for $10000-$14000, a 12% bonus, for $14000-$18000, a 15% bonus, for $18000 and up, there is a 18% bonus.

## LSP Quote Road Map

| Daily Serious Quote Goals | Monthly Assumptions | Source |
|---|---|---|
| Annual NB Premium | $410,556 | |
| Monthly Written Premium Goal | $34,213 | Goal |
| Divided by the Agency's Average Premium per item of : | $1,222 | Avg/item |
| Equals the number of P&C Items required per month: | 28 | |
| Divided by the Agency's items per policy of: | 1.9 | Avg items/policy |
| Equals the number of Policies needed per month: | 15 | |
| Divided by the Agency's assumed closing ratio: | 16.800% | Estimated close rate |
| Agency's # of serious quotes needed per month: | 90 | X12 = # per year |
| Divided by 22.5 business days in a month | 22.50 | M-F |
| Equals the Agency's # of serious quotes needed per day | 4 | |
| **How many LSPs in the Agency** | **2** | |
| **Equals the number of serious quotes a day per LSP** | **2** | |

Our yealy goal is $410,556 in new premiums, given our assumed closing raito of 17%, this basically amounts to 500 serious quotes per month, with 22.5 business days in a month and 2 LSPs, this means that each LSP should have 3-4 serious quotes per day.

I expect each LSP to generate $157,794 in premium per year, which amounts to 172 items per producer. I expect to have 5,581 total quotes, with each LSP writing 930 quotes per year, but only 4 quotes per day.

# Marketing Investment ($3,000/monthly) by year 5

Year 1 marketing investment is $1000k per month and is expected to grow to 36k in year 5. The total estimated annual prospecting expense is $36,000.

**Objectives:**

- Increase brand awareness: Enhance the agency's visibility and reputation in the target market.
- Generate leads: Attract potential clients who are interested in insurance products.
- Improve customer retention: Strengthen relationships with existing clients to encourage repeat business.
- Enhance online presence: Optimize the agency's website and social media platforms to attract and engage with prospects.

**Channel Strategy:**

- Digital Marketing (50%): Invest in online channels such as search engine optimization (SEO), pay-per-click (PPC) advertising, social media marketing, email marketing, and content creation.
- Traditional Marketing (30%): Allocate resources towards traditional channels like print advertisements, direct mail campaigns, local sponsorships, and community events.
- Networking and Referrals (10%): Dedicate funds to networking events, industry conferences, and referral programs to leverage word-of-mouth marketing.
- Analytics and Tracking Tools (5%): Invest in marketing analytics tools to measure the effectiveness of campaigns and make data-driven decisions.
- Miscellaneous Expenses (5%): Set aside a small portion of the budget for unforeseen marketing opportunities or expenses.

- Social Media Marketing: Establish a strong presence on platforms such as Facebook, LinkedIn, Twitter, and Instagram. Regularly post engaging content, interact with followers, and run targeted advertising campaigns.

- Local Sponsorships: Support community events or sports teams by becoming a sponsor. This can increase brand visibility and demonstrate the agency's commitment to the local community.
- Community Events: Participate in local fairs, trade shows, or networking events to connect with potential clients and build relationships.

# Life and Retirement Commission

I plan on aggressively selling these products not only to existing clients but to the broader market. My 20 plus year history in selling retirement minded products will allow me to greater position myself and my team moving forward with Allstate's new mandate for these products and Allstate's new relationship with Fidelity for managed products. I have been cross selling products like this throughout my career and continue to do so. I intend to make this a pillar of focus for my LSP's and offer generous compensation for the sale of these products. If a LSP sells three or more of these products a month they will receive a 50% payout splitting the profits with the house. If the LSP sells under 3 of these products the payout will be 25%.

# AAP Retention Plan

Our retention plan focuses on retaining existing clients and reducing customer churn. We want to build long-term relationships with our clients, increase customer loyalty, and ultimately drive growth and profitability.

**Our 5 Core objectives:**

**1. Understanding Client Needs and Expectations:**
The first step in developing a retention plan is to gain a deep understanding of the needs and expectations of your clients. We will have regular communications, surveys, and feedback sessions. By actively listening to our clients' concerns and preferences, we will tailor our services to meet their specific needs. This personalized approach strengthens the bond between the agency and clients.

**2. Providing Exceptional Customer Service:**
Exceptional customer service is a key factor in client retention. This includes being accessible through multiple channels such as phone, email, and online chat. By consistently delivering outstanding customer service, we hope to foster trust and loyalty among our clients.

**3. Building Strong Relationships:**
Building strong relationships with clients is essential for long-term retention. Regularly reaching out to clients through personalized emails or phone calls will help strengthen these relationships. We will also consider organizing client appreciation events or sending small tokens of appreciation to show gratitude for their business (Birthday Cards or proactive hand written notes). By demonstrating genuine care and interest in

their clients' well-being, we can foster a sense of loyalty that goes beyond price considerations.

**4. Offering Value-Added Services:**
To enhance client retention, we can offer value-added services that go beyond traditional insurance coverage. This can include providing educational resources, such as blog posts or webinars, to help clients better understand their insurance needs. We can also offer risk management assessments or personalized advice to help clients mitigate potential risks. By positioning ourselves as trusted advisors, we can differentiate ourselves from competitors and increase client loyalty.

**5. Regular Policy Reviews:**
Regular policy reviews are an effective way to engage with clients and ensure their insurance coverage remains up-to-date. We can proactively reach out to clients to schedule policy reviews and discuss any changes in their circumstances that may require adjustments to their coverage. This not only demonstrates the agency's commitment to client satisfaction but also provides an opportunity to cross-sell or upsell additional products or services.

In conclusion, a well-designed retention plan is crucial for the long-term success of any insurance agency. By understanding client needs, providing exceptional customer service, building strong relationships, offering value-added services, conducting regular policy reviews, utilizing technology, and monitoring success metrics, we can enhance client retention and drive sustainable growth.

# Financial Plan

The projection of $34,213.00 premium a month in the first year plus 28 items IPS and cross selling will create a stream of income and it will help us to grow where we need to be by year 1-3-5.

# Monthly Production Breakdown

| | What If | | |
|---|---|---|---|
| **Items per Line** | Items Per Month | Average Premium | Monthly Prem |
| Standard Auto | 6.0 | $978 | $5,871 |
| Non-Standard Auto | 0.0 | $1,509 | $0 |
| Specialty Auto | 0.0 | $515 | $0 |
| Homeowners | 12.0 | $2,097 | $25,166 |
| Renters | 5.0 | $145 | $724 |
| Condo | 5.0 | $491 | $2,453 |
| Other Property | 0.0 | $561 | $0 |
| ABI Auto | 0.0 | $3,417 | $0 |
| ABI Non-Auto | 0.0 | $3,458 | $0 |
| **Total Property and Casualty** | **28.0** | **$1,222** | **$34,213** |

We expect to complete 28 items per month, with an average premium o $1222, that comes out to $34213 per month.

# 5 Year Estimated Income Breakdown

| | ***Year 1*** | ***Year 2*** | ***Year 3*** | ***Year 4*** | ***Year 5*** |
|---|---|---|---|---|---|
| Estimated Value of Book: | $479,104 | $509,046 | $592,140 | $684,955 | $784,035 |

RK 10/02/20

XHIBIT

# STOP!

## READ BEFORE YOU COMPLETE THE AGENCY OWNERSHIP DISCLOSURE FORM:

**Per the EA Manual, ALL shareholders must be FINRA related family members.**

**The EA Manual can be found on Agency Gateway or the following link:**
**https://agencygateway.allstate.com/wps/myportal/id/13526**

Ownership interest in the corporation is limited to FINRA related family members[2] of the Key Person. Prior to execution of the C Agreement, the agency (corporation/LLC) must provide to the Company the full names and addresses of all officers, directors and any persons who own an interest in the corporation or LLC by completing an –Agency Ownership Disclosure Form (Exhibit B in the Reference Guide). Thereafter, the agency must promptly furnish the Company the full names and addresses of any new officers, directors or owners and submit a Partial Transfer of Interest Approval Request Form (Exhibit A in the Reference Guide) to request approval. The Company reserves the right in its exclusive judgment not to enter into the C Agreement, including but not limited to when any of the shareholders or members is:

[2] FINRA-related family members include parents, grandparents, mother-in-law or father-in-law, husband or wife, brother or sister, brother-in-law or sister-in-law, son-in law or daughter-in-law, children, grandchildren, cousin, aunt or uncle, or niece or nephew, and any other person whom the registered person supports, directly or indirectly, to a material extent.

For questions, please email COMCOEConversions@allstate.com

J.L.

# AGENCY OWNERSHIP DISCLOSURE FORM

**(Prior to execution of R3001C Agreement)**

**PART A:** To be completed by agency

NAME OF AGENCY: Old Slip Benefits & Insurance Services, LLC STATE: NY

NAME OF AGENT: JAMES LUKEZIC AGENT #: A0D9296

DATE R3001C AGREEMENT WILL BE EFFECTIVE: 3/1/24

Names and addresses of all officers, directors, shareholders, or members, and the percent of ownership: (attach additional sheets as necessary)

| NAME | ADDRESS | % OF OWNERSHIP |
|---|---|---|
| James Lukezic | [redacted] | 100 |
| | | |
| | | |
| | | |
| | | |

Names and addresses of any subsidiary or affiliated companies: (attach additional sheets as necessary)

| NAME | ADDRESS |
|---|---|
| | |
| | |

I CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS ACCURATE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

e-Signed by JAMES LUKEZIC
on 2024-02-05 19:48:07 GMT
SIGNATURE OF AGENT

February 05, 2024
DATE

**PART B:** To be completed by each person who has an ownership interest in the agency, or if any of the owners is a corporation, limited liability company, or partnership, by each officer, director, shareholder, member or partner: (use 1 form per individual)

NAME: James Lukezic

DATE OF BIRTH: [redacted]

SOCIAL SECURITY #: [redacted]

ADDRESS: [redacted]

PHONE #: [redacted]

All questions marked 'yes' will require additional information

| | | Y | N |
|---|---|---|---|
| 1. | Do you, or does any member of your family have any ownership in or operate any other insurance agency? | | X |
| 2. | Are you, or is any member of your family currently acting as an agent or broker for another insurance agency or insurance company? | | X |
| 3. | Do you currently have a valid insurance license? | X | |
| 4. | Has your insurance license(s) ever been suspended or revoked? | | X |
| 5. | Are you currently, or were you previously an Independent Agent representing Allstate or any affiliated company? | | X |
| 6. | Are you currently, or were you previously employed by Allstate? | | X |
| 7. | Is any member of your family currently, or was any member of your family previously employed by Allstate? | | X |
| 8. | Have you ever been convicted, or pled no contest to a criminal offense, either felony or misdemeanor? | | X |
| 9. | Are you currently, or were you previously an R3001 Exclusive Agent or Key Person in an R3001 Agency representing Allstate? | | X |
| 10. | Is any member of your family currently, or was any member of your family previously an R3001 Exclusive Agent or Key Person in an R3001 Agency? | | X |
| 11. | Do you currently have any ownership interest (other than shares in a publicly traded company) in or operate any business other than the agency? | | X |

For all questions above marked yes, please explain in detail below. Where appropriate, supply names, addresses, city and state, dates of service/appointment, positions held, etc., and identify question being addressed in left box. Attach additional sheets where necessary, making sure the top portion is completed.

| Q# | Explanation |
|---|---|
| | |
| | |
| | |
| | |

I CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS ACCURATE TO THE BEST OF KNOWLEDGE.

e-Signed by JAMES LUKEZIC
on 2024-02-05 19:49:26 GMT

SIGNATURE OF AGENT

February 05, 2024

DATE

**PART B:** To be completed by each person who has an ownership interest in the agency, or if any of the owners is a corporation, limited liability company, or partnership, by each officer, director, shareholder, member or partner: (use 1 form per individual)

NAME: ______________________ ADDRESS: ______________________
DATE OF BIRTH: ______________________ ______________________
SOCIAL SECURITY #: ______________________ ______________________
PHONE #: ______________________

All questions marked 'yes' will require additional information

| | Y | N |
|---|---|---|
| 1. Do you, or does any member of your family have any ownership in or operate any other insurance agency? | ☐ | ☐ |
| 2. Are you, or is any member of your family currently acting as an agent or broker for another insurance agency or insurance company? | ☐ | ☐ |
| 3. Do you currently have a valid insurance license? | ☐ | ☐ |
| 4. Has your insurance license(s) ever been suspended or revoked? | ☐ | ☐ |
| 5. Are you currently, or were you previously an Independent Agent representing Allstate or any affiliated company? | ☐ | ☐ |
| 6. Are you currently, or were you previously employed by Allstate? | ☐ | ☐ |
| 7. Is any member of your family currently, or was any member of your family previously employed by Allstate? | ☐ | ☐ |
| 8. Have you ever been convicted, or pled no contest to a criminal offense, either felony or misdemeanor? | ☐ | ☐ |
| 9. Are you currently, or were you previously an R3001 Exclusive Agent or Key Person in an R3001 Agency representing Allstate? | ☐ | ☐ |
| 10. Is any member of your family currently, or was any member of your family previously an R3001 Exclusive Agent or Key Person in an R3001 Agency? | ☐ | ☐ |
| 11. Do you currently have any ownership interest (other than shares in a publicly traded company) in or operate any business other than the agency? | ☐ | ☐ |

For all questions above marked yes, please explain in detail below. Where appropriate, supply names, addresses, city and state, dates of service/appointment, positions held, etc., and identify question being addressed in left box. Attach additional sheets where necessary, making sure the top portion is completed.

| Q# | Explanation |
|---|---|
| | |
| | |
| | |
| | |

I CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS ACCURATE TO THE BEST OF KNOWLEDGE.

e-Signed by JAMES LUKEZIC
on 2024-02-05 19:49:30 GMT
SIGNATURE OF AGENT

February 05, 2024
DATE

**PART B:** To be completed by each person who has an ownership interest in the agency, or if any of the owners is a corporation, limited liability company, or partnership, by each officer, director, shareholder, member or partner: (use 1 form per individual)

NAME: ____________________ ADDRESS: ____________________

DATE OF BIRTH: ____________________ ____________________

SOCIAL SECURITY #: ____________________ ____________________

PHONE #: ____________________

All questions marked 'yes' will require additional information

| | | Y | N |
|---|---|---|---|
| 1. | Do you, or does any member of your family have any ownership in or operate any other insurance agency? | ☐ | ☐ |
| 2. | Are you, or is any member of your family currently acting as an agent or broker for another insurance agency or insurance company? | ☐ | ☐ |
| 3. | Do you currently have a valid insurance license? | ☐ | ☐ |
| 4. | Has your insurance license(s) ever been suspended or revoked? | ☐ | ☐ |
| 5. | Are you currently, or were you previously an Independent Agent representing Allstate or any affiliated company? | ☐ | ☐ |
| 6. | Are you currently, or were you previously employed by Allstate? | ☐ | ☐ |
| 7. | Is any member of your family currently, or was any member of your family previously employed by Allstate? | ☐ | ☐ |
| 8. | Have you ever been convicted, or pled no contest to a criminal offense, either felony or misdemeanor? | ☐ | ☐ |
| 9. | Are you currently, or were you previously an R3001 Exclusive Agent or Key Person in an R3001 Agency representing Allstate? | ☐ | ☐ |
| 10. | Is any member of your family currently, or was any member of your family previously an R3001 Exclusive Agent or Key Person in an R3001 Agency? | ☐ | ☐ |
| 11. | Do you currently have any ownership interest (other than shares in a publicly traded company) in or operate any business other than the agency? | ☐ | ☐ |

For all questions above marked yes, please explain in detail below. Where appropriate, supply names, addresses, city and state, dates of service/appointment, positions held, etc., and identify question being addressed in left box. Attach additional sheets where necessary, making sure the top portion is completed.

| **Q#** | **Explanation** |
|---|---|
| | |
| | |
| | |
| | |

I CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS ACCURATE TO THE BEST OF KNOWLEDGE.

e-Signed by JAMES LUKEZIC
on 2024-02-05 19:49:33 GMT
SIGNATURE OF AGENT

February 05, 2024
DATE

**PART B:** To be completed by each person who has an ownership interest in the agency, or if any of the owners is a corporation, limited liability company, or partnership, by each officer, director, shareholder, member or partner: (use 1 form per individual)

NAME: ______________________ ADDRESS: ______________________

DATE OF BIRTH: ______________________ ______________________

SOCIAL SECURITY #: ______________________ ______________________

PHONE #: ______________________

All questions marked 'yes' will require additional information

| | Y | N |
|---|---|---|
| 1. Do you, or does any member of your family have any ownership in or operate any other insurance agency? | ☐ | ☐ |
| 2. Are you, or is any member of your family currently acting as an agent or broker for another insurance agency or insurance company? | ☐ | ☐ |
| 3. Do you currently have a valid insurance license? | ☐ | ☐ |
| 4. Has your insurance license(s) ever been suspended or revoked? | ☐ | ☐ |
| 5. Are you currently, or were you previously an Independent Agent representing Allstate or any affiliated company? | ☐ | ☐ |
| 6. Are you currently, or were you previously employed by Allstate? | ☐ | ☐ |
| 7. Is any member of your family currently, or was any member of your family previously employed by Allstate? | ☐ | ☐ |
| 8. Have you ever been convicted, or pled no contest to a criminal offense, either felony or misdemeanor? | ☐ | ☐ |
| 9. Are you currently, or were you previously an R3001 Exclusive Agent or Key Person in an R3001 Agency representing Allstate? | ☐ | ☐ |
| 10. Is any member of your family currently, or was any member of your family previously an R3001 Exclusive Agent or Key Person in an R3001 Agency? | ☐ | ☐ |
| 11. Do you currently have any ownership interest (other than shares in a publicly traded company) in or operate any business other than the agency? | ☐ | ☐ |

For all questions above marked yes, please explain in detail below. Where appropriate, supply names, addresses, city and state, dates of service/appointment, positions held, etc., and identify question being addressed in left box. Attach additional sheets where necessary, making sure the top portion is completed.

| Q# | Explanation |
|---|---|
| | |
| | |
| | |
| | |

I CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS ACCURATE TO THE BEST OF KNOWLEDGE.

e-Signed by JAMES LUKEZIC
on 2024-02-05 19:49:36 GMT

SIGNATURE OF AGENT

February 05, 2024

DATE

**PART B:** To be completed by each person who has an ownership interest in the agency, or if any of the owners is a corporation, limited liability company, or partnership, by each officer, director, shareholder, member or partner: (use 1 form per individual)

NAME: ______________________ ADDRESS: ______________________
DATE OF BIRTH: ______________________ ______________________
SOCIAL SECURITY #: ______________________ ______________________
PHONE #: ______________________

All questions marked 'yes' will require additional information

| | Y | N |
|---|---|---|
| 1. Do you, or does any member of your family have any ownership in or operate any other insurance agency? | ☐ | ☐ |
| 2. Are you, or is any member of your family currently acting as an agent or broker for another insurance agency or insurance company? | ☐ | ☐ |
| 3. Do you currently have a valid insurance license? | ☐ | ☐ |
| 4. Has your insurance license(s) ever been suspended or revoked? | ☐ | ☐ |
| 5. Are you currently, or were you previously an Independent Agent representing Allstate or any affiliated company? | ☐ | ☐ |
| 6. Are you currently, or were you previously employed by Allstate? | ☐ | ☐ |
| 7. Is any member of your family currently, or was any member of your family previously employed by Allstate? | ☐ | ☐ |
| 8. Have you ever been convicted, or pled no contest to a criminal offense, either felony or misdemeanor? | ☐ | ☐ |
| 9. Are you currently, or were you previously an R3001 Exclusive Agent or Key Person in an R3001 Agency representing Allstate? | ☐ | ☐ |
| 10. Is any member of your family currently, or was any member of your family previously an R3001 Exclusive Agent or Key Person in an R3001 Agency? | ☐ | ☐ |
| 11. Do you currently have any ownership interest (other than shares in a publicly traded company) in or operate any business other than the agency? | ☐ | ☐ |

For all questions above marked yes, please explain in detail below. Where appropriate, supply names, addresses, city and state, dates of service/appointment, positions held, etc., and identify question being addressed in left box. Attach additional sheets where necessary, making sure the top portion is completed.

| Q# | Explanation |
|---|---|
| | |
| | |
| | |
| | |

I CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS ACCURATE TO THE BEST OF KNOWLEDGE.

e-Signed by JAMES LUKEZIC
on 2024-02-05 19:49:38 GMT
SIGNATURE OF AGENT

February 05, 2024
DATE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------x
OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

Plaintiff, Index No. 69162/2024

- against-

ALLSTATE INSURANCE COMPANY,
REGINE MARIE NAPOLEON, BRITTANY CLEERE,
MARC STEVENSON and ALLISON ANN MCMAHON,

Defendants.
------------------------------------------x

111 Dr. Martin Luther King Jr. Blvd
White Plains, New York 10601
November 21, 2024

B E F O R E:

HONORABLE LINDA S. JAMIESON
Justice

A P P E A R A N C E S:

WUERSCH & GERING LLP
Attorney for Plaintiff
100 Wall Street, 10th Floor
New York, New York 10005
BY: DAVID T. AZRIN, ESQ.

TROUTMAN PEPPER LOCKE LLP
Attorney for Defendants
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103
BY: CHRISTOPHER YOUNG, ESQ.

A L S O P R E S E N T:

James Lukezic, Executive Managing Director,
Managing Principal at Old Slip Capital Partners

MEGAN MOYLES, Senior Court Reporter

THE CLERK: Number 13 on the calendar, Old Slip Benefits & Insurance Services v. Allstate Insurance Company, 69162 of 2024.

Please step up.

THE COURT: Good afternoon.

Appearances, please.

MR. AZRIN: David Azrin with Wuersch & Gering on behalf of the plaintiff, Old Slip Benefits & Insurance Services.

Good afternoon.

MR. LUKEZIC: James Lukezic, Old Slip Benefits.

THE COURT: Good afternoon.

MR. YOUNG: Good afternoon, Your Honor.

Christopher Young of Troutman Pepper on behalf of the defendant, Allstate Insurance Company and the individual named defendants.

THE COURT: Good afternoon, everybody.

Please be seated.

I do have a couple of motions for pro hac vice. Is there any oppositions to those motions?

MR. AZRIN: No, Your Honor.

THE COURT: Okay. So I don't know if they're returnable now, but they're granted.

MS. SHAMPANIER: Next week.

THE COURT: Okay. But there were proposed orders

uploaded, correct?

MS. SHAMPANIER: There were proposed orders.

(Whereupon, an off-the-record discussion was held.)

MR. HADALA: No, we have not uploaded anything.

THE COURT: So it is Motion Number 3 and Motion Number 4.

Okay. This is on for a preliminary conference.

I know that we do have a motion to dismiss that is pending. Has it been fully submitted at this point? Yes or no.

MR. AZRIN: No, Your Honor.

THE COURT: Still outstanding?

MR. AZRIN: Yes.

THE COURT: What is remaining?

MR. AZRIN: Our opposition and their reply.

THE COURT: Okay. I have a memorandum of law and reply. I do have --

MR. AZRIN: I apologize. There is a motion to dismiss one of the defendants --

THE COURT: Got you.

MR. AZRIN: -- Stevenson, on personal jurisdiction grounds. That is fully briefed, yes.

THE COURT: Yes. Okay. I see it.

Okay. So the other motion is still out -- still has opposition as well, coming? Yes?

MR. YOUNG: That's correct.

MR. AZRIN: Yes.

THE COURT: And when is that supposed to be in?

MR. AZRIN: Seven days before the 17th, so that would be December 10th.

THE COURT: All right. Great. So I do have all of your paperwork. And I do have your proposed preliminary conference order and it is fine with me. I don't have a problem. I know that you did fill out the mediation as well and you did pick somebody.

Is there anything that I can help you with at this juncture?

MR. AZRIN: Your Honor, there are some discovery issues, as well as an issue relating to the confidentiality protective order. So we could use your assistance on those items.

THE COURT: Okay.

MR. AZRIN: With regard to the confidentiality order, so we had proposed and prepared the model confidentiality order, which contains the confidentiality designation which prohibits the parties from using it for any other purposes. The defendants' counsel has requested an attorneys' eyes only provision. As you know, the model committee specifically decided not to use that, adopt that as a model because it is subject to overuse. It implicates

the rights of the parties, you know, to meaningfully prepare and defend their case.

I have discussed it with opposing counsel. They're not willing to withdraw that request. We do not see a need for an attorneys' eyes only provision and the confidentiality provisions of the standard stipulation protect any interest that they might have.

MR. YOUNG: Your Honor, the model rules also have another form that also includes attorneys' eyes only if the parties -- if the party -- producing party believes the information, it has been a request to produce as a trade secret. There are items we believe that have been requested and will be requested that are considered a trade secret, like customer lists, which is why we requested the attorneys' eyes only designation. Obviously, built into the confidentiality agreement would be the opportunity to contest the designation if the requesting counsel thought it was designated too broadly or in error. But we would request, because we do believe there would be some trade secret information that we will need to produce, that we would like to protect it with the attorneys' eyes only designation.

MR. AZRIN: So the customer list, Your Honor, doesn't make sense because right now, my client is an agent and he has full access to the customer list. His agency is

active. He has access to it. He is, of course, governed by the confidentiality provisions of his current agreements and so there is no purpose or need if that is what they're saying. The customer list, he has full access to it now. The standard for an attorneys' eyes only provision is a trade secret that is not available that would cause irreparable harm for me to share it with my client. So there is just no showing.

And there are a couple of cases where the courts have agreed that, unless you make a very strong showing of this kind of irreparable harm, it doesn't outweigh the parties' rights to meaningfully see that. There is the dim stock (ph) transfer case, New York Supreme Court, as well as Diaz versus Local 338, Eastern District of New York case. Rejected request for attorneys' eyes only provisions.

THE COURT: Okay.

MR. YOUNG: And, Your Honor, the reason it would become necessary is, as you know, the agreement is only active right now because of the order to show cause. Once he is no longer in a contract with us, he will have no right to sit. But he will be deemed a competitor at that point in time, which is why we want the protection.

MR. AZRIN: We can cross that bridge when we get to it, Your Honor. They can -- until that takes place, he has the customer list. He is governed by the confidentiality

order. He can't use it for any other purpose. As well as existing agreements.

If his agreement is terminated and the litigation is still going and they feel that they're going to be producing a customer list that he hasn't already seen and they need an attorneys' eyes only provision, then they can simply make an application at that time to add that.

MR. YOUNG: Or we can do what we proposed, which is that if --

THE COURT: He wants his client to be able to see that, what you're producing and I understand that.

MR. YOUNG: And if it came to that point, what we're proposing has a process by which he could protest that and we can raise it to you at that time. We're all arguing about something that maybe may not come to pass.

THE COURT: I agree. So I don't need attorneys' eyes only. If there is something that you deem that is going to be so, at some point, detrimental, that you don't want to reveal, then you will bring that my attention. Okay?

MR. YOUNG: Thank you, Your Honor.

THE COURT: What else?

MR. AZRIN: In terms of the discovery, we served our document request last month in October, October 16th. We got responses and we got a number of objections, Your

Honor.

We have had a meet and confer. There are a couple of issues that it would be useful to sort of get out of the way because they're important. So I wanted to bring those to your attention.

One has to do with the Zoom calls, which we had mentioned the last time that we were here. I don't know if you recall. There were Zoom calls between my client and the sales people who are trying to sell him the Allstate franchise and those are critical to the case because in that -- in those Zoom calls, they say, oh, yes, of course, you are going to be having your own separate investment advisory business and that's fine with us. And, in particular, there is one with Brittany Cleere. So they had objected to producing the Zoom calls. So we're looking for the Zoom calls between my client and any of the sales people, as well as the Zoom calls between the sales people, if they had their own separate Zoom calls between them where they're talking about my client, whether to take him on as a franchisee and whether to terminate him.

THE COURT: Okay.

MR. YOUNG: Your Honor, we have met and conferred on that. The question is -- the objection isn't to relevance. It was the request that we thought was overbroad. We had discussions. We were working it out. I

think that we can work it out.

THE COURT: Okay. I am going to let you work that out. If you have a problem, you will write a letter to the Court, a notice and upload it to NYSCEF.

MR. YOUNG: And, Your Honor, I think when we were last here, I mentioned that I asked him of this hearing for a couple of weeks because I was on trial for two and a half weeks. So I am just getting back into it. We are going to have a meet and confer on these issues. I am not sure it really serves any useful purpose right now to take up your time with things that I think we should be able to narrow with more fulsome discussion.

THE COURT: I am with you on that because I am in the middle of a hearing and I understand what it is like to be busy.

So he is there now and he can meet and confer with you. If you have any issues that you need the Court to address that you can't resolve amongst yourselves, the letter uploaded. Okay?

MR. AZRIN: Perfect.

THE COURT: Anything else that we need?

MR. AZRIN: No. Just we need to go ahead and schedule the mediation. We have met and conferred and talked about scheduling that for December, for next month. We have chosen the mediator. We will have to check her

availability. And we just need to go ahead and schedule the injunction hearing.

MR. YOUNG: Your Honor, we were here, initially, after you issued the order to show cause to have oral argument on the motion for the preliminary injunction. We were with you before. We have not responded to the motion. We have now fully briefed it and we are ready to argue why that injunction should not issue.

THE COURT: Do you want argument time?

MR. YOUNG: Yes, Your Honor.

THE COURT: Not today. Another day.

MR. AZRIN: Sure.

THE COURT: Okay. I mean, is everything in your motion? Do you really think you have to argue in something to it?

MR. YOUNG: Well, the only thing -- I was prepared to argue today some issues that were raised after we filed our opposition -- but it is also in the motion to dismiss -- dealing with some of the issues that were raised in the amended complaint. If the Court is willing to take it up on the papers, then --

THE COURT: Yes, I will. If you feel that everything is in there. I don't want to do it unless everything is in there.

MR. YOUNG: Yes.

THE COURT: Yes?

MR. YOUNG: If you're -- well, we would need to add --

THE COURT: If you feel you want to add something, I don't want to preclude you.

MR. YOUNG: I would want to add, yes. I would want to add something that we included in our motion to dismiss brief that I think is pertinent to the injunction as well.

THE COURT: I will decide it altogether. It will be in front of me. All right.

MR. YOUNG: Okay.

MR. AZRIN: Perfect. So that will be on the December 17th return date or there will be another date that you will set for the oral argument.

THE COURT: No. I don't need oral argument if it is all in the papers, unless you feel -- I don't generally do oral argument. Unless you feel that you have a particularly interested client that wants to hear you do your --

MR. YOUNG: No.

THE COURT: You have to have it in your papers; right?

MR. AZRIN: Yes. We would appreciate just a brief oral argument, Your Honor.

THE COURT: There won't be brief before the end of

the year. That's not happening.

MR. AZRIN: It is -- it does involve some -- various legal theories and I think that it would be useful for the Court.

THE COURT: When is it fully submitted?

MR. AZRIN: December 17th.

THE COURT: Okay. We will see you in January to argue. They're all coming in together. That's what we just decided. So I won't see you until January. December 17th is, like, the end of my --

You want to add something? You can take a look and think about that. I can put it on in January. It is your call.

MR. AZRIN: That would be fine from our side.

THE COURT: How much time do you think you are going to need?

MR. AZRIN: Fifteen minutes on our side.

THE COURT: Counsel.

MR. YOUNG: Fifteen minutes. You're talking about in-person, oral argument in January.

THE COURT: That's what I am talking about.

MR. YOUNG: That's fine, Your Honor.

THE COURT: If it is necessary.

MR. YOUNG: I don't think these issues are that -- I think they can be decided on the papers. I don't think I

need more than 15 minutes if counsel is going to take 15 minutes.

THE COURT: January 8th, 3:00 o'clock.

MR. AZRIN: Thank you, Your Honor.

MR. YOUNG: Thank you, Your Honor.

THE COURT: Thank you.

*************************

This is certified to be a true and accurate transcript of the stenographic notes.

Megan Moyles

____________________________

Megan Moyles

Senior Court Reporter

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

----------------------------------------------------------------------x

OLD SLIP BENEFITS & INSURANCE SERVICES LLC,

Plaintiff,

v.

-against-

ALLSTATE INSURANCE COMPANY,
REGINE MARIE NAPOLEON, BRITTANY CLEERE,
MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.

----------------------------------------------------------------------x

**HON. LINDA S. JAMIESON, JSC**

**COMMERCIAL DIVISION**

Index No.: 69162/2024

RJI Filing Date: September 12, 2024

**PRELIMINARY CONFERENCE ORDER**

**I. APPEARANCES**: Please include (1) your name; (2) your firm's name and address; (3) your firm's telephone number; (4) your direct telephone number; (5) your e-mail address; and (6) the party you represent.

Plaintiff(s) David T. Azrin, Esq., Wuersch & Gering LLP, 100 Wall Street, Floor 10, New York, NY 10005, (212) 509-5050; David.Azrin@wg-law.com, Attorneys for Plaintiff Old Slip Benefits & Insurance Services LLC

Defendant(s) Arthur Christopher Young, Troutman Pepper Hamilton Sanders LLP, 3000 Two Logan Sq, Philadelphia, PA 19103-2799, (215) 981-4190, christopher.young@troutman.com, Attorneys for Defendants Allstate Insurance Company, Regine Marie Napoleon, Brittany Cleere, Marc Stevenson, Allison Ann McMahon

Please use additional pages, if necessary.

## II. CONFIDENTIALITY AGREEMENT AND ORDER:

The Court recognizes that many cases in the Commercial Division involve facts that are highly sensitive. In such cases, in order for the parties to proceed to proper discovery, the Court may order the parties to enter into a confidentiality agreement which the Court will "So Order." The parties are free to draft their own confidentiality agreement, which the Court can "So Order." In the alternative, if they do not wish to do so, the parties are referred to the model confidentiality agreement found at:

http://www.nycbar.org/pdf/report/ModelConfidentiality.pdf

The parties ____ **HAVE** or ☒ **HAVE NOT** entered into a confidentiality agreement.

The Court _____ **HAS** or ☒ **HAS NOT** "So Ordered" the confidentiality agreement and, if the Court has "So Ordered" it, on what date did the Court "So Order" it:

The parties ☒ **WILL** or _____ **WILL NOT** be entering into a confidentiality agreement. If the parties **WILL**, please indicate when the parties expect to enter into the confidentiality agreement: 11/27/2024

If the parties have decided that they **WILL NOT** enter into a confidentiality agreement, please provide the Court with a brief explanation as to the reason(s) the parties have decided **not** to enter into a confidentiality agreement.

___

___

___

___

___

**III. DESCRIPTION OF THE CASE**: Pursuant to **22 NYCRR 202.12(c)(1)**, please provide a brief description of the factual and legal issues raised in the pleadings of the case:

(a) Plaintiff's legal theory and salient facts in support of claims/counterclaim defenses: See below Plaintiff's and Defendants' claims and contentions

Amount Demanded: $ Not yet specified.

(b) If issue has been joined (i.e., if defendant has answered the complaint) defendant ____________________ 's, legal theory and salient facts in support of defenses, counterclaims and third party claims. If issue has not yet been joined, defendant need not, at this time, answer this question. See attached. Amount Demanded on the Counterclaim/Third-Party Claims: $ *If there are multiple defendants:*

(c) If issue has been joined (i.e. if defendant has answered the Complaint), defendant ____________________ 's, legal theory and salient facts in support of defenses, counterclaims and third party claims. If issue has not yet been joined, defendant need not, at this time, answer this question.Amount Demanded on the Counterclaim/Third-Party Claims: $

Please use additional sheets, if needed.

Plaintiff's Contentions: Plaintiff contends that Allstate wrongfully terminated its insurance agency franchise agreement by its June 25, 2024 notice which claimed Old Slip was "maintaining an outside business interest which creates a conflict of interest and unauthorized brokering." In fact, the agreement did not prohibit Old Slip's principal from continuing his investment business. Its exclusivity provisions only prohibited Old Slip's principal from selling non-Allstate insurance products, and not investment products. During the entire recruitment process, a) Old Slip's principal made clear he intended to continue the investment business and to cross-sell Allstate insurance products to his investment clients, b) Allstate never requested he transfer his FINRA securities licenses to Allstate, and c) Allstate specifically represented to Old Slip that it was a long-term relationship that could not be terminated without cause. Allstate only gave him the agreement at the last minute and demanded he sign it right away.

The demand to transfer his investment business was done in bad faith, for improper motivations, to provide additional commissions to Allstate employees. The termination was done to bully and punish him for not transferring his investment business to Allstate. On information and belief, as further retaliation, Allstate caused FINRA to launch an investigation into him for unrelated matters. The termination breached Allstate's duty of good faith and fair dealing.

To the extent Allstate seeks to rely on the "without cause" language in paragraph 17(B)(2), such reliance is misplaced because Allstate elected to terminate for cause (acknowledging cause was required), the termination breached the duty of good faith and fair dealing, it was an illegal sale of an unregistered franchise, the language was unconscionable in the circumstances, and the contract language should be reformed because it was the result of a mistake on one side and misleading conduct on the other.

The entire transaction was the illegal sale of an unregistered franchise without providing the required disclosures. The individual defendants are personally liable for materially aiding the

sale of an unregistered franchise, and for tortious interference for their own personal gain.

Defendants' Contentions: Defendant Allstate Insurance Company contends that Plaintiff cannot prove that Allstate wrongfully terminated the Exclusive Agency Agreement "without cause" because "cause" was not required to terminate. While Allstate had good reasons to terminate, its reasoning is irrelevant to the contract claim here because Allstate invoked the right to terminate with or ***without cause***. Plaintiff's alternative causes of action fail. First, unconscionability is not a cause of action, and contract provisions giving both parties the right to terminate without cause are not unconscionable. Second, the equitable estoppel claim fails because the Agreement's express terms preclude Plaintiff from claiming reliance on any alleged conduct suggesting an infinite relationship. Third, Plaintiff's request for reformation fails because it does not allege fraud with the necessary particularity. Plaintiff's implied covenant claim similarly fails because it alleges the same wrongdoing as the contract claim, and "good faith" does not limit the right to terminate under the "without cause" provision. Finally, the claim for the violation of the New York Franchise Sales Act against Allstate fails because the Agreement does not meet the elements of a franchise under New York law. Defendants Regine Marie Napoleon, Brittany Cleere, and Allison Ann McMahon contend that Plaintiff's claim for the violation of the New York Franchise Sales Act against them fails because they are neither primary violators under Section 691(1), nor materially aided any alleged violation under Section 691(3). Defendants Napoleon and McMahon contend that Plaintiff's tortious interference claim against them fails because Plaintiff cannot show that the underlying Agreement has been breached; contracts terminable at will cannot support a claim for tortious interference with existing contracts; and they acted within the scope of their employment and did not commit any independent tort or acted for personal profit independent of any benefit to Allstate. Plaintiff Marc Stevenson contends that the Court lacks personal jurisdiction over him, and the claims against him must be dismissed.

## IV. DISCOVERY

It is hereby **ORDERED** that disclosure shall proceed pursuant to the Commercial Division Rules.

Have you met and conferred concerning discovery?

☒ **YES** _______ **NO.**

If **YES**, when did you meet and confer? 11/15/2024

If **NO**, when will you do so?

Have you adjusted your discovery demands in order to comply with the ***"proportionality in discovery"*** admonition in the Commercial Division Rules? ☒ **YES** ____**NO.**

**(1) DOCUMENT PRODUCTION**

***All documents produced by any and all parties and non-parties MUST be Bates Stamped.***

Pursuant to **Rule 11-e(a),** "For each document request propounded, the responding party shall, in its Response and Objections served pursuant to CPLR 3122(a) (the "Responses"), either:

*(a) state that the production will be made as requested;* ***or***

*(b) state with reasonable particularity the grounds for any objection to production.*

(a) Initial demands for discovery and inspection shall be served by all parties on or before: Plaintiff served initial demands on 10/16/2024. Defendants will serve initial demands on or before 12/4/2024. ________________________________________ .

Responses to demands shall be served by all parties on or before: 20 days after service.

## (2) INTERROGATORIES

Pursuant to **Rule 11-a,** "Interrogatories (a) are limited to 25 in number, including subparts, unless another limit is specified in the Preliminary Conference Order.

This limit applies to consolidated actions as well; (b) Unless otherwise ordered by the court, interrogatories are limited to the following topics: name of witnesses with knowledge of information material and necessary to the subject matter of the action, computation of each category of damage alleged, and the existence, custodian, location and general description of material and necessary documentation, including pertinent insurance agreements, and other physical evidence.

(a) Interrogatories shall be served by all parties on or before: Plaintiffs served Interrogatories on 10/16/2024. Defendants will serve Interrogatories on or before 12/4//2024.

(b) Answers to interrogatories shall be served on or before: Twenty days after service.

**(3) DEPOSITIONS OF INDIVIDUALS**:

Pursuant to **Rule 11-d**,"(a) Unless otherwise stipulated to by the parties or ordered by the court:(1) the number of depositions (of individuals) taken by plaintiffs, or by defendants, or by third-party defendants, shall be limited to 10; and (2) depositions shall be limited to 7 hours per deponent." Please review the remainder of Rule 11-d for additional directives concerning depositions. Priority of depositions is set by the first Notice to Take Depositions.

(a) Defendant's deposition of individual(s) on or before: 1/15/2025

(b) Plaintiff's deposition of defendant(s) on or before: 2/07/2025

(c) All depositions shall be completed on or before: 5/31/2025

**(4) DEPOSITION OF ENTITIES:**

On October 15, 2015, a new rule concerning the deposition of entities went into effect. **Commercial Division Rule 11-f.** The new Rule concerns the deposition of entities such as a corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, public corporation, government, or government subdivision, agency or instrumentality, or any other legal or commercial entity.

The Rule is intended to promote a more efficient process for deposition of entity representatives and reduce the likelihood of a mismatch between the information sought and the witness produced.

The essential elements of the new Rule are (emphasis added):

(i) A party wishing to take a deposition of an entity will serve a notice or subpoena enumerating those matters to be the subject of the deposition ***"with reasonable particularity."***

(ii) If the notice or subpoena *does not* name a particular officer, director, member or employee of the entity, the named entity must designate one or more officers, directors, members or employees or other individual(s) who **consents to testify** on its behalf; the identity, description and title of that individual; and the matter(s) on which that individual will testify.

(iii) If the notice or subpoena *does* name a particular officer, director, member or employee of the entity, the entity, pursuant to CPLR 3106(d), shall produce that individual, **unless**, no later than ten days before the deposition, the entity designates *another individual* who **consents to testify** on its behalf, in the place of the named or subpoenaed officer, director , member or employee of the entity; and shall provide the identification, description or title of the new individual, and the matter(s) on which the individual will testify.

(iv) Deposition testimony given pursuant to this Rule shall be usable against the entity on whose behalf the testimony is given to the same extent as provided in CPLR 3117(2).

(v) The deposition of an entity shall be treated as a *single deposition* even though more than one person may be designated to testify on the entity's behalf. Notwithstanding the foregoing, the cumulative presumptive (seven hour) durational limit is in effect **but** may be enlarged by agreement of the parties or upon application for leave of Court, which shall be freely given.

Names of entities to be deposed:

(i) For plaintiff(s): Allstate Insurance Company
(ii) For plaintiff(s):
(iii) For defendant(s): Old Slip Benefits & Insurance Services, LLC
(iv) For defendant(s):

Please use additional sheets if necessary.

All entity depositions will be completed on or before: 5/30/2025.

**(6) IMPLEADER:**

Defendant shall serve its third-party summons and complaint no later than **45 days after the Preliminary Conference.**

**(7) ELECTRONIC DISCOVERY AND PRIVILEGE LOGS**

Discovery of Electronically Stored Information (ESI) is one of the most expensive and challenging discovery categories. The Rules, as it concerns electronic discovery, **22 NYCRR 202.12(b) and (c)(3)**, as well as the related privilege logs, are an attempt to rein in the cost and complexity of electronic discovery and related privilege logs. In assessing whether the matter before the Court will benefit from electronic discovery, the parties should consider: (i) is there potentially relevant ESI material in the case; (ii) do the parties intend to rely on ESI; (iii) are there less costly or less burdensome alternatives to secure the necessary information without recourse to discovery of the ESI; (iv) is the cost of preserving and producing ESI proportionate to the amount in controversy; and (v) what is the likelihood that discovery of ESI will aid in the resolution of the dispute?

**(a)** Will there be Electronic Discovery in the case:

☒ YES NO NOT SURE

**(b)** Meet and Confer: Pursuant to Uniform Commercial Division Rule 8(b), 22 NYCRR 202.70(g)(8)(b), counsel MUST certify that they have *met and conferred* regarding electronic discovery, *before* the Preliminary Conference

(ii) Date(s) parties had their meet and confer conference(s): 11/15/2024

(iii) Did the parties reach an agreement concerning electronic discovery? ___YES ___NO _☒__PARTIALLY

(iv) Are counsel at this Preliminary Conference sufficiently versed in matters related to their client's technological systems to discuss competently all issues relating to electronic discovery:

☒ YES NO

**(c)** Other directives concerning electronic discovery.

***The following topics are to be updated and supplemented as new information becomes available.***

**(i) Preservation:** 22 NYCRR 202.12(c)(3)(a), (c) and (g)

**(ii)** **Production:** 22 NYCRR 202.12(c)(3)(e), (d)

**(v)** **Claw Back Provisions** for inadvertent production

**(vi)** **Costs**: Each party shall bear its own costs of production pursuant to *U.S. BankNat'l Assoc.* v. *Greenpoint Mtge. Funding Inc.* 94 A.D.3d 58 (1st Dep't 2012). In the event that cost shifting becomes an issue, the parties shall write a letter to the Court of not more than two pages outlining the problem prior to setting up a conference call with the Court.

**(d)** **Judicial Intervention**

The parties anticipate the need for judicial intervention.

____YES ____☒ NO ____MAYBE

**(e)** **Discovery of Electronically Stored Information from Non-Parties:**

Parties and non-parties should adhere to the Commercial Division's Guidelines for Discovery of Electronically Stored Information (ESI) from non-parties which can be found in Appendix A to the Rules of the Commercial Division.

**(8)** **END DATE OF FACT DISCLOSURE:**

Fact Disclosure shall be completed by: 5/30/2025.
(Generally within 6 months of the Preliminary Conference)

**(9)** **EXPERT DISCOVERY (if any):**

Pursuant to Rule 13(c), 22 NYCRR 202.70(g)(13(c)), the Court hereby ORDERS that if any party intends to introduce expert testimony at trial or in support of a motion for summary judgment, the parties, no later than thirty days prior to the completion of fact discovery, shall confer on a schedule for expert disclosure - including the identification of experts, the agreement to exchange expert reports and the timetable for the deposition of testifying experts. Expert disclosure shall be completed no later than four months after the completion of fact discovery.

In the event that a party objects to this procedure or timetable, the parties shall request a conference to discuss the objection(s) with the Court.

***The Note of Issue and Certificate of Readiness may not be filed until the completion of expert disclosure.***

Do the parties believe that there will be expert discovery in this case?
____YES ____NO ☒ NOT YET DECIDED

**(10) END DATE FOR ALL DISCOVERY:** 6/30/2025

**(11) NOTE OF ISSUE:**

Plaintiff shall file a note of issue/certificate of readiness on or before 7/30/2025.

**(12) DISPOSITIVE MOTION(S):**

All dispositive motion(s) shall be made on or before ______or within 30 days after the filing of the Note of Issue.

> ***Please Note:*** *If a party intends to use documents in their dispositive motion that the party wishes to file in a redacted form or under seal, the party must make an application to the court under* ***Rule 216.1(a)*** *seeking an order that there is "good cause" for such document(s) to be filed in a redacted form or under seal. This should be done* ***PRIOR*** *to making a dispositive motion.*

Such dispositive motions may be filed by Order to Show Cause or Notice of Motion. The Court encourages the parties to confer and agree on the dates for the opposition and reply papers to be exchanged and e-filed.

**(13) COMPLIANCE CONFERENCE**:

Parties or their representatives **with knowledge of the case and this Preliminary Conference Order** shall appear for a Compliance Conference on: 1/9/2025.

Parties or their representatives **with knowledge of the case and this Preliminary Conference Order** shall appear as well at *all* conferences.

**V. ALTERNATIVE DISPUTE RESOLUTION**

The 9th Judicial District has implemented a Presumptive Mediation Program. See Rules at:

https://www.nycourts.gov/LegacyPDFS/courts/9jd/ADR/rules/DISTRICT-WIDE-RULES.pdf

To that end, three Presumptive Mediation Forms are attached. Please consult with each side and choose a mediator from the 9th Judicial District Commercial Division Roster of Mediators, found at:

https://www.nycourts.gov/LegacyPDFS/courts/9jd/ADR/ROSTERS-OF-9JD-MEDIATORS.pdf

If you cannot agree on a mediator, the Court will select one for you. Please bring the **completed** Preliminary Conference Order and attached Presumptive Mediation Forms to the Preliminary Conference.

**VI. ADDITIONAL DIRECTIVES:**

Please follow the specific rules found under Justice Jamieson's Commercial Division Part Rules.

Please be aware of and follow **all** the rules found at **22 NYCRR 202.70(g)**. Particularly, please comply with the following two rules:

Rule 2**:** Parties shall **immediately** inform the Court that an action has settled, been discontinued or disposed of by submission of a stipulation or a letter;

Rule 5: ALL counsel MUST sign up for the FREE ***eTrack*** court notification service to keep track of future court appearances. The ***eTrack*** service is separate and apart from the e-filing system. Counsel are also responsible for notifying all other counsel of future court appearances. Please review the ***eTrack*** "Frequently Asked Questions" for details.

++++++++++++++++++++++++++++++++++++++++

THE DATES SET FORTH HEREIN MAY **NOT** BE ADJOURNED EXCEPT WITH THE PRIOR APPROVAL OF THE COURT.

***PARTIES MUST BRING COPIES OF ALL DISCLOSURE ORDERS TO ALL CONFERENCES.***

THIS PRELIMINARY CONFERENCE ORDER AND THE DATES CONTAINED HEREIN ARE:

Agreed to by:

/s/ David T. Azrin
Counsel for Plaintiff
David T. Azrin

Agreed to by:

/s/ A. Christopher Young
Counsel for Defendants
A. Christopher Young

SO ORDERED:

Linda S. Jamieson
HON. LINDA S. JAMIESON, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF WESTCHESTER

---------------------------------------x

OLD SLIP BENEFITS & INSURANCE SERVICES LLC,

Plaintiff,

-against- Index No. 69162/2024

ALLSTATE INSURANCE COMPANY et al,

Defendants.

---------------------------------------x

PROCEEDINGS

Westchester County Courthouse
111 Dr. M.L.K., Jr. Blvd
White Plains, New York 10601
December 16, 2024

BEFORE: HON. LINDA S. JAMIESON
Supreme Court Justice

APPEARANCES:

WUERSCH & GERING, LLP
Attorneys for the Plaintiff
100 Wall Street, 10th Floor
New York, New York 10005
BY: DAVID T. AZRIN, ESQ.

TROUTMAN PEPPER HAMILTON SANDERS LLP
Attorneys for the Defendants
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
BY: A. CHRISTOPHER YOUNG, ESQ.

Gina Hlapatsos, Sr. Court Reporter
(914) 824-5766

THE CLERK: This is number 3, 4, 5 and 6 on the calendar, Old Slip Benefits & Insurance Services LLC versus Allstate Insurance Company, Index Number 69162 of 2024. Appearances, please.

MR. AZRIN: Good morning, your Honor. David Azrin with the firm Wuersch & Gering on behalf of the plaintiff.

MR. YOUNG: Good morning, your Honor. Christopher Young with the firm of Troutman Pepper Hamilton & Sanders on behalf of the defendants.

THE COURT: Good morning. I believe there's an order to show cause that's being presented.

MR. AZRIN: Yes.

MR. YOUNG: Your Honor, I believe you ordered me to be here. I represent the defendant, Allstate, and I'm prepared to show cause why the order should not be entered.

THE COURT: Okay, I want to hear from him first.

MR. YOUNG: Thank you.

MR. AZRIN: Thank you, your Honor. As you know, this Court entered an order on September 19th ordering Allstate to quote/unquote refrain from carrying out or effectuating the scheduled termination of the agency agreement until a hearing and determination can be had on the motion for a preliminary injunction.

Subsequently, in late November, my client received a call from his bank that Allstate had told the bank -- this

is the bank which has given him the loan in order for him to operate the Allstate agency. He got a call from them that Allstate had told her that the agency agreement had been terminated and that it was in termination status.

Your Honor, this clearly violates both the spirit and the intent of the Court's order and the results could be devastating for my client. If they're ordered not to carry out or effectuate a termination, then it just goes without saying that they should not be then telling my client's bank that it's in terminated status which would then result in potentially the default and the agency no longer being able to operate because of the loan being called.

THE COURT: It hasn't been called, right?

MR. AZRIN: No, it hasn't.

THE COURT: And it's not in default, is it?

MR. AZRIN: No, your Honor. But under the grounds of the note, the bank would have grounds for terminating it. And you ordered that the termination should not be effectuated and they have notified and they've conceded to me in our conversations that they did notify the bank that it's in terminated status. They've never corrected that to the bank.

So if they had done it before, if they had notified the bank before you entered your September 19th order, they should have corrected it. And if they did it after, then it

was almost a direct violation of your order.

The case law says obviously that you have the narrative authority to modify your prior directives based on new conditions or where the defendant is interpreting an order too narrowly or is ignoring the order. The case is Yaeger 199 AD2d 162 and Huntington 97 AD2d 781.

The Court also has the authority, your Honor, to enter injunctive relief which does affect speech, which does tell somebody to stop saying or doing something where the statements are an instrument or incident of the action that has been enjoined.

And that case law, there's a whole line of cases on that, your Honor, Wolf versus Gold, 9 AD2d 257 out of the First Department; Nann v. Raimist, a Court of Appeals case, 255 NY 307; Trojan Electric, 162 AD2d 859 out of the Third Department, and a Second Department case Kurland Cadillac, AD2d 902. It's also in the New York Practice Series Commercial Litigation Section 138:6.

And so where, your Honor, the statements that are being made by the defendant are not directed towards public expression, but rather the injunction is intended to address a private wrong, and where again the statements that are being made are instrument or incident of the action that has been enjoined and the order is narrowly tailored, the Court does have authority to enter an injunction that does affect

speech.

So where you have ordered somebody not to effectuate a termination, it just goes without saying that they can't turn around then and start telling the world and telling my client's bank that he has been terminated.

So here, we have requested, your Honor, that both the temporary restraining order that is currently in effect as well as the preliminary injunction motion, which is still pending, that both of those be modified to add the provisions which we proposed in the order to show cause, that they in addition to not carrying out or effectuating the termination, they should not be making statements to my client's bank or any of the other key players, such as the landlord or licensing authorities, saying, which would be falsely, that he is terminated, because the Court has enjoined that termination. Thank you, your Honor.

THE COURT: Thank you. Counsel?

MR. YOUNG: Good morning, your Honor.

THE COURT: Good morning.

MR. YOUNG: Injunctive relief as requested by the plaintiff should not be expanded because Allstate has not communicated with the bank as alleged in the motion. And even if it did, the relief sought is unnecessary because the alleged communication neither violates the spirit nor the letter of the order to show cause.

And perhaps most importantly, your Honor, to restrain Allstate's speech in the way that is requested would be a prior restraint that is presumptively unconstitutional unless you find that the restrained speech would lead to some sort of evil. It's a very high bar, your Honor, and has not been met in the motion or in Counsel's argument.

I want to go through those three reasons quickly. The allegations against Allstate lack any substantive specificity which makes them difficult to address. Indeed, the affirmation contains three levels of hearsay, your Honor. There's an allegation of a phone call with some unidentified person who then is represented to have said something from Allstate.

We have looked. We're not aware of any recent communications with the bank, except for -- and this goes to what Counsel is mentioning. We did have a conversation. I asked for more information and it was not forthcoming before this motion was filed. It was requested actually on the day we were here, your Honor. We were here. You ordered -- you told us we were going to come back for oral argument and you were going to rule on the papers.

Within an hour of us leaving here, I get an email from Counsel saying will you cease and desist. I asked, why didn't you bring it up when we were here and were talking?

He didn't answer. I asked can we have more information, I'll look into it. I didn't get more information. I had one more conversation where I did not receive more information than what's in the order to show cause.

But importantly, your Honor, communication was made by Allstate in July of 2024, within weeks of the notice of termination and months before you entered your order to show cause. And let me explain what that communication was because it was communication that is done in the normal course and scope of Allstate's business, and it was communicated to plaintiff when he signed a grant of security interest to his lender so that he could get a loan for $405,000 in February of 2024.

Your Honor, if you look at Exhibit -- I believe it's Exhibit A to the affirmation, there's an intake form. On the very last page is a signature of the plaintiff's principal, and above his signature is a consent to the release -- an authorization of Allstate to release certain information to the lender who has a security interest in the commissions that Allstate's paying to the plaintiff. So we authorized a disclosure.

Further, your Honor, what was not attached to the affirmation was the security agreement, and I can hand up the package if the Court would like to see it.

THE COURT: Yes, that would be nice.

MR. YOUNG: May I approach, please?

THE COURT: Yes.

(Whereupon, a document was handed to the Court.)

THE COURT: So Counsel, you're saying that there was no communication in late November?

MR. YOUNG: There was communication in July of 2024, your Honor.

THE COURT: That was it. So nothing in November; is that correct?

MR. YOUNG: As far as we know.

THE COURT: As far as you know. So the July communication, what did the bank discuss during that communication?

MR. YOUNG: So I will give you -- if I may approach again, your Honor.

THE COURT: Yes.

(Whereupon, a document was handed to the Court.)

MR. YOUNG: The first document I handed up, your Honor, was a request for consent for the granting of security interest and economic interest package, and if you go to the very last page, it says, notice of termination website, which explains what Allstate does in the normal course and scope of its business to the plaintiff about disclosing certain information regarding terminations.

The second report that I handed up is a report that

Allstate prepared in July of 2024, and if you go to the third page -- actually, it's the third full page -- you'll see a notation for BFL Insurance Group. That's a reference to the plaintiff's agency which had been terminated.

So it provided information in July of 2024 to the lender that there was an estimated date of termination of September 30, 2024. And it does that because the lender has the right to receive the termination payment that's paid to the plaintiff upon termination when the termination takes place.

THE COURT: So there's been no communication with the bank and yourself whether the termination took place?

MR. YOUNG: No.

THE COURT: Because they would get something, correct?

MR. YOUNG: Correct. And that's the irony of it, your Honor. The reason, if such a call took place in November, we suspect that it more than likely was self-initiated by WinTrust Bank having that information that I just handed up to you that was communicated well before the OFC, in which they would have been curious, your Honor. Because of your order, Allstate has maintained the status quo.

As we speak, plaintiff continues to write new policies. Plaintiff continues to renew existing policies.

Plaintiff continues to get paid commissions from Allstate. The status quo is maintained and that's the reason why the lender would have called, because the lender would have seen that the termination would have taken place on September 30th, but instead of receiving a full termination payment, it continues to receive the assigned commissions that plaintiff has authorized Allstate to pay the lender.

THE COURT: Nothing more and nothing less, right?

MR. YOUNG: Nothing more and nothing less, your Honor. So the status quo is maintained. There's no reason to expand the relief. You're going to rule on the motion for a preliminary injunction in a few weeks, your Honor.

THE COURT: Yes, I am.

MR. YOUNG: And you know it's Allstate's position that what it did was it was legally entitled to terminate the agreement and we've submitted briefing that we believe establishes that right. So we are in a status quo. We're not in an injunction period. We're in status quo period. We've maintained the status quo. Nothing has changed.

And as your Honor noted, there is no default of the loan. This is all speculation of some harm that may or may not happen. Frankly, the fact that the lender reached out to the plaintiff suggests that there would not be a default, because the lender is interested in protecting its interest in the commission payments. So for that reason, your Honor,

the relief should not be entered.

And lastly, I just want to address what the relief seeks is to muzzle Allstate's speech. No question about it. From the Appellate Division citing Supreme Court precedent that goes back decades, you cannot order someone not to say something unless there's been a showing that the speech sought to be restrained will create a clear and present danger of a substantive evil.

Business harm does not meet that very, very high bar and that's all that's alleged here, and for that reason, it would be unconstitutional to enter an order restraining Allstate's speech. So we request that the relief not be granted.

THE COURT: Thank you. Counsel?

MR. AZRIN: Yes. Thank you, your Honor. So now we've received a copy of this estimated termination form, which I have not received before, and that shows exactly what we were saying, your Honor. They notified the bank, and it's important to remember that the bank is integrally related to the operation of this agency.

THE COURT: That was back in July, though, correct?

MR. AZRIN: Yes. And because the bank has the security interest, they're relying on the payments of their loan from the commissions for the operation, and in July, we now know that they told the bank that it was going to be

terminated September 30th of 2024. September 19th, the Court enters an order saying you are restrained from carrying out or effectuating. There would be, your Honor, as I mentioned before --

THE COURT: Did you give notice to the bank of that order?

MR. AZRIN: No, we did not, your Honor. We had no idea and would not have imagined that Allstate would have gone ahead and notified the bank.

THE COURT: Except under their agreement, they can do that.

MR. YOUNG: And he signed something that they're authorized to do it.

MR. AZRIN: It's not believable, your Honor, that there was no further communication after you entered your order. My client got the call out of the blue in the end of November saying we've noticed that it's in termination status. That is almost six months after they had received this in July, or four or five months after. And it's not believable why WinTrust Bank -- what caused them to make that call.

They said they were told by Allstate that he was terminated, and that was late November. And there would have been no reason if WinTrust -- if they had gotten this report, then why didn't they make the inquiry before? But

right now, what we have, your Honor, is point blank in writing, they've notified my client's bank that it's terminated and the termination is effective 9/30.

If they're ordered not to carry out the termination, it goes without saying that they shouldn't be making the statements and they should have corrected this with the bank.

THE COURT: But you can provide a copy of the order to the bank; am I correct?

MR. AZRIN: Yes, your Honor.

THE COURT: Which would correct everything; am I correct? Because it's clear there's an order that there is no termination until further order of this Court, right?

MR. AZRIN: Correct, your Honor. We're concerned about the fact that what's going to happen going forward. What we're seeking, your Honor, is, when you enter the preliminary injunction, which we believe is warranted in particular based on the recent Second Department decision which we filed a notice of authority on, it was directly on point. It was a termination provision without cause.

The Court said in the Second Department that the implied duty of good faith and fair dealing applies even to a termination, even when there is that type of language in the termination clause. And that's exactly what happened here. The Second Department rejected every one of the

identical arguments that Allstate has made trying to get around that duty.

Our concern, your Honor, is when the Court enters the preliminary injunction, that it not only state that they are enjoined from effectuating or carrying out the termination, but it goes without saying -- it shouldn't have to be said, but we would request that it be said -- that it should not be going forward.

Regardless of what they did in the past. Regardless of what they did in the past. Going forward is what we're requesting. Then it goes without saying if you're ordered not to terminate or capitulate the termination, you shouldn't go telling the bank or the lender going forward, future, forgetting about what happened in the past. That's our request. Thank you, your Honor.

THE COURT: Anything, Counsel?

MR. YOUNG: It's not necessary, your Honor. We've faithfully complied with your order. As I mentioned, he has not terminated. He continues to hold himself out as an exclusive Allstate agent, even though he's operating unaffiliated businesses that pose a legal risk for Allstate.

We filed today a response to the supplement on that case that Counsel mentioned just today. The case is factually distinguishable. But the more important point, your Honor, is what Counsel does not address, and this is

not really the place. We weren't here to argue the injunction motion.

THE COURT: Right.

MR. YOUNG: Which gets back to my point, the coincidence. Speaking of coincidence is that this all arose right after you told us you were not going to have argument. But a preliminary injunction requires a likelihood of success on the merits, and more importantly, irreparable harm, which is a huge point in this case and a huge point and the reason why we argue that it should not be entered because plaintiff cannot show irreparable harm, and for the same reason here.

There's no harm to the plaintiff going forward with some vague statement about not doing something. We have observed your order and have maintained the status quo. It's not necessary and it should not be entered. Thank you, your Honor.

THE COURT: Anything else?

MR. AZRIN: Your Honor, there's a legitimate concern. Our suspicions were correct to the extent that there were communications by the bank, by Allstate to the bank. We have a legitimate concern, and again, the focus is on, going forward, that it goes without saying, they should be prohibited from telling the bank going forward or other key players that he's been terminated.

THE COURT: Is there anybody that's going to be talking to the bank again from your side?

MR. YOUNG: Not that I'm aware of.

THE COURT: And you said nobody did it?

MR. YOUNG: We're not aware of any. We did a search. We did not find that anyone had.

MR. AZRIN: My clients pointe out that as we stated in the affidavit, there was a specific call from his relationship manager, Amanda Miranda, in November out of the blue, hey, what's the story with this? We heard from Allstate that you've been terminated and you're in termination status. Out of the blue in November. It gives us a legitimate concern.

THE COURT: And he said no, there's an order from the Court that that's not to happen, right?

MR. AZRIN: He said that that's not correct, yes. But it gives us a basis for a concern going forward. And that's what we're seeking to address. Thank you, your Honor.

THE COURT: Anything else?

MR. YOUNG: No. The test for an injunction and for the relief is not a legitimate concern. It's irreparable harm.

THE COURT: So that call that he got from his relations, whoever she was, what was her name?

MR. AZRIN: Amanda Miranda.

THE COURT: And she said, I just heard from Allstate, or I saw it? I don't know.

MR. AZRIN: I received a call from Allstate that you've been terminated and you're in termination status.

THE COURT: Recently, or in July?

MR. AZRIN: She called in November. This report was dated July of 2024. So if he gets the call that he's told that he received a call from Allstate that they've been terminated, she calls him and tells him that in the end of November, there's a concern.

THE COURT: So I suggest to you, Counselor, that you send a copy over to her of the order, my existing order, okay?

Okay, I'm going to reserve on this at this point and I'll upload my decision.

MR. AZRIN: Thank you, your Honor.

MR. YOUNG: Thank you, your Honor.

THE COURT: Thank you.

C E R T I F I C A T I O N
Certified to be a true and accurate transcript of the aforesaid proceeding.

Gina Hlapatsos
Gina Hlapatsos

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------x
OLD SLIP BENEFITS & INSURANCE
SERVICES, LLC,

Plaintiff,

-against- Index No. 69162/2024

ALLSTATE INSURANCE COMPANY, REGINE
MARIE NAPOLEON, BRITTANY CLEERE,
MARC STEVENSON, and ALLISON
ANN MCMAHON,

Defendants.
-------------------------------------------x

January 8, 2025
Westchester County Courthouse
111 Dr. Martin Luther King Blvd.
White Plains, New York

B E F O R E:

HONORABLE LINDA JAMIESON,
Justice

A P P E A R A N C E S:

WUERSCH & GERING
Attorneys for Plaintiff
100 WALL STREET
NEW YORK, NY 10005-3701
BY: DAVID T. AZRIN, ESQ.

TROUTMAN PEPPER LOCKE LLP
Attorneys for Defendants
3000 Two Logan Square
Philadelphia, PA 19103
BY: CHRISTOPHER YOUNG, ESQ.

JACQUELINE NISHI-BROACH
Senior Court Reporter

THE COURT CLERK: For the record, number 14, added to the calendar, the matter of Old Slip Benefits and Insurance versus Allstate Insurance Company, Index Number 69162 of 2024. Appearances, please?

MR. AZRIN: Good afternoon, Your Honor. David Azrin on behalf of the plaintiff, Old Slip Benefits and Insurance Services.

MR. YOUNG: Good afternoon, Your Honor. Chris Young on behalf of the defendants, Allstate Insurance Company and the individual defendants.

THE COURT: Go ahead.

MR. AZRIN: Thank you, Your Honor. I appreciate you giving us this opportunity. I thought it would be useful just to recap where we're at, since there has been a lot of briefing on the issue. So the issue that I wanted to address, which I request to do oral argument for, and you graciously granted, was that preliminary injunction.

So with respect to the preliminary injunction, as you know, the Court entered the TRO back in September. And what's on the table is the request to maintain that injunctive relief pending the hearing, full hearing, on the merits.

As you know, Your Honor, the purpose of a preliminary injunction is to maintain the status quo

pending that hearing. The first point I want to emphasize and highlight is that the issue with all of the briefing that's been done, Your Honor, the issue of the irreparable harm my client is going to suffer if the injunctive relief is not maintained, it has not been seriously contested. They have contested other issues, but that's not one of them.

It's not contested that the only business of this plaintiff is this franchise agency agreement. That is the asset. And the evidence is uncontested that my client, who was working based in Florida, he moved up here to New York with his wife and his daughter for the purpose of opening this agency. He purchased the accounts of two existing agencies and consolidated them, went through months of recruitment and training by Allstate, before he finally signed the agreement in the end of February of 2024.

He found office space, which was approved; the location was approved by Allstate. He consolidated -- as I mentioned, he bought two existing agencies, the Buglione from a man named Buglione, and a man named Fava. And he has continued providing excellent services to the Allstate customers that he purchased since he purchased it in March of 2024. And he even uses the name "BFL," in reference to the record, "The BFL Group," which stands for the agent he

bought it from, Buglione, and Fava, and his initials, Lukezic. That was to maintain the good will with the customers that have been built up over all these years, which he has continued to maintain.

The money damages, if injunctive relief is not entered, are impossible to calculate. His plan, which is in the record undisputed, is he not only consolidated two agencies, but also recruited other agents and consolidated them into it. He also had the plans, which he had discussed with Allstate, that he has an existing investment business through Old Slip Capital, and the plan was -- which he discussed with Allstate -- that he was going to cross-sell the Allstate Insurance products to his investment clients. And all of these damages, Your Honor, would be impossible to calculate if injunctive relief is entered to prevent the termination from going through.

The cases we had cited, just to refresh the Court's memory, addressing this exact same type of issue where there is injunctive relief requested to prevent the termination of a franchise agreement or some kind of distributorship agreement from going forward, there are four Second Department cases. The cases that we had cited were Second Department cases which held that in exactly this same type of situation, that it is appropriate to enter injunctive relief; because where you have a

franchise agreement or distributorship agreement and you terminate it and there are not grounds for terminating it, then it is almost impossible to calculate the damages, because the damages are the entire good will of the business. And how do you measure that? How do you calculate that?

And those cases were the Mr. Natural case and the U.S. Ice Cream case and the Piccote case, as well as the Supreme Court case Saferstein v. Wendy. And that Saferstein case summarized it very well; it said basically that the possibility of money damages, the damages can't be calculated in terms of measuring that destruction of that sole asset of the business. And in those cases that I cited, a couple of them were cases where injunctive relief was denied and the Second Department said no, it was appropriate to enter injunctive relief to prevent this type of damage.

And two of the cases, Your Honor, specifically held that the existence of a liquidated damages clause in the agreement does not prevent the entry of injunctive relief because of the harms, the destruction of the business; that was the Piccote case and the Saferstein case.

And the other harm that will be suffered by my client, Your Honor, which isn't really contested by

Allstate, is that if the termination goes through, Allstate will be required by law to file a report with the Department of Financial services stating that the agency was terminated, and the grounds. The grounds which they have used were quote-unquote "unauthorized trading," which I will address in a minute, which is totally, frankly, ludicrous under the circumstances.

Be that as it may, that report, if that goes through, will also cause incalculable harm, not only to Old Slip, its reputation, and its ability to try to find an appointment with a different agency, as well as to the principal, Mr. Lukezic. So that's the irreparable harm on our side, the irreplaceable harm suffered if the injunction is not maintained.

On the other side of the equation is: What the harm suffered by Allstate if the injunction remains in effect? That's the other part of the analysis. And on that point, Your Honor, there is not a shred of evidence they have submitted. Keep in mind my client has been operating this agency since March, and also since Your Honor entered the TRO in September, there has been no evidence submitted that there have been any problems with him providing services; no customer complaints, no issues in terms of his performance, nothing.

And to the contrary, he has continued to operate

the business, he has continued to provide excellent customer service, capitalizing on that good will from the agencies he bought it from, using some of the same staff from those agents. Not only is there no harm that will be suffered by Allstate -- Allstate is making money. He is continuing to operate the agency very well, and they continue to make money. He is growing the agency. He is adding new accounts and providing excellent customer service.

The next point, Your Honor, has to do with claims themselves. The claims themselves -- you recall, Your Honor, when you entered the TRO back in September, that there was a discussion about the issue of the duty of good faith in fair dealing as it applied -- as it related to the contract termination provisions in this contract. And counsel had pointed to those termination provisions. And we had responded by saying that that's all well and good, but the implied duty of good faith and fair dealing applies to every contract, even to these contract provisions. And the Court went ahead and entered the TRO on that basis.

The Court's decision on that issue, Your Honor, has essentially been validated by the Second Department in its recent JLO decision, which we submitted the supplemental authority on. That JLO case, Your Honor,

addressed an almost identical, accurate provision that provided for termination without cause, without any reason. And the Court in JLO said that the duty of implied of good faith and fair dealing still applies, and where the other party's actions would deprive the other party of the benefit of the bargain or where those actions are being exercised in a way to attempt to realize gains that the contract implicitly denies, that the duty still applies.

And what the Second Department has said is even where there is such a provision, the duty of good faith acts as a, quote, "limitation on an apparently unfettered contract right." That has been reaffirmed by the Court of Appeals in the Jennifer Realty case, which we cited in our opposition to the motion to dismiss. And conspicuously, Allstate did not even address the Jennifer Realty case in their reply on the motion to dismiss.

And that Jennifer Realty case, as well as the cases we cited in our original motion, the Second Department cases, the Outback, Rich Bell, and Elkoulily, all held that implied duty of good faith applies even where the party might have, technically speaking, an unfettered contract right. And the Jennifer Realty case emphasized that it's appropriate to apply this duty where -- in circumstances where the parties lack equal

bargaining power and where they are not on equal terms to access to information.

And in terms of the distinction between the contract claim and the implied duty of good faith and fair dealing, what Jennifer Realty explained is that a breach of the implied duty is a breach of contract. What the Jennifer Realty Court said was, "By spelling out the basis for their claim that the sponsor failed to exercise its duty of good faith and fair dealing, plaintiffs pleaded a valid cause of action for breach of contract."

And here the facts are, as I alluded to before, that during all of the months of the negotiations starting in September or October of 2023 all way through February of 2024, Allstate knew full well that my client had a separate investment advisory business and a broker dealer business. It's uncontested. He discussed it with them. It's uncontested. It was on every one of his e-mails that he exchanged back and forth with them. It's at the bottom of his e-mails. It's uncontested in the public records. Anyone could look up his name and they would see his broker dealer license and his investment advisory license.

And the whole idea, which he presented to Allstate, was that he was going to cross-sell his investment clients the Allstate Insurance products. And the Allstate people told him in the Zoom calls that were

recorded that this was a terrific idea. The agency agreement only prohibited him from selling non-Allstate insurance products, but not non-Allstate investment products. And even in one of the cases we cited, in Allstate's own FAQs they specifically said that "this agreement does not prohibit you from selling non-Allstate investment products."

And the scheme or the efforts by Allstate were motivated to try, obviously, to coerce him to transfer his valuable separate investment advisory business to the Allstate Financial Services platform, so that he would only be selling Allstate financial products, which he has explained in affidavits would be detrimental not only to him, but also to his clients, because Allstate Financial Services offers a very limited offering of investment products that wouldn't even be suitable for his investment clients.

And so Allstate was essentially trying to get him to do something, force him to transfer these investment clients, which he was not required to do, and was never part of the plan.

So in addition, Your Honor, to the claim for unlawful termination based on this theory of breach of implied duty of food faith and fair dealing, Old Slip has set forth four additional separate and independent bases

for granting the relief.

Number one is the illegal nature of the agreement. We have demonstrated that Allstate, because this was a franchise, essentially a franchise agreement, it meets all the elements, Allstate was required to give him a disclosure document which highlights the terms of the agreement, including the termination provisions. It's supposed to provide a history, so the person who is buying the franchise can see the terminations that they have done in the past and where those terminations have been disputed. All of that information is supposed to be provided to the prospect. And it's supposed to be -- the agreement and that disclosure document are supposed to be provided at least 14 days before you sign.

None of that happened here. In fact, to the contrary. The evidence we have submitted shows they handed him the agency agreement -- he kept asking for it, asking for it. The bank was demanding it; they had a deadline for the closing date. They handed it to him on the date it needed to be submitted. In these circumstances, Your Honor, we would submit that where you have an agreement that was essentially an illegal agreement, and it was signed using an illegal sales process, that the Court does have equitable authority to decide not to enforce particular provisions of that

illegal agreement. And we have cited the cases.

A second alternative grounds for relief is the theory of reformation. Reformation applies exactly to this situation. The case cries out for reformation where you have a unilateral mistake on one side. My client submitted affidavits demonstrating he was told repeatedly that this is a longterm relationship, that when you join the Allstate family, you join for life, it's your business. He was told that he would not be terminated unless they had a good reason. This is what he was told and understood.

And on the other side, reformation is appropriate where you have misleading conduct by the other side. Allstate knew full well the provisions of its contract, and they didn't fully disclose it to him. In fact, they misled him. Why else would he move up his family, invest all of the money taking out a loan, finding the location, hiring employees? And to think then that Allstate can then turn around two or three months later and said, "Oh, we can terminate, and maybe we don't have a good reason, but we can terminate without cause." It's just not what a reasonable person would assume. That's what the case law in reformation specifically says, where it's a provision that a reasonable person would assume is in there. So it meets the elements.

The third theory is unconscionability, where you have procedural and substantive unconscionability. We would submit this provision is unconscionable for the reasons I have already outlined. And the Court does have the authority not to enforce a particular provision of a contract which it believes is unconscionable.

And the fourth theory is equitable estoppel, where they themselves elected to terminate supposedly for cause, even though it was completely without justification. And they had led him to believe that it couldn't be terminated without cause. The doctrine of equitable estoppel would also apply -- we have cited the cases. Allstate won't be frozen into a relationship with my client, contrary to what was suggested. If the without-cause provision is removed or not enforced, they still have the power to terminate his agreement with cause, with legitimate cause, which is not the situation here.

The last issue I'd like to address, Your Honor, is the standard for likelihood of success. So I have addressed the irreparable harm, the balancing of the equities. I have addressed the claims. In terms of the standard of the likelihood of success, this was alluded to in some of the papers, but wasn't extensively briefed, so I thought it useful to review this.

The Second Department has repeatedly emphasized that the standard for likelihood of success on a preliminary injunction motion is not certainty or conclusive proof. Rather, the Second Department has phrased it as merely "a prima facie showing of a right to relief." And importantly, the Second Department recently emphasized in a case that where there are several legal theories that would support the granting of the injunctive relief, a party need only make the showing as to one of those theories.

And I just highlight some of the cases. The cases we cited in the briefs -- the Piccote case, Mr. Natural, and U.S. Ice Cream -- the Courts held, and this was the Second Department, said the standard is a probable chance of success, to merit injunctive relief. And the Courts in Mr. Natural and U.S. Ice Cream emphasized it need not be proven with certainty. They stated: "Existence of factual disputes will not bar the granting of preliminary injunctive relief where it is necessary to preserve the status quo and the party to be enjoined will not suffer irreparable harm."

And this is consistent with other Second Department cases which have emphasized that it does not require certainty or conclusive proof. And that includes the Anthony Water's Cafe case, 137 A.D.2d 791, where the

Court said the showing of a likelihood of success on the merits required before preliminary injunction may -- that it may be properly issued must not be equated with the showing of a certainty of success. And in the Ying Fung Moy case, 10 A.D.3d 604, the Court again said conclusive proof is not required.

In several cases the Second Department has stated the standard as merely requiring a prima facie showing of a right to relief. In the Weissman case, the Second Department held at 112 A.D.2d 1086: "A prima facie showing of a reasonable probability of success is sufficient. Actual proof of the Petitioner's claims should be left to a full hearing on the merits." And this same terminology was used in the McLaughlin case, 114 A.D.2d 165, as well as Moczan at 135 A.D.2d 692, using the terminology "a prima facie showing of a reasonable probability of success."

And as I alluded to earlier, the Second Department recently, just last month, held that where there are several legal theories that are put forth, that the Petitioner/the movant need only establish the likelihood of success on the merits on one of those causes of action. That was in the Commissioner of New York versus Polite, 2024 WL 4964811, where the Court held the plaintiffs only had to establish likelihood of success on

the merits on one cause of action that would entitle them to have relief sought in the preliminary injunction.

So for all of these reasons, Your Honor, we submit it's appropriate, in order to maintain the status quo, that you maintain the restraining order as a preliminary injunction pending a full hearing on the merits, where the plaintiff has demonstrated a prima facie showing of right to relief under at least one or more of five different legal theories, and there is a significant showing of irreparable harm -- I'm sorry, there is no significant showing of irreparable harm to the defendant if it is maintained, and there is clearly a showing of irreparable harm to my client if it is not maintained.

Thank you, Your Honor.

THE COURT: Thank you. Counsel?

MR. YOUNG: May it please the Court and counsel, Your Honor, it's worth reminding the Court that preliminary injunctive relief has been described as a drastic remedy, which will not be granted unless a clear right thereto is established under the law. And the undisputed facts upon the moving papers and the burden of showing an undisputed right rests upon the movant. That's the Peterson versus Corbin case, which we cite in our papers.

The Court knows plaintiff must show it is, one,

likely to succeed on the merits of its claim, and it will suffer irreparable harm in the absence of an injunction, and the balance of the equities does not favor the issuance of an injunction. Here plaintiff cannot meet the high bar of showing a likelihood of success on the merits of his claim, which is -- I will explain the reasons why. It's set forth in our brief, which might explain why counsel spent so much time talking about what the standard is.

We submit that there is no basis to find that there is a likelihood of success on any of the claims, which I will explain. It will -- nor can the plaintiff show that it will suffer irreparable harm in the absence of an injunction order, and I will go through that as well. I dispute counsel's description of Allstate's position that irreparable harm is not seriously contested. It has been seriously contested, and I will explain why.

Lastly, the balance of equities does not favor the issuance of an injunction. It actually -- because Allstate should not be forced to continue a contractual relationship that it no longer wants and be exposed to liability to third parties. Counsel somewhat betrayed why we're here today, Your Honor, when he explained that if an injunction -- if the status quo is maintained, it won't burden Allstate, because Allstate will be able to continue

with an exclusive agent, which it will not be able to terminate unless it has cause.

The problem with that, Your Honor, is it ignores the fact that there is an express contractual provision that says Allstate can terminate for convenience. Not only can Allstate terminate for convenience, but Old Slip can terminate for convenience. So what they want you to do, Your Honor, is issue an order that writes out of this contract a material provision. And the law does not permit you to do that.

The reason why counsel spent so much time talking about the implied covenant of good faith is because there is an express provision that says that Allstate can terminate without cause, which is what it did. It can terminate for cause; there is a provision that says it can terminate for cause. If it has a basis for cause, it can terminate immediately. It also says -- there is another provision, a separate and distinct provision, that says Allstate can terminate with or without cause, and Old Slip can terminate with or without cause.

As the Court likely knows from the appearances we have been here and the argument we have made and the cases we have cited involving this very contract, this contract is a contract that Allstate uses uniformly for

thousands of exclusive agents across the country. It's a form agreement that contains that provision. What Old Slip wants is to be a non-exclusive agent of Allstate, despite the fact that's what he signed up to be.

And the reason why we are here is because he does not want to be an exclusive agent of Allstate. And he wants to operate as a non-exclusive agent of Allstate with a provision that none of the other Allstate agents have, even the agents that he purchased the agencies from, purchased the economic interest from. So that's why we are here, Your Honor; not to maintain the status quo -- that won't burden Allstate -- but to benefit the plaintiff to stay in business for a claim which it can be compensated in money damages, which I will explain.

Most of what counsel argued is in the papers. I'm not going to belabor it. We have responded to the assertions about the implied covenant of good faith. As I said, the reason he is arguing implied covenant of good faith is because there is a clear reason for why he will not succeed on his merits given the expressed contractual language.

Let me spend a moment on that JLO case. That case and the other cases that are cited in the papers are factually distinguishable from our case. JLO was an agreement to develop property that contained a termination

without cause provision. After the parties performed for a number of years, they amended the agreement, and they amended the compensation regime, saying that the plaintiff will develop the property and, when the property gets sold, the plaintiff will be compensated.

What they didn't do is they didn't amend the termination without cause provision. So what happened was the plaintiff performed, the plaintiff developed the property, and weeks before the property was to be sold, the defendant said, "Oh, I'm terminating without cause, and I don't have to pay you." The Court's decision was based upon the specific fact that there was a specific harm to the plaintiff, a specific lack of a benefit of bargain that was being taken from the plaintiff because of the exercise of that bad faith, if you will, and terminating.

There is an absence of anything like that here. What plaintiff wants is to have a perpetual, infinite agency relationship with Allstate, under the guise that it would be a breach of the implied covenant of good faith to terminate him and to enforce the provision that says Allstate can terminate without cause. But that's not what the implied covenant of good faith allows him to do. It does not allow the Court to ignore express contractual provisions. It does not provide that remedy, it does not

provide that relief, and the facts here do not justify doing that.

Counsel went through the reasons why reformation might apply. I will address that briefly. Reformation requires mutual mistake. There is no mutual mistake here. In the absence of mutual mistake, be it unilateral mistake with some sort of fraud, some bad faith -- there is none of that there. This will address both reformation and the unconscionability argument.

Plaintiff has told you his story in several affirmations. He is a sophisticated businessman. He has a FINRA license. He operates financial services companies on Wall Street. Yes, he wanted to move into the insurance business. I don't know, he says he moved his family; we will get to discovery and determine whether that's true. I thought he had lived in the New York area. He certainly has businesses in the New York area.

But he purchased the economic interests of two agencies. He performed due diligence to do that. He spent hundreds of thousands of dollars to buy these economic interests. These agents whose economic interest he purchased have the very same contract that's at issue in this court. But yet he says to you, "It got pushed down my throat in late February, and I had to sign it." For that to be believed, he would have to have done due

diligence and never reviewed the Allstate contract.

He signed a pre-appointment agreement three months before he became an Allstate exclusive agent. The pre-appointment agreement identifies the contract he will enter into. A Google search of that contract would reveal blog posts by the counsels of the Allstate exclusive agency agreement, setting forth the five things you need to know about this contract is that it's terminable without cause.

He is a sophisticated businessman who should have known what he was getting into. He was taking out loans to jump into this relationship. He should have reviewed that agreement. To say this was unconscionable ignores the fact, one, not only was he a sophisticated businessman; he had counsel, as he set forth in his affirmation; he also operated under an LLC. He has two commercial entities.

And by the way, what he claims to be unconscionable is a term that gives both Allstate and the plaintiff the right to terminate without cause. Substantively, it could not be unconscionable for that reason alone.

Counsel talked about the claims that would allow for the Court to continue the injunction in place. First of all, they are all contested, Your Honor. Nothing has

been proven. We are just getting into discovery now. We have moved to dismiss four of the five claims. Two of the claims don't pertain to Allstate at all, because it's involving the tortious interference with the contract, which is the individual defendants.

But I want to take a moment to talk about the Franchise Sales Act. That is a claim that's a novel claim. It's not been proven. To sit there and say he has a basis for it, we will find out in discovery and when we finally come before you for a trial or summary disposition. But that is a huge, huge issue. This is not a franchise. This relationship does not fall within the ambit of the New York Franchise Sales Act. And Allstate is vigorously opposing that, Your Honor, and will continue to oppose it. We did not move to dismiss on it because there were a number of factual issues that we intend to show at summary judgment as to why this is not a franchise. So that's not a basis to grant injunction. It's not likely to succeed on it. It is contested.

Lastly, I want to talk about -- spend a few moments talking about irreparable harm. If you go to the memorandum of law that plaintiff submitted, Document Number 3, on page 15 plaintiff lays out what his claims of irreparable harm are. He says, "Conclusorily it will cause irreparable harm because Old Slip's entire business

is the offering and sale of Allstate Insurance products." So that's one aspect of his claim of irreparable harm.

He just purchased that business from two other people. A willing buyer and a willing seller got together and decided what the price of that economic interest is. It can be quantified. It can be determined. In fact, the termination provision upon which Allstate terminated this contract says he is entitled to a payment for his economic interest, so he will get a payment on his economic interest. He will not suffer irreparable harm for having lost that business.

I acknowledge counsel cited a number of cases, mostly in the franchise world, that talk about irreparable harm where a business is being destroyed. Those cases involve someone who worked for a franchise, worked for a brand, held themselves out as McDonalds, Wendy's, Church's Chicken, for a number of years. Years; not months, years. And the Courts said in those cases it would be inequitable and unfair to destroy that business, because the plaintiff in that case did business under the name of the franchisor.

This is the exact opposite here. I said this in September, and I will say it again. The reason we're here, Your Honor, is because plaintiff wanted to do something different. He didn't want to follow the

program. Allstate said, "Follow the program. We signed you as an exclusive Allstate agent. We want you to be an exclusive Allstate agent. To do that, you have to sell Allstate financial products exclusively." He said no. His choice. He said, "No, I don't want to be part of this brand, this regime. I want to do my own thing." That's his decision. But that does not create irreparable harm.

We cited the cases that all said when you have a business that's been in business for months, that doesn't rise to the level of irreparable harm for proving the drastic remedy of an injunction.

Plaintiff goes on to say that it will result in the loss of jobs, jobs of employees that were working for the other agencies. The economic interest is there. They can find jobs somewhere else. To the extent that's actually a loss, it can be compensated. It can be compensated in money damages.

Liability to third parties, including the landlord, again, to the extent plaintiff incurs liability to a landlord, that would be an item of damage, so it's compensable.

And the loss of future opportunities for the purchase of additional agency accounts, that's a good one. The reason why I say it's a good one is because there is nothing in the contract that says he is entitled to do any

such thing. So while he can argue that maybe somewhere, sometime in the future he might have been able to purchase other accounts, that's wholly speculative, Your Honor, and not a basis for what New York Courts call a drastic remedy.

In the reply brief counsel dealt with these cases he discussed. I want to talk briefly about those cases, because they are distinguishable, Your Honor. The Piccote Realty case involves someone who had been in business for this realty company for 25 years. 25 years. And then the agreement was terminated because they missed a payment. And they said, "Can we get back in?" And the defendant said no. In that case what the Court said was, "Yeah, while you might be compensated in damages because you have been working under this brand for 25 years, there is a irreparable harm here, because you can no longer act under that or do business under that brand, and that's not quantifiable."

We don't have that situation here. The Saferstein case was a license agreement that was peculiar to a product that was made by the plaintiff, and there was a single customer that it would not be able to sell to with the license terminated. And in that case the Court said, "Well, there is a specific customer here. If it's -- if we don't issue injunctive relief, it could

destroy the business." Again, someone that had been in business for a long time. We don't have that situation here.

What we have here, Your Honor, is someone saying, "If I can't do this business, I'm going to lose the revenue and profits going forward." That by itself is the definition of a compensable claim, a claim for lost profits. Might there be a dispute over the scope and breadth of the lost profits? Surely there will be. But it's not difficult or impossible to entertain. So for that reason plaintiff cannot meet the high burden of showing irreparable harm.

Lastly, on the balance of equities, Your Honor, in September I told you what the real harm to Allstate was. With someone holding themselves out as an Allstate exclusive agent and selling products Allstate is not aware of, it can create liability. He is acting as an agent of Allstate. Think about that. He is holding himself out as speaking for Allstate on certain matters. That by itself is a reason to say Allstate is irreparably harmed, even if it hasn't occurred yet. But every day that goes by there is a liability risk to Allstate. So the balance of equities certainly favors not entering an injunction in this case.

Thank you for your time, Your Honor.

THE COURT: Thank you. Anything else you would like to add?

MR. AZRIN: Thank you, Your Honor. Yes, just addressing the points counsel has raised.

With respect to the irreparable harm issue, Your Honor, it's impossible to distinguish the cases that we have cited that involve the threat and termination of a franchise agreement or license agreement. And those cases did not hinge on the number of months or years that had been in operation; that's just not in the case law. But here, as I mentioned, we do have a situation where my client's business did depend on the good will that had been built up for years with respect to the prior agency owners. And so there is an established good will that will be completely destroyed.

Counsel didn't address the employee issues, the employee jobs that will be lost. The opportunity to buy other agencies, it's in the complaint and in the affidavits that my client had in fact lined up the purchase of another agency right before he was terminated, and that after he was terminated Allstate said, "You no longer are qualified to go forward with that purchase."

Counsel hasn't addressed the harm of not being able to cross-sell, the money that could have been made from cross-selling Allstate insurance products to his

investment clients. And they haven't addressed the irreparable harm of the report to the Department of Financial Services that he had engaged in unauthorized trading.

With respect to their irreparable harm, we just have vague statements about him acting as an agent. He is conducting his investment advisory business under the name of Old Slip. He is operating the Allstate Insurance agency. There is no showing of any irreparable harm. It's all vague and speculative. And more importantly, Your Honor, as I mentioned before, he has been operating the agency successfully without any problems, without any customer complaints, without any issues. There is no factual showing of irreparable harm that would be suffered if the injunction is maintained.

Addressing the other issues that counsel raised, he is, yes, an exclusive agent of Allstate. But he is an exclusive agent of Allstate for insurance products. The contract says, Section 1(e), Old Slip will not solicit, sell, or service insurance of any kind for another company. Section 9 of the non-competition agreement says he will not solicit, sell, or service insurance of any kind for another company.

And that's why -- and counsel is correct that this agency agreement is used very widely. And that's why

we have the benefit of Court decisions on this very same contract. And we have the benefit of a Federal Court Southern District of New York case, 2021, which we cited, where the Court specifically quoted Allstate's own FAQs, where Allstate says, "This contract does not bar you from selling non-Allstate non-insurance products. It only prohibits you -- restricts you, makes you exclusive, for selling Allstate's insurance products." That's in their own FAQs, quoted in a Court decision.

We also have the benefit of Illinois Court case, in Allstate's home state, interpreting the same contract, where the Illinois court said to Allstate, "Yes, the implied duty of good faith and fair dealing does apply to your contract, even when it involves some otherwise unfettered contract right."

With respect to the termination, Your Honor, it's important to recall that they did not terminate him without cause. They terminated him for cause. They said, "You're being terminated for unauthorized trading." And the reason that's significant, Your Honor, is because it goes to the understanding of the parties and this agreement. They knew. Why didn't they just send him a letter saying, "You are terminated" if they didn't have to have cause?

The reason is because they knew it would cause a

firestorm, that they would never be able to sell another agreement if it got out, if it was widely publicized that they are going around terminating people without cause. It's consistent with the understanding of the parties that this was a longterm relationship.

With respect the JLO case, the implied duty of good faith and fair dealing, counsel is just simply mistaken or confused about that case. It did not hinge on the fact, as they argued in their brief and as I alluded to here, that there was specific earned compensation. He is confusing the Court's decision on the unjust enrichment claim and the quantum meruit claim. When the Court addressed good faith and fair dealing, it used the languages that every other Second Department case used and the Court of Appeals used in the Jennifer Realty, where it would result in depriving the person of the benefit of the bargain, or it's to obtain a right not otherwise there.

With respect to the due diligence argument, Your Honor, it's undisputed -- and this was briefed in connection with the Stevenson motion. It's undisputed in those e-mails, you can see that he asked repeatedly for a copy of the agreement. He was not sent the agreement until the last day when it needed to be submitted to the bank in order for the closing. And it wasn't even submitted to his counsel, which Allstate knew was working

on the bank loan.

So for all those reasons, Your Honor, we submit that the -- we would request the temporary restraining order be maintained, to maintain the status quo. Thank you.

MR. YOUNG: Your Honor, can I address one thing?

THE COURT: Yes.

MR. YOUNG: The issue of what Allstate would be required to say in the future is a prior restraint, which was the subject of the last time we were here. It's not a basis for irreparable harm, because it's something that hasn't happened. To the extent it injures plaintiff, it was defamatory and he can show it's defamatory, then he has a claim to a money judgment.

The whole issue of getting into "was it for cause or not for cause," we addressed that in the brief. The Court doesn't need to go there. What their argument essentially is is because we stated the reason -- there's nothing wrong with stating a reason -- you somehow forfeited your right to terminate without cause. That's not true. We gave 90 days' notice, which was part of the without-cause provision, because that's why we were terminating.

For those reasons we would ask that you deny the motion.

THE COURT: Okay. Thank you, gentlemen.

MR. AZRIN: Thank you, Your Honor.

MR. YOUNG: Your Honor, could I ask one matter of docket control?

THE COURT: Sure.

MR. YOUNG: When we were here in November for the pre-conference you asked about two pending motions, which were motions pro hac vice. Counsel indicated there was no objection. I don't believe those orders have been entered yet.

THE COURT: Really?

MR. YOUNG: I may be mistaken.

THE COURT: I will take a look. Let me see. I know it was granted on the record. Was there an order?

MR. YOUNG: We submitted.

THE COURT: There were orders submitted with it. On November 21 it was granted. But let me see. The pro hac vice. It was for Erica Hall Dressler?

MR. YOUNG: Yes.

THE COURT: And for Christopher --

MR. YOUNG: No, Millie --

THE COURT: Okay, I see it. They were granted on the record, but they were not. I will sign them and get them up to you.

MR. YOUNG: Thank you, Your Honor.

THE COURT: Sorry about that.

MR. YOUNG: No worries.

THE COURT: Thank you.

* * * * * *

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings in the matter of Old Slip Benefits & Insurance Services LLC vs. Allstate Insurance Company et al, Index Number 69162/2024 .

____________________________
JACQUELINE NISHI-BROACH
Senior Court Reporter

To commence the statutory time period for appeals as of right (CPLR § 5513 [a]), you are advised to serve a copy of this order, with notice of entry, upon all parties.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

**PRESENT: HON. LINDA S. JAMIESON**

---X

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

Plaintiff,

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.

---X

Index No. 69162/2024

DECISION AND ORDER

The following papers numbered 1 to 8 were read on the motion (seq. no. 1) by plaintiff Old Slip Benefits & Insurance Services, LLC ("plaintiff") pursuant to CPLR §§ 6301 and 6311 for an Order preliminarily enjoining defendant Allstate Insurance Company ("Allstate") from terminating the Exclusive Agency Agreement entered into by plaintiff and Allstate and dated March 1, 2024 (the "Contract") pending a full determination of the merits of this action:

| Papers | Numbered |
|---|---|
| Order to Show Cause | 1 |
| Affirmations and Exhibits in Support | 2 |
| Memorandum of Law in Support | 3 |
| Affirmation and Exhibits in Opposition | 4 |

| | |
|---|---|
| Memorandum of Law in Opposition | 5 |
| Affirmation in Reply | 6 |
| Memorandum of Law in Reply | 7 |
| Supplemental Affirmation and Exhibit in Reply | 8 |

The following papers numbered 1 to 6 were read on the motion (seq. no. 5) by defendant Marc Stevenson ("Stevenson") pursuant to CPLR § 3211(a)(8) for an Order dismissing the Amended Complaint against him:

| Papers | Numbered |
|---|---|
| Notice of Motion | 1 |
| Affirmation in Support | 2 |
| Memorandum of Law in Support | 3 |
| Affirmation and Exhibit in Opposition | 4 |
| Memorandum of Law in Opposition | 5 |
| Memorandum of Law in Reply | 6 |

The following papers numbered 1 to 4 were read on the motion (seq. no. 6) by defendants Allstate, Regine Marie Napoleon ("Napoleon"), Brittany Cleere ("Cleere") and Allison Ann McMahon ("McMahon") pursuant to CPLR § 3211(a)(7) for an Order partially dismissing the Amended Complaint against them:

| Papers | Numbered |
|---|---|
| Notice of Motion | 1 |
| Memorandum of Law in Support | 2 |

| | |
|---|---|
| Memorandum of Law in Opposition | 3 |
| Memorandum of Law in Reply | 4 |

**RELEVANT PROCEDURAL BACKGROUND**

This action was commenced on September 12, 2024, and arises from a dispute concerning Allstate's termination of the Contract. *See* NYSCEF Doc. Nos. 1, 31. In particular, the Amended Complaint alleges that plaintiff, which is a financial services and investment advisory business, entered into the Contract so as to operate a franchised insurance agency for Allstate in White Plains. *See* NYSCEF Doc. No. 31 at ¶¶ 1-47. It alleges that plaintiff's principal, James Lukezic ("Lukezic"), made clear to Allstate that the franchised agency would solely be offering insurance products, while plaintiff continued to separately operate its financial services business. *Id*. The Amended Complaint alleges that during contract negotiations, Lukezic expressed his understanding of the contemplated business arrangement to Stevenson, Napoleon, Cleere, and McMahon, who are Allstate employees. *Id*.

The Amended Complaint sets forth two principal allegations that underly plaintiff's lawsuit. *Id*. First, the chief allegation underlying six of plaintiff's seven causes of action is that Allstate terminated the Contract unlawfully and/or in bad faith by a termination letter dated June 25, 2024 (the

"Termination Letter"). *Id.* Second, plaintiff's third cause of action alleges that in any event, the Contract was an illegal franchise agreement such that it constituted an unlawful sale of a franchise in violation of the New York Franchise Sales Act. *Id.* Based upon the foregoing general allegations, the Amended Complaint asserts: (1) a first cause of action for breach of contract against Allstate; (2) a second cause of action for breach of the implied covenant of good faith and fair dealing against Allstate; (3) a third cause of action for violation of the New York Franchise Sales Act against all defendants; (4) a fourth cause of action for unconscionability against Allstate; (5) a fifth cause of action for reformation against Allstate; (6) a sixth cause of action for equitable estoppel against Allstate; and (7) a seventh cause of action for tortious interference with contract against Napoleon and McMahon. *Id.* at ¶¶ 48-85.

Regarding the principal allegation that Allstate sought to terminate the Contract unlawfully and/or in bad faith by way of the Termination Letter, plaintiff on September 12, 2024 moved (seq. no. 1) pursuant to CPLR §§ 6301 and 6311 for a temporary restraining order and a preliminary injunction enjoining Allstate from terminating the Contract pending a determination of the merits of this lawsuit. *See* NYSCEF Doc. Nos. 2-7. By

Order to Show Cause dated September 19, 2024, the Court granted plaintiff a temporary restraining order preventing Allstate from carrying out the termination of the Contract pending a determination on plaintiff's underlying motion for preliminary injunctive relief. *See* NYSCEF Doc. No. 16. Allstate opposes plaintiff's motion, arguing that the Contract may be terminated without cause and that Allstate acted in accordance therewith in furnishing the Termination Letter, such that plaintiff is not entitled to preliminary injunctive relief prolonging a lawfully terminated business relationship. *See* NYSCEF Doc. Nos. 20-24.

Thereafter, on November 4, 2024, Stevenson moved (seq. no. 5) pursuant to CPLR § 3211(a)(8) for an Order dismissing the Amended Complaint against him on the ground that the Court lacks personal jurisdiction over him. *See* NYSCEF Doc. Nos. 45-47. Stevenson contends that he is a Virginia resident who works for Allstate from his residence; that he has never travelled to New York for business purposes nor conducted any business activities in New York; and that he was improperly sued herein due to his limited phone and email correspondence with Lukezic after plaintiff had been approved as an Allstate agent. *Id.* Plaintiff opposes Stevenson's motion, arguing that Stevenson transacted business in New York in connection with the Contract. *See* NYSCEF Doc. Nos. 51-53.

On November 12, 2024, Allstate, Napoleon, Cleere, and McMahon separately moved (seq. no. 6) pursuant to CPLR § 3211(a)(7) for an Order partially dismissing the Amended Complaint against them. *See* NYSCEF Doc. Nos. 49-50. Their joint motion seeks dismissal of all claims as against Napoleon, Cleere, and McMahon as well as dismissal of all claims against Allstate except for the third cause of action alleging Allstate's violation of the New York Franchise Sales Act. *Id.* It is grounded in the principal argument that because the Contract may be terminated without cause and Allstate acted entirely in accordance with the Contract in furnishing the Termination Letter, there is no valid basis for any related liability as against Allstate or any individual defendant herein. *Id.* Plaintiff opposes the motion, contending that Allstate unlawfully terminated the Contract in a bad faith effort to deprive plaintiff of the benefit of its bargain, and that the Contract was nonetheless an illegal franchise agreement such that defendants should be held liable in connection with same. *See* NYSCEF Doc. No. 64.

Accordingly, presently before the Court are three motions, *i.e.*, plaintiff's motion for a preliminary injunction and defendants' two separate motions to dismiss the Amended

Complaint. The Court addresses the three motions in reverse chronological order below.

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Regarding the motion (seq. no. 6) of Allstate, Napoleon, Cleere and McMahon seeking to partially dismiss the Amended Complaint against them pursuant to CPLR § 3211(a)(7), it is well-settled that "the complaint must be liberally construed, giving the plaintiff the benefit of every favorable inference." *Cunningham v Nolte*, 188 AD3d 806, 807 (2d Dept 2020), *citing Leon v Martinez*, 84 NY2d 83, 87-88 (1994). "Such a motion should be granted only where, even viewing the allegations as true, the plaintiff still cannot establish a cause of action." *Cunningham*, 188 AD3d at 807, *citing Hartman v Morganstern*, 28 AD3d 423, 424 (2d Dept 2006). "The motion must be denied if from the pleadings' four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law." *511 West 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 152 (2002).

Plaintiff's first cause of action for breach of contract[1] is grounded in the allegation that Allstate materially breached the

[1] "The essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *Blank v Petrosyants*, 203 AD3d 685, 688 (2d Dept 2022), *quoting Liberty Equity Restoration Corp. v Yun*, 160 AD3d 623, 626 (2d Dept 2018).

Contract through the Termination Letter, which unlawfully terminated the Contract based upon the false claim that plaintiff had been engaged in "unauthorized brokering." *See* NYSCEF Doc. No. 31 at ¶¶ 48-53. The Termination Letter is dated June 25, 2024, and provides plaintiff with notice that effective September 30, 2024, the Contract is being terminated pursuant to Section XVII(B)(2) of the Contract. *See* NYSCEF Doc. No. 7. It further states that "Allstate is taking this action for reasons that include [plaintiff] maintaining an outside business interest which creates a conflict of interest and unauthorized brokering." *Id.*

Article XVII(B) of the Contract unambiguously states as follows:

> This Agreement may be terminated:
>
> 1. At any time by mutual agreement of the parties in writing;
>
> 2. By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law. Once written notice of termination has been given by either party, Agency will, immediately upon request of the Company, cease to act or to represent itself in any way as an agent or representative of the Company, but it will receive compensation pursuant to Section XV from the Company for the period up to and including the specified termination date; or

> 3. Alternatively, by the Company, with cause, immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.
> *See* NYSCEF Doc. No. 6.

As such, the Contract's plain terms provide that either party may terminate the agreement "with or without cause" on 90 days' written notice pursuant to Section XVII(B)(2), and that Allstate separately has the right to terminate "with cause" pursuant to Section XVII(B)(3). *Id.*

The Court agrees with Allstate that because the Termination Letter unambiguously cites Section XVII(B)(2) of the Contract and provides 90 days' written notice of termination, Allstate acted in accordance with the Contract's plain terms in terminating the Contract and therefore did not materially breach the Contract in the Termination Letter. As noted above, Section XVII(B)(2) allows either party the unfettered right to terminate "with or without cause." Accordingly, Allstate's references in the Termination letter to plaintiff's maintenance of an "outside business interest" and "unauthorized brokering" are effectively irrelevant, as Allstate was lawfully permitted to terminate the Contract without cause where, as here, it made such termination effective upon at least 90 days' written notice, *i.e.*, from June

25, 2024 to September 30, 2024. Therefore, plaintiff's first cause of action, which hinges upon the central allegation that Allstate materially breached the Contract through the Termination Letter, should be dismissed pursuant to CPLR § 3211(a)(7).

A federal case that involves Allstate as a defendant and the very same contractual language at issue herein is instructive. In *Rahman v Allstate Ins. Co.*, 644 F. Supp. 3d 231, 237 (E.D.L.A. 2022), the United States District Court for the Eastern District of Louisiana addressed Allstate's motion to dismiss a breach of contract claim against it where, as here, the operative contract "states that the Agreement may be terminated 'by either party, with or without cause, upon providing ninety (90) days prior written notice to the other." *See Rahman v Allstate Ins. Co.*, 644 F. Supp. 3d 231, 237 (E.D.L.A. 2022). In *Rahman*, the Court held that because Allstate had strictly complied with the contract's terms in terminating the agreement upon 90 days' written notice, it did not materially breach the contract, and such claim was dismissed. It stated: "The EA Agreement states that the Agreement may be terminated '[b]y either party, with or without cause, upon providing ninety (90) days prior written notice to the other . . . .' The Amended Complaint states that on March

25, 2021, Allstate's District Sales Leader notified Plaintiff by letter that the EA Agreement was being terminated effective June 30, 2021. This notification, made by written notice and over ninety days before the effective date of termination, is in compliance with the EA Agreement. Thus, Allstate did not breach the EA Agreement when it terminated Plaintiff, and Plaintiff has not sufficiently pleaded his breach of contract claim. *See Rahman*, 644 F. Supp. 3d at 237 (internal citations omitted and emphasis added).

As in *Rahman*, plaintiff's breach of contract claim is fatally undercut by the fact that the Termination Letter was provided in strict accordance with Section XVII(B)(2), such that Allstate did not materially breach the Contract. Therefore, plaintiff's first cause of action is dismissed pursuant to CPLR § 3211(a)(7). This holding is consistent with the Appellate Division's determination in *Baldo v Patton*, 65 AD3d 765, 766-767 (3d Dept 2009), in which the Court stated that the "Supreme Court properly held that the agreement was not ambiguous and permitted defendants to terminate the agreement with 90 days notice." The Court further noted that "[t]he agreement here states that 'if for any reason termination is required' such termination can be effected by presenting written confirmation 'to either party' within the stated time frame. The next

sentence provides for a prorated return of plaintiff's deposit if the agreement is terminated within the first five years. The agreement does not specifically require cause for termination. Thus, the agreement's plain language permits either party to terminate the agreement 'for any reason' (i.e., without cause) by simply providing 90 days notice of termination and defendants returning a portion of plaintiff's deposit." *See Baldo*, 65 AD3d at 766-767; *see also Matter of Chang v Department of Educ. of the City of New York*, 137 AD3d 597, 597 (1st Dept 2016) (affirming the dismissal of a breach of contract claim and finding that "[t]he court properly found that the agreement with petitioner afforded respondents the unconditional right to terminate the contract without cause and that such termination clauses are enforceable"); *Red Apple Child Dev. Ctr. v Cmty. Sch. Dists. Two*, 303 AD2d 156, 157 (1st Dept 2003) (stating that "[i]t is a well-established principle of law that when a contract affords a party the unqualified right to limit its life by notice of termination that right is absolute and will be upheld in accordance with its clear and unambiguous terms").

However, the Court will not dismiss plaintiff's second cause of action for breach of the implied covenant of good faith and fair dealing.[2] This claim is premised upon the separate

[2] "The implied covenant of good faith and fair dealing is a pledge that

legal theory that, regardless of whether Allstate technically and/or facially complied with the Contract's terms through the Termination Letter, Allstate breached the implied covenant of good faith and fair dealing because it used a contractual right in a bad faith effort to deprive plaintiff of the benefit of the parties' bargain, causing plaintiff to incur substantial monetary harm. *See* NYSCEF Doc. No. 31 at ¶¶ 54-61.

Without opining as to whether plaintiff may ultimately succeed on the merits of its second cause of action, the Court agrees with plaintiff that "[e]ven if a party is not in breach of its express contractual obligations, it may be in breach of the implied covenant of good faith and fair dealing when it exercises a contractual right as part of a scheme to deprive the other party of the benefit of its bargain." *See JLO Dev. Corp. v Amalgamated Bank*, 232 AD3d 705, 705 (2d Dept 2024), *citing Ahmed Elkoulily, M.D., P.C. v New York State Catholic Healthplan, Inc.*, 153 AD3d 768, 770 (2d Dept 2017). In *JLO Dev. Corp.*, the Court held that a claim for breach of the implied covenant of good faith and fair dealing was not subject to CPLR § 3211 dismissal where "the defendant could terminate the

neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not explicitly prohibit such conduct." *East Ramapo Cent. Sch. Dist. v New York Schs. Ins. Reciprocal*, 199 AD3d 881, 884 (2d Dept 2021).

consulting agreement upon 90 days' prior written notice," emphasizing that "the defendant still had an obligation to exercise good faith." *See JLO Dev. Corp.*, 232 AD3d at 705. The Court further explained: "While the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship, they do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included . . . Technically complying with the terms of a contract while depriving the plaintiff of the benefit of the bargain may constitute a breach of the covenant of good faith and fair dealing . . . Even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement." *Id.* (emphases added).

Therefore, because the Amended Complaint alleges that Allstate acted in bad faith in sending the Termination Letter as an improper means of depriving plaintiff of the benefits to which it is entitled under the Contract, plaintiff has stated a valid claim for breach of the implied covenant of good faith and fair dealing, which second cause of action shall not be dismissed herein. *See JLO Dev. Corp.*, 2024 NY. App. Div. LEXIS 5880 at **4-5; *see also Ahmed Elkoulily, M.D.*, 153 AD3d at 770-

771 (reversing the dismissal of a claim premised upon breach of the implied covenant of good faith and fair dealing and holding that "[a]lthough pursuant to its terms, Fidelis could terminate the agreement . . . in its sole discretion . . . Fidelis had an implied obligation to exercise good faith in reaching its determination"); *Richbell Info. Servs. v Jupiter Partners, L.P.*, 309 AD2d 288, 302 (1st Dept 2003) (stating that the implied covenant of good faith and fair dealing serves as a "limitation on an apparently unfettered contract right [that] may be grounded either on the construction of the parties' fiduciary obligations or on the purely contractual rule that even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement") (internal citations omitted).

With respect to plaintiff's fourth, fifth and sixth causes of action against Allstate, which read as alternative claims and/or legal theories underlying the dismissed first cause of action, the Court agrees with Allstate that such claims are also subject to dismissal pursuant to CPLR § 3211(a)(7). *See* NYSCEF Doc. No. 31 at ¶¶ 67-79. The fourth cause of action is styled as a claim for unconscionability. *Id.* at ¶¶ 67-72. This is a defense, and not a valid cause of action under New York law, such that it is dismissed pursuant to CPLR § 3211(a)(7). *See*

*Bevilacque v Ford Motor Co.*, 125 AD2d 516, 519 (2d Dept 1986) (stating that unconscionability "does not create a new cause of action to recover damages or to enforce a contract but, rather, provides a defense for a party opposing enforcement of a contract or a cause of action for rescission of a contract. Thus, the plaintiffs' causes of action founded upon unconscionability do not set forth cognizable claims and should have been dismissed"); *see also Fortune Limousine Serv., Inc. v Nextel Communications*, 35 AD3d 350, 354 (2d Dept 2006) (holding that "[t]he third cause of action seeking affirmative relief on the ground of unconscionable contract terms must also be dismissed as the doctrine of unconscionability is to be used as a shield, not a sword, and may not be used as a basis for affirmative recovery"); *Avildsen v Prystay*, 171 AD2d 13, 16 (1st Dept 1991) (affirming the dismissal of a cause of action sounding in unconscionability and noting that this doctrine "may not be used as a basis for affirmative recovery").

The fifth cause of action, which seeks reformation of the Contract, is also dismissed pursuant to CPLR § 3211(a)(7) because it fails to allege that the Contract was executed under mutual mistake or unilateral mistake coupled with fraud. *See* NYSCEF Doc. No. 31 at ¶¶ 73-76; *see also Timber Rattlesnake, LLC v Devine*, 117 AD3d 1291, 1292 (3d Dept 2014) (noting that "[a]

party seeking reformation must establish . . . that the writing in question was executed under mutual mistake or unilateral mistake coupled with fraud"). Plaintiff's self-serving allegation that it "was under the mistaken impression that this was a long-term relationship that could only be terminated if it breached its obligations" is insufficient for these purposes, as the Amended Complaint wholly fails to allege the essential elements of fraud that must be coupled with unilateral mistake, *i.e.*, what did Allstate purportedly misrepresent, why were its statements false and material, and were they made knowingly? *See Barclay Arms, Inc. v Barclay Arms Assocs.*, 74 NY2d 644, 646-647 (1989) (stating that "[a] bare claim of unilateral mistake by plaintiff, unsupported by legally sufficient allegations of fraud on the part of defendants, does not state a cause of action for reformation" and dismissing a reformation claim where "[t]he complaint did not allege the essential elements of a fraud claim, misrepresentation of a material fact, falsity, scienter and deception"); *Aventine Inv. Mgmt., Inc. v Canadian Imperial Bank of Commerce*, 265 AD2d 513, 514 (2d Dept 1999) (noting that "[o]ne who enters into a plain and unambiguous contract cannot avoid the obligation by merely stating that he erred in understanding its terms"); *Touloumis v Chalem*, 156 AD2d 230, 233 (1st Dept 1989) (dismissing a reformation claim where

the plaintiff failed to "allege every material element of fraud").

Plaintiff's sixth cause of action for equitable estoppel is also dismissed pursuant to CPLR § 3211(a)(7) given that Section XVII(B) of the Contract unambiguously allows for termination thereof by either party "without cause." *See* NYSCEF Doc. No. 6; NYSCEF Doc. No. 31 at ¶¶ 77-79; *see also Supply & Bldg. Co. v Estee Lauder Int'l, Inc.*, 1999 U.S. Dist. LEXIS 3978, *11 (S.D.N.Y. Mar. 31, 1999) (finding that equitable estoppel is unavailable where "the Agreement contains an explicit termination clause that expressly provides for termination without cause"). The Court credits Allstate's argument that this principle is particularly applicable here because the Contract contains an integration clause stating that it represents "the sole and entire agency agreement" between the parties, and "supersedes any prior oral statements and representations" as well as "any prior written statements" by Allstate. *See* NYSCEF Doc. No. 6 at Art. I(B). In light of this unambiguous contractual language, plaintiff cannot claim equitable estoppel based upon reliance upon any alleged behavior by Allstate suggesting that the parties' relationship was meant to be interminable. *See Presler v Domestic & Foreign Missionary Socy. of the Prot. Episcopal Church in the United States of Am.*,

113 AD3d 409, 409 (1st Dept 2014) (holding that "reliance on alleged oral assurances" is unavailable to a plaintiff where the written contract allowed for termination "without cause"); *Hobler v Hussain*, 111 AD3d 1006, 1007 (3d Dept 2013) (finding that the plaintiff could not have reasonably relied upon any alleged oral assurances where the contract could be terminated "without cause" and "contained an integration clause providing that it represented 'the entire agreement between the parties with respect to the subject matter hereof, and no amendment, change or modification shall be effective unless in writing and signed by the parties hereto'").

Turning to the branches of this motion concerning the individual defendants, the Court agrees with defendants that the third cause of action for violation of the New York Franchise Sales Act[3] should be dismissed pursuant to CPLR § 3211(a)(7) against Napoleon, Cleere, and McMahon. Although plaintiff has stated a valid claim against Allstate – which did not move to dismiss the third cause of action – dismissal of this claim is warranted against the individual defendants where, as here, plaintiff has not "sufficiently pleaded facts showing that the

[3] The third cause of action principally alleges that Allstate violated the New York Franchise Sales Act by selling plaintiff a franchise without first providing the required disclosures, and without Allstate being registered to sell franchises, in violation of NY Gen. Bus. Law §§ 680-695. *See* NYSCEF Doc. No. 31 at ¶¶ 62-66.

nonfranchisor defendants materially aided" Allstate's alleged violation of the statute. *See A.J. Temple Marble & Tile v Union Carbide Marble Care*, 87 NY2d 574, 584 (1996); *see also* NY Gen. Bus. Law §§ 680-695. Indeed, the third cause of action only mentions the individual defendants in one terse and conclusory sentence, alleging that they "personally participated" in Allstate's statutory violation. *See* NYSCEF Doc. No. 31 at ¶¶ 62-66. This is wholly insufficient for purposes of stating a claim for violation of the New York Franchise Sales Act against Napoleon, Cleere, and McMahon. As such, the third cause of action is dismissed against these individual defendants pursuant to CPLR § 3211(a)(7). *See A.J. Temple*, 87 AD2d at 584 (holding that alleging that an individual defendant violated the Act by "participat[ing] in and direct[ing] the unlawful conduct" of a franchisor is not "a sufficient factual allegation that his actions materially aided the franchisor's violations"); *see also Coraud LLC v Kidville Franchise Co., LLC*, 109 F. Supp.3d 615, 623 (S.D.N.Y. 2015) (finding that allegations of "general, run-of-the-mill interaction with a potential franchisee" are "insufficient" to hold individual defendants liable for "materially aid[ing]" a corporate defendant in violating the New York Franchise Sales Act).

Plaintiff's seventh cause of action for tortious interference with contract[4] is grounded in the allegation that Napoleon and McMahon tortiously interfered with plaintiff and Allstate's business relationship by causing their employer, Allstate, to materially breach the Contract. *See* NYSCEF Doc. No. 31 at ¶¶ 80-85. In light of the Court's determination herein that Allstate did not materially breach the Contract via the Termination Letter, plaintiff cannot show that the underlying Contract was breached. As such, this claim must be dismissed pursuant to CPLR § 3211(a)(7). *See Jack L. Inselman & Co. v FNB Financial Co.*, 41 NY2d 1078, 1080 (1977) (noting that "[i]n order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party, a situation not here present") (internal citations omitted); *Jaffe v Paramount Communs.*, 222 AD2d 17, 24 (1st Dept 1996) (holding that "[s]ince plaintiff failed to state a cause of action for breach of contract against [corporate defendant], the tortious interference claims against [individual defendants] were also properly dismissed").

[4] This claim "consists of four elements: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." *Weiss v Bretton Woods Condominium II*, 203 AD3d 1100, 1101-1102 (2d Dept 2022).

Furthermore, even if plaintiff's breach of contract claim had survived this motion, the seventh cause of action would nonetheless be subject to dismissal because Napoleon and McMahon are Allstate employees acting within the scope of their employment in connection with the Contract between Allstate and plaintiff. *See Citicorp Retail Services, Inc. v Wellington Mercantile Services, Inc.*, 90 AD2d 532, 532 (2d Dept 1982) (holding that "[o]fficers, directors or employees of a corporation do not become liable to one who has contracted with the corporation for inducing the corporation to breach its contract merely because they have made decisions and taken actions that resulted in the corporation's breaching its contract"); *see also Presler v Domestic & Foreign Missionary Socy. of the Prot. Episcopal Church in the United States of Am.*, 113 AD3d 409, 410 (1st Dept 2014) (finding that individual defendants who "were acting in the scope of their employment" cannot be held liable for tortiously interfering with plaintiff's contract). Therefore, the seventh cause of action is dismissed pursuant to CPLR § 3211(a)(7).

Accordingly, for the reasons stated above, defendants' motion (seq. no. 6) to partially dismiss the Amended Complaint pursuant to CPLR § 3211(a)(7) is granted in part and denied in part, such that Napoleon, Cleere and McMahon are dismissed from

this action, and only the second and third causes of action remain as against Allstate.

**STEVENSON'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

The procedural basis for Stevenson's motion to dismiss the action against him due to lack of personal jurisdiction is CPLR § 3211(a)(8), which provides for dismissal of a pleading where "the court has not jurisdiction of the person of the defendant." *See* CPLR § 3211(a)(8). To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff must "make a *prima facie* showing that personal jurisdiction exists." *Opticare Acquisition Corp. v Castillo*, 25 AD3d 238, 243 (2d Dept 2005); *accord Chen v Lu*, 144 AD3d 735, 736-737 (2d Dept 2016) (holding that "the Supreme Court properly granted that branch of the defendant's cross motion which was pursuant to CPLR 3211(a)(8) to dismiss the complaint for lack of personal jurisdiction").

It is well-settled that "where a motion is made to dismiss a complaint for lack of personal jurisdiction, it is the plaintiff who bears the 'ultimate burden of proof' to prove a basis for such jurisdiction." *Paterno v Laser Spine Inst.*, 112 AD3d 34, 39 (2d Dept 2013). However, "such a motion can be successfully opposed by a *prima facie* showing that the defendants were subject to the personal jurisdiction of the court." *Paterno*, 112 AD3d at 39, *quoting Daniel B. Katz &*

*Assoc. Corp. v Midland Rushmore, LLC*, 90 AD3d 977, 978 (2d Dept 2011). In order to meet that burden of proving that there exists a basis for personal jurisdiction over a non-resident defendant, a plaintiff must expressly allege facts in the complaint that bring such defendant within the parameters of CPLR 301 or 302, and must allege facts that comport with the constitutional limits of due process. *See LaMarca v Pak-Mor Mfg. Co.*, 95 NY2d 210, 213-214 (2000); *Repwest Ins. Co. v Country-Wide Ins. Co.*, 166 AD3d 61, 64 (1st Dept 2018); *Deutsche Bank AG v Vik*, 163 AD3d 414, 415 (1st Dept 2018).

The Amended Complaint acknowledges that Stevenson resides and is domiciled in Virginia, and alleges in cursory fashion that he is an Allstate employee who "actively participated in the sale of the Allstate insurance franchise agreement to Plaintiff." *See* NYSCEF Doc. No. 31 at ¶ 6. The pleading otherwise only references Stevenson twice, conclusorily alleging that Stevenson, Napoleon, Cleere, and McMahon together "actively participated" in "the sales and recruitment process" such that those four defendants should be held personally liable in connection with the third cause of action for violation of the New York Franchise Sales Act. *Id.* at ¶¶ 31, 66.

In contrast to the conclusory and terse allegations regarding Stevenson in the Amended Complaint, Stevenson's

affirmation sets forth detailed averments concerning his involvement with plaintiff and the Contract. *See* NYSCEF Doc. No. 47. Specifically, Stevenson avers that he is an Allstate employee who resides and works in Virginia and that he had no involvement with the Contract, *i.e.*, he did not draft it nor was he a party to it. *Id*. Stevenson avers that in his role as a Candidate Concierge, he never participated in any discussions about Allstate's exclusive agency opportunity for plaintiff or about the parties' respective decisions to enter into the Contract. *Id*. Stevenson further avers that he is not responsible for the New York market from a deployment or sales perspective, and that his role with Allstate has never involved conducting any business in New York or traveling there for business purposes. *Id*. Indeed, Stevenson avers that he last visited New York as a tourist over 25 years ago. *Id*. Stevenson avers that he first corresponded with Lukezic on December 4, 2023 after plaintiff had been approved as an exclusive Allstate agency, and Stevenson thereafter corresponded by telephone and email with Lukezic solely regarding the onboarding process in which Stevenson sent Lukezic materials, *inter alia*, to complete plaintiff's enrollment for insurance coverage and to provide links to training materials. *Id*.

In opposition, plaintiff furnishes an affirmation from Lukezic in which he avers, without substantiation, that Stevenson "was the dominant and integral force responsible for every aspect of the sales process." *See* NYSCEF Doc. No. 52. Moreover, the email documents annexed to Lukezic's affirmation undercut this claim, instead reflecting that Stevenson as Allstate's Candidate Concierge merely provided logistical support to plaintiff by, *inter alia*, providing relevant updates and emailing necessary documents for signature, all on behalf of Allstate. *See* NYSCEF Doc. No. 53.

Having reviewed the parties' submissions, the Court determines that plaintiff has not met its burden of establishing that this Court has personal jurisdiction over Stevenson under either CPLR §§ 301 or 302. Indeed, the Record demonstrates that Stevenson lives and works in Virginia, and his limited email and telephone contacts with Lukezic were all made solely on behalf of Stevenson's employer, Allstate, after it had approved plaintiff to become an exclusive Allstate agency. *See* NYSCEF Doc. Nos. 31, 47, 52, 53. Stevenson's contacts with Lukezic were made entirely in Stevenson's role as an Allstate employee, and were not in his personal capacity. *Id*. Moreover, the interactions between Stevenson and Lukezic in no manner demonstrate that Stevenson sought out or initiated any business

relationship with plaintiff; rather, Stevenson was merely providing logistical support to plaintiff in Stevenson's capacity as Allstate's Candidate Concierge. *Id.*

As such, these contacts do not constitute the transaction of business in New York, and Stevenson is not subject to general or specific jurisdiction in New York, a State that Stevenson has not even visited in this millennium. *See Laufer v Ostrow*, 55 NY2d 305, 313 (1982) (stating that "[a]lthough a corporation can act only through an employee or agent, the employee or agent being a live rather than a fictional being can act on behalf of himself or his employer or principal. He does not subject himself, individually, to the CPLR 301 jurisdiction of our courts, however, unless he is doing business in our State individually"); *IMAX Corp. v Essel Group*, 154 AD3d 464, 465-466 (1st Dept 2017) (holding that the petitioner "failed to establish that New York courts have general jurisdiction over respondent Chandra individually pursuant to CPLR 301" where "the evidence submitted by petitioner demonstrates that Chandra's business activities in New York were undertaken on behalf of a corporate entity"); *Pramer S.C.A. v Abaplus Intl. Corp.*, 76 AD3d 89, 95-96 (1st Dept 2010) (noting that "there are no allegations that [the individual defendant] personally conducted any transaction in New York, notwithstanding his possible corporate

affiliation, so jurisdiction cannot be obtained over him as an individual"); *L.F. Rothschild, Unterberg, Towbin v McTamney*, 89 AD2d 540, 540 (1st Dept 1982) (holding that "[t]he telephone communications defendant had with plaintiff's account executive from outside the State do not constitute sufficient contact with New York to confer personal jurisdiction over a nonresident under CPLR 302").

Moreover, even if Stevenson's actions had constituted transacting business in New York – which they do not – the Court's exercise of personal jurisdiction over him would not comport with federal due process requirements. Given that Stevenson played no role in the negotiation or execution of the Contract, and that his involvement with plaintiff was limited to providing logistical support on behalf of Allstate from Stevenson's residence and place of business in Virginia, it would be unreasonable to require Stevenson to defend against this lawsuit in his personal capacity in New York. *See Rushaid v Pictet & Cie*, 28 NY3d 316, 330 (2016) (stating that "[i]t is well established that a nondomiciliary must have 'certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice'"), *citing International Shoe Co. v Washington*, 326 US 310, 316 (1945); *Trotman v Priority Auto,*

*Inc.*, 231 AD3d 1075, 1075 (2d Dept 2024) (affirming the Supreme Court's CPLR § 3211[a][8] dismissal of an action for lack of personal jurisdiction and noting that "[i]n any event, the plaintiff failed to establish that the defendants had the requisite minimum contacts with New York such that the prospect of defending a suit here comported with traditional notions of fair play and substantial justice, as required by the Federal Due Process Clause").

Accordingly, Stevenson's motion (seq. no. 5) to dismiss the Amended Complaint against him is granted in its entirety pursuant to CPLR § 3211(a)(8).

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Although the parties have briefed the elements required for preliminary injunctive relief and appeared for oral argument on January 8, 2025 in connection with plaintiff's motion for a preliminary injunction (seq. no. 1), the Court determines that discovery regarding plaintiff's remaining claims against Allstate is warranted before the Court may render a determination on the merits of plaintiff's motion. In the interim, the temporary restraining order issued in the Order to Show Cause dated September 19, 2024 shall remain in full force and effect pending a determination on the merits of plaintiff's underlying motion. *See* NYSCEF Doc. No. 16.

The foregoing constitutes the decision and order of the Court.[5]

Dated: White Plains, New York
January 23, 2025

HON. LINDA S. JAMIESON
Justice of the Supreme Court

To: Wuersch & Gering LLP
Attorneys for Plaintiff
100 Wall Street, 10th Floor
New York, New York 10005

Troutman Pepper Hamilton Sanders LLP
Attorneys for Defendants
875 Third Avenue, 18th Floor
New York, New York 10022

[5] All other arguments raised on these three motions and all materials submitted by the parties in connection therewith have been considered by this Court, notwithstanding the specific absence of reference thereto.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,<br><br>Defendants. | Civil Action No. 7:25-cv-1110 |

**NOTICE OF REMOVAL**

Defendant Allstate Insurance Company ("Allstate" or "Defendant") hereby removes this civil action, with reservation of all rights and defenses, from the Supreme Court of the State of New York, County of Westchester, Index No. 69162/2024 (the "State Court Action"), to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §§ 1441, 1446, and 1332. As addressed below, the Court has jurisdiction over this matter under 28 U.S.C. § 1332(a) because Plaintiff Old Slip Benefits & Insurance Services, LLC ("Old Slip" or "Plaintiff") and Allstate are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. Removal is also procedurally proper pursuant to 28 U.S.C. § 1441(a) and timely pursuant to 28 U.S.C. § 1446(b)(3). In support of removal, Allstate states as follows:

## I. BACKGROUND

1. This action is a civil action within the meaning of the Acts of Congress relating to the removal of cases.

2. Plaintiff commenced the State Court Action by filing a complaint and motion for

preliminary injunction in the Supreme Court of the State of New York, County of Westchester on September 12, 2024. Allstate was served with the Complaint on September 16, 2024. Plaintiff subsequently amended the Complaint on October 15, 2024. A true and correct copy of the Complaint, Amended Complaint, and any other pleadings, process, or orders served on Defendants in the State Court Action is attached hereto as **Exhibit A**.

3. The Amended Complaint asserted claims against Allstate for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the New York Franchise Sales Act, unconscionability, reformation, and equitable estoppel. Additionally, it asserted claims against several Allstate employees, including (1) tortious interference with contract against Regine Marie Napoleon and Allison Ann McMahon, and (2) violation of the New York Franchise Sales Act against Regine Marie Napoleon, Brittany Cleere, Allison Ann McMahon, and Marc Stevenson ("Individual Defendants").

4. Marc Stevenson moved to dismiss the Amended Complaint on November 4, 2024, for lack of personal jurisdiction. The remaining Individual Defendants and Allstate moved to dismiss the Amended Complaint on November 12, 2024, for failure to assert a cause of action.

5. From the filing of Plaintiff's Complaint through the filing of Defendants' motions to dismiss, grounds for diversity did not exist because two Individual Defendants were non-diverse to Plaintiff. Specifically, Plaintiff and Individual Defendants Regine Marie Napoleon and Allison Ann McMahon are all citizens of the state of New York. Am. Compl. ¶¶ 2,4,7.

6. On January 23, 2025, however, the court issued a Decision and Order dismissing all claims against Individual Defendants, and all claims against Allstate except for breach of the implied covenant of good faith and fair dealing and violation of the New York Franchise Sales Act.

7. As a result of the court's dismissal of all claims against Individual Defendants, Allstate remains the sole defendant in this action.

8. Accordingly, this action can now be removed pursuant to 28 U.S.C. § 1332 because it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## II. DIVERSITY JURISDICTION EXISTS

9. Plaintiff is a "New York limited liability company, with its principal place of business at 199 Main Street, Suite 200, White Plains, New York, whose sole member is domiciled in the State of New York." Am. Compl. ¶ 2. Thus, Plaintiff is a citizen of the state of New York.

10. Allstate is an Illinois corporation with its principal place of business at [3100] Sanders Road, Northbrook, Illinois." Am. Compl. ¶ 3. Thus, Allstate is a citizen of the state of Illinois.

11. Because Plaintiff and Allstate are citizens of different states and are the sole remaining parties in this action, there is complete diversity of citizenship.

12. Moreover, Plaintiff seeks damages in excess of $75,000. While Plaintiff's Amended Complaint did not specify the amount of alleged damages it seeks in the suit, the monetary damages Plaintiff sought during settlement discussions and in mediation provide adequate basis for Allstate to allege that it seeks far in excess of $75,000, exclusive of interest and costs. Affirmation of A. Christopher Young in Support of Notice of Removal, attached hereto as **Exhibit B.**

13. Thus, the amount in controversy requirement is satisfied.

## III. REMOVAL IS PROCEDURALLY PROPER

14. In addition to satisfying the requirements of diversity jurisdiction, Allstate has satisfied all other requirements for removal.

15. Venue in this District is proper under 28 U.S.C. § 1441(a) because the United States District Court for the Southern District of New York is the federal judicial district corresponding to the place where the State Court Action is pending.

16. Moreover, this Notice of Removal is timely under 28 U.S.C. § 1446(b)(3), which provides that if the case stated by the initial pleading is not removable, a defendant must file a notice of removal within thirty days of receiving "an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."

17. In accordance with 28 U.S.C. § 1446(b)(3), the case stated by Plaintiff's initial pleading was not removable as it included causes of action against non-diverse defendants.

18. The case became removable on January 23, 2025, when the court dismissed all causes of actions against non-diverse defendants.

19. Allstate timely filed this Notice of Removal on February 7, 2025, within 30 days of receiving the state court's decision.

20. This Notice of Removal is also timely under 28 U.S.C. § 1446(c)(1) because it is filed within one year of September 12, 2024—the date of commencement of the State Court Action.

21. Finally, in accordance with 28 U.S.C. § 1446(d), Defendant will promptly provide written notice of the filing of this Notice of Removal to Plaintiff and shall file a copy of this Notice along with a Notice of Filing of Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of Westchester, where this action is currently pending. *See* Notice of Filing of Notice of Removal, attached hereto as **Exhibit C**.

**WHEREFORE**, Allstate respectfully removes this action from the Supreme Court of the

State of New York, County of Westchester, to the United States District Court for the Southern District of New York.

February 7, 2025

Respectfully submitted,

**TROUTMAN PEPPER LOCKE LLP**

By: */s/ A. Christopher Young*
A. Christopher Young
Erica H. Dressler (admitted *pro hac vice*)
Milica Krnjaja (admitted *pro hac vice*)
215.981.4190
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
christopher.young@troutman.com
erica.dressler@troutman.com
millie.krnjaja @troutman.com

Sophia N. Dauria
875 3rd Ave
New York, NY 10022
212.704.6185
Sophia.dauria@troutman.com

*Attorneys for Allstate Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of February 2025, I caused the foregoing to be electronically filed with the Court and a copy of the foregoing was served via email to:

David T. Azrin
100 Wall Street, 10th Floor,
New York, NY 10005
david.azrin@wg-law.com
*Attorney for Plaintiff*

*/s/ A. Christopher Young*
A. Christopher Young

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

Plaintiff,

-against-

ALLSTATE INSURANCE COMPANY et al.,

Defendants.

25-CV-1110 (JGLC)

**NOTICE OF INITIAL PRETRIAL CONFERENCE**

JESSICA G. L. CLARKE, United States District Judge:

Unless and until the Court orders otherwise, counsel for all parties shall appear for an initial pretrial conference with the Court on **May 20, 2025** at **12:00 p.m.** The conference will be held remotely by Microsoft Teams. Counsel will receive Microsoft Teams log-in credentials at the email addresses listed on the docket. The public listen-only line may be accessed by dialing: 646-453-4442 | Access Code: 937464169#.

All counsel must familiarize themselves with the Court's Individual Rules and Practices, which are available at https://nysd.uscourts.gov/hon-jessica-g-l-clarke. All parties are required to register promptly as filing users on ECF.

Counsel are directed to confer with each other prior to the conference regarding settlement and each of the other subjects to be considered at a Federal Rule of Civil Procedure 16 conference. Additionally, in accordance with Paragraph 3(c) of the Court's Individual Rules and Practices, the parties are hereby ORDERED to file on ECF a joint letter, described below, as well as a proposed Civil Case Management Plan and Scheduling Order attached as an exhibit to the joint letter, no later than **May 13, 2025**. The parties shall use this Court's form Proposed Civil Case Management Plan and Scheduling Order, which is also available at https://nysd.uscourts.gov/hon-jessica-g-l-clarke.

The joint letter shall not exceed five pages, and shall provide the following information in separate paragraphs:

(1) A statement indicating whether the parties believe they can do without an initial pretrial conference altogether. If so, the Court may enter a case management plan and scheduling order and the parties need not appear;

(2) A brief statement of the nature of the action and the principal defenses thereto, and the major legal and factual issues that are most important to resolving the case, whether by trial, settlement or dispositive motion;

(3) A brief explanation of why jurisdiction and venue lie in this Court. In any action in which subject matter jurisdiction is founded on diversity of citizenship pursuant

to Title 28, United States Code, Section 1332, the letter must explain the basis for the parties' belief that diversity of citizenship exists. Where any party is a corporation, the letter shall state both the place of incorporation and the principal place of business. In cases where any party is a partnership, limited partnership, limited liability company or trust, the letter shall state the citizenship of each of the entity's members, shareholders, partners, and/or trustees. *See, e.g.*, *Handelsman v. Bedford Vill. Assocs. L.P.*, 213 F.3d 48 (2d Cir. 2000). If this information is lengthy, it may be included in an Appendix to the letter, not to be included in the page limit;

(4) A statement of all existing deadlines, due dates and/or cut-off dates;

(5) A brief description of any outstanding motions;

(6) A brief description of any discovery that has already taken place and of any discovery that is necessary for the parties to engage in meaningful settlement negotiations;

(7) A brief description of the status of prior settlement discussions, without disclosing exact offers and demands;

(8) Any other information that the parties believe may assist the Court in advancing the case to settlement or trial, including, but not limited to, a description of any dispositive issue or novel issue raised by the case.

If this case has been settled or otherwise terminated, counsel are not required to submit such a letter or to appear, provided that a stipulation of discontinuance, voluntary dismissal or other proof of termination is filed on the docket prior to the date of the conference, using the appropriate ECF Filing Event. *See* SDNY ECF Rules & Instructions §§ 13.17-13.19 & App'x A, *available at* https://www.nysd.uscourts.gov/electronic-case-filing.

In accordance with the Court's Individual Rules and Practices, requests for an extension or adjournment may be made only by letter-motion filed on ECF and must be received at least 48 hours before the deadline or conference. The written submission must state (1) the original date and the new date requested; (2) the number of previous requests for adjournment or extension; (3) whether these previous requests were granted or denied; (4) the reason for the extension or adjournment; (5) whether the adversary consents and, if not, the reasons given by the adversary for refusal to consent; and (6) to the extent applicable, the date of the parties' next scheduled appearance before the Court. Unless counsel are notified that the conference has been adjourned, it will be held as scheduled.

**Counsel who have entered a notice of appearance as of the issuance of this order are directed (1) to notify counsel for all other parties in this action who have not yet appeared by serving upon each of them a copy of this order and the Court's Individual Rules and Practices forthwith, and (2) to file proof of such notice with the Court.** If unaware of the identity of counsel for any of the parties, counsel receiving this order must forthwith send a copy of this order and the Court's Individual Rules and Practices to that party personally.

Dated: February 13, 2025
New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,<br><br>Defendants. | Civil Action No. 7:25-cv-01110 |

**NOTICE OF DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR AN ORDER DECLARING THAT THE TEMPORARY RESTRAINING ORDER HAS EXPIRED OR, ALTERNATIVELY, FOR AN ORDER DISSOLVING THE TEMPORARY RESTRAINING ORDER**

**PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law in Support of Defendant Allstate Insurance Company's ("Allstate") Motion for an Order Declaring that the Temporary Restraining Order ("TRO") Has Expired, Allstate will move this Court on a date and at a time to be designated by the Court, before the Honorable Jessica G. L. Clarke, United States District Court, Southern District of New York, 500 Pearl Street, New York, New York 10007, for an order declaring that the TRO issued by the Supreme Court of the State of New York, County of Westchester on September 19, 2024, has expired by operation of Federal Rule of Civil Procedure 65, or alternatively, for an order dissolving the TRO because there is no good cause for an extension.

Dated: March 14, 2025

Respectfully submitted,

**TROUTMAN PEPPER LOCKE LLP**

By: *A. Christopher Young*
A. Christopher Young

Erica H. Dressler (admitted *pro hac vice*)
Milica Krnjaja (admitted *pro hac vice*)
215.981.4190
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
christopher.young@troutman.com
erica.dressler@troutman.com
millie.krnjaja @troutman.com

Sophia N. Dauria
875 3rd Ave
New York, NY 10022
212.704.6185
Sophia.dauria@troutman.com

*Attorneys for Defendant Allstate Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

By: *A. Christopher Young*
A. Christopher Young

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,<br><br>Defendants. | Civil Action No. 7:25-cv-01110 |

**[PROPOSED] ORDER GRANTING DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR AN ORDER DECLARING THAT THE TEMPORARY RESTRAINING ORDER HAS EXPIRED OR, ALTERNATIVELY, FOR AN ORDER DISSOLVING THE TEMPORARY RESTRAINING ORDER**

It is hereby ORDERED that Defendant Allstate Insurance Company's ("Allstate") Motion for an Order Declaring that the Temporary Restraining Order ("TRO") Has Expired or, Alternatively, For an Order Dissolving the TRO is GRANTED, and it is hereby DECLARED that the TRO issued by the Supreme Court of the State of New York, County of Westchester on September 19, 2024, has expired by operation of Federal Rule of Civil Procedure 65, or, alternatively, it is hereby DECLARED that the TRO is dissolved because there is no good cause for an extension.

Dated: ______________________

New York, New York

SO ORDERED

______________________
JESSICA G. L. CLARKE
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

Plaintiff,

v.

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.

CASE NO: 7:25-cv-01110-JGLC

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR AN ORDER DECLARING THAT THE TEMPORARY RESTRAINING ORDER HAS EXPIRED OR, ALTERNATIVELY, FOR AN ORDER DISSOLVING THE TEMPORARY RESTRAINING ORDER

David T. Azrin, Esq.
Wuersch & Gering LLP
100 Wall Street, 10th Floor
New York, NY 10005
Tel. (212) 509-5050

Table of Contents

Page(s)

FACTUAL BACKGROUND ..... 1

PROCEDURAL BACKGROUND ..... 8

ARGUMENT ..... 10

I. THE STATE COURT ALREADY DECIDED THAT THERE WAS GOOD CAUSE TO EXTEND THE RESTRAINING ORDER ..... 10

II. GOOD CAUSE EXISTS TO MAINTAIN THE RESTRAINING ORDER AND GIVE DEFERENCE TO THE STATE COURT'S DECISION ..... 14

CONCLUSION ..... 27

Table of Authorities

Page(s)

CASES

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
98 N.Y.2d 144 (2002) .......... 20

*Ahmed Elkoulily, M.D., P.C. v. New York State Catholic Healthplan, Inc.*,
153 A.D.3d 768 (2d Dept. 2017) .......... 10, 19

*Albini v. Solork Assoc.*,
37 A.D.2d 835 (2d Dept. 1971) .......... 22

*Allstate Ins. Co. v. Fougere*,
2019 WL 4776986 (D. Mass. Sept. 30, 2019) .......... 3

*Am. Sys. Consulting, Inc. v. Devier*,
514 F. Supp. 2d 1001 (S.D. Ohio 2007) .......... 17

*Aristacar Corp. v. Attorney General*, 1
43 Misc.2d 551, 541 N.Y.S.2d 165 (1989) .......... 25

*Arizona v. California*,
460 U.S. 605 (1983) .......... 15

*Brown v. Erie Ins. Co.*,
207 A.D.3d 1144 (4th Dep't 2022) .......... 18

*Bucciarelli v. Nationwide Mutual Insurance Company*,
662 F. Supp. 2d 808 (E.D. Mich. 2009) .......... 25

*Cooper Health Systems v. Virtua Health, Inc.*,
259 F.R.D. 208 (D. N. J. 2009) .......... 16

*D.H. Blair & Co. v. Gottdiener*,
462 F.3d 95 (2d Cir. 2006) .......... 11

*Denison v. Shawmut Mining Co.*,
124 F. 860 (C.C.W.D.N.Y. 1903) .......... 16

*Doe v. New York City Dep't. of Social Services*,
709 F.2d 782 (2d Cir. 1983) .......... 15

*Does 1-9 v. Kappa Alpha Theta Fraternity Inc.*,
2022 WL 3448638 (N.D. Tex. 2022) .......... 17

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
680 F.Supp.2d 625, 626 (S.D.N.Y.), *aff'd*, 381 F. App'x 117 (2d Cir. 2010)...................... 23

*Erie Railroad Co. v. Tompkins*,
304 U.S. 64 (1938)........................................................................................................ 18

*Fieger v. Pitney Bowes Credit Corp.*,
251 F.3d 386 (2d Cir. 2001) ......................................................................................... 18

*Filstein v. Bromberg*,
36 Misc.3d 404 (N.Y. Sup. Ct. 2012) ........................................................................... 26

*Firestone v. Berrios*,
42 F.Supp.3d 403 (E.D.N.Y. 2013) .............................................................................. 16

*Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*,
153 F. Supp. 2d 1253 (D. Kan. 2001) ........................................................................... 15

*Franke v. Wiltschek*,
209 F.2d 493 (2d Cir. 1953) ......................................................................................... 18

*Garbinski v. Nationwide Mutual Insurance Company*,
2011 WL 3164057 (D. Conn. 2011), *aff'd*, 523 F. App'x 24 (2d Cir. 2013)........................ 25

*GGC Int'l Ltd. v. Ver*,
2025 WL 81319 (S.D.N.Y. Jan. 13, 2025) ......................................................................11

*Glossip v. Gross*,
576 U.S. 863 (2015)...................................................................................................... 16

*GPA Inc. v. Ligget Group, Inc,.*
862 F.Supp. 1062 (S.D.N.Y. 1994) .............................................................................. 20

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*,
415 U.S. 423 (1974)..............................................................................................11, 13, 14

*Guaranty Trust Co. of N.Y., v. York*,
326 U.S. 99 (1945)........................................................................................................ 18

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*,
2021 WL 535485 (S.D.N.Y. 2021) ............................................................................... 16

*In re Crim. Contempt Proc. Against Crawford*,
133 F. Supp. 2d 249 (W.D.N.Y. 2001).......................................................................... 14

*Jack Kahn Music Co. v. Baldwin Piano & Organ Co*,
604 F.2d 755 (2d Cir. 1979) ........ 20

*JLO Dev. Corp. v. Amalgamated Bank*,
232 A.D.3d 705 (2d Dept. 2024) ........ 10, 19

*LaGuardia Associates v. Holiday Hospitality Franchising Inc.*,
92 F.Supp.2d 119 (E.D.N.Y. 2000) ........ 21

*Lanza v. Carbone*,
130 A.D.3d 689 (2d Dep't 2015) ........ 26

*Lepore v. New York News Inc.*,
365 F.Supp. 1387 (S.D.N.Y. 1973) ........ 22

*Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*,
397 F.3d 77 (2d Dep't 2005) ........ 16

*Marcone APW, LLC v. Servall Co.*,
85 A.D.3d 1693 (4th Dep't 2011) ........ 24

*Michalski v. Home Depot, Inc.*,
225 F.3d 113 (2d Cir. 2000) ........ 18

*Mr. Natural, Inc. v. Unadulterated Food Products, Inc.*,
152 A.D.2d 729 (2d Dept. 1989) ........ 22, 23

*New York Tel. & Tel. Co. v. Averill*,
199 N.Y. 128 (1910) ........ 26

*Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*,
470 F. Supp. 1308 (N.D.N.Y. 1979) ........ 18

*Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO*,
306 F.2d 840 (2d Cir. 1962) ........ 14

*PDL Vitari Corp. v. Olympus Industries, Inc.*,
718 F.Supp. 197 (S.D.N.Y. 1989) ........ 20

*Picotte Realty, Inc. v. Gallery of Homes, Inc.*,
66 A.D.2d 978 (3d Dep'. 1978) ........ 22, 24

*Pimentel v. Aminov*,
23 Misc.3d 1112(A) (Queens Sup. Ct. 2009) ........ 24

*Portaleos v. Shannon*,
2013 WL 4483075 (N.D.N.Y. 2013) .......... 11

*Progressive Restaurant Systems, Inc. v. Wendy's International Inc.*,
1990 WL 106719 (N.D.N.Y. 1990) .......... 21

*Richbell Info. Servs. v. Jupiter Partners, L.P.*,
309 A.D.2d 288 (1st Dep't 2003) .......... 10, 19

*Romero v. Allstate Ins. Co.*,
1 F. Supp. 3d 319 (E.D. Pa. 2014) .......... 3

*Rosenberg v. MetLife, Inc.*,
8 N.Y.3d 359 (2007) .......... 7

*S.E.C. v. Variable Annuity Co.*,
359 U.S. 65 (1959) .......... 6

*Saferstein v. Wendy*,
137 Misc.2d 1032 (N.Y. County 1987) .......... 22, 24

*Santos v. Reverse Mortg. Solutions, Inc.*,
2012 WL 4891597 (N.D. Cal. 2012) .......... 17

*Sea Tow Servs. In'l, Inc. v. Tampa Bay Marine Recovery,*
*632 F.Supp.3d 91 (E.D.N.Y. 2022)* .......... 25

*Sec. & Exch. Comm'n v. AriseBank*,
2018 WL 10419828 (N.D. Tex 2018) .......... 15

*Seitzman v. Hudson River Assoc.*,
126 A.D.2d 211 (1st Dept. 1987) .......... 23

*Standard Forms Co. v. Nave*,
422 F.Supp. 619 (E.D. Tenn. 1976) .......... 13

*Sun Forest Corp. v. Shvili*,
152 F. Supp. 2d 367 (S.D.N.Y. 2001) .......... 11

*Tehan v. Disability Management Services, Inc.*,
111 F.Supp.2d 542 (D.N.J. 2000) .......... 11, 16

*Thales Avionics, Inc. v. L3 Techs., Inc.*,
719 F.Supp.3d 337 (S.D.N.Y. 2024) .......... 23

*Torah Soft Ltd. v. Drosnin,*
224 F.Supp.2d 704 (S.D.N.Y. 2002) .... 15

*Trefelner v. Burrell Sch. Dist.*,
655 F. Supp. 2d 581 (W.D. Pa. 2009).... 15

*U.S. Ice Cream Corp. v. Carvel Corp.*,
136 A.D.2d 626 (2d Dept. 1988) .... 22

*United States v. Richmond,*
550 F.Supp. 605 (E.D.N.Y. 1982) .... 26

*W. T. Grant Co. v. Srogi*,
52 N.Y.2d 496 (1981) .... 16

*Winne v. Equitable Life Assurance Society of the U.S.*,
315 F. Supp. 2d 404 (S.D.N.Y. 2003) .... 6

*Xtria, LLC v. Int'l Ins. All., Inc.*,
2009 WL 4756365 (N.D. Tex. 2009) .... 17

STATUTES

28 U.S.C. §1450 ---- 10, 15

N.Y. Gen. Bus. Law § 681(3)----26

N.Y. Gen. Bus. Law § 683(8)----25

N.Y. Gen. Bus. Law § 695 ----26

RULES AND REGULATIONS

C.P.L.R. § 6313 ----8, 11

Fed. R. Civ. P. 65(b)---- 14, 15

NY Comp. Codes R. & Regs. Tit. 11 § 20.2---- 6

NY Comp. Codes R. & Regs. Tit. 13 § 200.1 ----26

OTHER AUTHORITIES

2 *Cyc. of Federal Proc.* § 3:131 (3d ed.)----11

2 N.Y. Prac., *Com. Litig. in N.Y. State Courts* § 10:32 (5th ed.) ----10

Moore's *Federal Practice,* § 107.31[3] (3d ed. 2008) ----10

Moore's *Federal Practice*, § 134.22[3][c][i] (3d ed. 2008)----16

Restatement (Second) of Contracts §178 (1981) ----26

Wright & Miller, 11 A *Federal Practice and Procedure* § 2943 (1995)------------------------------19
Wright & Miller, 11 A *Federal Practice and Procedure* § 2953 (1995)------------------------------15
Wright & Miller, 19 *Federal Practice and Procedure* § 4511.1 (1995)------------------------------18

Plaintiff, Old Slip Insurance & Benefits, LLC ("Old Slip"), responds to Defendant Allstate Insurance Company's Motion for an Order Declaring that the Temporary Restraining Order has Expired or, Alternatively, for an Order Dissolving the Temporary Restraining Order, as follows:

**FACTUAL BACKGROUND[1]**

James Lukezic ("Lukezic"), Old Slip's owner, has been in the financial services industry for 24 years and has established a nationwide financial services capital management and investment advisory business. Lukezic's investment advisory business which operates under the name Old Slip Capital Partners, LLC is affiliated with his companies, Old Slip Registered Investment Advisors, LLC, an SEC Registered Investment Advisor, and Old Slip Capital Management, Inc., a licensed Broker/Dealer, and member of FINRA/SIPC. Lukezic has securities licenses, including a registered investment advisor, licensed broker dealer, and accredited investment fiduciary, with Series 7, 24, 63, 65, and 66 FINRA securities licenses.

In 2023, Lukezic decided to become an Allstate insurance agency franchisee, to sell Allstate's insurance products, and to cross-sell Allstate's insurance products to his investment advisory business' existing clients.

In March 2024, Lukezic purchased the accounts of two then-existing Allstate agencies, consolidated them into one agency, leased space in White Plains, hired and trained employees, and began managing those accounts and selling Allstate insurance products, from the Allstate agency location in White Plains. He planned to purchase the accounts of additional Allstate agencies, and to consolidate them into the business. Lukezic relocated his family to Westchester from Florida where they resided, to establish and operate the agency.

[1] These facts are outlined in the detailed affidavits and evidence filed in the state court proceeding (Doc. 15-4, 16-1, 18-5, 19-3), as well as the affidavits and exhibits filed with this opposition.. (Exhibits A-D).

Since March 2024, he has been successfully operating the agency, providing excellent customer service with fully trained staff, and generating significant premiums for Allstate. Allstate never raised any issues regarding the agency's performance.

During the franchise sales process, Lukezic made it clear to Allstate, in his business plan and discussions with them, that his Allstate agency would solely offer insurance products. Allstate was aware that he owned a separate investment advisory business, and that he would be marketing Allstate insurance products to his clients, a strategy that Allstate supported. Allstate never suggested that he would need to transfer his FINRA licenses to Allstate, and never asked him to sign the required paperwork to effectuate such a transfer. The agreement was to sell Allstate insurance products, and ***not*** investment products.

Prior to Lukezic signing the agency franchise agreement, Allstate was fully aware of Lukezic's investment business, and that he was going to maintain that business, and cross-sell Allstate insurance products to his investment clients.

Lukezic made this clear in all of his communications with Allstate during the recruitment, onboarding and training process, during the fall of 2023 until he signed in February 2024. This includes a recorded zoom call he had with Brittany Cleere on November 15, 2023, in which Lukezic described his investment business to her and his plans. Brittany Cleere was a long-time Allstate employee, and she was one of the people who had to approve him becoming an Allstate agent. The internal Allstate email stream, Exhibit C, where Cleere approved Lukezic the day after the zoom call, confirms Allstate was fully aware of his investment business and his securities licenses, and never asked him to transfer those licenses.

Lukezic purchased the accounts of two Allstate insurance agents, Anthony Fava and Alfred Buglione, both of whom had been Allstate agents for more than 30 years. Both of these agents

confirm that, based on their conversations with the Allstate salesperson Regine Napoleon, it was clear Allstate was fully well aware that Lukezic has his own separate investment advisory business and that he planned to continue his investment advisory business and to sell Allstate insurance products to his network of investment clients. (*See* Affirmation of Anthony Fava, Exhibit A; Affirmation of Alfred Buglione, Exhibit B).

This is consistent with the signed agency agreement. The plain language of the Allstate Agency agreement only restricted Plaintiff from offering "insurance" products of other companies, and not other non-insurance investment products. Section 1[E] of the Allstate Agency agreement is limited to the sale of "insurance", and Section 9 of the Key Person Confidentiality Non-Competition Agreement, is likewise limited to the sale of "insurance." (Doc. 15-5).

This plain reading of the contract is bolstered by Allstate's own March 23, 2000 set of Questions and Answers ("Q & As") regarding this widely used form of agreement. There, Allstate explicitly stated that the non-competition provisions do not apply to "*non-insurance*" products, and that offering non-insurance products to customers is "*not a violation of the noncompete provision.*" *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 350 (E.D. Pa. 2014) (emphasis added). *See also Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *13 (D. Mass. Sept. 30, 2019) ("the unambiguous language of the EA Agreement provides that the Agency is not to sell *insurance* policies of any competitors").

***Operation of the Allstate Insurance Agency as an Allstate Franchisee***

During the sales and recruitment process, Allstate continuously assured Plaintiff that their relationship was long-term, and represented that once you become an Allstate agent you never leave and that most of its agents had remained with Allstate for more than 25 years. Allstate emphasized its commitment to helping agents in every way and assured him that it would take care of everything needed to operate the agency. From about December 2023 to February 2024, Lukezic

was required to undergo extensive mandatory training on Allstate's system to be an Allstate agent. Additionally, Allstate required him to make purchases to operate as an Allstate franchised business, which Lukezic paid to Allstate and its affiliated companies.

***Allstate Illegally Terminated the Agency Agreement***

Incredibly, within thirty days after his agency was established, Allstate's salesperson Regine Napoleon approached Lukezic and demanded that he transfer all of his financial services customers to Allstate's separate financial services company, and cease offering financial services products other than Allstate financial services products to his financial services customers. Napoleon told him to relinquish his FINRA licenses and bring all of his investment advisory clients to Allstate.

In response, Lukezic explained that this was never part of the deal and that it would be impossible to do so because Allstate's AFS platform is not equipped to handle his more sophisticated accounts, and that the agreement states ***nothing*** about FINRA or investment advisory or broker/dealer services and only deals with insurance products. The demand was contrary to their sales process discussions, during which he had emphasized that he was purchasing two agencies so that he could cross-sell Allstate insurance products to his investment advisory clients, and Allstate had never mentioned or asked him to sign the documents necessary to transfer his FINRA licenses.

As Lukezic wrote in an email to Allstate on March 25, 2024: "I made it abundantly clear to everyone I spoke to that I would be keeping my RIA (investment advisory business) and BD (broker dealer). I've spent 20 years building those businesses. I was told this was all fine and not an issue and was told that many Agents have these outside pre-existing businesses." As he further reiterated in an email to Allstate's Allison McMahon on March 26, 2024, "Through the entire

process I was told Allstate would be a vertical under my independent agency "Old Slip Benefits & Insurance Services, LLC". I, through the entire process, made my transition handlers aware of my substantial RIA and BD and even indicated that I would cross sell those substantial books through Allstate offerings. Never did I ever say I would relinquish those businesses."

The request also made no sense because Allstate's financial services division only offers one type of financial services product to its customers, namely a Fidelity Brokerage Account, which was not suitable for his customers. If fulfilled, the demand, would significantly hurt his customers and would have an anticompetitive effect, because his customers would be forced to purchase only the Fidelity financial service product offered by Allstate, rather than choosing from the many financial services products that his affiliates offer. Under FINRA rules, as a broker dealer, he has a fiduciary duty to offer a range of products to his clients to ensure they end up with a product that is "suitable" to them.

The only explanation for Allstate's actions is that the Allstate salespersons were motivated by their personal interests. At the time, Allstate was not allowing agents to write any new insurance business. Accordingly, the salespersons were not earning new commissions from any new business, and they wanted to make up for this by forcing Lukezic to transfer his financial services business to Allstate so that they could earn commissions on the business he would bring.

In internal Allstate emails when the issue first arose, McMahon and Cleere placed blame for the situation on Regine Napoleon, and agreed that she "has some clean up to do." (Exhibit D).

On June 25, 2024, after some discussions, Allstate issued a termination letter which claimed it was terminating the agreement ***for cause*** due to "***unauthorized brokering***." (Doc. 15-6). Allstate unjustifiably claimed he violated the Agency Agreement by maintaining an "outside business interest," which was false.

The termination was unjustified because the plain language of the Allstate Agency Agreement only restricted Plaintiff from offering insurance products of other companies, and not other non-insurance investment products which Plaintiff's affiliates offer through their regulated investment advisory business and broker-dealer business. (Doc. 15-5).

Lukezic's investment related companies offer investment products and variable annuities (but not fixed annuities). Such variable annuities are ***not*** insurance.[2] Rather, they are considered securities.[3]

Accordingly, Allstate's termination of his agreement, on the ground that he was engaged in "unauthorized brokering", was unsupported by the agreement, because the Allstate Agency Agreement did not prohibit Plaintiff from offering and selling other non-insurance products including variable annuities. There was simply no legal justification for Allstate's demands or termination of the agreement.

Any suggestion that Plaintiff engaged in improper conduct is false and would cause irreparable harm to him, his business and reputation, and jeopardize his other licenses.

***Need to Maintain the Status Quo***

If implemented, the threatened shutdown of his Allstate insurance franchised business, which was scheduled to go into effect on September 30, 2024, will cause irreparable harm to Plaintiff, because Plaintiff's entire business is the offering and sale of Allstate insurance products. The termination will destroy its business, and result in the loss of jobs of Plaintiff's employees, liability to third parties, and the loss of future opportunities for purchase of agency accounts.

[2] *S.E.C. v. Variable Annuity Co.*, 359 U.S. 65, 72-73 (1959).

[3] *Winne v. Equitable Life Assurance Society of the U.S.*, 315 F. Supp. 2d 404, 408 (S.D.N.Y. 2003).

Importantly, the termination will cause irreparable harm because Allstate claimed it terminated Plaintiff for cause because it was engaging in "unauthorized brokering". State insurance law requires Allstate to notify the Department of Financial Services of the termination and the reasons for the termination. Insurance Law § 2112, 11 NYCRR § 20.2. The false public accusation of "unauthorized brokering" will have irreversible repercussions for Plaintiff and its owner Lukezic, and will be a permanent negative mark on his record. It will cause other companies to terminate their selling agreements with Plaintiff, making it impossible to find another insurance agency, and may result in a Department of Financial Services investigation. Plaintiff will not have the right to monetary compensation for the false accusation, because Allstate will enjoy absolute immunity for filing such false reports. *Rosenberg v. MetLife, Inc*., 8 N.Y.3d 359 (2007).

The restrictions which Allstate is attempting to impose on Plaintiff, and its efforts to bully Lukezic to transfer his securities business to Allstate, would violate his agreements with other investment companies, and will have anti-competitive effects, by interfering with his customers' freedom to choose their broker and investments.

Soon after it threatened to terminate his agreement, Allstate caused further harm to Plaintiff by interfering with the agreement Plaintiff had made with Andrew Murphy, another Allstate agent, to purchase his business and consolidate it into Plaintiff's agency. Allstate wrongfully killed the deal, by notifying Murphy that Plaintiff was no longer an "approved buyer", and that Murray could not sell his agency to Old Slip.

Extending the termination date will not cause any harm to Allstate. Plaintiff has been operating the agency successfully for a year servicing the customer accounts. Allstate never raised any issues of poor performance. Plaintiff has been renewing existing policies and generating substantial premiums for Allstate. Allstate will not suffer any great harm if the termination date

is extended, while Plaintiff continues to service the accounts.

## PROCEDURAL BACKGROUND

On September 12, 2024, Plaintiff initiated this action in Westchester County Supreme Court, asserting causes of action for breach of contract, implied covenant of good faith and fair dealing, New York Franchise Sales Act, and tortious interference with contracts and relationships, against Defendant Allstate Insurance Company, as well as four of its employees. Index No. 69162/2024 (Westchester County). (Complaint, Doc. 14-1). When filed, the case did not meet the requirements for removal based on diversity jurisdiction because Plaintiff and individual defendants were citizens of New York. Plaintiff simultaneously filed a Motion for Preliminary Injunction and Temporary Restraining Order brought by order to show cause, with supporting affidavits and memorandum of law. (Motion Papers, Doc. 15, Doc. 16).

On September 12, 2024, Plaintiff's counsel gave notice to Defendants' counsel of the filing of the action and the request for a temporary restraining order. (Sept. 12, 2024 Notice, Doc. 15-7). On September 19, 2024, the parties attended an in-person hearing before Judge Linda Jamieson and presented oral argument to the Court. (Sept. 19, 2024 Transcript, Doc. 15-8).

On September 19, 2024, Judge Linda Jamieson entered a TRO, preventing Allstate from effectuating the termination of Plaintiff's Agency Agreement until a determination on Plaintiff's motion for preliminary injunction relief, which, finding that the order was necessary "***to maintain the status quo and prevent irreparable harm***." (Sept. 19, 2024 Order, Doc. 15-9) (emphasis added). Under New York law, CPLR 6313, the TRO continued to be effective until the court determined the preliminary injunction motion.[4]

By October 16, 2024, the parties fully briefed the motion for preliminary injunction, which

[44] N.Y. C.P.L.R. 6313 (McKinney), Commentary C6313:1.

was taken under submission. (Injunction Motion Papers, Doc. 15). On November 21, 2024, the parties appeared for a case management conference. (Nov. 21, 2024 Transcript, Doc. 20-3). On October 15, 2024, Defendants filed a motion to dismiss which was fully briefed by December 16, 2024. (Motion to Dismiss Motion Papers, Doc. 17). On November 4, 2024, Defendant Stevenson filed a motion to dismiss for lack of personal jurisdiction, which was fully briefed by November 20, 2024. (Stevenson Motion Papers, Doc. 18). On December 10, 2024, Plaintiff filed a motion to expand the scope of the restraining order and the requested injunctive relief. (Expanded Relief Motion Papers, Doc. 19). On December 16, 2024, the parties appeared before the court to address the requested relief. (December 16, 2024 Transcript, Doc.19-5).

On January 8, 2025, the parties appeared before the court on all of the pending motions and presented oral argument on the motions, including whether Plaintiff had demonstrated irreparable harm if the injunctive relief was not maintained. (Jan. 8, 2025 Transcript, Doc. 15-19).

During this briefing period, the parties exchanged written discovery demands. Specifically, in October 2024, Plaintiff served written discovery requests on the Defendants, and a third party subpoena. In January 2025, Allstate began producing documents in response to Plaintiff's requests. In December 2024, Defendants served written discovery requests on Plaintiff. On January 23, 2025, the parties participated in a formal mediation.

The state court's January 23, 2025 decision addressed the parties' pending motions.

The state court upheld the claim for breach of the implied covenant of good faith and fair dealing, stating that Plaintiff had the right to challenge the termination decision based on a breach of implied covenant of good faith and fair dealing claim, regardless of the "without cause" clause.

> "[T]he Court agrees with plaintiff that even if a party is not in breach of its express contractual obligations, it may be in breach of the implied covenant of good faith and fair dealing when it exercises a contractual right as part of a scheme to deprive the other party of the benefit of its bargain." (Doc. 15-20, at 13).

The court specifically rejected Allstate's argument that the termination without cause provision of the agency agreement barred the claim. (Doc. 15-20, at 12-15).

> "Technically complying with the terms of a contract while depriving the plaintiff of the benefit of the bargain may constitute a breach of the covenant of good faith and fair dealing. Even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement." (January 23, 2025 Decision, Doc. 15-20, at 14).[5]

With respect to the motion for preliminary injunction, after examining the evidence submitted by the parties, the state court **made a determination** that good cause existed to **extend the temporary restraining order,** to give the parties the opportunity to conduct further discovery. (Doc. 15-20, at 29). The state court specifically referred to its September 19, 2024 Order, which found that the temporary injunctive relief was necessary "to maintain the status quo and prevent irreparable harm." (Sept. 19, 2024 Order, Doc. 15-9).

The action became removable on January 23, 2025 when the state court dismissed the individual defendants who were New York citizens. (Doc. 15-20). On February 7, 2025, Defendants removed this action to this Court. (Doc. 1).

## ARGUMENT

### I. THE STATE COURT ALREADY DECIDED THAT THERE WAS GOOD CAUSE TO EXTEND THE RESTRAINING ORDER

Once a case is removed to federal court, the originating state court's orders become

[5] The state court relied upon and discussed several New York intermediate appellate level decisions which had upheld such claims in the context of a termination without cause contract provision, including *JLO Dev. Corp. v. Amalgamated Bank*, 232 A.D.3d 705 (2d Dept. 2024), *Ahmed Elkoulily, M.D., P.C. v. New York State Catholic Healthplan, Inc.*, 153 A.D.3d 768 (2d Dept. 2017), and *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 309 A.D.2d 288 (1st Dept. 2003).

federalized, as if they were entered directly by the federal court. 28 U.S.C. §1450;[6] *Portaleos v. Shannon*, 2013 WL 4483075, at *2 (N.D.N.Y. 2013); *see generally* 2 *N.Y. Prac., Com. Litig. in New York State Courts* § 10:32 (5th ed.) ("A district court takes a removed action as it existed in state court at the time of removal and must give effect to all actions and procedures accomplished in state court before removal"); *Moore's Federal Practice*, § 107.31[3] (3d ed. 2008) (same).

Under Section 1450, the district court "must give effect to all actions and procedures accomplished in a state court prior to removal." *D.H. & Co. v. Gottdiener*, 462 F.3d 95, 108 (2d Cir. 2006). Section 1450 is designed to promote judicial economy by making it unnecessary to duplicate motions previously filed in state court, and to ensure that interlocutory orders entered by the state court to protect various rights of the parties will not lapse upon removal. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 435-36 (1974); *Tehan v. Disability Management Services, Inc.*, 111 F.Supp.2d 542 (D.N.J. 2000).

Motions that were pending in state court ***are still considered pending*** in this Court. *GGC Int'l Ltd. v. Ver*, 2025 WL 81319, at *1 (S.D.N.Y. Jan. 13, 2025) (noting that it is well-established that motions pending in state court at the time of removal survive removal and finding that pre-removal and fully briefed state court motions to dismiss were ripe for decision); *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 387 (S.D.N.Y. 2001); *see generally* 2 *Cyc. of Federal Proc*. § 3:131 (3d ed.) ("The federal court will resume hearing motions begun in state court that remained undecided at time of the removal").[7]

[6] "Whenever any action is removed from a State court to a district court of the United States, . . . [a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court."

[7] To assist the Court in understanding the state court proceedings, Plaintiff has filed the pleadings, motions, memoranda of law, supporting affidavits and exhibits, orders and decisions, and hearing transcripts, from the state court proceedings in separate bundles for each motion or category of document. (ECF Documents ("Doc.") 14 through 20).

Here, the state court made the good cause determination ***before*** the case was removed, and therefore, this case came to this Court as if this Court made the finding of good cause.

Specifically, the state court's September 19, 2024 decision entering the TRO prevented Allstate from proceeding with its scheduled termination of the Agency Agreement pending a determination on Plaintiff's motion for preliminary injunctive relief. (Order dated Sept. 19, 2024, Doc. 15-9, at 2). The court determined that such order was necessary **"to maintain the status quo and prevent irreparable harm**." (*Id*., at 2). Under CPLR 6313, the TRO continued in full force until the court decided the preliminary injunction motion.[8]

On January 8, 2025, after further briefing, two oral arguments, and initial written discovery, the state court heard oral argument on the preliminary injunction motion.

Based on the extensive evidence presented by both sides the state court decided that good cause existed to **extend** the temporary restraining order to give the parties the opportunity to conduct further discovery.

> "Although the parties have briefed the elements required for preliminary injunctive relief and appeared for oral argument on January 8, 2025 in connection with plaintiff's motion for a preliminary injunction (seq. no. 1), the Court ***determines that*** discovery regarding plaintiff's remaining claims against Allstate is warranted before the Court may render a determination on the merits of plaintiff's motion. In the interim, the temporary restraining order issued in the Order to Show Cause dated September 19, 2024 shall remain in full force and effect pending a determination on the merits of plaintiff's underlying motion. *See* [Order to Show Cause dated September 19, 2024]."

(Decision dated Jan. 23, 2025, Doc. 15-20, at 29). The state court specifically stated that it had considered "all other arguments raised on these three motions and all material submitted by the parties in connection therewith," even if they were not specifically referenced in its decision. (*Id.*

[8] N.Y. C.P.L.R. 6313 (McKinney), Commentary C6313:1.

at 30, n.5). The state court specifically referenced its September 19, 2024 Order, Doc. 15-20, at 29, which determined that the temporary injunctive relief was necessary "to maintain the status quo and prevent irreparable harm." (Doc. 15-9, at 2).

Federal law mandates that, upon removal, ***this state court determination becomes a ruling by this Court***.

The cases cited by Allstate on page 7 of its motion, *Herrick v. Grindr*, *John W. Williams, Inc. v. United Food and Commercial Workers Local 342*, and *Carrabus v. Schneider*, are distinguishable because in those cases, there was no determination by the state court prior to removal to extend the temporary restraining order, because the cases were removed within days of filing. Likewise, *Granny Goose,* 415 U.S. 423, is distinguishable there was no good cause determination by the state court to extend the temporary restraining order before the action was removed. *See Standard Forms Co. v. Nave*, 422 F.Supp. 619 (E.D. Tenn. 1976) (distinguishing *Granny Goose*, continuing restraining order entered by state court, and denying motion to dissolve as moot). Allstate cites no cases in a procedural posture similar to this case, where the state court already made a good cause determination to extend an existing restraining order prior to removal. This case is unusual because most cases are removed right after the filing of the state court action and entry of the TRO.

Here, by the time the case became removable, the state court had ***already heard extensive briefing, evidentiary submissions, and oral argument on the preliminary injunction motion*** and ***made a specific determination that there was good cause for the temporary restraining order to remain in effect until the parties conducted further discovery*** and then the court would make a ruling on the preliminary injunction motion. (Doc. 15-20, at 29).

Accordingly, the TRO did ***not*** cease to exist after the 20-day limit in Rule 65(b) expired,

because there is already an order which found good cause to extend the temporary restraining order pending further discovery and a determination on the motion.

And as a result of the extension, as a practical matter, the restraining order became the equivalent of an enforceable preliminary injunction, although it is limited in duration pending further discovery. *Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 843 (2d Cir. 1962) ("the continuation of the temporary restraining order beyond the period of statutory authorization, having, as it does, the same practical effect as the issuance of a preliminary injunction, is appealable"); *In re Crim. Contempt Proc. Against Crawford*, 133 F. Supp. 2d 249, 256 (W.D.N.Y. 2001) ("This is not a case like *Granny Goose* where the party being enjoined was left to guess at the intended duration of the TRO.. . . [W]here, as here, a district court expressly extends a TRO issued after notice and a hearing beyond the statutory 20–day limit in Rule 65(b), the TRO does not cease to exist after the 20 days have expired, but instead becomes an enforceable preliminary injunction subject to appellate review").

Plaintiff's motion for preliminary injunction – which was filed and fully briefed in the state court - is considered ***still pending*** in this court.[9] The state court's January 2025 order (Doc. 15-20) – which is an order of this court by virtue of 28 U.S.C. §1450 - was designed to allow the parties time to conduct discovery, present further evidence to the court, and then come back to the court for a ruling on the still-pending motion for preliminary injunction.

## II. GOOD CAUSE EXISTS TO MAINTAIN THE RESTRAINING ORDER AND GIVE DEFERENCE TO THE STATE COURT'S DECISION

Allstate's argument that no good cause exists to maintain the restraining order is misplaced,

[9] Unlike some other district court, this Court does not have a local rule which requires that, after removal, the parties must re-file pending state court motions.

because the state court already considered - and rejected - the identical arguments presents here.

While caselaw is limited on the issue of what constitutes "good cause" for purposes of extending a Rule 65(b) order, a showing that the grounds for originally granting the temporary restraining order continue to exist should be sufficient. Wright & Miller, 11A *Federal Practice and Procedure*, § 2953, at 279 (1995).

A trial court's determination that further discovery needs to be taken prior to ruling on the preliminary injunction motion constitutes good cause to extend a restraining order. *See Sec. & Exch. Comm'n v. AriseBank*, 2018 WL 10419828, at *1 (N.D. Tex 2018); *Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 599 (W.D. Pa. 2009) ("Since discovery is needed before the court will decide the motion for preliminary injunction, the temporary restraining order will remain in effect until the hearing on the preliminary injunction"); *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1260–61 (D. Kan. 2001) ("good cause" may include the need for additional time to prepare and present its preliminary injunction or the fact that the pendency of discovery or related proceedings necessitated additional delay).

The state court's ruling that there was good cause to extend the temporary restraining order pending further discovery is entitled to deference post-removal.

The law of the case doctrine provides that when a court decides an issue, that decision should continue to govern the same issues in subsequent stages in the same case. *Arizona v. California*, 460 U.S. 605, 619 (1983). The rule is designed to conserve judicial resources and minimize inconsistent decisions. *Id.* A court may depart from the law of the case for "cogent" or "compelling" reasons including an intervening change in law, availability of new evidence, or the need to correct a clear error or prevent manifest injunctive. *Doe v. New York City Dept. of Social Services*, 709 F.2d 782, 789 (2d Cir. 1983); *Torah Soft Ltd. v. Drosnin,* 224 F.Supp.2d 704, 710

(S.D.N.Y. 2002). Applying these principles, courts are generally reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge or court. *Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 94 (2d Dept. 2005).

It is well-established that the law of the case doctrine applies to pre-removal state court orders. *Torah Soft,* 224 F.Supp.2d at 710; *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485 (S.D.N.Y. 2021); *Firestone v. Berrios*, 42 F.Supp.3d 403, 412 (E.D.N.Y. 2013); 18 *Moore's Federal Practice* § 134.22[3][c]i] (3d ed. 1999) ("When an action is removed from a state court to a federal court, the law of the case doctrine applies to the decisions entered by the state court prior to removal").

Where nothing has changed, the law of the case doctrine counsels deference to the state court's rulings. *Cooper Health Systems v. Virtua Health, Inc.*, 259 F.R.D. 208, 212 (D. N. J. 2009) ("Although a court has the power to revisit prior decisions, it should hesitate to do so absent a change in circumstances such as when new evidence is available"); *Tehan*, 111 F.Supp.2d 542 (refusing to reconsider state court order where moving party did not present any new facts or circumstances to warrant reconsideration); *Denison v. Shawmut Mining Co.*, 124 F. 860 (C.C.W.D.N.Y. 1903) (same).

Here, there is no intervening change of controlling law that warrants reconsideration, because the preliminary injunction showing that Plaintiff was required to make under New York law is substantially similar to the one under federal law. *Hodnett,,* 2021 WL 535485, at *5 (the preliminary injunction "showing that Plaintiff[s] must make under [New York] law is substantially similar to the one under federal law").[10]

[10] *Compare* federal test, *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (likelihood to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest), with state test, *W. T. Grant*

Accordingly, this Court should credit the state court's finding in its original September 2024 order, and in its subsequent January 2025 order, that, absent the entry of injunctive relief, the Plaintiff's business will suffer irreparable harm. *Does 1-9 v. Kappa Alpha Theta Fraternity Inc.*, 2022 WL 3448638, at *2 (N.D. Tex. 2022) (extending the state court's pre-removal TRO for good cause, explaining that the state court already determined that plaintiffs met the requirements for a TRO and that appropriate deference to the state court's order requires extending it to prevent injustice).

Likewise, in *Am. Sys. Consulting, Inc. v. Devier*, 514 F. Supp. 2d 1001, 1010 (S.D. Ohio 2007), the court found good cause to continue the state court's TRO enforcing a non-compete agreement, and without the necessity of posting a bond, crediting the state court's finding, explaining that "based on the representations of Plaintiff that its business will be irrevocably damaged in the absence of continued temporary injunctive relief—representations the [state] trial court credited—this Court similarly credits for present purposes the state court's finding that Plaintiff will suffer irreparable harm in the absence of a temporary restraining order." *See also Santos v. Reverse Mortg. Solutions, Inc.*, 2012 WL 4891597, at *7 (N.D. Cal. 2012) (district court denied defendant's motion to dissolve state court's preliminary injunction, finding defendants had failed to show some change in law or circumstance, noting that, "[t]he only thing that has changed since entry of the preliminary injunction is the venue of this action, which has shifted from state to federal court."); *Xtria, LLC v. Int'l Ins. All., Inc.*, 2009 WL 4756365, at *5 (N.D. Tex. 2009) (extending the state court's pre-removal TRO, explaining that pre-removal state-court rulings are

*Co. v. Srogi*, 52 N.Y.2d 496, 517 (1981) (likelihood of success on the merits, irreparable injury absent granting the preliminary injunction, and a balancing of the equities).

entitled to deference after removal).

It is state law, not federal law, that defines what injury is cognizable and controls any assessment of the moving party's probability of success on the merits. *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987); *Franke v. Wiltschek*, 209 F.2d 493, 494 (2d Cir. 1953); *Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*, 470 F. Supp. 1308, 1324 (N.D.N.Y. 1979) (federal court must look to state law to determine whether there is an underlying basis for granting the equitable relief). Likewise, it is state law which determines the appropriate remedies, and the types and availability of damages, for contract and implied covenant claims. Wright & Miller, 19 *Fed. Prac. & Proc. Juris.* § 4511.1 (3d ed.).

A federal court sitting in diversity is to make a determination as to what it thinks a state court would do if faced with the same case. *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 401 (2d Cir. 2001); *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000); *Niagara Mohawk Power Corp.,* 470 F. Supp. at 1313.

Here, we have ***an actual state court*** that already decided the proprietary of injunctive relief, considering the likelihood of success on the merits, irreparable harm, and the balancing of the equities, based upon the most recent New York state appellate court decisions, in ***the same case***.

The rule in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), is intended to ensure that decisions in diversity cases are the same as it would be if tried in a state court. The accident of a suit by a non-resident litigant in a federal court instead of in a state court a block away, should ***not*** lead to a substantially different result. *Guaranty Trust Co. of New York, v. York*, 326 U.S. 99, 109 (1945).

In the context of a preliminary injunction motion, if the remedy being sought is so inextricably interwoven with the substantive right being sued upon that a denial of that remedy

would be tantamount to a denial of the state-created right, then state law should apply. Wright & Miller, 11A *Federal Practice & Procedure* § 2943 (3d ed.). Federal courts enforce state-created substantive rights if the mode of proceeding and remedy is consonant with the traditional body of equitable remedies, practice and procedure, and in so doing they were enforcing rights created by the states and not arising under any inherent or statutory federal law. Wright & Miller, 11A *Federal Practice & Procedure* § 2943 (3d ed.).

Here, Plaintiff twice demonstrated to the state court—first, in its application for the TRO, and second, in its further briefing on the preliminary injunction motion – that that the relevant factors justified entering and maintaining the restraining order. (Doc. 15 and Doc. 16).

There has been no change in the law or change in circumstances which provides a compelling or cogent reason to depart from the state court's decision. Allstate's motion constitutes nothing more than a re-hashing of arguments that were already rejected by the state court.

In the state court proceeding, Allstate made the identical argument that a restraining order was not justified because a party cannot challenge a termination under the doctrine of the implied covenant of good faith and fair dealing where the contract gives the party the right to terminate without cause, and that injunctive relief cannot be based upon this claim. The state court squarely rejected this argument twice, in the original September 2024 TRO hearing, and in the subsequent January 2025 Decision, finding that Plaintiff can challenge the decision based on this theory, and finding that there was good cause to maintain the restraining order based on this theory. (Doc. 15-20, at 29).[11]

[11] *See* Decision, Doc. 15-20, at 29 (maintaining the restraining order, even after it dismissed the breach of contract claim, and upheld the implied covenant claim, relying upon *JLO Dev. Corp. v. Amalgamated Bank*, 232 A.D.3d 705 (2d Dept. 2024); *Ahmed Elkoulily, M.D., P.C. v. New York State Catholic Healthplan, Inc.*, 153 A.D.3d 768 (2d Dept. 2017), and *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 309 A.D.2d 288 (1st Dept. 2003); September 2024 Oral Argument, Doc.

Allstate likewise made the identical arguments regarding irreparable harm, arguing that Plaintiff failed to show that it would suffer irreparable harm that could not be compensated by money damages. The state court similarly rejected these arguments, in its original September 2024 TRO decision when it found the restraining order was necessary to maintain the status quo and prevent irreparable harm, and again after extensive briefing on the issues in its January 2025 decision, where it stated it had examined all the elements and that the restraining order should remain in effect. (*See* Plaintiff's Motion Papers, Doc. 15; September 24, 2024 Oral Argument, Doc. 15-8; January 2025 Oral Argument, Doc. 15-19).[12]

The decision to enter and maintain the restraining order is supported by ample federal and state precedent, discussed extensively in the state court proceedings. The decision was based on a proper balancing of the equities, under federal and state court precedent.

Federal courts applying New York law have held that preliminary injunctive relief is appropriate to enjoin the impending termination of a franchisee/licensee because of the unique

15-8; January 2025 Oral Argument, Doc 15-19. *See also 511 W. 232nd Owners Corp. v. Jennifer Realty Co*., 98 N.Y.2d 144, 153 (2002); *Brown v. Erie Ins. Co.*, 207 A.D.3d 1144 (4th Dep't 2022).

[12] Allstate's argument on pages 9-10 of its motion regarding the length of the relationship is likewise a re-hash of arguments presented to and rejected by the state court. The customer goodwill which Plaintiff is seeking to protect is not just the goodwill which Plaintiff itself has built-up the past 12 months, but also the goodwill built-up by the prior Allstate agents Buglione and Fava. The cases cited by Allstate are distinguishable, because most did ***not*** involve termination of a franchise agreement, where the entire existence of the business depended on the continuation of the relationship. *See, e.g, GPA Inc. v. Ligget Group, Inc*,. 862 F.Supp. 1062, 1068-69 (S.D.N.Y. 1994) (holding that case was ***not*** analogous to cases involving the termination of a franchise or distributorship, because plaintiff provided private label manufacturing services to several customers); *Jack Kahn Music Co. v. Baldwin Piano & Organ Co*, 604 F.2d 755, 759 (2d Cir. 1979) (plaintiff offered a full line of pianos and instruments); *PDL Vitari Corp. v. Olympus Industries, Inc*., 718 F.Supp. 197 (S.D.N.Y. 1989) (plaintiff never had a written agreement and business never even started). Here, threatened termination if carried out, and the subsequent mandated notice to the state agency that the relationship was terminated for "unauthorized brokering" and "conflict of interest," will destroy the entire business, which is selling Allstate insurance.

irreparable harm that would be caused to the franchisee/licensee if relief is not granted, and the federal courts have found good cause to extend state court restraining orders on this basis.

For example, in *Progressive Restaurant Systems, Inc. v. Wendy's International Inc.*, 1990 WL 106719 (N.D.N.Y. 1990), a New York Supreme Court issued a TRO enjoining defendants from terminating the franchise agreements before the action was removed to federal court. *Id*., at *1. When the case arrived in federal court, the federal court *extended* the temporary restraining order until a hearing and determination of plaintiff's application for a preliminary injunction. *Id.*, at *2. The court explained that the continuation of the TRO was necessary because:

> "the threat of bankruptcy or loss of a party's business, absent the granting of preliminary relief, constitutes irreparable injury, for otherwise a final judgment might be useless. . . . The plaintiffs have been granted franchise rights to market, sell and distribute Wendy's Old Fashioned Hamburgers, chili and food products. In reliance on Wendy's representations, plaintiffs have entered into leases and mortgages with various third parties for the buildings from which they operate the franchises and have spent thousands of dollars renovating the buildings specifically to operate the Wendy's franchises. . . . the defendants will not be able to show any prejudice or undue hardship as a result of continuing the franchise agreements pending the outcome of this litigation." *Progressive Restaurant*, at *2.

Likewise, in *LaGuardia Associates v. Holiday Hospitality Franchising Inc.*, 92 F.Supp.2d 119 (E.D.N.Y. 2000), the state court had entered a temporary restraining order enjoining Holiday from removing plaintiffs from the Holiday reservation system. *Id.*, at 123. After the case was removed to federal court, the TRO was extended with the parties' consent pending a hearing on the merits. *Id.*, at 123. Judge Weinstein entered injunctive relief preventing the franchisor from terminating the franchise agreements.

> "Irreparable harm can generally be assumed where a franchisor is attempting to terminate an exclusive franchise arrangement on short notice. By the nature of the exclusive arrangement, the franchisee's business operation depends on the economic relationship established by the franchise agreement. The franchise relationship is the lifeline of the franchise's business; the franchise's investment of capital, time, and effort in promoting the franchisor's goods or services – to the general exclusion of competing goods and services – would be irreparably lost upon

termination. Money damages cannot make the franchisee in such situations whole. . . . Where the loss of a product will cause the destruction of business itself . . ., the availability of money damages may be a hollow promise and injunctive relief appropriate." *LaGuardia*, 92 F.Supp.2d at 131 (citations omitted).

Similarly, in *Lepore v. New York News Inc.*, 365 F.Supp. 1387 (S.D.N.Y. 1973), the district court granted preliminary injunctive relief enjoining a publisher from terminating the plaintiffs' carrier agreements. "If the defendant does in fact terminate the plaintiffs, the plaintiffs will be irreparably harmed. They will have lost their business and their customers and should they eventually succeed on the merits of this case, it may be impossible to reestablish the businesses as going concerns. Such a victory would, indeed, by pyrrhic." *Lepore*, 365 F.Supp. at 1989.

These cases are consistent with several state court cases. *See Mr. Natural, Inc. v. Unadulterated Food Products, Inc.*, 152 A.D.2d 729 (2d Dept. 1989) (reversing trial court order which denied motion for preliminary injunction to enjoin distributor from terminating exclusive distributorship agreements); *U.S. Ice Cream Corp. v. Carvel Corp.*, 136 A.D.2d 626 (2d Dept. 1988) (reversing trial court order which denied motion for preliminary injunction to enjoin franchisor from terminating the plaintiffs' exclusive license to sell Carvel products); *Albini v. Solork Assoc.*, 37 A.D.2d 835 (2d Dept. 1971) (reversing trial court order which denied motion for preliminary injunction enjoining sale*); Picotte Realty, Inc. v. Gallery of Homes, Inc.*, 66 A.D.2d 978, 978 (3d Dept. 1978) (affirming preliminary injunction restraining real estate company from terminating broker's license agreement); *Saferstein v. Wendy*, 137 Misc.2d 1032 (New York County 1987) (entering preliminary injunctive relief enjoining licensor from terminating a license agreement pending a determination on the merits).

Given that the state court upheld Plaintiff's right to challenge the termination decision on an implied covenant claim (Doc. 15-20, at 13-15), there is no logical basis to distinguish these cases, because Plaintiff still ***has the right to challenge the termination decision***, and to seek

appropriate equitable and legal remedies arising from the termination, whether it be under a breach of contract or implied covenant claim.

It is well-established that injunctive relief is appropriate to enjoin action being taken in violation of the implied covenant of good faith and fair dealing. *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A*., 680 F.Supp.2d 625, 626 (S.D.N.Y.), *aff'd*, 381 F. App'x 117 (2d Cir. 2010) (granting preliminary injunction to prevent transfer based on claim of breach of covenant of good faith and fair dealing, even though defendant's actions may have technically been consistent with the agreement); *Thales Avionics, Inc. v. L3 Techs., Inc*., 719 F.Supp.3d 337 (S.D.N.Y. 2024) (granting preliminary injunction based on likelihood of success on the claims for implied duty of good faith and fair dealing and breach of contract); *Seitzman v. Hudson River Assoc*., 126 A.D.2d 211, 215 (1st Dept. 1987) (granting injunctive relief to enforce agreement, where defendant's attempt to avoid its obligations violated its implied covenant of good faith and fair dealing).

The threatened termination of an exclusive licensing or franchise creates a unique threat of irreparable harm which justifies injunctive relief pending a determination on the merits, because the termination will result in the destruction of the business, termination of its employees and liability to third parties, which cannot be remedied by monetary damages, as would occur here.

As the court explained in *Mr. Natural*, the termination of an exclusive license or distributorship agreement "places the plaintiff in real danger of losing its business or suffering dissolution. Such interference with an ongoing business, particularly one which uses an exclusive distributorship arrangement, risks injury for which monetary damages will be inadequate." *Mr. Natural*, 152 A.D.2d at 730. Likewise, in *U.S. Ice Cream*, the court found that the threatened termination of an exclusive licensing arrangement creates the danger that the plaintiff cannot stay

in business. "Such interference with an ongoing business, particularly one involving a unique product and an exclusive licensing and distribution arrangement, risks irreparable injury and is enjoinable." *U.S. Ice Cream*, 136 A.D. at 628.

Furthermore, the possibility that money damages may be adequate, or the existence of a liquidated damages clause, does ***not*** prevent the availability of injunctive relief. *Piccote*, 66 A.D.2d at 978; *Saferstein*, 137 Misc.2d at 1036. As the court explained in *Piccote*, "We do not agree with defendant's contention that [the agreement] precludes the granting of injunctive relief because plaintiff has an adequate remedy at law. . . . Picotte cannot replace Gallery's distinctive system of services, image and referral benefits it enjoys under the contract. The damages it will incur for these items under the contract represent intangibles not ascertainable in a breach of contract action. They constitute irreparable injury. Finally, the equities clearly tip to plaintiff in maintain the status quo until the issue of whether the reporting form was sent is determined by trial." *Picotte*, 66 A.D.2d at 979.

Allstate has it backwards when it incorrectly argues that injunctive relief cannot be entered because Plaintiff's damage claims are speculative because of its short track record, and its inability to quantify the lost profits from the inability to buy additional agencies. To the contrary, the fact that damages will be impossible or very difficult to quantify is exactly the reason why injunctive relief is appropriate, *Marcone APW, LLC v. Servall Co.*, 85 A.D.3d 1693, 1696 (4th Dep't 2011); *Picotte Realty,* 66 A.D.2d at 978; *Safterstein,* 137 Misc.2d at 1035, and why it is considered a more efficient remedy than monetary damages. *Pimentel v. Aminov*, 23 Misc.3d 1112(A), at *2 (Queens Sup. Ct. 2009).

Allstate's feeble concern about the remote hypothetical possibility that one of Lukezic's securities clients would name Allstate lacks sense, because Allstate has nothing to do with his

securities business, as it is not the broker-dealer. In the remote event a customer named Allstate, the claims would be fully covered by Plaintiff's E&O policy and the indemnification provisions in the agreement. (Doc. 15-5, Sections X, XI). Contrary to Allstate's suggestion, Old Slip is not seeking to freeze Allstate into a never-ending permanent relationship. Rather, it is merely asking that, if Allstate desires to terminate the relationship, it should have a good reason.

Plaintiff is likewise entitled to injunctive relief under the the New York Franchise Sales Act. The statute requires a franchisor to provide a disclosure document, at least 10 business days before the franchisee signs or pays any money, which specifically describes whether the agreement can be terminated without cause and the grounds for termination, as well as disclosure of all prior terminations and the reasons if in litigation. NY GBL §683(8); 13 NYCRR 200.2[c]. The statute "bespeaks a state policy to prevent overreaching in the franchise relationship." *LaGuardia Assocs.,* 92 F.Supp.2d at 127.[13]

The agreement given by Allstate to Plaintiff was illegal because it was sold without providing the state-mandated disclosure document, which provides a disclosure of the grounds for terminating the agreement, as well as a description of other litigation with franchisees involving termination, and because Allstate did not give Plaintiff the required disclosure document, and did not give him a copy of the agreement until the day it was required to sign. Plaintiff would not have

[13] Here, the relationship met all of the elements of a franchise relationship under New York law, as it included the payment of monies to Allstate or its affiliates before and after signing, the right to operate the business under the Allstate brand, and a marketing plan and substantial assistance and control. N.Y. GBL § 681(3); 13 NYCRR § 200.1. *See Aristacar Corp. v. Attorney General*, 143 Misc.2d 551, 552, 541 N.Y.S.2d 165 (1989); *Garbinski v. Nationwide Mutual Insurance Company*, 2011 WL 3164057, at *9-11 (D. Conn. 2011), *aff'd*, 523 F. App'x 24 (2d Cir. 2013); *Bucciarelli v. Nationwide Mutual Insurance Company*, 662 F. Supp. 2d 809, 818 (E.D. Mich. 2009) (finding sale of insurance agency agreement constituted a franchise sale under Michigan law which contains definition similar to New York). New York's franchise definition is among the broadest in the country, *Sea Tow Servs. Int'l, Inc. v. Tampa Bay Marine Recovery, Inc.*, 632 F. Supp. 3d 91, 108 (E.D.N.Y. 2022), and the statute requires it to be liberally construed. N.Y. GBL § 695.

signed the agency agreement if he had been given the state-mandated disclosure and time to review the agreement.

In the franchise context, the court has authority to craft appropriate equitable relief for violations of the New York Franchise Sales Act to prevent overreaching in the franchise relationship, including injunctive relief and rescission. *LaGuardia Associates*, 92 F.Supp.2d at 127. Where a contract is determined to be illegal, a court has authority to rescind portions of the agreement without holding the agreement to be void altogether. *See New York Tel. & Tel. Co. v. Averill*, 199 N.Y. 128, 141 (1910) (where agreement was illegal, court has authority to rescind portions without holding the agreement to be void altogether); *Lanza v. Carbone*, 130 A.D.3d 689, 692 (2d Dept. 2015) (same); *Filstein v. Bromberg*, 36 Misc.3d 404, 410 (N.Y. Sup. Ct. 2012) (court refused to enforce a clause in an agreement which ran counter to New York public policy); *United States v. Richmond,* 550 F.Supp. 605, 609 (E.D.N.Y. 1982) (court held an aspect of an agreement was void as contrary to public policy); *Restatement (Second) of Contracts* §178 (1981) (court may refuse to enforce portions of contract which violate public policy).

Here, enforcement of the "without cause" language in the agreement would violate New York's public policy interest in ensuring that franchisors provide proper disclosure of all terms including the termination provisions and prior terminations. Therefore, as part of the requested equitable relief on its New York Franchise Act claim, the court has the authority to refuse to enforce the without cause termination provision, because Allstate did not make proper disclosure so that Plaintiff could make an informed decision, as required by New York law.

The state court properly considered the public policy concerns. Allstate's actions are contrary to several public policy interests. First, as noted by Judge Weinstein in *LaGuardia*, the tenor of the NYFSA is to prevent and guard against franchisor overreaching. The termination of

Plaintiff's franchise agreement after only six months in operation for fabricated reasons is contrary to the public policy interest in protecting New York franchisees from abuse. Second, Allstate's actions are anticompetitive. Allstate's attempt to bully Old Slip's owner to transfer his financial services customers to Allstate, and to force them to purchase Allstate's limited offering of financial services products, would deprive those customers of having the freedom to choose of among several different financial products which Old Slip's affiliates offer to their customers. Accordingly, both the private equities and the public policy interests favor extending the restraining order.

## CONCLUSION

For all the foregoing reasons, Plaintiff Old Slip Benefits & Insurance Services, Inc., respectfully requests that the Court deny the Defendant Allstate's Motion for an Order Declaring that the Temporary Restraining Order has Expired or, Alternatively, for an Order Dissolving the Temporary Restraining Order, and grant such further relief the Court deems appropriate.

Dated: New York, New York
March 28, 2025

Respectfully submitted,

**WUERSCH & GERING LLP**

*/s/ David T. Azrin*
David T. Azrin
Wuersch & Gering LLP
100 Wall Street, 10th Floor
New York, N.Y. 10005
Tel. (212) 509-4745
Fax. (212) 509-9559
Email: David.Azrin@wg-law.com
*Attorneys for Plaintiff Old Slip Benefits & Insurance Services, LLC*

**Certificate of Compliance**

Undersigned counsel certifies that this memorandum complies with the word limits of Local Rule 7.1, and states that the total number of words are 8,740, not including the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates.

_____*/s/David T. Azrin*_______
David T. Azrin

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,
Plaintiff,
v.

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,
Defendants.

CASE NO: 7:25-cv-01110-JGLC

**DECLARATION OF ANTHONY FAVA**

I, Anthony Fava, hereby declare as follows:

1. My name is Anthony Fava. I was an Allstate insurance agent in Mamaroneck since 1989 until early 2024, when I sold my financial interest to James Lukezic.

2. In the fall of 2023, Regine Napoleon called and said that she had a pre-approved buyer, James Lukezic. She mentioned that he was in the financial business. She said that he has investment clients and that he was going to cross-sell the Allstate insurance products to his network of clients. She never said anything about him moving his investment business to Allstate.

3. Prior to selling, I met with Jim at lunch and spent time talking with him so I could understand his experience and his plans. James was always very clear about his plans. He was not going to move his investment business to Allstate. He was going to cross-sell Allstate insurance products to his investment clients. Anybody that would have spoken with James would have understood this. And, based on what I know about Allstate's financial products, I am sure Allstate does not even have the capability of getting that business or doing anything with it because they do not have the markets or the products to offer to those clients.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on March 28, 2025 (date)

[signature]
Anthony Fava

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,<br><br>Plaintiff,<br>v.<br><br>ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,<br><br>Defendants. | CASE NO: 7:25-cv-01110-JGLC<br><br><br><br><br>**DECLARATION OF AL BUGLIONE** |

I, Al Buglione, hereby declare as follows:

1. My name is Al Buglione. I started with Allstate in White Plains back in 1965. After going to the army a couple years, I came back and then I held several positions with Allstate. I was a senior field underwriter for commercial insurance for Allstate for 15 years, and then I was an Allstate Insurance Agent in Mount Vernon, New York, for more than 14 years.

2. I knew Regine Napoleon because she was my Allstate sales leader for some time. I had told her in 2022 or early 2023 that I was interested in selling my agency.

3. In about September 2023, she called me and said one of her counterparts had an approved buyer, and the buyer was ready to go. She asked if I was still interested in selling and my answer was yes. I asked if he had received all of the approvals, and she said yes. I told Regine that she could give Lukezic my information. I called her back and asked how soon can we close, because I wanted to close as soon as December. She said that he first had to go through the recruitment and training process. I told her that my plans were to stay on as support staff through the transition.

4. In my conversations with her, I asked about his Old Slip investment business, and she indicated that he was going to continue his Old Slip investment business and use that

business to cross-sell Allstate insurance to those clients. She never mentioned anything about him relinquishing or transferring all the investment business to Allstate. As a practical matter, that does not even make sense, because he couldn't transfer all that business because Allstate does not offer all of the investment products that he sells to his financial clients. Also, to get approved, James would have to go through four or five people at Allstate who did the approval and recruiting .process. It is impossible that he went through that entire recruiting and training process and they were not aware of his investment business and his plans for keeping that business and cross-selling the Allstate insurance products.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on 3/28/2025 (date).

Signed by:
Al Buglione
B54B0C58909D4B7...
Al Buglione

Message

| | |
|---|---|
| **From:** | Stevenson, Marc [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4DE270A3EA21461DBA3AEDF10672BC08-STEVENSON,] |
| **Sent:** | 11/16/2023 10:09:54 PM |
| **To:** | Cleere, Brittany [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a4cad0db8bbc4e69b9d708849acc97fd-Cleere, Bri]; Foreman, Adrian [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=bff49e2e495940148418b3d81ac4d84d-afory] |
| **CC:** | Napoleon, Regine [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=77d237a5c45e418b9991f80b89fa91d8-rnapo]; STEVENS, MATT [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=054ad4f87d374980b0da1c64f7e5d432-Stevens, Ma] |
| **Subject:** | RE: James Lukezic Governance Exception Request |
| **Attachments:** | [External] Approved - Book Merger - OB Purchase & Merge - James Lukezic-OB Purchase and Merge |

All,

Please be advised that governance has approved James Lukezic's OB Purchase & Merge – see attached.

Thank you,

**Marc Stevenson**
Candidate Concierge
Agency Strategy, Producer Onboarding & Offboarding Team
East Zone - *NY, MA, CT, VT, NH, ME, RI, PA*

[redacted]

***Have you utilized the Agency Support Team to quickly answer your questions surrounding process support, education, and problem resolution? Call*** [redacted] ***(Option 6) to be connected to the correct person fast!***

---

**From:** Cleere, Brittany [redacted]>
**Sent:** Thursday, November 16, 2023 1:18 PM
**To:** Foreman, Adrian [redacted]>
**Cc:** Napoleon, Regine [redacted]>; Stevenson, Marc <[redacted]>; STEVENS, MATT [redacted]
**Subject:** Re: James Lukezic Governance Exception Request

Approved.

---

**From:** Foreman, Adrian <[redacted]>
**Sent:** Thursday, November 16, 2023 1:17:34 PM
**To:** Cleere, Brittany <[redacted]>
**Cc:** Napoleon, Regine <[redacted]>; Stevenson, Marc <[redacted]>; STEVENS, MATT [redacted]
**Subject:** James Lukezic Governance Exception Request

Good afternoon Brittany!

In brief, I have created the exception request in Allconsult. My next step is to upload your email approval in the file for governance.

- Candidate Profile:

  James Lukezic, a seasoned sales professional with 20+ years in financial banking, currently serves as Managing Director at Old Slip Capital Partners. He's also the Chairman of The Board at International Trust Fund. James holds active producer licenses in life, health, property casualty, and financial securities 7, 66, and 24 series. As of today, he secured funding from Wintrust and an approved location by Regine Napoleon.

- Acquiring: AJ Fava Agency & Buglione Associates Agencies

- Selling Agent Agency Owners:
  - 051088 Buglione and Associates LLC - Al Buglione
  - 099526 AJ Fava Agency Inc. - Anthony Fava

- New Office Location: 199 Main Street, White Plains NY. 10601

- YTD Combined Production:
  - $4.6M GWP
  - 89% Retention
  - PIF 2042
  - Combined AAP~ Emerging

- CF Market 7: Westchester, NY Operating Hours: Mon–Fri 9 am – 6 pm, Sat 9 am – 12 pm



Adrian Foreman
Sales Deployment Specialist
East Zone (4)
Allstate Insurance
Mobile [redacted]

Allstate you're in good hands®

Allstate.com Gateway Allstate Mobile

**Be more than just an agent.**

Be an Allstate Agency Owner.

Allstate

Message

| | |
|---|---|
| **From:** | Cleere, Brittany [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a4cad0db8bbc4e69b9d708849acc97fd-Cleere, Bri] |
| **Sent:** | 3/25/2024 7:29:23 PM |
| **To:** | McMahon, Allison [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2905710d443745e49c29c31439d35a76-Woelk, Alli] |
| **Subject:** | Re: Retired Allstate Agent / Wilton Reinsurance Life Company of New York |

Agree.

---

**From:** McMahon, Allison <[redacted]>
**Sent:** Monday, March 25, 2024 3:29:05 PM
**To:** Cleere, Brittany <[redacted]>
**Subject:** Re: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

Sounds like Regine has some clean up to do. Thanks for the insight.

Get Outlook for iOS

---

**From:** Cleere, Brittany <[redacted]>
**Sent:** Monday, March 25, 2024 3:24:41 PM
**To:** McMahon, Allison <[redacted]>
**Subject:** Re: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

Wish I had more to tell you

---

**From:** McMahon, Allison <[redacted]>
**Sent:** Monday, March 25, 2024 3:23:31 PM
**To:** Cleere, Brittany <[redacted]>
**Subject:** RE: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

No problem

**From:** Cleere, Brittany <[redacted]>
**Sent:** Monday, March 25, 2024 3:23 PM
**To:** McMahon, Allison <[redacted]>
**Subject:** Re: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

I'm not available at 9 tomorrow

Besides our interview I don't have any interactions

Would have been regine Adrian and possibly Allen or

---

**From:** McMahon, Allison <[redacted]>
**Sent:** Monday, March 25, 2024 3:20:32 PM
**To:** Napoleon, Regine <[redacted]>; Paiva, Kendall <[redacted]>
**Cc:** Ferrara, Vincent <[redacted]>; Cleere, Brittany <[redacted]>; STEVENS, MATT <[redacted]om>
**Subject:** RE: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

Let's call him and make sure he has clarity on this – we can discuss tomorrow at 9 am first so we are aligned.

Thanks Regine and Kendall.

**From:** Napoleon, Regine <[redacted]>
**Sent:** Monday, March 25, 2024 2:40 PM
**To:** McMahon, Allison <[redacted]>
**Subject:** RE: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

Do you want to add Brittany and Marc Stevenson to tomorrow morning's call? I already added Adrian. I can forward it to the others if you agree

**Regine Napoleon**
Sales Market Leader – Agency Distribution
**Phone:** [redacted]39
**Email:** [redacted]m
**Allstate Insurance** (New York, NY)

**From:** McMahon, Allison <[redacted]>
**Sent:** Monday, March 25, 2024 2:13 PM
**To:** Ferrara, Vincent <[redacted]>; Napoleon, Regine [redacted]>
**Cc:** Cleere, Brittany <[redacted]>
**Subject:** RE: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

Let's get on a call to address this as I was not involved in the hiring of this agent – I need clarity on what happened here, and we need to take steps to address the proper next steps.

Thanks team.

**From:** Ferrara, Vincent <[redacted]>
**Sent:** Monday, March 25, 2024 1:45 PM
**To:** Napoleon, Regine <[redacted]>
**Cc:** McMahon, Allison <[redacted]>
**Subject:** RE: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

He needs to change this immediately and should not be sending emails to Allstate emails from his personal email with that signature

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28

New York, NY, 10005
www.oldslipcap.com

Joe Sangaline is going to catch it and forward to compliance this guy is playing with fire

Click HERE **to register** for upcoming **LIVE AFS Trainings** as well as for links to **AFS Life Education and Producer Support.**

*Vinny*
#ONETEAMONEDREAM
**Vincent J Ferrara**
Financial Sales Consultant D2/D3
**Allstate**
[redacted]
AFS Customer Relationship Summary (CRS): www.allstate.com/FormCRS
Securities offered through Allstate Financial Services, LLC (LSA Securities in LA and PA) Registered Broker - Dealer, Member FINRA, SIPC. Investment Advisory Services offered through Allstate Financial Advisors, LLC. Check the background of this firm on FINRA's BrokerCheck website http://brokercheck.finra.org. Annuities and life insurance offered and issued by third party companies not affiliated with Allstate.

[redacted]

**From:** Napoleon, Regine <[redacted]>
**Sent:** Monday, March 25, 2024 1:38 PM
**To:** Ferrara, Vincent <[redacted]>
**Subject:** FW: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

Hey Vinny,

When an agent sells their book, what is the process to have the agent name changed with Wilton?

**Regine Napoleon**
Sales Market Leader – Agency Distribution
**Phone:** [redacted]
**Email:** [redacted]
**Allstate Insurance** (New York, NY)

[redacted]

**From:** James Lukezic <[redacted]>
**Sent:** Saturday, March 23, 2024 2:44 PM
**To:** Tony <[redacted]>; [redacted]

**Cc:** Napoleon, Regine <[redacted]>; Paiva, Kendall <[redacted]>
**Subject:** [External] Re: Retired Allstate Agent / Wilton Reinsurance Life Company of New York

**This Message Is From an External Sender!**
This message came from outside your organization. If you don't trust this email, report it using the Report Phish button.

Thanks Tony.

Regine: who do I call or email to effect this change?

**James J. Lukezic, AIF®**
Managing Principal
Executive Managing Director
Institutional Consultant

Bio vcard

Direct: 212.256.1334
Cell: 917.783.6064

**Old Slip Capital Partners**
40 Wall Street, Floor 28
New York, NY, 10005
www.oldslipcap.com

---

**From:** Tony <[redacted]>
**Sent:** Saturday, March 23, 2024 1:46:53 PM
**To:** [redacted]om [redacted]m>; [redacted]om
[redacted]m>
**Cc:** James Lukezic <james@oldslipcap.com>
**Subject:** Retired Allstate Agent / Wilton Reinsurance Life Company of New York




RE: AGENT NUMBER 0000510280 A J FAVA AGENCY, INC
and AGENT NUMBER 099526000 ANTHONY FAVA

Somehow this was either overlooked or not processed properly. I am now receiving mail at my home in Florida from this company. I never sent Wilton Reinsurance any information or address change.

I am no longer an Agent with Allstate and should have no affiliation with any 3rd party vendors that I was assigned to by Allstate.

Can someone please handle the transfer of this to James Lukesic and also have Wilton Reinsurance remove my information from their system.

Best regards,

Anthony Fava

Old Slip Capital Partners, LLC is a diversified financial services firm directly affiliated with the following companies: Old Slip Registered Investment Advisors, LLC is a SEC Registered Investment Advisor. Old Slip Capital Management, Inc. is a Broker/Dealer, Member of FINRA/SIPC. Old Slip Benefits and Insurance Services, LLC provides corporate, group, and individual insurance.

Compliance Disclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

Plaintiff,

v.

ALLSTATE INSURANCE COMPANY, et al.,

Defendants.

------------------------------x

New York, N.Y.

25 Civ. 1110 (JGLC)

May 8, 2025
3:05 p.m.

Before:

HON. JESSICA G.L. CLARKE,

U.S. District Judge

APPEARANCES

WUERSCH & GERING LLP
Attorneys for Plaintiff
BY: DAVID T. AZRIN
RAMSHA ANSARI

TROUTMAN PEPPER LOCKE LLP
Attorneys for Defendants
BY: ARTHUR C. YOUNG
MILICA KRNJAJA

(Case called)

THE COURT: Counsel, please state your name for the record, starting with the plaintiff.

MR. AZRIN: Good afternoon, your Honor. David Azrin with the law firm Wuersch & Gering on behalf of plaintiff Old Slip Benefits & Insurance. With me is my client James Lukezic, as well as my associate Ramsha Ansari.

THE COURT: Good afternoon to you both.

MR. YOUNG: Good afternoon, your Honor. Christopher Young with the law firm Troutman Pepper Locke on behalf of the defendant Allstate Insurance Company, and with me today is my colleague Milica Krnjaja, also from Troutman Pepper Locke.

THE COURT: Good afternoon to you both.

So, just one thing before we get to the argument that I just wanted you all to be aware of. So I know that this is a White Plains designated case so you are probably wondering why you all are in Manhattan, but that is because I am now in the White Plains wheel but I have not officially moved up to White Plains, so that is why we have this appearance here today in Manhattan, because starting later in the year into next year, any appearances in this case would be at the White Plains court house, so you all know why that came about.

So, in terms of the argument today, I know that defendant's counsel, that you all intend to split the argument, which is fine. Happy to do that. I think what would be most

helpful is let's start with the issue of whether the TRO expired. I will hear from both sides on that issue. You can also address the redaction issue as well. And then I will hear from both sides on the issue of if I determine that the TRO did expire, whether that order is stayable. And so I will hear from both sides on that issue as well.

Mr. Young, why don't I start with you since this is your motion.

MR. YOUNG: Thank you, your Honor. May it please the Court, counsel:

We are here today, as the Court noted, on Allstate's motion to declare the TRO issued by the Supreme Court of New York to be expired, or in the alternative, to be dissolved. This is our first appearance with you, I would like to take a few moments to explain why we are here today.

Plaintiff did not disclose its intent to continue its affiliated registered investment advisory and brokerage businesses to Allstate before executing what I will refer to as the EA agreement, which is the exclusive agency agreement, in March of 2024.

Allstate, when it learned that plaintiff was continuing its affiliated businesses, advised it that under the EA agreement it cannot be affiliated with other businesses without Allstate's approval, and Allstate would only permit or approve selling other financial services products, under the

Allstate Financial Services umbrella. They were an exclusive agent, after all. Plaintiff refused to stop its affiliated businesses or move its FINRA licenses to AFS. That was its choice. As a result, Allstate terminated the EA agreement in June of 2024 because plaintiff would not agree to act as Allstate's exclusive agent. At that time, Allstate gave plaintiff 90 days' written notice in accordance with the with or without cause termination provision of the EA agreement.

Several weeks before the termination was to take effect in late September, plaintiff sued Allstate and several of its employees in the Supreme Court challenging Allstate's right to terminate the EA agreement based on breach of contract. Plaintiff obtained a TRO in September which maintained the status quo pending an injunction hearing. That's the TRO subject of today's argument. No hearing has been held on the injunction motion, to date. Instead, the Supreme Court Judge, Judge Jamieson, also in White Plains, received the parties briefing, the issue was fully briefed, and held oral argument in January 2025. In the meantime, Allstate moved to dismiss all the claims in the amended complaint except for one, your Honor, the statutory franchise sales act claim.

Later in January, January 23, 2025, Judge Jamieson issued a decision and order which did three things which is relevant to today's proceedings. First, she dismissed the breach of contract claim finding that Allstate's termination,

under the with or without cause provision of the EA agreement, was lawful. Allstate fully complied with that provision, gave 90 days' written notice, to which she found was lawful and enforceable. She did not dismiss plaintiff's implied covenant of good faith claim, however. She found that plaintiff could pursue such a claim to the extent it proves the termination deprived it the benefit of its bargain and I will explain the significance of that in a moment. And importantly, for why we are here today, she did not decide the plaintiff's motion for a preliminary injunction. She made no determination, which is plain from her order, which is an exhibit to the motion. She declared that discovery regarding plaintiff's remaining claims is warranted before she wanted to decide the motion.

Worth mentioning, your Honor, is that she also dismissed the Allstate employees, which is what gave rise to diversity jurisdiction, and on February 7 Allstate removed the case.

THE COURT: Just give me, to the discovery issue, I know that she said that discovery was warranted and it sounds like, if I am reading the record correctly, that no discovery was actually pursued because at this point the case was removed; correct? In other words, you all didn't have time to engage in any discovery after the order?

MR. YOUNG: No, we actually -- well, after the TRO we did engage in discovery. We have not taken testimony or

depositions but we have exchanged documents and written discovery so, yes, Judge Jamieson did enter a case management order and we were proceeding under it until diversity jurisdiction was created through that order in January.

THE COURT: All right. Do you have a sense of what discovery she thought was necessary in order to make a determination on the preliminary injunction?

MR. YOUNG: No. And as I am prepared to explain, your Honor, the motion was fully briefed, she accepted affidavits from both parties on the issues of irreparable harm, likelihood to succeed on the merits. I don't know why she thought there was more discovery to be taken. She found that the contract was enforceable, the termination provision was enforceable. Ironically, she said the implied covenant of good faith claim would proceed, as I mentioned, so that she could pursue to the extent a determination to deprive plaintiff of the benefit of the bargain.

You know, and it is hornbook law in New York, that the implied covenant of good faith is recognized but it does not change the terms of a contract. She found that the termination provision was enforceable but she said the plaintiff could pursue monetary damages. If the benefit of the bargain, as I understand counsel will argue, is to stay in this contract indefinitely, well that would then change the term of the provision of a contract that Judge Jamieson found to be

enforceable and that Allstate complied with it. The implied covenant of good faith cannot allow -- you cannot use the implied covenant of good faith to do that, which is why we are confused as to why she thought more discovery needed to be taken because the relief that is allowed under the implied covenant, therefore, would be damages. And if there is a right of relief of damages then you don't have irreparable harm.

And I remind the Court, your Honor, that Rule 65, both Rule 65 and the state court, recognizes that injunctions, like the one that is sought here, is an extraordinary remedy. It is not to be given lightly and it needs to be proven strictly by showing irreparable harm and the likelihood to succeed on the merits and balance of the interest between the entity or person to be enjoined and the public's rights. We think there was no basis for her to have denied the motion at that time and we are frankly confused as to why she thought more discovery was warranted. As you may know, your Honor, state court proceeds differently than federal court in these matters. It was not error for her to have done that in the state court system. There was no 65(b) time limitation like there is in federal court.

THE COURT: And so, in other words, a TRO can last, it can have more of an unlimited nature to it.

MR. YOUNG: Correct.

THE COURT: But in federal court, obviously, we know

that is not the case and so how is what she actually came up with, how is that not more like a preliminary injunction, in other words, which in the federal court, right, would not have an expiration date until the end of the case. So, I think plaintiff could argue here that effectively what the judge did on the state court level was issue a preliminary injunction.

MR. YOUNG: And that is what the plaintiff argues and that argument does not have merit in light of the state court rule that requires whether -- it requires the judge, when she determines an injunction, to state the basis for the injunction.

THE COURT: But doesn't that, in any event, undermine your argument that the TRO expired, that I need to apply -- in other words, if I see this as what it really is, as a preliminary injunction, that it didn't actually expire.

MR. YOUNG: We would agree with you, your Honor, procedurally. If you find that Judge Jamieson entered a preliminary injunction and decided the plaintiff's motion, yes, the Rule of 65(b) and *Granny Goose* does not apply. I think we all agree on that. The question is did Judge Jamieson's order get to a preliminary injunction and plainly on its face it did not, your Honor. She even said she needs more discovery in order to make a determination. She made no determination that plaintiff has been irreparably harmed. She made no determination that there was likelihood of success on the

merits, made no determination on the balancing of the interests of the hardships. She didn't require an appeal bond be posted which is not required but the Judge often does that as we would ask for here if you were to find it was an injunction. None of that was done. Therefore, you are in *Granny Goose*-land, you are in 65(b)-land because once it was removed, the granting use says it lasts only as long as Rule 65 allows. And we have removed the case on February 7, 14 days went by, plaintiff didn't move to extend the TRO for good cause. It could have. It didn't. Another 14 days went by and it could have then asked for an extension. It didn't.

Remember also, Rule 65(b)(3) requires an expeditious hearing on an injunction because I get back to the anchor of this argument, your Honor, and the anchor with any injunction, as you know, Rule 65 remedy is extraordinary. It is not to be given because might have, could have, would have. It is burdens on the movant to show irreparable harm, likelihood to succeed on the merits. You can't just take from what Judge Jamieson wrote that she made any determination like that and for that reason we are in *Granny Goose*-land and it expired and the plaintiff has made no efforts to even have a hearing on the motion for preliminary injunction, which is why it should be declared expired.

And more fundamentally, your Honor, I get into it here, the merits of whether you call it an injunction hearing

or what we call it, whether there is good cause, it is the same test. There is no irreparable harm here, your Honor.

Plaintiffs sought to challenge the termination provision. Judge Jamieson found that Allstate had lawfully terminated the provision. Now, Judge Jamieson saved the implied covenant of good faith claim but, as I explained, that remedy is a monetary one, it is not a substitute for challenging the termination. So, the remedy left is monetary.

We cited the case law, your Honor, in our briefing. A monetary relief, by definition, does not create the irreparable harm. Now, plaintiff argues that while we had this business and we generated goodwill in the business, and if you allow the termination to proceed, by the way, a termination, which plaintiff agreed that Allstate could do with the plain reading of the contract, if you allow that to happen, the business will be destroyed. We cited the cases in our brief that show that a business of several months does not generate goodwill almost as a matter of law to be able to say that the business will be destroyed. Cases in this court house have found that businesses of a year and a half, two years, have not generated enough goodwill to have any -- be irreparably harmed from the destruction of business. Keep that in mind when counsel argues that they're the same as a franchise and should be accorded and found that they are irreparably harmed. They are not.

And another fundamental difference between those

franchise cases that counsel argued and what we have today, in the franchise cases, like *La Guardia*, and there was the *Kentucky Fried Chicken* case, there was a termination of a franchise agreement because of a default and the argument was we are going to be destroyed because we want to continue as under the Kentucky Fried Chicken brand or the Holiday Inn brand. This is the exact opposite here, your Honor. He wants to continue as Allstate but he wants to continue as Allstate doing something totally different than everybody else. He wants to continue using the Allstate brand and doesn't want to be an exclusive, though. He wants to say he is an exclusive agent but he is not. He wants to be his own, do his own thing, do something different than the contract and the EA manual requires him to do. So he is fundamentally different, it is a fundamentally different situation and he can't show irreparable harm because there is no goodwill to be destroyed.

The second claim is under the Franchise Sales Act which is in some sense, even stranger. Counsel didn't ask for -- plaintiff didn't say that that was the point in state court for the injunction but has now said, in response to our motion, it's a statutory remedy that requires -- or found to be a franchisor. We dispute that we are a franchisor and that will be a decision for another day, your Honor, but what that statute says is if you are a franchisor, you have to make certain disclosures and if you don't, then the plaintiff can

rescind the contract. Think about that, your Honor. The remedy is recision. And, of course, damages. That's not the remedy that they want. They want the remedy -- they want you to grant the extraordinary remedy of a perpetual injunction maintaining this relationship indefinitely, even though a judge has found that Allstate lawfully terminated the contract. That's not the purpose of an injunction, your Honor. If he wants to pursue the Franchise Sales Act claim he can try to rescind which means he walks away. He acts as though the contract is a nullity. But that's not what they want. So that is really curious as to why they say that's a basis for an injunction. They can get damages under that statute, too, but again, if they can get damages, they have a remedy, it is not irreparable harm.

Lastly, your Honor, as you know, it is not just irreparable harm and likelihood of success. There is also a balance of the equities. Allstate's been found now to have complied with the contract, they terminated it, but has not been forced to be in business with the plaintiff in which the plaintiff holds himself out to the world, itself out to the world, as Allstate's exclusive agent. That creates risk for Allstate.

I used the example with Judge Jamieson of the Bernie Madoff situation. Allstate wants to approve who its exclusive agents are selling for because if they're selling some

financial services product that ends up being a Ponzi scheme, who do you think they're going to sue? Oh, your affiliated company has been using the Allstate brand. Maybe Allstate wins but it is a mess that Allstate doesn't want and it implemented rules and procedures for preventing that from happening and right now, by judicial fiat, he is holding himself out as an Allstate exclusive agent. Just this past week, two weeks, a suit was filed against Allstate in state court in New Jersey claiming that an exclusive agent had not purchased Workers Compensation insurance for an insured and Allstate was sued as the broker for the agent's agents. That's the kind of thing that Allstate is on the hook for every single day that this proceeds.

It is not right. Allstate is entitled to be able to terminate as was found it was lawfully able to do. Public policy? Public policy favors enforcing contracts, your Honor. This provision said both parties can terminate the agreement. Judge Jamieson found that Allstate lawfully terminated the agreement. We are in a fundamentally different situation than we were in in the fall once she found that because the only thing left is the implied covenant claim and the Franchise Sales Act claim and, as explained, those do not allow the equitable relief the plaintiff seeks here and also, by definition, could not be irreparably harmed.

I will move over to the motion to seal very quickly,

as I understand that is how you would like me to proceed.

THE COURT: Yes. Thank you.

MR. YOUNG: A fairly routine motion, your Honor. It was in response to some assertions that plaintiff said in its response which we felt misinterpreted, misconstrued what was said in the EA manual which is an adjunct to the EA agreement, it is incorporated.

We made a last-minute decision that we needed to attach that but it says on the front of it it is confidential. It is really a document for internal use at Allstate and its exclusive agents. I don't think that the public has a need to see it given that it is considered confidential and proprietary and didn't think that asking that it be filed under seal, in which the Court and the parties had access to a full document, would be prejudicial.

So we ask, though, that -- and mostly because a lot of it is not relevant to what we are arguing about, so our thought, it would be prudent to file under seal and take out what isn't relevant and what Allstate considers confidential, frankly, was surprised that there was opposition to that. But we believe that it serves the public interest to show that it has been filed and the public does not have an interest in seeing it because it is proprietary and confidential. Plaintiff may say it doesn't believe it is confidential but really that is Allstate's determination, what it believes is

its confidential information and would like it protected.

THE COURT: In terms of the likely harm of disclosure, what is that public disclosure?

MR. YOUNG: It is competitive, your Honor. Allstate has procedures and processes that are described in that manual as everyone in this room probably knows. Allstate competes with the State Farms, the Geicos -- you know, the lizard -- nationwide. All of those folks. So that is the sensitivity, your Honor.

There was another version filed in California, I think in 2017, that counsel pointed out. Yes, it was filed. That was a different version. This one is updated. I'm not here to say that it is a different version, it is different. It is fundamentally a lot of the same things but it is a different version which makes it a little different but it is a competitive interest that Allstate wishes to protect.

THE COURT: Understood.

MR. YOUNG: Thank you, your Honor.

THE COURT: Mr. Azrin?

MR. AZRIN: Thank you, your Honor.

Here are the facts, your Honor, upon which Judge Jamieson, the Commercial Division in Westchester County, twice entered the restraint to prohibit termination from being effectuated. These facts were all presented to her in detailed affidavits, exhibits, affidavits filed by both sides.

So my client first started talking to Allstate back in 2023. He was located in Florida, had a very established broker-dealer licensed business, investment advisory business with established investment clients, and started talking with Allstate about the idea, your Honor, of opening an Allstate Insurance agency where he would sell property and casualty insurance. He would purchase two existing agencies and then he would cross-sell that property and casualty insurance to his existing investment advisory clients. Allstate said that's a great idea.

Mr. Lukezic moved up from Florida with his wife and young child up to Westchester County, purchased two existing agencies from Tony Fava and Al Buglioni -- Al, who is here in the courtroom here today -- and found a location, hired employees, started -- but, before he signed, your Honor, he went through a months' long sales process. They called it the onboarding process but it is essentially a sales process where they're trying to sell him on going forward and purchasing. They're seeing if they're going to approve him and they're trying to sell him.

So during the months' long process, from October of 2023 until he signed in February of late 2024, he had hours and hours of conversations with Allstate sales representatives. They sent him e-mails with the requirements for purchasing these agencies and becoming an agent. In all of those

conversations, specific dates that we have identified in the affidavits he specifically told them that he has an established investment advisory business, he is going to continue that business, and the whole idea was that he would cross-sell the property and casualty insurance to those existing clients. They sent him e-mails with the list of the licensing requirements. The only licensing requirement was a property and casualty insurance brokerage license, there was no mention of him transferring his securities licenses, his FINRA licenses to Allstate Financial Services, a subsidiary. In fact, to the contrary, he told them he would never do that and he was going to continue that business. These are reflected in recorded Zoom calls, they're reflected in the e-mails that they sent to him where they said all you need is the property and casualty insurance license. It's reaffirmed by the affidavits that we submitted by the two, I call them the sellers, Tony Fava and Al Buglioni. They confirmed that in all of their conversations with the Allstate salespeople. These were salespeople, they're trying to sell him on buying it.

In those conversations they also discussed with him hey, this guy looks like a good buyer, he has this established business, he is going to cross-sell the property and casualty insurance. When he got the agreement, the agency agreement that is used throughout the Allstate system, it specifically says the exclusivity provisions are limited to insurance

products. The specific provisions state that it only applies to Allstate Insurance products. That's in Section 1(e) of the agency agreement and Section XXI(g) of the individual non-compete agreement that he signed. It says that the exclusive nature applies to the sale of insurance. It says any other authority granted under this agency agreement is non-exclusive.

In Allstate's FAQs that they publish when they first started using this form about 10 years ago it was litigated, the scope, and in the *Romero* decision, a federal court decision, the federal judge quoted the FAQs that Allstate issued and in those FAQs they said these exclusivity provisions do not apply to, quote unquote, non-insurance products. Sale of non-Allstate non-insurance products would, quote, not be a violation of the non-compete provision.

This is what he entered into the agreement under the premise. He also discussed with them the idea that he was going to purchase these two agencies and that in the future his plan -- and when he purchased the agencies he consolidated them into one location and that his plan was to purchase additional agencies and consolidate them as well. Allstate was eager to find a buyer for these agencies. The sellers were eager to sell them.

This was the premise that he went under. He hired employees, one of whom is here today. He signed the lease, he

signed notes to the bank, to the sellers. He purchased the goodwill of the customer base. He has been operating, your Honor, with no problems, no performance issues whatsoever since he started operating these agencies in March of last year, March of 2024, for over a year.

30 days into the arrangement, after he's purchased the agencies, moved his family, signed the lease, hired the employees, he repeatedly told the Allstate salespeople this was his plan. They said, *Great idea. The only license you need is the property and casualty license.* They never sent him any paperwork for him to transfer his FINRA securities licenses. 30 days after he is already into this they say, *You must immediately transfer your FINRA licenses to Allstate Financial Services.*

That made no sense. It was contrary to the agreement. It was contrary to everything he discussed with them. And, on a public policy and practical sense it made no sense because he has these hundreds of investment advisory clients that are purchasing all different types of investment products. Allstate Financial Services only offers a very limited array of investment products, they're more suited to very -- not the high net worth individuals that he has. Their products would not be suitable in any way and he couldn't transfer them over anyway because he has -- Allstate Financial Services would have to have agreements with those investment product companies and

he tried to talk to them, tried to make sense out of it, and was unable.

When they issued the notice of termination they issued it for cause, not without cause. They issued it for cause. They said we are terminating you because you are engaged in, quote unquote, unauthorized brokering, even though their own agency agreement, their own non-compete agreement and the *Romero* federal court decision said the agreement is only exclusive as to insurance products. But they said you engaged in unauthorized brokering.

So, yes, we did sue and we presented all of this to Judge Jamieson. And counsel was there at the hearing, at the initial hearing in September. And on September 19 she issued an order saying I'm entering a temporary restraining order. I do find that there is a risk of irreparable harm and I do find that there is grounds for entering this restraint and she did block the termination from being effectuated.

Now, stepping back, your Honor, now we are here in federal court on a diversity case. A diversity case is decided under New York law. And what the Erie doctrine says is that our job of the federal you courts on a diversity case is to try to determine what would a New York court do if they were faced with this type of situation and they're trying to divine what a New York court might do because the issues are decided under New York State law.

Well, here, your Honor, we have not only a hypothetical situation, we have the actual New York judge who reviewed the actual facts and the actual New York law and she made the decision. She decided the issue of whether there was a risk of irreparable harm. She decided, in her January 23, 2025 decision, that even though the only remaining claims were the breach of implied covenant and good faith and fair dealing, which she upheld, she said it was a breach of that duty, that is a valid claim for breach of that duty regardless of the "without cause" language. She cited the New York State appellate court decisions that said that where, even if you have without cause language, that where the other party to the contract engages in conduct that would deprive you of the benefit of the bargain, you do have breach of implied covenant of good faith and fair dealing. That was her decision under New York law and it was well founded by the New York Appellate Court decisions. And based on that, she decided to continue the restraints.

So, in terms of what do we have here, what did actually happen in the state court? So let's take a look at that. And you had asked about the discovery and I will try to answer some of those questions as well.

So, after the restraint was entered in September of 2024, the parties fully briefed the injunction motion, as I mentioned, filing affidavits which you can find document

numbers, we have refiled everything from the state court here, Documents 15-4, 15-16, 16-1, 19-3. Defendants filed an affidavit with exhibits, document 15-12. We had extensive briefing which is all reflected in document 15.

At the same time the parties started engaging in discovery. We propounded written discovery requests within a month or two in, I believe it was October or November, and we started getting documents from the defendants in December or January, thousands of them. We have produced hundreds of documents. We also issued third-party subpoenas and obtained documents from those.

We did all of this while the parties were fully briefing the injunction motion. We went to court again on a status conference where discovery issues were addressed. That's reflected in the record there was a November 21, 2024 conference. There was also another conference and that conference was document no. 20-3, it has been filed in this case. There was a December 16 court conference, that was filed, the transcript is document no. 19-5. We have given you all of the transcripts of all of these hearings.

At the November 21, 2024 conference, the status conference, Allstate's counsel, Mr. Young, represented to the Court, quote, to your Honor, we have now fully briefed the injunction motion, we are ready to argue why that injunction should not issue. That's on page 10 of the transcript document

no. 20-3: The injunction was also addressed, again at the hearing on December 16th in document no. 19-5. And at the same time the parties, there were motions to dismiss which were fully briefed as to the -- whether it stated valid claims and also there was a personal jurisdiction motion, there was also a motion as to the scope of the injunction.

Finally, on January 8 we had extensive oral argument on each of the elements required for the entry of an injunction. That transcript is in document no. 15-19, 13 pages of argument by Allstate addressing each of the elements for preliminary injunction, 18 pages of argument by myself on each of the elements. The same arguments -- the same arguments -- that are being remade again.

Everything was fully submitted. It is true, neither side at that hearing did request further discovery.

THE COURT: Did either side request an evidentiary hearing?

MR. AZRIN: We had asked the Court if there would be an evidentiary hearing and she had said that, I guess it is her normal practice to rule based on the papers, based on the affidavits. We were prepared and initially we were thinking that this would be an evidentiary hearing and then they informed us that that was their practice, just to do it based on the affidavits. And if you look at New York State case law, most of the injunction cases are actually done based on

affidavits, the injunction themselves.

On January 23 she issued her decision which is in document no. 15-20.

We just can't disregard the extensive work that Justice Jamieson did on this case. She said in her order, the parties have briefed the elements required for preliminary injunctive relief and appeared for oral argument. She made specific reference to her prior September 19 order in which she had held that the restraint was necessary to prevent irreparable harm. She said that she felt that discovery regarding plaintiff's claims is warranted and that she said in the interim -- this was her ruling after a full briefing on the preliminary injunction, hearing all of the evidence, affidavits, exhibit -- she said restraints shall remain in full force and effect pending a determination of the merits of plaintiff's underlying motion. She stated she considered all the other arguments including arguments that Allstate had raised, that we had raised, and even if they're not specifically referenced in her decision.

I would agree that the decision is somewhat unusual in the sense that it does blur the distinction between a TRO and a preliminary injunction because if you think about it in the big picture, what is the purpose of a TRO? The TRO is intended to maintain the status quo until you have the preliminary injunction hearing. The preliminary injunction hearing is not

permanent, it is just to maintain the status quo until you have the trial. What she did, she heard all the elements and she found that there was -- it was warranted to maintain the restraints in place pending further discovery. She didn't set a date, pending for discovery, presumed that there would be further motion practice at that time.

THE COURT: So are you requesting that I, essentially, construe this decision as a preliminary injunction and also find that she found that there was enough there for a preliminary injunction? Because that seems a little bit inconsistent with what she ultimately concluded, which was that discovery is necessary, which I agree seems somewhat contradictory to how we think of TROs and PIs.

MR. AZRIN: She makes reference to further determination, a further determination on the motion so it is not a hundred percent clear what she had in mind. That could be construed --

THE COURT: What I am asking is what you are asking of me.

MR. AZRIN: Our position is that, yes, as a practical matter and for all intents and purposes, she considered everything. She considered all of the elements, she felt that it was warranted to maintain the restraint so in that sense, yes, it was a preliminary injunction. If it is not a preliminary injunction then we get to the point that her

decision, and even if it is considered a preliminary injunction but even if it is not, her decision must still be given deference, either under Section 1450 of the U.S. Code or under the law of the case doctrine. Her decision meant something and it is entitled to deference.

Here is the other quirky part, is that whether or not this TRO is maintained or dissolved, assuming it is considered a TRO, the preliminary injunction motion is still pending and the case law, it is black letter law, any motions that were pending in state court pre-removal motions are still pending here. So regardless of what you do on whether on Allstate's motion dissolving the TRO or maintaining it, we are still going to have a hearing on the preliminary injunction motion because that is still a pending motion that if you interpret it that way hasn't been ruled upon.

So, in that sense it would not make any sense to dissolve the TRO and then go forward on another, a second preliminary injunction motion where if you dissolved the TRO then you might be reinstating it.

We, your Honor, are prepared to move forward as quickly as possible on any avenue that you choose.

THE COURT: Let me ask you this, and this actually might be a question for Mr. Young, but if I determine that the TRO expired Allstate, as I understand it, there is a 90-day period between when the contract is actually terminated or that

wouldn't apply? It would be terminated as of the day I decide the TRO is dissolved? Is that correct? I see Mr. Young nodding so I assume that would be his position and I don't know if you have a view with respect to that.

MR. AZRIN: There was a 90-day notice that was given, it was given for cause and it was 90 days. That 90-day period has expired.

What we are prepared to do though, your Honor, is this is a unique situation and I will go into it, I will try to make it brief, but why we are not in *Granny Goose*-land, this is a unique creature and I will try to explain why. But, regardless, we are prepared to move forward in any way as expeditiously as possible. If it is determined that we do need to still have a preliminary injunction hearing then, yes, we would like to have it live and we are prepared to do it next week. We don't need any further discovery. Both sides have exchanged thousands of pages of documents.

We are ready to go to a preliminary injunction hearing next week. We are ready to go to trial in two or three months. We are ready to go, we don't feel there is any more need for discovery and so to the extent that -- so, our request is that either this be treated as a preliminary injunction or that it be treated as a TRO. There is certainly good cause for maintaining it. If we are going to give any deference whatsoever to all the hard work that Justice Jamieson put into

this case then it should be maintained, we will have another, quote unquote, preliminary injunction hearing, we will have live testimony, and we will do it as soon as you like.

Just briefly, as I mentioned, the two ways, I believe I am looking at this is either under Section 1450, which is the statute which says that any state court order becomes federalized when it comes into federal court and that, as I mentioned, pre-removal motions are still considered pending. It can also be viewed of the lens of the law of the case doctrine.

So, for example, your Honor, in the *Torah Soft* case which we mentioned, that was a Southern District of New York case. The state court Judge, Justice Gammerman, he made some rulings on various claims before the case was removed. After it was removed, Magistrate Judge Francis took a look at it and said, OK, Justice Gammerman's rulings mean something and we are going to defer to his rulings based on the law of the case.

In the *Hodnett* case, another Southern District of New York case, a State Court Justice Sherwood, he made certain rulings with respect to a certain requested injunctive relief. In fact, he had held that the TRO was not justified. After it was removed, then the plaintiff went and tried to move again for the same temporary restraining order, sort of analogous to what Allstate is trying to do here is try to get another bite at the apple. Judge Vyscocil, District Court Judge, said hey,

Justice Sherwood's rulings mean something, if he said --

THE COURT: But on that point, if I say that in effect what she has issued was a preliminary injunction, isn't that contradicting what the very thing that she said, that she is not granting your motion for preliminary injunction?

MR. AZRIN: I don't know that she said that she was specifically -- I don't think she used the words "denying it" but, yes, she did say -- she did say -- that discovery is warranted and before the court may render a determination on the merits of the plaintiff's motion. Yes. But for practical purposes, she has made some kind of finding that there is sufficient elements there, both on a factual and legal basis on each of the elements to maintain the restraints so in that sense it is a preliminary injunction-lite pending another preliminary injunction hearing. You could view it that way. But I hear what you are saying.

Then, in a couple other cases we cited, *American Systems*, another Southern District of New York case, again, there was a TRO that was issued by the state court, it was set to expire, the case was removed, the federal judge was deciding good cause and again, said hey, we need to credit the state court's findings. And the same thing happened in the *Does v. Kappa Alpha* case.

Similarly here, your Honor, just like Justice Sherwood's and Justice Gammerman's orders, Justice Jamieson's

rulings mean something. We can't discount them, we must credit her decision to maintain the restraints based on New York law, based on all the evidence where neither side had made a request to present additional evidence, nobody said there was anything missing, there was a full record, fully submitted.

So in that sense it is more like the *Santos* case which we cited. It is a California District Court case. There the Court entered injunctive relief prohibiting a bank from going forward with a foreclosure sale in the state court. They labeled it a preliminary injunction. The defendant removed it and then moved for it to be dissolved. The federal court said nothing has changed. This was a preliminary injunction, the state court found the elements, nothing has changed, there is no basis for dissolving it.

So, in terms of *Granny Goose*, just briefly, the reason we are not in *Granny Goose*-land is because there is no case similar to this, and both sides have researched it, no case where a state court judge had a full-blown preliminary injunction hearing, labeled as such, with all of the evidence and affidavits and exhibits that everybody wanted to submit and it was submitted to the Court and the Court made a ruling finding whether or not the restraints should maintain in effect. Every other case, the more typical situation is where the TRO is entered and then the preliminary injunction hearing is scheduled and then, often times, on the day of that hearing

or the day before the defendant removes it and then the question arises under *Granny Goose*, OK, where do things stand in federal court and what is the effect and the duration of that TRO. And the holding in *Granny Goose*, the TRO in that case, in the *Granny Goose* case itself was set to expire, it had a time limit on it itself, and that is usually the case with TROs, they're set to expire within a number of days or on a set date of a preliminary injunction hearing which has been set. And so the Court, it said in the *Granny Goose* case the only holding was that by the time the other side found out about the violations, moved for contempt, that deadline for that restraint had long since expired and this is what the concurring opinion by the four Justices, Marshall and Rehnquist, they all said that, really, the other language was surplusage because the real holding here is when a state court ruling has a deadline on it and it expires, it can't be given longer effect. Section 1450 doesn't extend it to make it a limited duration. That was the crux of that case.

And if you look at every one of the other cases that are under the *Granny Goose* line of cases, they all had similar situations. Every one of the cases that they rely upon, *Carrabus*, *NutriQuest*, *Herricks, Western Convenience*, *John Williams*, *DiMauro*, in all of those cases it was a TRO that had a deadline on it and then it was removed. Importantly and most significantly, there was never, in any of those cases, a full

blown hearing on the merits of the injunction hearing and that is what the *Granny Goose* court was concerned about and that is what Rule 65 is concerned about is, OK, you have a TRO and it might be issued quickly and there might not be a full record but we want to get it to a full blown injunction hearing as soon as possible. Well, here you had that and that's what makes this case a one-of-a-kind different case where you did have a full-blown hearing.

So each one of the cases is distinguishable, the *Carrabus* case, the TRO had a deadline, it was to expire May 22, 2000. There was no full-blown hearing on the injunction and so the court had to address the issue, OK, where does it stand when it gets to federal court.

The *NutriQuest* case, they cite that a number of times, it is clearly distinguishable for a number of reasons. Here, again, it was to be maintained in effect until further order of the court. There were a couple state court hearings in the state court before it was removed but importantly, the district court, when it ruled on the matter, said none of those hearings -- none of those hearings -- those state court hearings address the merits of the injunction and the district court judge also relied heavily on the fact that there was a local rule in that court that required any pre-removal motions that were pending to be refiled in the federal court. And it also mentioned that the federal judge had reminded the

plaintiff about this rule. And knowing that and the other side had said that they are going to take the position it was expired and that and knowing that they never refiled the motion. The Southern District does not have such a rule. And, in addition, it is not like *NutriQuest* because we did have a full-blown hearing on the injunction.

The same things apply to *Western Convenience*, *DiMauro* and *John Williams*. Each of them the TRO was set to expire by deadline, there had not been a full-blown record, a full-blown hearing on the injunction.

With respect to, so in that case our case is more like the *Santos* case and it is more like the criminal contempt of *Crawford* case we cited, which *Granny Goose* was not a removal case but there the court distinguished *Granny Goose* because it said this is not a case like *Granny Goose* where there is any kind of guess about the intended duration and a district court has to have the ability to extend a TRO, assuming we are going to treat this as a TRO, the district court has to have the ability to extend it to have time to schedule the hearing and for the parties to brief the preliminary injunction motion and do any discovery.

And the other cases that we have cited on the good cause element, each of those cases, the SEC case, the *Trefelner* case, *Flying Cross* and *American Systems*, all of those cases said the same thing. Of course, the federal court has that

discretion and the *Xtria* case which we cited also said we are not, in deciding the cause we are not looking at the issue of whether the TRO should have been entered. That issue was already decided by the state court. That issue is federalized and has already been determined. The only issue we are deciding on the good cause analysis is whether there is a good reason to keep it into effect until I, the judge, and the parties, can prepare for our injunction hearing. And the sorry, the parties should not be penalized due to the court's calendar that of course the judge has authority to extend it.

On the issues, I will just touch briefly on the issue of irreparable harm, I mentioned it briefly. Yes, as Judge Jamieson found, based on all of this evidence, there is going to be and there would be irreparable harm. My client built up a business, invested in it, it has been operating without any performance issues. There will be irreparable harm in terms of all of the lost opportunities which are impossible to quantify and that's why you enter injunctive relief where the opportunities are difficult to quantify.

If the termination goes forward there will be a notice that is sent to the New York State agency saying that he engaged in, quote unquote, unauthorized brokering. That could have serious ramifications. It will have ramifications for his relationship with his landlord. It will have ramifications for people like Tony Fava and Al Buglioni; Al, who is here in the

courtroom. He is counting on these commissions coming in for his retirement. It will have effect on my client's family. It will have effect on my client's employees. It will have irreparable harm that Allstate has not -- has not, as Judge Jamieson found by her rulings -- has not demonstrated that Allstate was going to suffer irreparable harm by the continuation of that. Again --

THE COURT: Did she address irreparable harm? She doesn't address it in the March order, correct? It is not there.

MR. AZRIN: She makes reference to the September order, she doesn't address it in the January order, correct, but she makes reference to the September 19 order.

THE COURT: I said March, I meant January.

MR. AZRIN: No, I gotcha.

And as I mentioned, his relationship not only with the landlord and as well as the bank, the loan which is hundreds of thousands of dollars which he would default on. But, again, all of these things are difficult to quantify because we don't know all of the ramifications. It is hard to value what is the lost opportunity that he would have had with all of the plans that he had to acquire additional agencies and the ramifications for his other licenses and reputation if this report is made to the insurance agency.

So all that we are requesting, your Honor, is that in

accordance with Judge Jamieson's ruling, which is entitled to deference and respect, that we maintain these restraints whether we call it a preliminary injunction or maybe a preliminary injunction-lite, or whether we call it a TRO and that the case move forward on an expedited basis.

Thank you.

THE COURT: Your idea of a preliminary injunction hearing here, I am just trying to understand what I would need to determine first, even get that, because if I determine that this really was a preliminary injunction and it didn't -- and so therefore it didn't expire, there would then be no need for a hearing, correct, unless it is on -- unless the defendants are saying, which they are, that this injunction should be dissolved, in which case does a hearing make sense under those circumstances?

Just to get how we would get there procedurally. And I will hear from you on that as well, Mr. Young.

MR. AZRIN: If we find that this was, for all practical intents and purposes given the record, a preliminary injunction, then it remains in effect in this court, there would be no need for further preliminary injunction hearing, although in order to give deference to Judge Jamieson's ruling the Court could schedule a further hearing on the preliminary injunction when discovery is completed to hear further on it. I don't think that's necessary but if we were going to give

full deference to what she did, then she does seem to contemplate that.

The alternative would be that we just get to trial and, again, a preliminary injunction is only to maintain the status quo until the trial. That's the purpose of it. And there are many cases where the courts agree to move forward to, in a sense, combine the preliminary injunction with the final trial on the merits.

THE COURT: What I am a bit uncomfortable with here, I think there is a strong argument that this, in effect, is a preliminary injunction and, you know, the Second Circuit has recognized that TROs that go beyond the time limit effectively become preliminary injunctions and that seems to essentially be what this is, but typically for preliminary injunctions one needs to make findings of fact and reach conclusions of law and that didn't happen here with respect to a preliminary injunction and so I don't know where we go from there.

MR. AZRIN: You know, I hear what you are saying. She did, to the extent that I think it is fair to say she did make a finding in the September 19 order, which she specifically referenced and in a sense incorporated.

THE COURT: But she didn't make factual findings.

MR. AZRIN: She said this is warranted to maintain the status quo and prevent irreparable harm. That's what she said.

THE COURT: Understood.

MR. AZRIN: Right. And in that sense I think we are out of *Granny Goose*-land because there is no case where there was a full-blown injunction hearing in state court and the issue arose in those cases. So I think we can put that aside so all we are dealing with now is then whether we treat it as a preliminary injunction and say no further injunction hearing is necessary, or we treat it as a TRO, find if there is good cause and in deference to her, Judge Jamieson, and then we move forward with a live preliminary injunction.

The third option, as I suggested, would be that we consider it a preliminary injunction, subject to further review according to in accordance with Judge Jamieson, which can be done at the trial. Because, again, the preliminary injunction is only to get us to the trial. If we move and do the trial on an expedited basis, then we can have a determination in the spirit of what Judge Jamieson said. After we have done full discovery, we have a trial, we decide whether the injunction should remain in effect.

THE COURT: Wouldn't the most consistent thing with her order be to construe this as a preliminary injunction and then effectively, actually, have the evidentiary hearing that she never had based on defendant's request to dissolve this injunction? I will hear from Mr. Young with respect to that but any reaction from you, Mr. Azrin?

MR. AZRIN: We are prepared to do that. We will have

that hearing next week, present live testimony. We are ready to go.

THE COURT: Let me hear from Mr. Young and I will come back to you on the sealing issue.

MR. AZRIN: Sure.

MR. YOUNG: Thank you, your Honor.

What Judge Jamieson did was not a preliminary injunction. She made it plain in her text of her order. She made no determinations of any factual findings despite the record that counsel described to you.

It is important, you raise a really good point and I am glad you raised it. The *Pan American World Airways* case, which I believe the court referenced says what you said, your Honor, but it says that the reason it is treated as an injunction isn't because it is an injunction, it is treated as an injunction for appellate reasons because of the danger of a TRO that lasts indefinitely. It recognized that Rule 65(b) has a time limitation specifically because of that danger and that's what it addressed. It didn't say a TRO in the state court that becomes, that they have a hearing and then you are in federal court is now an injunction hearing with everything that goes along with it like the findings of fact. That is not what *Pan American World Airways* says and I want to make clear on that.

We are in *Granny Goose*-land, no matter what Judge

Jamieson did. She did not make findings and while she is entitled, her opinion is entitled to deference, we don't dispute that. We don't. But, I want to read you what Justice Marshall said in *Granny Goose* .

The underlying purpose of Section 1450 and the policies reflected in 65(b) can easily be accommodated by applying the following rule: An *ex parte* temporary restraining order issued by a state court prior to removal remains in force after removal no longer than it would have remained in effect under state law. But, in no event does the order remain in force longer than the time limitations imposed by Rule 65(b) measured from the date of removal.

That is Justice Marshall. That is precedent, your Honor. All of those cases counsel talked about fall away under that theory, that straight rule issued by the majority opinion in *Granny Goose*. It is federal law that applies. The discussion about Erie was a confusing statement. Of course Erie applies to substantive law. We are talking about procedural law here, rule 65 in this court. Justice Marshall resolved that issue.

It is a TRO, your Honor. It expired. Counsel is talking out of both sides of his mouth. He wants you to say it is an injunction here but then he wants a hearing. If he truly believed what Judge Jamieson did was an injunction he wouldn't be asking for a hearing.

Now, he could have asked for an extension. He didn't. That would be the good cause. All the cases he talked about that give deference to the state court order was because they had actually asked for an extension, as Rule 65(b) required. The TRO has expired. You can extend, there is case law that says you can extend because if you find the parties have exercised good faith in asking for a hearing and for some reason it was impossible to have a hearing, your Honor, this is May 8, 2025, three months removed from removal. The first time plaintiff's counsel has asked for a hearing is in this courtroom today. Are you going to find that is exercising good faith? To get an expedited hearing required by Rule 65(b)(3)?

Fundamentally though -- and I already discussed it, I'm not going to repeat what I said -- for all the reasons I addressed there is no irreparable harm here. There is no basis to issue the extraordinary remedy of an injunction.

Counsel talked about harm to others. Not to the plaintiff, to others. Banks, loans -- that's monetary damage. Impossible to calculate monetary damages. There are plenty of economic consultants in the precincts of this court house that would be more than happy to write a report on what lost opportunity means in economic terms so it is not possible to prove, it is litigated all the time. He has a monetary remedy which means there is no irreparable harm. It should be found to be dissolved and we don't need a hearing because you can

decide it right now that there is no irreparable harm.

THE COURT: Why don't we go to the stay issue.

Mr. Azrin, I will hear from you on in opposition on both stay and on the redaction issue, just to get us moving.

MR. AZRIN: Thank you, your Honor.

THE COURT: Sorry. Yes, go ahead.

MR. YOUNG: It is counsel's motion.

THE COURT: It is your motion. My apologies.

Go ahead, Mr. Azrin.

MR. AZRIN: Thank you, your Honor.

On the stay, your Honor, this as really just to dot our Is and cross all our Ts in the sense of what we are really asking for here is that in the event that the Court were to immediately vacate the restraining order, which we don't think is the right result for all of the reasons that we have discussed, but in that event, it was just to protect ourselves in a sense, that we would be -- that the Court, our request on that is that the Court would delay the effectiveness of that vacate order to give us time to make application for a stay to the appellate court on the determination on that application, similar to what the federal judge in this court did in the *American Freedom* case that we cited, vacated an order but they gave the party time to make that application to the appellate court. Hopefully this won't be necessary but that was the limited purpose of that order, just to show, if and when we

were to go to the appellate court, to show, as I think we are required to do, that we had made the request for a stay to the district court.

On the motion to seal, your Honor, we were surprised when counsel decided again on this motion where, again, we had had a preliminary injunction hearing, been fully briefed, nobody asked to submit anything additional and Allstate had not asked to submit anything additional including these standards or this manual. So, we were surprised then to get the request. Partly we were surprised because it hadn't been asked for before. We were also surprised because there were many portions of the manuals and the standards that actually favor our position and bolster the position that this contract, this agreement was not exclusive as to non-insurance products. And I don't know if that's the reason they hadn't filed it before but the case law, your Honor, on the sealing and redaction issue, says that where a document is going to be relied upon by the Court as a basis for its decision, then there does trigger actually a public interest and the public has a right to know what did this judge base her decision on. And to the extent that you were to base your decision at all on those standards then we would want to have the opportunity to cite and make reference to the portions that we believe favor our position and the public would have a right to see the entire document, not to mention the fact that when we did a quick search we saw

that the standards had been filed before. So that seemed to me to sort of take the wind out of the sails of any argument that this was some type of highly confidential document where counsel appointed, and I assume authorized by Allstate, had actually filed the entire document not under seal.

Thank you.

THE COURT: Thank you.

Counsel?

MS. KRNJAJA: I would like to address one statement that plaintiff's counsel made and that is that they seek the motion to stay, because if and when they go to the appellate court, and those words "if and when" are exactly the reason why we are opposing plaintiff's motion. It is premature. To seek stay of a Court's order, plaintiff's counsel still must meet the same elements of an injunction that it would have to meet on the preliminary injunction motion at issue here and we just -- plaintiff's counsel cannot claim that plaintiff can meet the element of likelihood of success on the merits on appeal before even having a chance to read that this Court's order that could possibly grant Allstate's motion. And if the Court did grant the motion, we still don't know which of the two routes the motion suggests is going to be the ones the court picks in this case and those two different routes have two very different outcomes and are completely different procedurally.

If the Court finds that the TRO has expired, plaintiff would not even be -- would not even have anything to appeal because you can't appeal an order that confirms that something has expired. Any appeal in that case would be moot and we cite numerous cases for that proposition including *Pan American* that, in footnote 4, cites the two cases that have found exactly that, two appellate courts that have refused to take on the appeal because they have found that the TRO has expired.

THE COURT: But in those cases, aren't they appealing -- they are appealing the TRO, not necessarily -- that has expired, not appealing the issue of whether the TRO expired. Right? In other words, in those cases there is no -- it is moot because there is no case or controversy for the appellate court to decide but in, as I understand what they would be appealing, is just the question of whether under the law the TRO actually did expire, if that is WHAT I determine under *Granny Goose*. To me, that seems like there would be a case or controversy about whether it in fact expired, which would mean it is not moot, which makes it distinguishable from these cases that say generally an expired TRO is not appealable.

What is your response to that?

MS. KRNJAJA: I might be wrong about this but my reading of those cases is the exact circumstance that is present here and that is the finding of the district court that

a TRO has expired. Even though it was a different circumstance on the district court level because the non-movants in those cases already exercised whatever the order was prohibiting them from doing, the district court's order stated that the TRO has expired and therefore those defendants were not subject to sanctions for defying the TRO because there was nothing to defy. It expired. On appeal the question was can we decide -- can we even review the district court's order that had found that something is expired and the answer was no, we cannot, because we cannot review -- there is no existing order to review because you would be reviewing the TRO.

THE COURT: Well, they wouldn't be reviewing the TRO, they would be reviewing whether, under *Granny Goose*, whether the TRO expired; right? That would be the question, which is still, to me, a live question.

MS. KRNJAJA: I don't think there is a difference there because if the Court found that something is expired by virtue of Rule 65 --

THE COURT: In other words, the Second Circuit might disagree with me. They might say the TRO didn't in fact expire and couldn't they do that? That is something that they could say I was wrong about; right?

MS. KRNJAJA: Potentially, which brings me back to my first point which is all the ifs and hypotheticals of us to even discussing this before we have the Court's order detailing

what the decision is, is really difficult and it is unfair to Allstate to even have to make a hypothetical argument for challenging a motion to stay that might hypothetically be challenging the Court's order. It is just at this point we don't even know if plaintiff has any grounds to challenge the Court's order that might issue in the future because we still have to meet the likelihood of success on the merits of the appeal and before we see the Court's reasoning we just cannot address that at this point. At a later point, if the motion is renewed, sure, maybe we could. We could read the Court's order and assess if there is any ground to challenge your Honor's decision but at this point we just do not know.

THE COURT: All right. Thank you.

Thank you, all, for great arguments. This is a complicated one. I am going to consider it a bit further but hope to issue something in the near future. And I appreciate you all coming down today and for your professionalism and, again, for the great arguments by all counsel.

We are adjourned. Thank you, all.

o0o

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

Plaintiff,

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.

25-CV-1110 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Old Slip Benefits & Insurance Services LLC brings this suit against Allstate Insurance Company to prevent an alleged unlawful termination of a franchise agreement between the parties. Before the case was removed to federal court, a state court judge issued a temporary restraining order preventing termination of that agreement in order to maintain the status quo pending resolution of Plaintiff's preliminary injunction motion. The TRO was initially issued eight months ago and reaffirmed again in January 2025 with no set expiration date. The case was then removed to federal court on February 7, 2025. Because the Federal Rules of Civil Procedure govern the expiration of the TRO, the TRO expired fourteen days later, and Plaintiff never sought to extend it before its expiration. The Court therefore agrees with Defendant that the TRO has expired. Nevertheless, the Court stays the effect of this decision to allow Plaintiff time to seek a stay before the Second Circuit. Additionally, and for the reasons stated below, the Court denies Defendant's request to maintain under seal a redacted manual that is relevant to this case and was already made public in another action.

## BACKGROUND

### I. Factual Background

Plaintiff Old Slip Benefits & Insurance Services LLC ("Old Slip") is owned by James Lukezic, a financial services professional who holds various securities licenses and began his own practice in 2016. ¶¶ 9–10.[1] In 2023, Lukezic decided to purchase the assets of two existing Allstate Insurance Company ("Allstate" or "Defendant") agencies in Westchester County, New York. ¶ 11. To do so, he formed Old Slip as the entity that would own and operate his new Allstate franchised business. *Id.* Old Slip entered into an Exclusive Allstate Franchise Agreement ("EA Agreement") with Allstate on February 21, 2024, which was effective on March 1, 2024. ¶ 18; ECF No. 15-5 at I.A. During the sales process, Lukezic informed Allstate that his Allstate agency would only be offering insurance products and that he owned a separate diversified financial services firm. ¶ 12. Additionally, Allstate's marketing led Plaintiff to believe that Allstate offered it a long-term relationship that would not be terminated unless Old Slip breached its obligations. ¶ 18.

The EA Agreement states that Old Slip "will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company." ECF No. 15-5 at I.E. The EA Agreement also states that the agreement may be terminated "by either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as required by law." *Id.* at XVII.B.2. Upon such written notice, the EA Agreement requires that Old Slip, upon Allstate's request, cease to act or to represent itself in any

[1] All paragraph references herein refer to the Amended Complaint at ECF No. 14-2 unless otherwise noted.

way as an agent or representative of Allstate. *Id.* Plaintiff began operations pursuant to the EA Agreement in March 2024. ¶ 11.

Within a month of Old Slip beginning operations, an Allstate salesperson demanded that Lukezic cease offering financial services products other than Allstate's and transfer all of his financial services customers to Allstate's separate financial service company. ¶ 32. The salesperson also informed Lukezic that he had to relinquish his FINRA licenses and bring all of his investment advisory clients to Allstate. *Id.* Lukezic declined to do so because such requests directly contrasted his discussions with Allstate during the sales process. ¶ 33. As a result, on June 25, 2024, Allstate issued Old Slip a termination letter for unauthorized brokering by maintaining an outside business interest. ¶ 36. The termination was scheduled to go into effect on September 30, 2024. ¶ 42. Fearing irreparable harm in the form of destruction of his business, loss of jobs, liability to third parties, loss of future opportunities, and a permanent negative mark on Lukezic's record with the Department of Financial Services, Plaintiff filed this action. *See* ¶¶ 42–43.

## II. Procedural History

Plaintiff first brought this case in Westchester County Supreme Court on September 12, 2024, against Allstate and several individual defendants. ECF No. 14-1. That same day, Plaintiff moved for a temporary restraining order ("TRO") by order to show cause and for a preliminary injunction. ECF No. 15-1. On September 20, 2024, pending a hearing and determination of Plaintiff's motion for preliminary injunctive relief, Justice Linda Jamieson granted a TRO "in order to maintain the status quo and prevent irreparable harm." ECF No. 15-9 at 2.

Shortly thereafter, the individual defendants, along with Allstate, moved to dismiss Plaintiff's complaint for failure to state a claim, among other grounds. ECF No. 17-1. On

January 23, 2025, Justice Jamieson dismissed the claims against all individual defendants and dismissed all but two claims against Allstate. ECF No. 17-7. Despite the motion being fully briefed and after hearing oral argument, Justice Jamieson expressly did not rule on Plaintiff's preliminary injunction motion. Instead, she decided that "discovery regarding plaintiff's remaining claims against Allstate [was] warranted before the Court [could] render a determination on the merits of plaintiff's [preliminary injunction] motion." *Id.* at 29. In other words, Justice Jamieson intended to leave the TRO in place for an indefinite period.

On February 7, 2025, after all the individual defendants were dismissed, Allstate removed the case to this Court based on diversity jurisdiction. ECF No. 1. One month later, Defendant moved to declare the TRO expired, or alternatively, for an order dissolving it. ECF No. 12 ("TRO Mem."). Plaintiff opposed the motion and filed an alternative request that if the Court were to grant Defendants' motion that it stay the effectiveness of such a decision. ECF Nos. 21 ("TRO Opp."), 22 ("Stay Mem."). As part of the briefing of these issues, Defendant filed a largely redacted version of an Allstate Manual relevant to the parties' briefing. Defendant seeks to maintain that document under seal. *See* ECF Nos. 25 ("TRO Reply"), 26 ("Redact Mem."). The Court heard oral argument on the parties' motions on May 8, 2025, and on May 16, 2025, Plaintiff filed additional authority with the Court in response to the Court's inquiry at oral argument. ECF Nos. 44, 45.

**DISCUSSION**

The Court first addresses Defendant's motion for an order declaring that the TRO expired, finding that under Federal Rule of Civil Procedure 65, the TRO expired fourteen days after the case was removed to federal court. The Court nonetheless stays effect of its order so that

Plaintiff may seek relief from the Second Circuit. The Court then addresses and denies Defendant's request to file a redacted version of the Allstate Manual.

## I. The Temporary Restraining Order Has Expired

As the Second Circuit has made clear, a "temporary restraining order issued by a state court prior to removal remains in force after removal no longer than it would have remained in effect under state law, but in no event does the order remain in force longer than the time limitations imposed by Rule 65(b), measured from the date of removal." *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 47 (2d Cir. 2020) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439–40 (1974)). Under Rule 65(b), TROs last no longer than 14 days, unless before the expiration the TRO is extended for good cause for up to another 14 days or unless the adverse party consents to a longer extension. In sum, "[t]emporary restraining orders entered prior to removal expire *at the earlier of* 14 days from the date of removal or the date set by the state court." *Herrick v. Grindr, LLC*, No. 17-CV-932 (VEC), 2017 WL 744605, at *2 (S.D.N.Y. Feb. 24, 2017) (emphasis added).

Here, this action was removed on February 7, 2025, and without any timely request for an extension, the TRO expired on February 21, 2025. As courts have cautioned, "[t]he plaintiff must be ever alert to this, so as to take whatever steps are necessary to satisfy the now-applicable federal requirements and assure that the TRO does not lapse before the preliminary injunction hearing comes on." *Carrabus v. Schneider*, 111 F. Supp. 2d 204, 211 (E.D.N.Y. 2000) (quoting David D. Siegel, *New York Practice* § 640 at 1105–06 (3d ed. 1999)). Plaintiff failed to request an extension of the TRO before it expired and likewise failed to timely seek a hearing in this Court on its preliminary injunction motion.

None of the arguments Plaintiff raises to escape this conclusion have merit. Plaintiff first argues, and the Court seriously considered, whether Justice Jamieson's order extending the TRO

indefinitely was effectively a preliminary injunction that should remain in place. When Justice Jamieson extended the TRO indefinitely, the preliminary injunction motion was fully briefed (including affidavits and other evidentiary submissions), and she had held oral argument on the motion. She appeared to have all the relevant briefing before her when she decided to extend the TRO further. She also determined that this preliminary relief should stay in place while the parties engaged in an indefinite period of discovery. Such an order has the hallmarks of a preliminary injunction in federal court. Plaintiff contends that in order for this court to give full effect to all actions and procedures accomplished in state court before removal, the Court must treat Justice Jamieson's decision as a preliminary injunction. ECF No. 24:4–25:24.

However, Justice Jamieson expressly declined to grant Plaintiff a preliminary injunction. Instead, she concluded that "discovery regarding plaintiff's remaining claims against Allstate [was] warranted before the Court [could] render a determination on the merits of plaintiff's motion." ECF 17-7 at 29. Justice Jamieson notably did not analyze the factors for preliminary injunction as required under the applicable procedural rule. *See* N.Y. C.P.L.R. 6312(c) (MCKINNEY 2019) ("[T]he court shall make a determination by hearing or otherwise whether each of the elements required for issuance of a preliminary injunction exists."). And, the fact that the TRO had no express end date does not conflict with any applicable state rule. *Compare* N.Y. C.P.L.R. 6313 (MCKINNEY 2019) ("Upon granting a temporary restraining order, the court shall set the hearing for the preliminary injunction *at the earliest possible time*.") (emphasis added), *with* FED. R. Civ. P. 65(b)(2) ("The order expires at the time after entry—*not to exceed 14 days*—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension.") (emphasis added). As such, the extension of the TRO pending further discovery did not, as Plaintiff argues, transform the TRO into the

equivalent of a federal court-enforceable preliminary injunction. TRO Opp. at 14. Instead, the state court's TRO simply remained in effect following Justice Jamieson's January 2025 decision. Plaintiff seeks to give full effect to Justice Jamieson's order, and construing the order as a TRO does that. *See* ECF No. 45 at 24:4–5; TRO Opp. at 13.

Plaintiff next urges the Court to retroactively extend the TRO for good cause. TRO Opp. at 14–27. However, as Rule 65 makes clear, a party must request an extension for good cause *before* the TRO expires. *See* FED. R. CIV. P. 65(b). Plaintiff failed to do so here. Even if Plaintiff had made a timely request, the Court, unless consent is obtained, can only extend a TRO for good cause for a "like period," which the Supreme Court has interpreted to mean only up to fourteen (14) additional days. *See In re Crim. Contempt Proc. Against Crawford, Warren*, 329 F.3d 131, 136 (2d Cir. 2003) (citing *Granny Goose*, 973 F.3d at 440 n.15); *de Blasio*, 973 F.3d at 47 ("We note that Rule 65(b)(2) was amended in 2009 to change the expiration of a TRO (unless extended) from ten to fourteen days."). That period expired long ago.

Lastly and relatedly, Plaintiff contends that the Court can extend the TRO indefinitely because Justice Jamieson already determined there was good cause to do so. But Plaintiff fails to cite any Federal Rule that would permit this Court to allow a TRO to remain in place indefinitely without the consent of the opposing party. As the Supreme Court made clear, although Plaintiff has a right to maintain the relief it obtained in state court after removal, Defendant "[b]y the same token. . . ha[s] a right to the protections of time limitation in Rule 65(b) once the case was removed to federal court." *Granny Goose*, 973 F.3d at 439. Those time limits expressly prohibit the result Plaintiff seeks here. Therefore, Defendant's motion is granted. The Court will, however, stay the effect of this decision for two weeks to allow Plaintiff to seek a stay before the Second Circuit. The Court denies Plaintiff's requested relief for a longer stay pending appeal.

Although allowing the termination of the parties' agreement will certainly harm Plaintiff and the livelihood of its employees, all other factors weigh against Plaintiff's requested stay. *See New York v. United States Dep't of Homeland Sec.,* 974 F.3d 210, 214 (2d Cir. 2020) ("[A] stay is not a matter of right, even if irreparable injury might otherwise result; rather, a stay is an exercise of judicial discretion, and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of discretion.") (cleaned up) (internal citation and quotation marks omitted).

**II. Defendant's Motion to File a Redacted Version of the EA Manual Is Denied**

Defendant seeks leave to file a redacted version of Exhibit A to the TRO Reply, which is a copy of Allstate's Exclusive Agency Independent Contractor Manual ("EA Manual"). Redact Mem. at 1. In its TRO Reply, Allstate cites to three pages of the EA Manual's forty-eight (48) pages and contends that the rest of the document contains "highly confidential and commercially sensitive information about a variety of subjects important to Allstate's relationship with its exclusive agents." *Id.* Defendant asserts that the information in the EA Manual could cause Allstate harm by providing competitors with insight into its relationship with its exclusive agents. *Id.* at 2. It further asserts that Allstate's interest in protecting its confidential business information weighs in favor of the redactions and that the public interest in access is outweighed as the redacted portions are not necessary to evaluate Allstate's pending TRO motion. *Id*.

Plaintiff opposes Defendant's request, asserting that Allstate has failed to satisfy its heavy burden to show that the entire remaining portions of the EA Manual constitute a trade secret or confidential information, and that the asserted harm outweighs the presumption of public access. ECF No. 33 at 2. The Court agrees. Here, the exhibit was filed in connection with Defendant's briefing on the validity of the TRO and is likely to be referenced again in this matter. The parties'

dispute centers their exclusive agency relationship, and it is natural that the EA Manual will be relevant to this case's resolution. *See* ECF No. 45 at 43:22–24. As such, the Court concludes that the document is a judicial document, and thus the presumption of public access applies. *See Sec. & Exch. Comm'n v. Telegram Grp. Inc.*, No. 19-CV-9439 (PKC), 2020 WL 3264264, at *1 (S.D.N.Y. June 17, 2020) (noting that documents filed in connection with motions are subject to a substantial presumption of public access).

"[S]pecific business information and strategies [that] may provide valuable insights into a company's current business practices that a competitor would seek to exploit" warrants confidential treatment. *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) (internal citation and quotation marks omitted). Here, however, Defendant redacts nearly the entire document without any particularity. *Cf. id.* (authorizing plaintiffs' proposed redactions, which were generally limited to specific business information and strategies). Additionally, a prior version of the EA Manual, which substantially mirrors the current version, has already been made public. *Khalil v. Allstate*, No. 20-CV-09409 (C.D. Calif. 2022), ECF No. 63-3. Defendants fail to explain what competitive harm exists where most of the document is already public, and public documents may not be redacted. *See In re Telegraph Media Grp. Ltd.*, No. 23-MC-215 (JGLC), 2023 WL 5770115, at *6 (S.D.N.Y. Sept. 6, 2023) (denying a motion to seal information that was already a matter of public record); *Louis Vuitton*, 97 F. Supp. 3d at 511 ("[T]here is no justification for keeping the information that has already been public under seal."). As such, the Court finds that the proposed redactions are unwarranted and Defendant's motion for leave to file a redacted version of the EA Manual is DENIED.

## CONCLUSION

For the foregoing reasons, the Court finds that the state court's TRO has expired. The Court, however, stays the effect of this Order until June 5, 2025, at Plaintiff's request, to permit Plaintiff to seek an emergency stay from the Second Circuit. Defendant's motion to file a redacted version of Exhibit A to their TRO Reply is DENIED, and Defendant is hereby ORDERED to file the unredacted version of Exhibit A to their TRO Reply by no later than May 26, 2025. The Clerk of Court is respectfully directed to terminate ECF Nos. 12, 22, and 26.

Dated: May 21, 2025
New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------
OLD SLIP BENEFITS & INSURANCE SERVICES, LLC

Plaintiff,

v.

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.

--------------------------------------------------------------

Case No. 25-CV-01110 (JGLC)

**NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that Plaintiff, Old Slip Benefits & Insurance Services LLC, hereby appeals to the United States Court of Appeals for the Second Circuit from the Opinion and Order entered in this action on May 21, 2025.

Dated: New York, New York
May 21, 2025

Respectfully submitted,

**WUERSCH & GERING LLP**

*<u>/s/ David T. Azrin</u>*

David T. Azrin
Wuersch & Gering LLP
100 Wall Street, 10th Floor
New York, N.Y. 10005
Tel. (212) 509-4745
Fax. (212) 509-9559
Email: David.Azrin@wg-law.com
*Attorneys for Plaintiff Old Slip Benefits & Insurance Services, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

Plaintiff,

v.

ALLSTATE INSURANCE COMPANY, et al.,

Defendants.

------------------------------x

New York, N.Y.

25 Civ. 1110 (JGLC)

Remote Conference

May 22, 2025

Before:

HON. JESSICA G. L. CLARKE,

U.S. District Judge

APPEARANCES

WUERSCH & GERING, LLP
Attorneys for Plaintiff
BY: DAVID T. AZRIN
IMRAN H. ANSARI

TROUTMAN PEPPER LOCKE LLP
Attorneys for Defendant Allstate Insurance Company
BY: ARTHUR CHRISTOPHER YOUNG
ERICA H. DRESSLER
MILICA KRNJAJA

THE COURT: Good afternoon. We are here in Old Slip Benefits & Insurance Services, LLC v. Allstate Insurance Company, Case No. 25 Civ. 1110.

Who do we have on for the plaintiff?

MR. AZRIN: Good afternoon, your Honor. David Azrin, with the law firm Wuersch & Gering, on behalf of the plaintiff, Old Slip Benefits & Insurance.

THE COURT: Good afternoon.

Anyone else on for the plaintiff?

MS. ANSARI: Good afternoon, Judge. Ramsha Ansari, also from Wuersch & Gering, on behalf of the plaintiff.

THE COURT: Good afternoon to you, as well.

And for Allstate?

MR. YOUNG: Good afternoon, your Honor. Chris Young, on behalf of the defendant Allstate, from the law firm Troutman Pepper Locke, LLP.

MS. DRESSLER: Good afternoon, your Honor. Erica Dressler, also from Troutman Pepper Locke, on behalf of the defendant Allstate.

MS. KRNJAJA: Good afternoon, your Honor. Milica Krnjaja, on behalf of Allstate, from Troutman Pepper Locke.

THE COURT: Good afternoon to you all. Good to see you all again.

I apologize for the technical difficulties that we were having earlier, and I thank you all for your patience

with respect to that, but it looks like we are all up and running.

And, Mr. Azrin, your clients are on and able to listen in?

MR. AZRIN: Yes, your Honor. And there are some other members of the public who are also attending––the sellers and employees.

THE COURT: Excellent. Thank you.

All right. So this conference is being recorded. So to the extent you all at any point seek the transcript, you can do so after this conference.

We are here for an initial pretrial conference. I have obviously ruled as of last night on the TRO issue, which is now before the Second Circuit.

But I have before me the letter that you all submitted with the case management plan, which I have reviewed, so we will go through that. I know that that joint letter also -- that the parties flagged a couple of potential discovery dispute-like issues, so we will discuss that. And lastly, we will discuss where you all are with respect to settlement, and then anything else that the parties wish to raise.

All right. So in terms of the discovery schedule --

MR. AZRIN: Your Honor, if I may --

THE COURT: You may.

MR. AZRIN: -- before we go on to that.

So, yes, your Honor made that ruling with respect to the TRO, but what I think we are losing sight of is the fact that the motion for preliminary injunction is still pending. And that motion that was filed back in September of '24 in the state court, and is considered still pending in the federal court, has not yet been ruled upon. And what we are requesting is that we set a hearing on that motion for preliminary injunction as quickly as possible, and we also intend to file an emergency motion to declare that that motion is still pending and for a hearing to be set on it.

It is black-letter law, your Honor, that a pre-removal motion is still pending in federal court, and there hasn't been a ruling on that. Judge Cronan cited that black-letter rule in a recent case, *GGC v. Ver*, 2025 WL 81319. Judge Lynch said the same thing in the *Sun Forest* case. This was also repeated in *Cyclopedia of Federal Procedure*, and of course it is consistent with 28 U.S.C. 1450, which says that all of the proceedings in an action, prior to removal, shall remain in full effect.

So that motion is still pending before the Court.

You know, there are often cases where somebody files a motion for preliminary injunction, the Court, for whatever reason, doesn't enter the TRO, but you still have the motion for preliminary injunction.

And I had mentioned this fact, your Honor, in our court conference. I had highlighted the fact --

THE COURT: You did, but the problem with that argument, Mr. Azrin, is the TRO expired before. So you did not request to have either an evidentiary hearing until the date of the conference. What I concluded is that the temporary restraining order expired long ago.

So that's the problem, is there is this gap in time between when that TRO expired and when you are now requesting an evidentiary hearing on a preliminary injunction. And I didn't have sufficient information before me and, in fact, Justice~Jamieson already determined that there was not enough information before her to grant a preliminary injunction.

So that's where we are with respect to that ruling.

And what it appears that you are seeking is reconsideration, which, you know, that issue is now before the Second Circuit. I also don't know that it would be proper for me to do anything that would then -- to the extent that this issue is now before them, for me to take any action with respect to the order that could deprive the Second Circuit of jurisdiction. So --

MR. AZRIN: Actually, I researched that issue, your Honor, and on that issue, the Courts have said that, with respect to appeals of preliminary injunctions and temporary restraining orders, the appeal does not——does not——restrict in

any way the district court's jurisdiction. It is contrary to --

THE COURT: On the merits.

MR. AZRIN: -- in some other --

THE COURT: On the merits.

MR. AZRIN: -- situations.

THE COURT: On the merits.

MR. AZRIN: With respect to any aspect of it. It's in Wright & Miller. I can cite you to the portion of Wright~& Miller. It does not deprive you of jurisdiction to do it.

But what we are losing sight of is the TRO is separate. A TRO is separate from a motion for preliminary injunction. And that motion for preliminary injunction is still pending. You can deny a request for a TRO while the motion for preliminary injunction is still pending, but that motion is a separate motion, and that motion has not been fully -- has not yet been ruled on on the merits. And this is important because it affects a lot of people, your Honor, and there is irreparable harm if this business is shut down. And so you can -- it's still consistent with you denying the TRO, but then going ahead and scheduling the motion for preliminary injunction.

In fact, the rule, 65 -- Rule 65 requires that you schedule it on an expeditious basis and as a priority above

all other matters, is what Rule 65 says. And that's on the preliminary injunction, not talking about the TRO.

So we are requesting, again, repeating our request that we made -- when we -- we reminded the Court in our papers that were filed in our opposition in March, on March 28—Document No. 21, pages 11, 14, 19, and 22—we informed the Court in March that the motion for preliminary injunction is still pending. And then we stated this again at the May 8 conference. The transcript at Document No. 45, page 26.

At the hearing, we repeatedly mentioned that -- the May 8 hearing, that we still need a preliminary injunction, and we stated on May 8: We are ready to go. We are ready to have the preliminary injunction hearing next week. That is what we said. And Rule 65(b)(3) requires the Court to set the hearing on the preliminary injunction to take precedence over all other matters.

MR. YOUNG: Your Honor, could I be heard on this?

THE COURT: You may.

MR. YOUNG: Briefly, also was noted to you by the defense on the May 8 hearing that Rule 65(b)(3), the last sentence says, "At the hearing, the party who obtained the order must proceed with the motion. If the party does not, the Court must dissolve the order."

You referenced that in your order and mentioned the fact that the -- not only had the TRO expired, but that the

time for seeking a preliminary injunction had long passed, and by that, Rule 65(b)(3) allows you to dissolve the TRO. But implicit in that is that if you don't proceed expeditiously on an injunction hearing, then the injunction can be denied.

THE COURT: (Unintelligible).

MR. AZRIN: Judge Cronan said it is well-established that motions pending in state court at the time of removal survive removal, and that when they are fully briefed those motions are ripe for decision.

We have requested a hearing. We reminded the Court in March that the motion was still pending. We requested a hearing. And when that hearing -- and we said we were ready to -- we said we were ready to go two weeks ago. And the hearing can still be set. There is no issue with -- no procedural bar for that motion to be heard.

Yes, you vacated the TRO, but you still have on your plate the motion for preliminary injunction. So you can maintain that ruling that you maintained with the TRO and still, pursuant to your obligations and the case law under the applicable case law and the federal statute, Section 1450, to schedule the hearing on the preliminary injunction and get a ruling on the merits.

THE COURT: But the problem I am having here is that the TRO -- what I found is that the TRO expired long ago. So there's a --

MR. AZRIN: Which is different than the motion for preliminary injunction.

THE COURT: Let me finish. I will give you a chance to speak. Let me finish.

The TRO expired long ago. If that is the case, then Allstate is being deprived of the chance to effectively take the action that they were entitled to take months ago when the TRO dissolved. That is the problem.

I don't see how it would be appropriate for me to now rule on a preliminary injunction with respect to something that, candidly, Allstate should have been able to do long ago when the TRO dissolved. That's --

MR. AZRIN: So Allstate --

THE COURT: -- the concern that I have.

MR. AZRIN: Allstate did not——did not——go ahead and suspend the agency and shut down the agency when that time period when expired. And do you know why not? Because the case law says that as long as it is in effect, it is -- until there is a court ruling, it is still in effect and you can be held in contempt. It is still an enforceable order. And that is why, otherwise, your Honor, they would have just gone ahead and shut down the agency. But they didn't because they knew, under the applicable case law, then they would be in violation of the TRO as it stood, as it was still in effect.

So what they did was they brought it to your

attention. And both parties brought it to your attention. They brought it to your attention and said, hey, this TRO is still in effect. And at that moment we requested the hearing, we reminded you the preliminary injunction is still in effect.

So they, they -- everyone is following the rules. They sought the ruling from your Honor. You have said, for the reasons you have cited, that you don't think the TRO should stay in effect, and you gave the additional two weeks, so the TRO is still in effect for these two weeks.

We are requesting now that we move promptly, expeditiously to the preliminary injunction. Everyone has followed the rules as they stand. They sought the clarification of what is the status. The status was unclear, obviously, because it is unclear whether that was a good-cause determination that became federalized, which was our position --

THE COURT: If I schedule a preliminary injunction hearing, say, for even a week from now, the only reason that Allstate couldn't dissolve this, the act against the -- and move forward with ending the agreement is because I allowed you time to go to the Second Circuit to hear this issue. Otherwise, the TRO is dissolved.

So if I allow a preliminary injunction hearing in a week or two weeks, effectively what I am saying is that the TRO is still in place for those entire two weeks. And I --

MR. AZRIN: Well --

THE COURT: -- don't think that's proper.

MR. AZRIN: Well, what I mentioned, your Honor, at the outset, was there are plenty of cases where you have somebody make a motion for preliminary injunction, they request a TRO. For whatever reason, the Court doesn't grant the TRO. You still move to the preliminary injunction.

So we still have an obligation --

THE COURT: But then there is nothing that stops them in this week -- what would be stopping them, in this week, from just saying, there is no agreement and, you know, that's it --

MR. AZRIN: Well, they'd be taking a risk --

THE COURT: -- with respect to your client.

MR. AZRIN: -- but, regardless, if they did, we would still, we would still be entitled to a preliminary injunction. We would still be entitled to a preliminary injunction to undo whatever they did. And they would be taking a risk that the Second Circuit could find that even the TRO should have remained in effect.

Now, you, in an abundance of caution --

THE COURT: I think that's a very different -- I think that's a very different motion——one preserving the status quo versus one forcing them into an agreement which --

MR. AZRIN: The goal --

THE COURT: -- I --

MR. AZRIN: The goal --

THE COURT: -- I think would require different briefing.

MR. AZRIN: The goal of the rules --

THE COURT: What I will --

MR. AZRIN: -- your Honor -- overall, the goal of the rules is --

THE COURT: Hold on. Stop talking when I talk. I want to hear from Mr. Young.

Mr. Young?

MR. YOUNG: Yes. To state the obvious --

THE COURT: (Unintelligible).

MR. YOUNG: Your Honor, thank you.

-- Mr. Azrin and his client does not speak for Allstate.

Allstate moved, because it had respect for the judicial proceedings and your courtroom, your Honor. As a matter of law—and I think you recognize that in your order—as of February 21, Allstate could have terminated the agreement. It did not, for the reasons I just said, not because for the reasons Mr. Azrin said.

So Allstate deferred to this Court to seek its view, and it got its view last night.

I will repeat what I have said about Rule 26(b)(3).

The hearing was first requested on May 8. It doesn't -- plaintiff has not comported with Rule 26(b)(3). And for the reasons you have said, your Honor, there is no basis to hold a hearing now, especially since you have given them two weeks to extend the TRO to go to the Second Circuit.

I have not looked at the cases on what that means as far as the notice of appeal that was filed last night. I would like to have that opportunity, if you are going to entertain plaintiff's request, because I don't know the answer to that, whether you have the authority to now deal with the merits of the motion now, even the preliminary injunction that, although, has been briefed I don't believe requires you to rule on it because of what you did last night.

THE COURT: All right. Why don't we set a briefing schedule with respect to this, including, you know, the extent to which this is an issue I can rule on while it is pending before the Second Circuit.

How is –– let's see. Mr. Azrin, I assume you want to do this quickly, so when is the earliest you can submit a brief on this issue?

MR. AZRIN: I can submit it by tomorrow.

And I can cite you to the Wright & Miller section right now, which is 16 Federal Practice and Procedure 3921.2, where it states that it does not defeat the power of the trial court to proceed further.

THE COURT: All right. So you can submit a brief by tomorrow.

Mr. Young, any proposal with respect to any opposition?

MR. YOUNG: Tuesday, your Honor? Would that be --

THE COURT: Okay.

MR. YOUNG: Tuesday, the close of business?

THE COURT: That's fine.

MR. YOUNG: And, your Honor, would your order still be in effect for the TRO, pending the stay in the Second Circuit?

THE COURT: It is.

All right. Let's now get to the discovery schedule here. You all submitted a proposed case management plan. In terms of -- there are a couple of disputes to just go through.

In paragraph 5, there is a dispute with respect to initial disclosures. We are now in federal court, so those are -- you all do need to serve those. I will just include a date 14 days from today for initial disclosures.

On fact discovery, I know that there is a dispute between whether you all need 90 days versus 120 days. Let me hear from you all briefly with respect to this.

Mr. Azrin?

MR. AZRIN: Thank you, your Honor.

Yes. As I stated at the hearing on May 8, we are

ready to go to trial, so we don't believe any further discovery is necessary. At most, 30 days. The parties have exchanged thousands -- tens of thousands of documents, and we are ready to go to trial. That's our position.

THE COURT: All right.

Mr. Young?

MR. YOUNG: Thank you, your Honor.

The tens of thousands of documents that Mr. Azrin refers to are the documents that Allstate produced, not the plaintiff.

Earlier this month, we finally received the plaintiff's document production of a few hundred. We are going through them now. There are a number of deficiencies that we intend to address with Mr. Azrin, many of what -- much of what we have requested has not been produced. There is going to be a number of depositions. And, by the way, pending before your Honor is a motion for leave to file a second amended complaint, all of which, we believe, requires or warrants a 120-day discovery period, which is not asking you for anything extreme. It is what you have said in your procedures that is the typical discovery period in a case like this.

THE COURT: All right.

Mr. Azrin, are you also intending to take depositions here?

MR. AZRIN: No, your Honor.

THE COURT: All right.

MR. YOUNG: We do need to take depositions, your Honor.

THE COURT: Do you have a sense of how many people you intend to depose?

MR. YOUNG: Three to five.

THE COURT: All right. Why don't we do this. I will give you all 120 days, but no extensions. So let's get this done in that time period.

In terms of expert discovery, there is reference to a damages expert. I assume, Mr. Azrin, that that is what you are contemplating?

MR. AZRIN: No, your Honor. I think that was -- the defendants were thinking about that.

THE COURT: Oh, all right.

Mr. Young, are you thinking about retaining a damages expert?

MR. YOUNG: We are not. It would be -- ours would be a rebuttal expert to the plaintiff's damages expert.

THE COURT: All right.

And, Mr. Azrin, you are saying you are not intending to retain an expert?

MR. AZRIN: At this moment in time, no, we are not.

THE COURT: All right. I will just not include -- I

will just take this portion out. If anything changes with respect to this, you all can let me know.

So then I will include, in paragraph 12, a joint letter date one week after the close of fact discovery, and then I just won't include anything in paragraph 13, unless you all tell me, Mr. Azrin, that you intend to retain an expert.

MR. AZRIN: Very good.

THE COURT: All right.

MR. YOUNG: And, your Honor, I assume that would be the same if we decide to retain an expert through discovery, as well.

THE COURT: Yes.

All right. That, I think, takes care of the schedule.

Going back to the parties' proposed -- the parties' joint letter, there are a couple of issues, one with respect to inadvertent production of documents. It sounded like, from the letter, that perhaps you all were still conferring with respect to this.

Is that correct, Mr. Azrin?

MR. AZRIN: Before we get to that, there was one other issue that was -- one that wasn't the subject of agreement on the scheduling order, if I can bring that to your attention --

THE COURT: Yes.

MR. AZRIN: -- and that was in terms of the trial length.

We would like, if possible, to get a -- to fix a trial date. And in terms of planning purposes, we had estimated, from my experience, that this may be a 12- to 15-day trial, depending on the number of witnesses. We have all of the preliminary issues. And they had taken the position in the scheduling plan that it was five to seven days.

THE COURT: Well, what's the basis for this lasting up to 15 trial days?

MR. AZRIN: From my experience, we are going to be having five to seven witnesses. I assume that they will be having a similar number of witnesses. I can estimate from the direct examination, because that's all I can speak to, is the direct examination of our witnesses will probably take three or four days. Then there will be -- and that doesn't include, obviously, openings and closings and jury selection.

And so just with that estimate and from my experience and, you know, knowing we only have a few hours of actual testimony per day, and then the -- we have to tack on to that their cross-examination of our witnesses, and then of course our -- their witnesses and my cross-examination of their witnesses. So, from my experience, it is at least a two-week trial.

THE COURT: Mr. Young?

MR. YOUNG: Your Honor, there are two claims remaining as of the time of this conference, and both of them revolve around, really, a nearly identical nexus of facts.

I think, while there might be a number of witnesses, I think, with my experience at least, that issues tend to get slimmed down on trials as you move through them and that it becomes more efficient later in the trial, which is why we don't think this trial would last more than seven trial days.

THE COURT: Yes. It's not typically my practice to set a trial date at the initial pretrial conference, especially -- you know, you all have motion practice with respect to the motion to amend. There might be motion practice at the close of fact discovery, a motion for summary judgment. So it's not typically my practice to set a trial date at this point.

That is something that we would confer about as soon as fact discovery is over. So I will hold this issue until then. I think at that point we will have a better sense of the number of witnesses, what is going to be at issue at trial, and how long it is likely to be.

So I will save that for now, but I will keep this in the order just to note the parties' dispute with respect to this, and we can address it at a later point.

All right. So, Mr. Azrin, back to the inadvertent

production issue, are you all still conferring?

MR. AZRIN: Your Honor, the way -- so where this stands is that Allstate had produced -- it's hard for me to answer that question without giving you the background. I'm trying to keep it short.

THE COURT: That's fine.

MR. AZRIN: But Allstate had produced tens of thousands of documents. Many of them were marked confidential.

After we got them, then we got a -- what we believe was a wholesale request to clawback. There were, I believe, over 2 or 300 pages, if I'm not mistaken, entire e-mail streams where they were clearly -- from our view they were clearly not attorney-client privilege, and it just appeared to be a wholesale marking -- designation of attorney-client privilege.

Pursuant to the requirements of the protective order and, more importantly, pursuant to the requirements of Federal Rule 26(b)(5)(B), we reviewed those and determined -- identified certain documents that we believed and agreed were attorney-client privilege. We informed Allstate of those -- about those documents, and we destroyed those documents.

With respect to the other documents, in compliance with our obligations where we do not believe that they were attorney-client privilege——they were not seeking any legal

advice, in some cases they were merely forwarding something, there was nothing about them in any way that could be considered attorney-client privilege—we did segregate those, and we have agreed not to use them or to disclose them until there is a Court determination on the issue. So that is where things stand with that clawback --

THE COURT: How many are --

MR. AZRIN: -- request.

THE COURT: How many are in that bucket?

MR. AZRIN: I don't recall offhand. It was in the hundreds, hundreds of documents and maybe, like, 7 or 8 or 900 pages. My friend, Mr. Young, can speak to that if he knows the number. But there were a very large number of documents and pages that were clawed back.

I don't know how it happened. It's hard for me to imagine how it happened. But, in any case, they claimed that it was some type of oversight and not an intentional waiver, and the protective order provides that it is not going to be considered a waiver, so we have not taken that position. We have complied with our obligations. And that's where it stands.

THE COURT: All right.

Mr. Young, I will hear from you on this.

MR. YOUNG: Thank you, your Honor.

To get to your point -- to answer your question

directly, I think we are still in a position of meeting and conferring on the issue. I don't want to take up the Court's valuable time on issues that go into the substance of it if we can resolve it.

Needless to say, and I think the Court recognizes, we disagree with a lot of the background information that was given, but we will address that at the time, at the appropriate time.

The e-mails were largely e-mails between in-house counsel and the corporate client and the individual clients at the time, which is why we designated them as privileged. A vendor of Allstate's produced them inadvertently, and we took appropriate action -- immediate appropriate action so as not to waive the privilege.

There were 153 documents that we are claiming privilege over out of the 7 to 10,000 documents we have produced. Plaintiff did agree to delete 15 of them. So right now, there is a dispute of 138 documents.

I assumed, before we sent the joint letter, that we were going to have another round of Mr. Azrin telling us, after further study, whether or not he was going to challenge the privilege. We have produced a privilege log. But it sounds to me from his response in the joint letter that he has nothing further to reconsider, so it may be 138 documents in dispute.

How would the Court prefer that we bring this to the Court's attention if we cannot resolve it?

THE COURT: Yes, so if you can't resolve it, you all should submit a joint letter. This is outlined in my individual rules. You know, once you have confirmed that you have reached an impasse, submit a joint letter setting out both sides' positions. And you should include sort of your last compromise position from each party and why the other -- why you wouldn't agree to the other side's last compromise position.

And then, generally, if I am able to rule based on the joint letter, I will, or if it requires -- if I have questions, I will schedule a conference for us to discuss further.

MR. YOUNG: Your Honor, can I say one more thing, and it may --

THE COURT: You may.

MR. YOUNG: -- lead to the next subject you have.

One thing counsel said that I think requires some clarification. The plaintiff -- this happened when we were in state court, and counsel referred to having destroyed the documents under the protective order and the waiver being under the protective order. I don't think that's correct.

The protective order in state court did not have a clawback procedure. And, really, one wasn't necessary because

in state court there is a commercial division rule that addresses inadvertent disclosures of privileged material that does preserve the privilege so long as the party acts quickly to alert everyone of the inadvertent disclosure.

So that leads into the issue of when we get to the stipulated protective order as to why we have asked for a new one be created.

One, because we are in federal court. We are not in state court any longer. And while the state court -- that's not a criticism of either the state court rules or the federal rules. I just think it is just cleaner to have this -- since we have this experience for both parties, it is a good protection and a good way to move forward so that both the Court and the parties have a game plan and rules and process in place for how to handle it, which is why we have asked for a stipulated protective order that contains a nonwaiver provision, a clawback provision.

And also——and we can discuss this with you later——we don't want to get into the issues of our discovery dispute because maybe we don't have to bring it to you if we can resolve them, but there is an attorneys' -- there is -- there appears to be a real need for attorneys' eyes only provision, so we would ask the Court approve that in a stipulated protective order.

THE COURT: All right.

Mr. Azrin, do you want to address anything with respect to the protective order?

MR. AZRIN: Yes. Thank you, your Honor. Yes.

So in the state court proceeding we had stipulated to the entry of a protective order. It is a quite detailed protective order. Paragraphs 14 to 16 of that protective order contain the detailed procedures dealing with the inadvertent production issue. They also contain -- also Federal Rule 26(b)(5)(B) outlines the procedures.

So this was a very detailed protective order. It covers every possible scenario. It was stipulated. And the federal law——28, Section 1450, federal law——says that all of the proceedings that were had in the state court do become federalized, and they become a matter of -- they become effective in federal court. That is in the *Portaleos v. Shannon* case. And all the cases I have cited today were cited in our briefs previously, *Portaleos v. Shannon*, as well as Moore's Federal Practice, Section 107-31, that you must give effect to all of the actions and procedures accomplished.

It was stipulated. It was agreed to as a procedure by Allstate that it covered all of the issues dealing with document production. Now we have the overlay of the federal rules which provide additional guidance, so there is no need. That is the whole purpose, your Honor, of Section 1450, is to avoid having to redo everything in a case, redo it when it

comes to federal court.

So we feel it addresses all of the protections. I have asked counsel, What are the things that you feel -- they feel are not addressed and haven't gotten an adequate response, except that they said that it needs to be a little bit more detailed on the inadvertent production. I pointed them to the fact that Federal Rule 26(b)(5)(B) addresses inadvertent production. So I don't see the need for it. It is a waste of time and it is unnecessary, and it was stipulated.

THE COURT: All right. It sounds like, Mr. Young, you haven't sent over a revised proposed protective order yet. You all are still talking generally. Is that correct?

MR. YOUNG: No, your Honor. We did send a proposed --

THE COURT: Oh, you did. All right.

MR. YOUNG: -- stipulated protective order.

THE COURT: Okay.

MR. YOUNG: One thing I would point out on the state protective order, paragraph 14 and 16 doesn't deal with privileged information, it deals with confidential information, which is a different animal. Close in issues, but that's why we want the additional protection.

We are happy to raise these issues with counsel again and see if we can't come to some agreement.

THE COURT: Yes, including if -- you know, if this is language that largely just tracks the rules, I don't see why that would be inappropriate here.

The same thing with attorneys' eyes only. If you all agree that there is -- that there is any category of documents that makes sense to be attorneys' eyes only -- and I understand from Mr. Azrin's position that there may be no documents that fall under that category, but to the extent that you all are able to agree to that, I don't think that including language like that in a revised proposed protective order means that, you know, everything needs to fall under that provision. And again, to the extent you all have disputes as to what falls under AEO under any agreed protective order, those are certainly disputes that you all could raise with me later.

So why don't you all continue to confer and see if you can reach agreement on a revised proposed protective order. If not, again, submit it by joint letter setting out both sides' position --

MR. AZRIN: We will do that --

THE COURT: -- with respect to --

(Indiscernible crosstalk)

MR. AZRIN: We will do that, your Honor.

I just point out that, with respect to the attorneys' eyes only provision, so here it highlights why this is an

unnecessary exercise. Because when we entered the stipulated order in state court, there actually was a request by Allstate for an attorneys' eyes only provision. And Judge -- and it is reflected in the November 21, 2024 transcript, ECF Document No. 20-3, pages 4 to 7, and Judge~Jamieson specifically rejected including an attorneys' eyes only provision.

Attorneys' eyes only provisions are not favored. They restrict a party's ability to participate in the defense of their own case. The documents will be marked confidential. They can't be used or disclosed to anybody. But an attorneys' eyes only provision goes a step further, and Judge~Jamieson already ruled on this issue. She addressed it at a court conference, and it was -- she said it is not favored. And Allstate signed the stipulated order without the attorneys' eyes only provision. It was entered by the state court.

THE COURT: Understood. All right.

MR. YOUNG: Your Honor, could I just say something to --

THE COURT: You may.

MR. YOUNG: -- speak to that?

Judge~Jamieson invited us to come back if there was an issue that required attorneys' eyes only treatment of a document or a category of documents. And since that time, there has come an issue, and it has nothing to do with Allstate. Allstate produced 7 to 10,000 documents without

claiming any of them are attorneys' eyes only. There is an issue from the plaintiff on claiming a certain category of documents are confidential, and if we can agree to attorneys' eyes only, where Allstate wouldn't see it, we would just see it, then that would take that dispute off the table as far as resolving that dispute. I think there is also a claim that the request is irrelevant.

But that is just an example where we think an AEO provision actually is very helpful here and should be considered by the Court.

THE COURT: All right.

Are there any other discovery dispute-like issues or anything else you all raised in the joint letter, other than settlement, that you would like to discuss now, Mr. Azrin?

MR. AZRIN: No, I don't have anything else on my list.

It was mentioned that there is this pending motion to amend, which was filed May 5, and it is going to be fully briefed on May 27.

But I don't have any other open issues on my list.

THE COURT: All right. Thank you.

Mr. Young?

MR. YOUNG: Nothing further, your Honor.

THE COURT: All right.

Mr. Azrin, in terms of settlement, is there

anything -- I know that you all have had a few settlement discussions that have not been successful. It doesn't appear that you all sort of agree as to when the next settlement discussion should even be. It sounds like the defendants are potentially interested in a referral to the magistrate judge after fact discovery, but I didn't see any indication that the plaintiff agrees with respect to that.

So just without getting into details, Mr. Azrin, can I hear a little bit more from you about sort of where you all are with respect to settlement and if there is anything in particular that has been a barrier here, again, speaking in generalities.

MR. AZRIN: Well, we don't see any possibility of settlement, and we are ready to go to trial.

We had a full day of mediation, court-ordered mediation. It was unsuccessful. I won't get into any other details. But, for many different reasons, including the signals, you know, we have gotten from the other side, we do not foresee any potential for a settlement.

THE COURT: All right.

Mr. Young, anything you would like to say now? Otherwise, I have your position with respect to this.

MR. YOUNG: Yes. My position is set forth in the joint letter.

THE COURT: All right.

MR. YOUNG: We think it would be helpful. But, obviously, can lead a horse to water, can't make it drink.

THE COURT: All right. So, you know, just so you all are aware, at the end of fact discovery, in paragraph, I believe it is 12 or 13, the one that -- 12, that requires you to submit a joint letter at the end of fact discovery, as part of that letter, in advance of submitting that letter, you all are required to confer for at least one hour with respect to settlement. So just warning you all that this is going to come back again, and I would appreciate that you all do your best to participate in that discussion in good faith.

All right. Any --

MR. AZRIN: With respect to the reference to leading a horse to water, your Honor, just for the record, we were the ones who pushed for the mediation over objections by Allstate. So we have always been willing to discuss settlement.

But after that full day of settlement, it is clear that there is no possibility -- after that full day of mediation, there is no possibility of settlement.

So there is no issue of leading us anywhere. We have always been willing to talk, but it's clear there is no possibility at this time.

THE COURT: All right. Well, I encourage you all --

MR. YOUNG: Your Honor, we did not object. We actually went, both of us, jointly, because it was a

requirement of state court, but we also thought at the time it was -- we had thought it should be later on, not in January. We thought that would be more beneficial. I'm not sure that's an objection to the process, but be that as it may. We are where we are right now.

THE COURT: All right. Well, I would encourage you all to continue to discuss this, because notwithstanding what is in this order, it sounds like there could be some potential discussions here that could be fruitful. I think you all should remain open to that. And again, you are required to participate in those discussions at the close of fact discovery.

All right. Anything else for us to discuss now, Mr. Azrin?

MR. AZRIN: Nothing further, your Honor. Thank you.

THE COURT: Mr. Young?

MR. YOUNG: Nothing further, your Honor. Thank you.

THE COURT: All right. We are adjourned.

(Adjourned)

C E R T I F I C A T E

I, Kristen J. Carannante, certify that the transcript of the digital audio recording of the proceedings in the above-entitled matter is a true and accurate transcription.

Signature /s/ *Kristen J. Carannante*
KRISTEN J. CARANNANTE, RPR, RMR, FCRR
(848) 459-3124
kjcarannante@gmail.com

Date: May 30, 2025

WUERSCH & GERING

Via ECF
May 23, 2025 In-Person Oral Argument Requested

Hon. Jessica G. L. Clarke
United States District Judge
Southern District of New York
500 Pearl Street, Room 1040
New York, NY 10007

Re: *Old Slip Benefits & Insurance Services, LLC v. Allstate Insurance Company, et al.*, Case No. 25-cv-01110 (JGLC)

Dear Honorable Judge Clarke:

On behalf of the Plaintiff in the above-referenced action, we submit the following supplemental briefing as to the Court's jurisdiction pending the appeal of the Court's May 21, 2025 Opinion and Order.

**Background**

Plaintiff brought its motion for preliminary injunction in Westchester County Supreme Court on September 12, 2024. On February 7, 2025, the day this action was removed to this Court, the motion was filed with this Court. ECF Doc. 1-1, at 30, and it was refiled on March 27, 2025, ECF Doc. 15-9 and 15-10. It is black-letter law that pre-removal motions are still pending in federal court after removal and are ripe to be be decided. *GGC Intl'l Ltd. v. Ver*, 2025 WL 81319, at *1 (S.D.N.Y. 2025) (Cronan, J.); *Sun Forest Corp. v. Shvili*, 152 F.Supp.2d 367, 387 (S.D.N.Y. 2001) (Lynch, J.); 2 *Cyc. of Federal Proc*. § 3:131 (3d ed.); 28 U.S.C. § 1450.

Plaintiff reminded this Court that the motion was still pending in its opposition papers on March 28, 2025, ECF Doc. 21, at 11, 14, 19, and 22. Plaintiff stated this again at the May 8 Court conference, explaining that whatever the Court's ruling on the TRO, the Court must still consider and rule on the still-pending motion for preliminary injunction. Plaintiff's counsel also repeatedly stated that Plaintiff was ready for the preliminary injunction hearing, as early as the following week, and ready for the matter to be set for trial. Transcript, ECF Doc. 45, at 26-28, 36-39.

Accordingly, as stated at the May 22, 2025 case management conference yesterday, Plaintiff moves for an emergency declaration that the state court motion for preliminary injunction is still pending, and requests the motion be set for hearing next week.

In response, the Court inquired whether the Court has jurisdiction to proceed with the preliminary injunction motion hearing in light of the Plaintiff's appeal of the Court's May 21, 2025 Opinion and Order, and requested briefing on this issue.

**Motions for Preliminary Injunction**

When a party brings a motion for preliminary injunction combined with a stop-gap request for temporary restraining order, the crux of the motion is the request for the preliminary injunction.

The fact that the court denies the stop-gap request for a temporary restraining order does not impact or affect the movant's due process right to move forward with a hearing on the merits of the preliminary injunction motion.

There are numerous circumstances under which a court may deny a request for a temporary restraining order but then proceed to hear and decide the motion for preliminary injunction. As the federal bankruptcy judge, Honorable C. Timothy Corcoran III, explained,

> "If the court denies the TRO and the reason for the denial would not as a matter of law preclude the issuance of a preliminary injunction, the court will schedule for hearing the motion for preliminary injunction or otherwise determine how it will consider that motion."

"Preliminary Injunctions and Temporary Restraining Orders", View From the Bench, Tampa Bay Bankruptcy Association, The Cramdown. *See also*, "Temporary Injunctive Relief: Initial Considerations", Westlaw Practical Law Practice Note w-007-7081 ("the denial of a TRO does not technically impact the possibility of obtaining a temporary injunction").

The following are just a few examples of situations where a TRO was denied or vacated, but the court proceeded to hear the preliminary injunction motion. *Yukon Packaging, LLC v. Jones Sustainable Packaging, LLC,* No. 5:25-CV-00007-KDB-DCK, 2025 WL 209171, at *2 (W.D.N.C. Jan. 15, 2025) ("the TRO motion will be denied. However, the Court is sensitive to Yukon's expressed need to address these issues promptly in light of the approaching deadline for concluding important customer negotiations. Therefore, if Yukon files a motion for a preliminary injunction, it will be heard promptly"); *Ferring B.V. v. Apotex, Inc.*, No. 3:13-CV-00595-RCJ-VP, 2014 WL 1379758, at *5 (D. Nev. Apr. 7, 2014) ("The Court denies a TRO but will permit Ferring an opportunity to argue for a preliminary injunction"); *Brass Smith, LLC. v. Lawrence Metal Products, I*nc., 2007 WL 2908882 (D. Colo. 2007) (denying patentee's motion for a TRO to prevent alleged design patent infringement based on accused infringer's planned activities to show accused product at an upcoming trade show due to deficiencies in the patentee's supporting affidavit, but granting the patentee a hearing date for a motion for preliminary injunction before the date of the scheduled trade show at which time the accused infringer would have an opportunity to be heard).

**Plaintiff's Appeal of this Court's May 21, 2025 Opinion and Order**

Here, Plaintiff has appealed this Court's May 21, 2025 Opinion and Order which held that the temporary restraining order expired due to purported non-compliance with the technical extension requirements of Fed. R. Civ. P. 65(b).

On appeal, Plaintiff intends to argue that the state court already had a hearing on the preliminary injunction, and found that there was good cause to maintain the restraints, and that this

good cause finding satisfied the technical requirements of Fed. R. Civ. P. 65(b), to maintain the restraints pending the hearing on the preliminary injunction motion.

Regardless of which way the appeals court rules, this will not impact Plaintiff's right to a hearing on the still-pending motion for preliminary injunction.

For example, if the appeals court rules that the temporary restraining order should have remained in effect pending a hearing on the preliminary injunction, this Court's order either denying or granting the preliminary injunction after considering it on the merits, will not be inconsistent with the appeals court order.

"Ordinarily an interlocutory injunction appeal under Section 1292(a)(1) does not defeat the power of the trial court to proceed further with the case." Wright & Miller, 16 *Fed. Prac. & Proc. Juris*. § 3921.2 (3d ed.) (citing cases).

Rule 62[c] provides that: "While an appeal is pending from an interlocutory order . . . that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond od or other terms that secure the opposing party's rights."

This provision is supplemented by Appellate Rule 8(a), which provides that a party ordinarily must move first in the district court for "an order suspending, modifying, restoring, or granting an injunction while an appeal is pending."

As explained by the Second Circuit,

> "The rule is that if an appeal is taken from a judgment determining the entire action, the district court's hands are tied, except to aid the appeal under Fed.R.App.P. 7 and 8, and to correct clerical errors under Fed.R.Civ.P. 60(a). An exception exists from an order granting or denying a preliminary injunction, which does not prevent the district court from proceeding on the merits. Another exception to total divestiture of district court jurisdiction occurs when the judgment appealed from does not determine the entire action, in which case the district court may proceed with those matters not involved in the appeal."

*New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989).

> "The "divestiture of jurisdiction rule is ... not a per se rule." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996). The rule is judicially crafted and is "rooted in the interest of judicial economy." *Id.* Therefore, "its application is guided by concerns of efficiency and is not automatic." *Id.* (citing *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996) and *United States v. Salerno*, 868 F.2d 524, 539–40 (2d Cir. 1989))".

*New York v. United States Dep't of Homeland Sec.,* 475 F. Supp. 3d 208, 224 (S.D.N.Y. 2020).

> "Applying this rule, the appeal does not prevent the district court from proceeding

> on the merits. Moreover, proceeding with the hearing on the motion for preliminary injunction does not affect the appellate court's consideration of whether the stop-gap temporary restraining order should have been deemed expired. Consideration of the motion for preliminary injunction is the proper way to preserve the status quo, to preserve what the court believes to be the lawful situation. Wright & Miller, 16 *Fed. Prac. & Proc. Juris*. § 3921.2 at 3; *New York State Nat'l Org. of Women v. Terry,* 886 F.2d 1339, 1350 (2d Cir.1989), *cert. denied,* 495 U.S. 947 (1990); *Leonhard v. United States,* 633 F.2d 599, 609–10 (2d Cir.1980), *cert. denied,* 451 U.S. 908 (1981)."

*Kidder, Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556, 565 (2d Cir. 1991) ("We find that Judge Pollack had the jurisdiction to issue an injunction to preserve the status quo").

> "Overlapping legal issues between this Court's previous order and Plaintiffs' instant motion do not automatically divest this Court of jurisdiction. A district court may advance a case despite a pending interlocutory appeal and, in doing so, is often required to rule on issues relevant to those on appeal. The Second Circuit has held that a district court retains jurisdiction to issue a permanent injunction despite a pending appeal from an order granting a preliminary injunction. *Webb*, 78 F.3d at 55; *cf. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. E. Air Lines, Inc.*, 847 F.2d 1014, 1019 (2d Cir. 1988) (affirming issuance of an injunction by the district court based on new evidence while the district court's previous denial of an injunction was pending appeal). Indeed, Defendants ask this Court to revisit its prior legal analysis in deciding their instant motion to dismiss. Moreover, the judicial efficiency concerns that guide the divestiture of jurisdiction rule counsel against depriving this Court of authority to hear Plaintiffs' motion. As Plaintiffs correctly note, this Court, as a district court, is best suited to make factual findings and issue concordant, narrowly tailored relief, . . . "

*New York v. United States Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 225 (S.D.N.Y. 2020).

In other words, the matter may proceed in district court on the merits while the appeal is pending. *New York State Nat. Org. for Women*, 886 F.2d at 1350. It is well-settled in the Second Circuit that an interlocutory appeal of an order granting or denying a preliminary injunction "does not divest the district court of jurisdiction." *Forshey v. Miller*, 2018 WL 11574487, at *1 (N.D.N.Y. Feb. 1, 2018).

It is for this reason that "the district court retains jurisdiction to issue a permanent injunction during an appeal from an order granting or denying a preliminary injunction." *Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 452050, at *2 (S.D.N.Y. Feb. 5, 2019) (Stein, J.). *See also Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996) ("jurisdiction is retained where, as here, the appeal is from an order granting or denying a preliminary injunction").

> "If the district court issues a permanent injunction to replace the preliminary injunction, the appeal of the preliminary injunction is rendered moot. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 314 (1999)

> (“Generally, an appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter”)”.

*Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 452050, at *2 (S.D.N.Y. Feb. 5, 2019) (Stein, J.) (citing *Hedges v. Obama*, 724 F.3d 170, 188 n.113 (2d Cir. 2013); *Webb v. GAF Corp.*, 78 F.3d 53, 56 (2d Cir. 1996); *Town of West Hartford v. Operation Rescue*, 991 F.2d 1039, 1043 (2d Cir. 1993); *New York State Nat. Org. for Women*, 886 F.2d at 1350).

The district court even retains jurisdiction to make modifications to a preliminary injunction that is on appeal. *Sec. & Exch. Comm'n v. Xia*, No. 21-CV-5350 (PKC) (JAM), 2024 WL 3447849, at *6 (E.D.N.Y. July 9, 2024) (citations omitted) (“district courts may “modif[y] ... injunction orders during the pendency of an appeal ... to preserve the status quo where, in its sound discretion, the court deems the circumstances to justify”).

Accordingly, under the well-established Second Circuit authority cited above, the fact that an order granting or denying a preliminary injunction is on appeal does ***not*** divest the district court with authority to proceed in the case to issue a permanent injunction during the appeal, even though the permanent injunction may replace the preliminary injunction which is on appeal.

Similarly, in an identical manner, the fact that an order granting or dissolving a temporary restraining order is on appeal does not divest the district court with authority to proceed in the case to issue a preliminary injunction during the appeal, even though the preliminary injunction may replace the temporary restraining order which is on appeal.[1]

[1] Alternatively, assuming hypothetically, the Court was still concerned that proceeding on the preliminary injunction motion would be inconsistent with the divestiture of this Court’s jurisdiction by virtue of the interlocutory appeal, this Court has authority to proceed to conduct the hearing and issue an “indicative ruling” under Fed. R. Civ. P. 62.1.

Rule 62.1 provides that: “If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.”

This rule provides the Court can conduct the hearing and then indicate to the appeals court that it would grant or deny the motion for preliminary injunction if the Court of Appeals remands for that purpose. *See, e.g., New York v. United States Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 231 (S.D.N.Y. 2020) (issuing a preliminary injunction, explaining that the opinion “shall also serve alternatively as an indicative ruling under Federal Rule of Civil Procedure 62.1”), *aff’d*, 974 F.3d 210 (2nd Cir. 2020).

Thank you for your consideration of this matter.

Respectfully submitted,

*David T. Azrin*

David T. Azrin

WUERSCH & GERING

Via ECF
May 29, 2025 In-Person Oral Argument Requested

Hon. Jessica G. L. Clarke
United States District Judge
Southern District of New York
500 Pearl Street, Room 1040
New York, NY 10007

Re: *Old Slip Benefits & Insurance Services, LLC v. Allstate Insurance Company, et al.*, Case No. 25-cv-01110 (JGLC)

Dear Honorable Judge Clarke:

Pursuant to this Court's May 22, 2025 directive, Plaintiff submits this reply brief on the issue of the Court's jurisdiction to proceed with a preliminary injunction hearing, and in further support of its letter motion for a declaration that the motion for preliminary injunction is still pending, and its request to set a further hearing on the motion next week.

This Case Came to this Court with a Ruling that the Restraints Shall Remain in Effect Pending Further Consideration of the Preliminary Injunction Motion

By ordering the restraints to remain in place, after hearing all of the evidence on the preliminary injunction motion, including briefing on each of the elements for a preliminary injunction, Commercial Division Justice Jamieson made the determination that Plaintiff had made a sufficient showing that Allstate's attempted termination was unlawful, in breach of the implied covenant of good faith and fair dealing, and with the potential to cause irreparable harm, sufficient to justify her order maintaining the restraints in place, to allow for further discovery, pending the court's further consideration of the motion which was still pending. Jan. 20, 2025 Decision and Order, Doc. 15-20.

Section 1450 provides that, when the case arrived here, the state court's ruling became federalized, as if they were entered by this Court, and all pending pre-removal motions are considered still pending in this court. 28 U.S.C. § 1450; *Miller v. Steloff*, 686 F. Supp. 91, 93 (S.D.N.Y. 1988); *Istituto per lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Products*, Inc., 47 F.R.D. 310, 312 (S.D.N.Y.1969); *Florasynth, Inc. v. Pickholz*, 598 F.Supp. 17, 18 (S.D.N.Y.), *aff'd*, 750 F.2d 171 (2d Cir.1984).

As a result, when the case came to the federal court, it came to this Court as if this Court had made Justice Jamieson's determination.

Therefore, the case came to this Court with a judicial determination that there was sufficient evidence to maintain the restraints in place pending further discovery and further consideration of the motion for preliminary injunction.

That is how the case came to this Court.

Justice Jamieson's ruling became an order of this Court. Justice Jamieson's ruling meant something.

The parties have now had the opportunity to conduct further discovery, and the motion for preliminary injunction is ready for further consideration.

Judge Jamieson's January 23, 2025 Order, which became an order of this Court, complied with any requirements of *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444–45 (1974), and Fed. R. Civ. P. 65.

As stated in *Granny Goose*, "Where a court intends to supplant such a [temporary restraining order] with a preliminary injunction of unlimited duration pending a final decision on the merits or further order of the court, it should issue an order clearly saying so. And where it has not done so, a party against whom a temporary restraining order has issued may reasonably assume that the order has expired within the time limits imposed by Rule 65(b)." *Granny Goose*, 415 U.S. at 444–45.

Like the order in *In re Crim. Contempt Proc. Against Gerald Crawford, Michael Warren*, 329 F.3d 131, 139 (2d Cir. 2003), "The TRO itself could not have been any clearer with respect to its intended duration, as it explicitly stated that it was to "remain in full force and effect until modified by further Order, or until resolution of plaintiffs' motion for preliminary injunction."

Here, that is exactly what Judge Jamieson did – she made clear that she was supplanting the original temporary restraining order with an order of unlimited duration maintaining the restraints pending a final decision on the merits or further order of the court.

As stated by Judge Schwartz in *Bonechi v. Irving Weisdorf & Co.*, No. 95 CIV. 4008 (AGS), 1995 WL 731633, at *2 (S.D.N.Y. Dec. 8, 1995), Rule 65's time limit on the effectiveness of a temporary restraining order clearly applies to those orders that are granted ex parte. There is no indication in Rule 65(b) that temporary restraining orders granted with notice to the defendant also must expire after this time period. Id. at *2. Only where there has been no notice or hearing, a TRO continued past the Rule 65 time limits would expire pursuant to the Rule. *In re Crim. Contempt Proc. Against Crawford*, 133 F. Supp. 2d 249, 259 (W.D.N.Y. 2001).

Contrary to the suggestion in Allstate's brief, Allstate did not choose to abide by the January 23, 2025 out of any graciousness on its part. Rather, it was required to abide by the order, or else it would have been held in contempt. It had two choices, move to vacate or appeal, but either way, it had to obey the until it was vacated. *In re Criminal Contempt Proceedings*

*against Crawford*, 329 F.3d 131, 139 (2d Cir. 2003) ("the appellants could have appealed the extension of the TRO. They could have asked the district court to issue an order vacating the TRO. What they could not do, however, is disobey the Order without consequences") (emphasis added); *Gilead Scis., Inc. v. Safe Chain Sols., LLC*, 684 F. Supp. 3d 51, 64 (E.D.N.Y. 2023) (same).

Allstate chose to do the former, and sought an order to declare it had expired or to vacate it on the ground that Plaintiff could not demonstrate good cause to keep it in effect. Until there was a court ruling vacating it, Allstate could have been held in contempt if it went forward with the termination. *Crawford*, 329 F.3d at 139 (upholding contempt conviction in similar circumstances).

If it had appealed, it would still need to abide by the restraint pending the appeal, and if the appeals court found it deficient in its findings, the Second Circuit would remand the case back to the district court for proper findings of fact and conclusions of law, and it would still remain in effect until further ruling by the district court, because it would be inequitable to punish the movant for the court's failure to make specific findings. *In re Crim. Contempt Proc. Against Crawford*, 133 F. Supp. 2d 249, 262 (W.D.N.Y. 2001)

In light of this underlying legal framework, on February 13, 2025, after the case was first removed, and this Court scheduled its first status conference for May 20, 2025, Doc. 4, Plaintiff's counsel intended to discuss with the Court the treatment of the state court's order and the scheduling of the preliminary injunction motion, as both sides – Plaintiff and Allstate - were unsure at the time about the case status and appropriate treatment of Judge Jamieson's order.

As soon as Allstate filed its motion indicating it was taking the position that Judge Jamieson's order was a temporary restraining order that had to be renewed, or in the alternative, asked the Court to make a ruling there was no longer good cause to keep it in effect, Plaintiff made clear in its March 28, 2025 opposition to the motion, Doc. 21, and at the May 8 hearing, Transcript, Doc. 46, that, if the Court did not consider the January 23, 2025 order to be a preliminary injunction, then the preliminary injunction motion was still pending and in that event, as Plaintiff's counsel requested, a hearing should be had on an expedited basis, as reflected in the transcript of the May 8 hearing. May 8 Hearing Transcript, Doc. 46.

The Appeal of this Court's May 20, 2025 Order Does Not Prevent this Court from Moving Forward with Further Consideration of the Preliminary Injunction Motion as Directed by Judge Jamieson

Allstate's entire argument seeking to prevent any consideration of the preliminary injunction motion because it would upset the "status quo", rests on its mistaken understanding of the Court's authority to proceed with the case on the merits pending an interlocutory appeal, which is based on its misunderstanding of the term "status quo."

As Wright & Miller insightfully point out, the "status quo" depends on your point of view. Wright & Miller, 16 *Fed. Prac. & Proc. Juris*. § 3921.2 (3d ed.) ("The theory that a line can be drawn between district court action designed to "maintain the status quo" and other action plunges courts headlong into the always unsatisfactory task of determining what is the status quo").

Allstate neglects to inform the Court that, subsequent to *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623 (2d Cir. 1962), the Second Circuit has repeatedly clarified what it means when it refers to the "status quo" in injunction cases.

"" Status quo' means the last actual, peaceable uncontested status which preceded the pending controversy." *North American Soccer League LLC. v. United States Soccer Federation, Inc*., 883 F.3d 32, 37 (2d Cir. 2018) (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) and *LaRouche v. Kezer,* 20 F.3d 68, 74 n.7 (2d Cir. 1994).

> "The "status quo" in preliminary-injunction parlance is really a "status quo ante." *See Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (referring to reinstatement of benefits as "restoration of the *status quo ante*"); *accord O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) (per curiam) ("requir[ing] a party who has recently disturbed the status quo to reverse its actions ... restores, rather than disturbs, the status quo ante, and is thus not an exception" to the ordinary standard for preliminary injunctions). This special "ante" formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current "status quo" precipitated by their wrongdoing."

*N. Am. Soccer League,,* 883 F.3d at 37 (2d Cir. 2018).

In other words, "status quo" is the relationship of the parties before the first contested wrongful act was committed and before the lawsuit was commenced.

Based on this definition of the "status quo," the status quo was that Plaintiff was an Allstate agent.

And, regardless of the validity of the Court's determination that the TRO may or may not have expired, the fact is that Plaintiff remains an Allstate agent today.[1] And Plaintiff is continuing to act as an Allstate agent and continuing to provide service its customers.

[1] Given that Allstate was required to give Plaintiff 90 days' notice of termination, the 90-day clock should start on May 21, 2025 when the court lifted the January 23, 2025 restraint, and therefore the agreement should remain in effect until August 20, 2025. At a minimum, Plaintiff should get the benefit of the 11 days that remained in the 90-day notice period, at the time Allstate was

Of course, if Allstate were to go ahead and effectuate the termination, and the Second Circuit were to reverse this Court's May 21, 2025 order because the state court's preliminary injunction hearing took the order outside the ambit of *Granny Goose* and Rule 65, then Allstate could be found to be acting in contempt of court.

Moreover, even if Allstate were to effectuate the termination, such an event would ***not*** prevent the court from entering injunctive relief to ***reinstate*** the Plaintiff to the status quo.

In fact, Allstate's entire argument in its brief rests on the second mistaken assumption that if Allstate goes ahead and terminates Old Slip, this Court is utterly powerless to entertain an injunction to reinstate him.

This is utterly absurd. Courts commonly enter preliminary and permanent injunctive relief to reinstate parties to a business relationship if the court finds the termination unlawful.

For example, in *Galvin v. New York Racing Ass'n,* 70 F. Supp. 2d 163, 179 (E.D.N.Y.), *aff'd sub nom. Galvin v. New York Racing Ass'n, Inc. (NYRA)*, 166 F.3d 1200 (2d Cir. 1998), after an equine veterinarian was terminated from all racetracks, the district court held that it had authority to, and did, reinstate him months after the termination went into effect, on a motion for preliminary injunction relief.

And in *Travellers Int'l AG v. Trans World Airlines, Inc.*, 684 F. Supp. 1206, 1216 (S.D.N.Y. 1988), the court entered preliminary injunctive relief reinstating a travel agent's business relationship with an airline, after the termination had gone into effect, and ordered the parties to continue with their relationship.

In *In re Comp III, Inc.*, 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992), the district court held that it had authority to remedy the termination of the franchise agreement by reinstating the franchisee, and the court explicitly rejected the franchisor's argument that injunctive relief was not available because injunctive relief may only be sought prior to termination in order to preserve the status quo.

And in *Bronx Auto Mall, Inc. v. Am. Honda Motor Co.*, 934 F. Supp. 596, 605 (S.D.N.Y. 1996), aff'd, 113 F.3d 329 (2d Cir. 1997), the court entered preliminary and permanent injunctive relief ordering an auto company to continue supplying the terminated dealer even though the contract had already expired by its terms.

Likewise, in the employment context, the courts often enter orders reinstating terminated employees months or years after their employment relationship was over. *Chen-Oster v.*

restrained on September 19, 2024 from effectuating the termination. See June 25, 2024 Termination Notice, Doc. 15-6.

*Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 591 (S.D.N.Y. 2017) (courts in this circuit have granted reinstatement in a variety of circumstances).

What if the court was wrong about expiration of the TRO? Refusing to go forward with the preliminary injunction will interfere with the Second Circuit's jurisdiction because it may cause irreparable harm to Plaintiff and threaten the appeals court's ability to grant meaningful relief to the Plaintiff to restore the parties to their rightful relationship.

It is because the Second Circuit has defined the status quo as the relationship of the parties before the lawsuit was commenced, the Second Circuit has repeatedly held that, where a district court denied a preliminary injunction, and the plaintiff appealed the denial, the district court still retained authority to move forward with a permanent injunction hearing, even though the entry of the permanent injunction will completely alter the relationship of the parties as it stood at the time of the appeal, and will make the appeal of the denial of the preliminary injunction utterly meaningless and moot.

As stated in *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996), jurisdiction is retained to enter permanent injunctive relief, even though, "the appeal is from an order granting or denying a preliminary injunction."

And in *Thomas v. Bd. of Ed., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1047 (2d Cir. 1979), the Second Circuit specifically held the district court had authority to proceed with permanent injunction hearing, despite the fact that plaintiff had appealed the district court's denial of the preliminary injunction. The Court emphasized that "granting or denying preliminary injunctive relief does not strip the district court of jurisdiction to proceed with the action on the merits" (relying upon *Ex parte National Enameling & Stamping Co*., 201 U.S. 156, 162 (1906) (which stated, in the context of an appeal from an "interlocutory order or decree granting or continuing an injunction," that "[t]he case ... is to proceed in the lower court as though no such appeal had been taken"), and 9 Moore's *Federal Practice* P 203.11 (2d ed. 1975)). *See also New York State Nat'l Org. of Women v. Terry,* 886 F.2d 1339, 1350 (2d Cir.1989), *cert. denied,* 495 U.S. 947 (1990); *Leonhard v. United States,* 633 F.2d 599, 609–10 (2d Cir.1980), *cert. denied,* 451 U.S. 908 (1981).

Likewise, in *Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 452050, at *2 (S.D.N.Y. Feb. 5, 2019), Judge Stein held that "the district court retains jurisdiction to issue a permanent injunction during an appeal from an order granting or denying a preliminary injunction."

This result is consistent with the holdings of other circuits, which have likewise held a district court has authority to move forward to a permanent injunction even after the plaintiff has appealed a denial of a preliminary injunction.

For example, in *Ry. Lab. Executives' Ass'n v. City of Galveston, Tex., By & Through Bd. of Trs. of the Galveston Wharves*, 898 F.2d 481, 481 (5th Cir. 1990), the Fifth Circuit held that "the pendency of the interlocutory appeal from the district court's judgment denying the preliminary injunction did ***not*** divest the district court of jurisdiction to proceed with other aspects of the case" and therefore, the district court "did not act improperly in considering the plaintiff's petition for a permanent injunction." (emphasis added).

And in *United States v. Price,* 688 F.2d 204, 215 (3d Cir. 1982), the Third Circuit held that despite "an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits." *See generally* 20 Moore's *Federal Practice* § 303.32[2][b][v] (3d ed.) ("an appeal from an order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the action on the merits").

Of course, if you applied the rule proposed by Allstate, the district court clearly would not have authority to go forward on the permanent injunction pending appeal of the denial of a preliminary injunction, because the entry of the permanent injunction would clearly alter the "status quo" as it existed at the time of the appeal. This result is incorrect because, as the Second Circuit has explained, the status quo is determined as the relationship that existed before the first uncontested action between the parties (in this case, the termination), and before the defendant took that first wrongful act.

Moreover, moving forward with the preliminary injunction hearing is consistent with this Court's January 23, 2025 order.

The correct result, therefore, based on the foregoing Second Circuit precedent, is that consideration of the motion for preliminary injunction is the proper way to preserve the status quo, as it existed before the controversy commenced.

Just like the district court has authority to move forward with a permanent injunction hearing, despite the fact that its refusal to enter a preliminary injunction is on appeal, the district court likewise has authority to move forward with a preliminary injunction hearing, despite the fact that its vacation of a restraining order is on appeal.

Contrary to Allstate's argument, there is no conflict in Plaintiff's position with regard to treatment of the January 23, 2025 order.

It remains Plaintiff's position that, because there was a full contested hearing on the preliminary injunction motion, and the January 23, 2025 order was as a matter of law an order of this Court, the order satisfied any requirements of *Granny Goose* or Rule 65(b), because by virtue of this order, this Court found good reason, after a full contested hearing on the preliminary

injunction motion, to extend the restraints, pending further discovery and further consideration of the preliminary injunction motion.

Allstate was fully heard at the January 8, 2025 preliminary injunction hearing on its request to deny the preliminary injunction motion and dissolve the temporary restraining order, and this request was denied. Transcript, Jan. 8 Hearing, Doc. 15-9. As a result, to the extent its January 23, 2025 order is not considered a preliminary injunction, then the preliminary injunction motion was still under consideration by the state court, and by this Court, when it was removed.

This is exactly the position that Plaintiff has taken in the appeal, when it identified the issues to be decided on appeal, as whether the January 23, 2025 order satisfied the requirements of *Granny Goose*, and whether even if it did not, whether this court retained the authority to make the good cause determination, and should have done so. Second Circuit Docket No. 19. In the required Second Circuit case forms, Plaintiff explicitly stated that the preliminary injunction motion is still pending. *See* Form C, and Addendum B, Second Circuit, Case No. 25-1320, Second Circuit Docket No. 19.

Any other characterization of Plaintiff's position is a misstatement of its position on appeal. Allstate's brief misstates and misrepresents Plaintiff's position on appeal. Plaintiff's position in this court and in the appellate court are consistent.

If the Court Has Any Doubt About Its Jurisdiction, This Court is Authorized by Rule 62.1 to Move Forward with the Preliminary Injunction Hearing and Issue an "Indicative Ruling"

Allstate's brief conspicuously does not mention or dispute this Court's authority to proceed under Rule 62.1, to conduct a preliminary injunction hearing and to the extent it is unsure of its jurisdiction, to issue an "indicative ruling."

Rule 62.1, enacted in 2009 to address this type of situation, provides that if the district court is unsure whether it has jurisdiction pending the appeal of an interlocutory order, the district court can proceed with the preliminary injunction, and then after making its findings, it can indicate to the appeals court that it would grant or deny the motion for preliminary injunction if the Court of Appeals remands for that purpose. "If the district court concludes that it has authority to grant relief without appellate permission, it can act without falling back on the indicative ruling procedure." Advisory Committee Notes, Fed. R. Civ. P. 62.1.

This is exactly what the court did in *New York v. United States Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 231 (S.D.N.Y. 2020), *aff'd*, 974 F.3d 210 (2nd Cir. 2020), when the district court issued a preliminary injunction, despite the then-pending appeal of its prior interlocutory order, stating that, if it is determined the court did not have jurisdiction due to the then-pending appeal, then the court's opinion "shall also serve alternatively as an indicative ruling under Federal Rule of Civil Procedure 62.1." *Id.* at 231.

Undersigned counsel certifies that this brief complies with the Court's word limits, and contains 3,405 words including footnotes.

Thank you for your consideration of this matter.

Respectfully submitted,

*David T. Azrin*

David T. Azrin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC,

Plaintiff,

-against-

ALLSTATE INSURANCE COMPANY, et al.,

Defendants.

25-CV-1110 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

The Court has closely reviewed the parties' briefing at ECF Nos. 50, 52, and 55 regarding Plaintiff's request for an immediate hearing on its preliminary injunction motion. Plaintiff's application is denied.

As an initial matter, the Court already ruled against this requested relief, *see* ECF No. 48 at 5, and the Court finds no basis to reconsider that ruling.

Additionally, the Court is divested from jurisdiction with respect to Plaintiff's request. Plaintiff has appealed the Court's ruling, and the issue of the status of the preliminary relief Plaintiff obtained is pending before the Second Circuit. It is well-settled that "it is a waste of judicial resources for two courts to be considering the same issues in the same case at the same time[.]" *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1349 (2d Cir. 1989). It is for that reason that a notice of appeal will "divest[] the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal." *Id.* at 1350. The issue of "divestiture of jurisdiction" is "rooted in the interest of judicial economy" and although it is not automatic, it "is guided by concerns of efficiency." *New York v. U.S. Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 224 (S.D.N.Y. 2020) (internal citations and quotation marks omitted).

Here, the issue of Plaintiff's request relief is pending before the Second Circuit. *See* ECF No. 56. Any decision by the Second Circuit will dictate whether Plaintiff can properly seek the relief in its preliminary injunction request. Either the Second Circuit will agree that the temporary restraining order expired long ago, and no preliminary injunction is in place, in which case Plaintiff's requested relief in its preliminary injunction motion is moot. Plaintiff would then need to seek new relief—namely, an order requiring Allstate to reinstate its contract with Plaintiff. This extraordinary relief has not yet been requested (nor could it have been) and has not been briefed before this Court or the state court. Or, the Second Circuit will agree with Plaintiff that the TRO remains in place, in which case the Court would thereafter hold a hearing on the preliminary injunction. Or, if the Second Circuit determines that Justice Jamieson's ruling is in effect a preliminary injunction, then any preliminary injunction hearing would be unnecessary. Holding a hearing now based on this uncertainty is extremely inefficient and a waste of judicial resources, making divestiture appropriate.

The case—*Broker Genius, Inc. v. Seat Scouts LLC*—relied on by Plaintiff is particularly instructive. No. 17-CV-8627 (SHS), 2019 WL 452050 (S.D.N.Y. Feb. 5, 2019). There, the court concluded it was permitted to proceed on the merits while an appeal of a preliminary injunction entered in the case was pending. *Id.* at *2. The case went to trial, and the defendants were found liable. The plaintiff then sought to reduce the amount of security it posted for the preliminary injunction. The court concluded that it was divested from jurisdiction to do so because the preliminary injunction remained on appeal. *Id.*

Here, the Court likewise concludes that it may proceed with the merits of this case, but not Plaintiff's requested preliminary relief. The Court has already held an initial pretrial conference and entered the parties' proposed case management plan. The parties will proceed

toward trial. The Court only refrains from addressing Plaintiff's requested preliminary relief. This approach is consistent with *Broker Genius* and the other cases Plaintiff relies on that stand for the proposition that the Court is not completely divested from jurisdiction based on an interlocutory appeal.

Plaintiff also cites *Kidder* and *New York v. U.S. Dep't of Homeland Sec.,* which do not mandate a different result. In those cases, the courts issued preliminary injunctions while an interlocutory appeal was pending in quite different circumstances. In *Kidder*, the Court issued a preliminary injunction to preserve the status quo. *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 565 (2d Cir. 1991). Here, the Second Circuit has already temporarily stayed the effect of the Court's order. And, in *New York*, the court issued a preliminary injunction when the plaintiffs sought new relief based on new intervening facts. *New York v. United States Dep't of Homeland Sec.,* 475 F. Supp. 3d 208, 224–225 (S.D.N.Y. 2020). The facts here have not changed.

Lastly, even if the Court is not divested from jurisdiction with respect to this issue, the Court, in its discretion, declines to address Plaintiff's potentially moot request for the reasons stated above. And no rule requires otherwise. During the initial pretrial conference, Plaintiff's counsel repeatedly stated that the Court was ***required*** to hold a preliminary injunction hearing as soon as practicable, citing Federal Rule of Civil Procedure 65(b)(3). That argument did not appear in Plaintiff's briefing—and for good reason. That rule applies for temporary restraining orders issued without notice, which is inapplicable here. *See* FED. R. CIV. P. 65(b)(3). For this same reason, the Court declines to hold a hearing in order to provide an indicative ruling under Federal Rule of Civil Procedure 62.1.

As such, the Court denies Plaintiff's requested relief and will revisit this issue after further ruling from the Second Circuit. The Clerk of Court is respectfully directed to terminate ECF No. 50.

Dated: June 2, 2025
New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

OLD SLIP BENEFITS & INSURANCE SERVICES, LLC

Plaintiff,

v.

-against-

ALLSTATE INSURANCE COMPANY, REGINE MARIE NAPOLEON, BRITTANY CLEERE, MARC STEVENSON, and ALLISON ANN MCMAHON,

Defendants.

------------------------------------------------------------

Case No. 25-CV-01110 (JGLC)

**NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that Plaintiff, Old Slip Benefits & Insurance Services LLC, hereby appeals to the United States Court of Appeals for the Second Circuit from the Opinion and Order entered in this action on June 2, 2025.

Dated: New York, New York
June 3, 2025

Respectfully submitted,

**WUERSCH & GERING LLP**

*/s/ David T. Azrin*

David T. Azrin
Wuersch & Gering LLP
100 Wall Street, 10th Floor
New York, N.Y. 10005
Tel. (212) 509-4745
Fax. (212) 509-9559
Email: David.Azrin@wg-law.com
*Attorneys for Plaintiff Old Slip Benefits & Insurance Services, LLC*

Case: 25-1320, 05/30/2025, DktEntry: 32.1, Page 1 of 1

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 30th day of May, two thousand twenty-five.

Before: Maria Araújo Kahn,
*Circuit Judge.*

---

Old Slip Benefits & Insurance Services, LLC,

Plaintiff - Appellant,

v.

Allstate Insurance Company, Regine Marie Napoleon, Brittany Cleere, Marc Stevenson, Allison Ann McMahon,

Defendants - Appellees.

---

**ORDER**

Docket No. 25-1320

Appellant moves for a stay of the district court's May 21, 2025 order pending appeal. Appellee opposes the motion.

IT IS HEREBY ORDERED that the motion is REFERRED to the next available three-judge motions panel. The Court grants a temporary stay of the district court's order until the motion is reviewed and decided by the motions panel.

For the Court**:**
Catherine O'Hagan Wolfe,
Clerk of Court

[Seal: United States Court of Appeals, Second Circuit] Catherine O'Hagan Wolfe

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

[Seal: United States Court of Appeals, Second Circuit] Catherine O'Hagan Wolfe

CERTIFIED COPY ISSUED ON 05/30/2025

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

---

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 24th day of June, two thousand twenty-five,

---

Old Slip Benefits & Insurance Services, LLC,

Plaintiff - Appellant,

v.

Allstate Insurance Company, Regine Marie Napoleon, Brittany Cleere, Marc Stevenson, Allison Ann McMahon,

Defendants - Appellees.

---

**AMENDED ORDER**
Docket Nos. 25-1320 (Lead)
25-1417 (Con)

Appellant Old Slip Benefits & Insurance Services LLC moves for a stay pending appeal of the district court's order declaring that a state court-issued temporary restraining order had expired under Federal Rule of Civil Procedure 65(b). Appellee Allstate Insurance Company opposes.

Upon due consideration, it is hereby ORDERED that decision on the motion is DEFERRED and the motion is referred to the merits panel to which the case is assigned upon completion of briefing. The parties are further ORDERED to comply with the following briefing schedule. *See* Fed. R. App. P. 2. Appellant's brief must be filed by August 1, 2025. Appellee's brief must be filed by September 8, 2025. Appellant's reply, if any, must be filed within 14 days of the date Appellee's brief is filed. The Clerk of the Court is directed to schedule this appeal to be heard by the first available panel upon the completion of briefing.

The temporary stay issued by this Court on May 30, 2025, shall remain in effect while briefing proceeds.

For The Court:
Catherine O'Hagan Wolfe,
Clerk of Court

